WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer, Esq. (GH 7732)
Stephen A. Youngman, Esq. (*pro hac vice*)
Shai Y. Waisman, Esq. (SW 6854)

Attorneys for Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | |
| | : | **Chapter 11 Case No.** |
| | : | |
| **SILICON GRAPHICS, INC.,** *et al.*, | : | **06-10977 (BRL)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

-------------------------------------------------------------x

**NOTICE OF FILING OF DEBTORS' FIRST AMENDED**
**JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11**
**OF THE BANKRUPTCY CODE DATED JULY 27, 2006,**
**AS MODIFIED, AND AMENDED PLAN SUPPLEMENT THERETO**

PLEASE TAKE NOTICE that on September 15, 2006, Silicon Graphics,

Inc. and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and

debtors in possession, filed (i) the Debtors' First Amended Joint Plan of Reorganization

Under Chapter 11 of the Bankruptcy Code dated July 27, 2006, as modified (the "Plan");

(ii) a blackline of the Plan showing changes from the version filed on July 27, 2006 (the

"Blackline"); and (iii) amendments to the following Plan Supplement[1] documents: List of

Initial Board Members, Form of New Organizational Documents, Form of Registration

Rights Agreement, Schedules 8.1(A) and (B), and Schedule 12.9.

---

[1] Capitalized terms used herein but not defined have the meanings ascribed in the Plan.

PLEASE TAKE FURTHER NOTICE that the Plan is annexed hereto as Exhibit A, the Blackline is annexed hereto as Exhibit B, and the amended Plan Supplement documents are annexed hereto as Exhibit C. Copies of the foregoing are also available for inspection by: (i) contacting the Clerk of the Court at One Bowling Green, New York, New York 10004-1408, (ii) contacting counsel for the Debtors, or (iii) accessing the Court's website at www.nysb.uscourts.gov. Note that a PACER (http://www.pacer.psc.uscourts.gov) password and login are needed to access documents on the Court's website (www.nysb.uscourts.gov).

Dated: September 15, 2006
New York, New York

/s/ Gary Holtzer
Gary T. Holtzer, Esq. (GH 7732)
Stephen A. Youngman, Esq. (*pro hac vice*)
Shai Y. Waisman, Esq. (SW 6854)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

In re                                          :
                                               :        Chapter 11 Case No.
                                               :
SILICON GRAPHICS, INC., *et al.*,              :        06-10977 (BRL)
                                               :
            Debtors.                           :        (Jointly Administered)
                                               :

---------------------------------------------------------------x


## DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, AS MODIFIED

WEIL, GOTSHAL & MANGES LLP
Attorneys for Debtors and
    Debtors In Possession
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

Dated: September 15, 2006

# TABLE OF CONTENTS

**Page**

Article I            DEFINITIONS AND INTERPRETATION.............................1

    A.    Definitions ....................................................................................1

         1.1    6.50% Indenture ..................................................................1

         1.2    11.75% Indenture ................................................................1

         1.3    Administrative Expense Claim.............................................1

         1.4    Ad Hoc Committee...............................................................2

         1.5    Affiliate...............................................................................2

         1.6    Allowed ...............................................................................2

         1.7    Backstop Commitment Agreement .......................................2

         1.8    Backstop Fee .......................................................................2

         1.9    Backstop Purchasers ...........................................................2

         1.10    Ballot ..................................................................................3

         1.11    Bankruptcy Code ................................................................3

         1.12    Bankruptcy Court ...............................................................3

         1.13    Bankruptcy Rules ...............................................................3

         1.14    Benefit Plans.......................................................................3

         1.15    Business Day .......................................................................3

         1.16    Cash.....................................................................................3

         1.17    Charging Lien .....................................................................3

         1.18    Claim ...................................................................................3

         1.19    Collateral ............................................................................3

         1.20    Commencement Date ..........................................................3

         1.21    Confirmation Date ..............................................................4

         1.22    Confirmation Hearing..........................................................4

         1.23    Confirmation Order .............................................................4

         1.24    Contingent Claim.................................................................4

         1.25    Cray Asia/Pacific Equity Interests.......................................4

         1.26    Cray Financial Equity Interests ...........................................4

         1.27    Cray Indenture ....................................................................4

1.28 Cray Indenture Trustee Fees .......................................................4

1.29 Cray Research America Latina Equity Interests .......................4

1.30 Cray Research Eastern Europe Equity Interests .......................4

1.31 Cray Research India Equity Interests ........................................5

1.32 Cray Research International Equity Interests ............................5

1.33 Cray Research LLC Equity Interests ........................................5

1.34 Cray Unsecured Debentures ......................................................5

1.35 Cray Unsecured Debenture Claim .............................................5

1.36 Cray Unsecured Debenture Rights Offering Record Date ........5

1.37 Creditors' Committee ................................................................5

1.38 Customer Support Agreements ..................................................5

1.39 Debtors ......................................................................................5

1.40 Debtors in Possession ...............................................................5

1.41 DIP Lenders ...............................................................................6

1.42 Disbursing Agent .......................................................................6

1.43 Disclosure Statement .................................................................6

1.44 Disclosure Statement Order ......................................................6

1.45 Disputed .....................................................................................6

1.46 Distribution Date .......................................................................6

1.47 Distribution Pro Rata Share .......................................................7

1.48 Distribution Record Date ...........................................................7

1.49 Effective Date ............................................................................7

1.50 Exit Facility ...............................................................................7

1.51 Final Distribution Date means ...................................................7

1.52 Final Insurance Order ................................................................7

1.53 Final Order .................................................................................7

1.54 General Unsecured Claim ..........................................................8

1.55 General Unsecured Cray Asia/Pacific Claim ............................8

1.56 General Unsecured Cray Financial Claim .................................8

1.57    General Unsecured Cray Research America Latina
        Claim ............................................................................ 8

1.58    General Unsecured Cray Research Eastern Europe
        Claim ............................................................................ 8

1.59    General Unsecured Cray Research India Claim ........................ 8

1.60    General Unsecured Cray Research International Claim ........... 8

1.61    General Unsecured Cray Research LLC Claim ........................ 8

1.62    General Unsecured Paragraph Claim ........................................ 8

1.63    General Unsecured SGI Federal Claim ..................................... 8

1.64    General Unsecured SGI Real Estate Claim .............................. 8

1.65    General Unsecured SGI World Trade Claim ............................. 9

1.66    General Unsecured Silicon Graphics Claim ............................. 9

1.67    General Unsecured Silicon Studio Claim ................................. 9

1.68    General Unsecured WTI Claim ................................................. 9

1.69    Global Settlement ..................................................................... 9

1.70    Global Settlement Agreement ................................................. 9

1.71    Indentures ................................................................................. 9

1.72    Indenture Trustee ...................................................................... 9

1.73    Indenture Trustee Fees ............................................................. 9

1.74    Initial Distribution Date ........................................................... 9

1.75    Intercompany Claim ............................................................... 10

1.76    IP License Agreements ........................................................... 10

1.77    Lampe Conway ....................................................................... 10

1.78    Lampe Conway Rights Offering Option ................................ 10

1.79    Lien .......................................................................................... 10

1.80    Liquidating Trust .................................................................... 10

1.81    Liquidating Trust Agreement ................................................. 10

1.82    Liquidating Trust Assets ......................................................... 10

1.83    Local Bankruptcy Rules .......................................................... 10

1.84    Management Incentive Plan .................................................... 10

1.85    New Board.................................................................................10

1.86    New Common Stock.................................................................10

1.87    New Management Agreements ...............................................11

1.88    New Organizational Documents.............................................11

1.89    Non-Debtor Subsidiary...........................................................11

1.90    Non-Disclosure Agreements ..................................................11

1.91    Old Equity Interests ................................................................11

1.92    Other Priority Claim ...............................................................11

1.93    Other Secured Claim ..............................................................11

1.94    Overallotment Shares .............................................................11

1.95    Paragraph Equity Interests......................................................11

1.96    Person ......................................................................................11

1.97    Plan ..........................................................................................11

1.98    Plan Supplement......................................................................12

1.99    Postpetition Financing Agreement .........................................12

1.100   Postpetition Financing Obligation ..........................................12

1.101   Postpetition Financing Order...................................................12

1.102   Prepetition Agent.....................................................................12

1.103   Prepetition Credit Agreement..................................................12

1.104   Prepetition Credit Agreement Claim .......................................13

1.105   Priority Tax Claim ...................................................................13

1.106   Ratable Proportion ...................................................................13

1.107   Registration Rights Agreement  ..............................................13

1.108   Reorganization Cases ..............................................................13

1.109   Reorganized Debtors ...............................................................13

1.110   Reorganized Silicon Graphics .................................................13

1.111   Rights Offering........................................................................13

1.112   Rights Offering Agent .............................................................13

1.113   Rights Offering Trust Account.................................................13

1.114  Schedules ................................................................................ 13

1.115  Secured Claim ........................................................................ 14

1.116  Secured Tax Claim ................................................................ 14

1.117  Secured Note Claim ............................................................... 14

1.118  Secured Note Deficiency Claim ............................................ 14

1.119  Secured Note Rights Offering Record Date ........................... 14

1.120  Senior Secured Convertible Notes ......................................... 14

1.121  Senior Secured Notes ............................................................ 14

1.122  SGI Federal ............................................................................ 14

1.123  SGI Federal Equity Interests .................................................. 14

1.124  SGI Real Estate Equity Interests ........................................... 14

1.125  SGI World Trade .................................................................... 14

1.126  SGI World Trade Equity Interests .......................................... 14

1.127  Silicon Graphics .................................................................... 15

1.128  Silicon Studio Equity Interests .............................................. 15

1.129  Subordinated Securities Claim .............................................. 15

1.130  Subscription Expiration Date ................................................ 15

1.131  Subscription Form ................................................................. 15

1.132  Subscription Purchase Price .................................................. 15

1.133  Subscription Right ................................................................. 15

1.134  Tax Code ................................................................................ 15

1.135  Trust Advisory Board ............................................................ 15

1.136  Trustee ................................................................................... 15

1.137  U.S. Trustee ........................................................................... 16

1.138  Unliquidated Claim ............................................................... 16

1.139  Voting Record Date ............................................................... 16

1.140  WTI Equity Interests ............................................................. 16

B.      Interpretation; Application of Definitions and Rules of
        Construction .......................................................................... 16

C.      Relief Sought by Filing the Plan ........................................... 16

| | | |
|---|---|---|
| Article II | | PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS ........................................................................ 16 |
| | 2.1 | Administrative Expense Claims ............................................. 16 |
| | 2.2 | Postpetition Financing Agreement ......................................... 17 |
| | 2.3 | Professional Compensation and Reimbursement Claims ........ 17 |
| | 2.4 | Indenture Trustee Fees ............................................................ 17 |
| | 2.5 | Priority Tax Claims ................................................................. 18 |
| Article III | | CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS, IMPAIRMENT AND VOTING ........................ 19 |
| Article IV | | PROVISIONS FOR TREATMENT OF CLAIMS AND EQUITY INTERESTS ........................................................... 20 |
| | 4.1 | Other Priority Claims (Class 1) ............................................. 20 |
| | 4.2 | Secured Tax Claims (Class 2) ................................................. 20 |
| | 4.3 | Other Secured Claims (Class 3) ............................................. 21 |
| | 4.4 | Prepetition Credit Agreement Claims (Class 4) ...................... 21 |
| | 4.5 | Secured Note Claims (Class 5) ............................................... 22 |
| | 4.6 | General Unsecured Silicon Graphics Claims (Class 6) ........... 22 |
| | 4.7 | Cray Unsecured Debenture Claims (Class 7) .......................... 22 |
| | 4.8 | Subordinated Securities Claims (Class 8) .............................. 23 |
| | 4.9 | Old Equity Interests (Class 9) ................................................ 23 |
| | 4.10 | General Unsecured SGI Federal Claims (Class 10) ................ 23 |
| | 4.11 | SGI Federal Equity Interests (Class 11) ................................. 24 |
| | 4.12 | General Unsecured SGI World Trade Claims (Class 12) ........ 24 |
| | 4.13 | SGI World Trade Equity Interests (Class 13) ......................... 24 |
| | 4.14 | General Unsecured Cray Research LLC Claims (Class 14) ........................................................................................ 24 |
| | 4.15 | Cray Research LLC Equity Interests (Class 15) ..................... 25 |
| | 4.16 | General Unsecured SGI Real Estate Claims (Class 16) .......... 25 |
| | 4.17 | SGI Real Estate Equity Interests (Class 17) ........................... 25 |
| | 4.18 | General Unsecured Silicon Studio Claims (Class 18) ............. 25 |

| | | |
|---|---|---|
| 4.19 | Silicon Studio Equity Interests (Class 19) | 26 |
| 4.20 | General Unsecured Cray Research America Latina Claims (Class 20) | 26 |
| 4.21 | Cray Research America Latina Equity Interests (Class 21) | 26 |
| 4.22 | General Unsecured Cray Research Eastern Europe Claims (Class 22) | 26 |
| 4.23 | Cray Research Eastern Europe Equity Interests (Class 23) | 27 |
| 4.24 | General Unsecured Cray Research India Claims (Class 24) | 27 |
| 4.25 | Cray Research India Equity Interests (Class 25) | 27 |
| 4.26 | General Unsecured Cray Research International Claims (Class 26) | 27 |
| 4.27 | Cray Research International Equity Interests (Class 27) | 28 |
| 4.28 | General Unsecured Cray Financial Claims (Class 28) | 28 |
| 4.29 | Cray Financial Equity Interests (Class 29) | 28 |
| 4.30 | General Unsecured Cray Asia/Pacific Claims (Class 30) | 28 |
| 4.31 | Cray Asia/Pacific Equity Interests (Class 31) | 29 |
| 4.32 | General Unsecured Paragraph Claims (Class 32) | 29 |
| 4.33 | Paragraph Equity Interests (Class 33) | 29 |
| 4.34 | General Unsecured WTI Claims (Class 34) | 29 |
| 4.35 | WTI Equity Interests (Class 35) | 30 |
| Article V | MEANS OF IMPLEMENTATION | 30 |
| 5.1 | Settlement of Claims | 30 |
| 5.2 | Intercompany Claims | 30 |
| 5.3 | Merger/Dissolution/Consolidation | 31 |
| 5.4 | Cancellation of Existing Securities and Agreements | 31 |
| 5.5 | Surrender of Existing Securities | 31 |
| 5.6 | Incurrence of New Indebtedness | 32 |
| 5.7 | Issuance of New Common Stock | 32 |

| | | | |
|---|---|---|---|
| | 5.8 | Exemption from Securities Laws | 32 |
| | 5.9 | Hart-Scott-Rodino Compliance | 33 |
| | 5.10 | Registration Rights Agreement | 33 |
| | 5.11 | The Liquidating Trust | 33 |
| Article VI | | PROVISIONS GOVERNING VOTING AND DISTRIBUTIONS | 37 |
| | 6.1 | Voting of Claims | 37 |
| | 6.2 | Nonconsensual Confirmation | 37 |
| | 6.3 | Distributions On Account of General Unsecured Silicon Graphics Claims | 37 |
| | 6.4 | Date of Distributions | 37 |
| | 6.5 | Disbursing Agent | 37 |
| | 6.6 | Rights and Powers of Disbursing Agent | 38 |
| | 6.7 | Expenses of the Disbursing Agent | 38 |
| | 6.8 | Delivery of Distributions | 38 |
| | 6.9 | Manner of Payment | 40 |
| | 6.10 | No Fractional Distributions | 40 |
| | 6.11 | Cash Distributions | 40 |
| | 6.12 | Setoffs and Recoupment | 40 |
| | 6.13 | Allocation of Plan Distributions Between Principal and Interest | 41 |
| Article VII | | PROCEDURES FOR TREATING DISPUTED CLAIMS UNDER PLAN OF REORGANIZATION | 41 |
| | 7.1 | Objections | 41 |
| | 7.2 | No Distributions Pending Allowance | 41 |
| | 7.3 | Distributions After Allowance | 41 |
| | 7.4 | Resolution of Administrative Expense Claims and Claims | 42 |
| | 7.5 | Estimation of Claims. | 42 |
| | 7.6 | Interest | 42 |

**TABLE OF CONTENTS**
**(continued)**

| | | |
|---|---|---|
| Article VIII | | EXECUTORY CONTRACTS AND UNEXPIRED LEASES .................................................................42 |
| | 8.1 | Assumption or Rejection of Executory Contracts and Unexpired Leases ..................................................42 |
| | 8.2 | Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases ...........................43 |
| | 8.3 | Inclusiveness.............................................................44 |
| | 8.4 | Cure of Defaults .......................................................44 |
| | 8.5 | Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan ...............................................44 |
| | 8.6 | Indemnification Obligations ...................................45 |
| | 8.7 | Insurance Policies ....................................................45 |
| | 8.8 | Retiree Benefits .......................................................45 |
| | 8.9 | Benefit Plans............................................................45 |
| Article IX | | THE RIGHTS OFFERING ......................................46 |
| | 9.1 | Issuance of Subscription Rights .............................46 |
| | 9.2 | Subscription Period .................................................46 |
| | 9.3 | Subscription Purchase Price ...................................46 |
| | 9.4 | Exercise of Subscription Rights .............................47 |
| | 9.5 | Transfer Restriction; Revocation............................47 |
| | 9.6 | Lampe Conway Rights Offering Option .................48 |
| | 9.7 | Backstop of the Rights Offering.............................48 |
| | 9.8 | Distribution of the New Common Stock .................49 |
| | 9.9 | No Interest ...............................................................49 |
| | 9.10 | Exercise of Subscription Rights .............................49 |
| Article X | | CORPORATE GOVERNANCE AND MANAGEMENT OF THE REORGANIZED DEBTORS...............................................................49 |
| | 10.1 | General .....................................................................49 |
| | 10.2 | New Organizational Documents...............................49 |

| | | |
|---|---|---|
| 10.3 | New Boards of the Reorganized Debtors | 50 |
| 10.4 | Officers of the Reorganized Debtors | 50 |
| 10.5 | Management Incentive Plan | 50 |
| 10.6 | New Management Agreements | 50 |
| Article XI | CONDITIONS PRECEDENT TO EFFECTIVE DATE | 50 |
| 11.1 | Conditions Precedent to Effectiveness | 50 |
| 11.2 | Waiver of Conditions | 51 |
| 11.3 | Satisfaction of Conditions | 51 |
| Article XII | EFFECT OF CONFIRMATION | 52 |
| 12.1 | Vesting of Assets | 52 |
| 12.2 | Binding Effect | 52 |
| 12.3 | Discharge of Claims and Termination of Equity Interests | 52 |
| 12.4 | Discharge | 52 |
| 12.5 | Injunction or Stay | 53 |
| 12.6 | Terms of Injunction or Stay | 53 |
| 12.7 | Exculpation | 53 |
| 12.8 | Releases | 54 |
| 12.9 | Avoidance Actions/Objections | 55 |
| Article XIII | RETENTION OF JURISDICTION | 55 |
| Article XIV | MISCELLANEOUS PROVISIONS | 57 |
| 14.1 | Effectuating Documents and Further Transactions | 57 |
| 14.2 | Withholding and Reporting Requirements | 57 |
| 14.3 | Corporate Action | 57 |
| 14.4 | Modification of Plan | 58 |
| 14.5 | Revocation or Withdrawal of the Plan | 58 |
| 14.6 | Plan Supplement | 59 |
| 14.7 | Payment of Statutory Fees | 59 |
| 14.8 | Post-Confirmation Date Professional Fees and Expenses | 59 |
| 14.9 | Dissolution of the Creditors' Committee | 59 |

# TABLE OF CONTENTS
## (continued)

Page

| 14.10 | Indenture Trustee as Claim Holder | 60 |
| 14.11 | Exemption from Transfer Taxes | 60 |
| 14.12 | Expedited Tax Determination | 60 |
| 14.13 | Exhibits/Schedules | 60 |
| 14.14 | Substantial Consummation | 60 |
| 14.15 | Severability of Plan Provisions | 60 |
| 14.16 | Governing Law | 61 |
| 14.17 | Notices | 61 |

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

In re
                                              :     **Chapter 11 Case No.**

**SILICON GRAPHICS, INC.,** *et al.*,    :     **06-10977 (BRL)**

           **Debtors.**          :     **(Jointly Administered)**

-----------------------------------------------------------------x

## DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, AS MODIFIED

Silicon Graphics, Inc., Silicon Graphics Federal, Inc., Cray Research, L.L.C., Silicon Graphics Real Estate, Inc., Silicon Graphics World Trade Corporation, Silicon Studio, Inc., Cray Research America Latina Ltd., Cray Research Eastern Europe Ltd., Cray Research India Ltd., Cray Research International, Inc., Cray Financial Corporation, Cray Asia/Pacific, Inc., Paragraph International, Inc. and WTI Development, Inc. propose the following chapter 11 plan pursuant to section 1121(a) of the Bankruptcy Code:

## ARTICLE I

## DEFINITIONS AND INTERPRETATION

**A.**     **Definitions.**

The following terms used herein shall have the respective meanings set forth below:

1.1     ***6.50% Indenture*** means that certain indenture dated December 24, 2003 between Silicon Graphics and U.S. Bank National Association, as indenture trustee, pursuant to which the Senior Secured Convertible Notes were issued, as amended from time to time.

1.2     ***11.75% Indenture*** means that certain indenture dated December 24, 2003 between Silicon Graphics and U.S. Bank National Association, as indenture trustee, pursuant to which the Senior Secured Notes were issued, as amended from time to time.

1.3     ***Administrative Expense Claim*** means any right to payment constituting a cost or expense of administration of the Reorganization Cases Allowed under and in accordance with, as applicable, sections 330, 365, 503(b), 507(a)(2) and 507(b) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses of preserving the Debtors' estates, (b) any actual and

necessary costs and expenses of operating the Debtors' businesses, (c) any indebtedness or obligations incurred or assumed by the Debtors in Possession during the Reorganization Cases and (d) any compensation for professional services rendered and reimbursement of expenses incurred. Any fees or charges assessed against the estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code is excluded from the definition of Administrative Expense Claim and shall be paid in accordance with Section 14.7 of the Plan.

1.4 *Ad Hoc Committee* means the ad hoc committee of certain holders of the Senior Secured Convertible Notes.

1.5 *Affiliate* has the meaning set forth in section 101(2) of the Bankruptcy Code.

1.6 *Allowed* means, with reference to any Claim against the Debtors, (a) any Claim against any Debtor that has been listed by such Debtor in its Schedules (as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009) as liquidated in amount and not disputed or contingent and for which no contrary proof of Claim has been filed or no timely objection to allowance or request for estimation has been interposed, (b) any timely filed proof of Claim (i) as to which no objection has been or is interposed in accordance with Section 7.1 of the Plan or such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules or the Bankruptcy Court and as to which any such applicable period of limitation has expired or (ii) as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective holder of such Claim, (c) any Claim expressly allowed by a Final Order or under the Plan, (d) any Claim that is compromised, settled or otherwise resolved pursuant to the authority granted to the Reorganized Debtors pursuant to a Final Order of the Bankruptcy Court or under Section 7.4 of the Plan; *provided, however,* that Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims." Unless otherwise specified in the Plan or by order of the Bankruptcy Court, "Allowed Administrative Expense Claim" or "Allowed Claim" shall not, for any purpose under the Plan, include interest on such Claim from and after the Commencement Date.

1.7 *Backstop Commitment Agreement* means those certain commitment agreements executed by and between in each case the Debtors and each of the Backstop Purchasers in connection with the Rights Offering.

1.8 *Backstop Fee* means $1,000,000.

1.9 *Backstop Purchasers* means one or more funds managed by each of Quadrangle Debt Recovery Advisors LLC, Symphony Asset Management LLC and Watershed Asset Management, LLC.

1.10    ***Ballot*** means the form distributed to each holder of an impaired Claim that is entitled to vote to accept or reject the Plan on which is to be indicated acceptance or rejection of the Plan.

1.11    ***Bankruptcy Code*** means title 11 of the United States Code, as amended from time to time, as applicable to the Reorganization Cases.

1.12    ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of New York or any other court of the United States having jurisdiction over the Reorganization Cases.

1.13    ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time.

1.14    ***Benefit Plans*** means all employee benefit plans, policies and programs sponsored by any of the Debtors, including, without limitation, all incentive and bonus arrangements, all medical and health insurance, life insurance, dental insurance, disability benefits and coverage, leave of absence, savings plans, retirement pension plans and retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code); *provided, however,* that Benefit Plans shall not include any equity, stock, option, or other similar plans in effect on or prior to the Commencement Date.

1.15    ***Business Day*** means any day other than a Saturday, Sunday or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.16    ***Cash*** means legal tender of the United States of America.

1.17    ***Charging Lien*** means any Lien or other priority in payment arising prior to the Effective Date to which the applicable Indenture Trustee is entitled, pursuant to the respective Indenture, against distributions to be made to holders of Claims with respect to the Senior Secured Convertible Notes, Senior Secured Notes and Cray Unsecured Debentures for payment of any Indenture Trustee Fees.

1.18    ***Claim*** has the meaning set forth in section 101(5) of the Bankruptcy Code.

1.19    ***Collateral*** means any property or interest in property of the estates of the Debtors subject to a Lien, charge or other encumbrance to secure the payment or performance of a Claim, which Lien, charge or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state law.

1.20    ***Commencement Date*** means May 8, 2006, the date on which the Debtors commenced their Reorganization Cases.

1.21　***Confirmation Date*** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket.

1.22　***Confirmation Hearing*** means the hearing conducted by the Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy Code to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.23　***Confirmation Order*** means the order or orders of the Bankruptcy Court, in form and substance reasonably acceptable to the Debtors, the Ad Hoc Committee and the Creditors' Committee, after consultation with Lampe Conway, confirming the Plan.

1.24　***Contingent Claim*** means any Claim, the liability for which attaches or is dependent upon the occurrence or happening of, or is triggered by, an event, which event has not yet occurred, happened or been triggered as of the date on which such Claim is sought to be estimated or an objection to such Claim is filed, whether or not such event is within the actual or presumed contemplation of the holder of such Claim and whether or not a relationship between the holder of such Claim and the applicable Debtor now or hereafter exists or previously existed.

1.25　***Cray Asia/Pacific Equity Interests*** means all shares of common or preferred stock or other instrument evidencing an ownership interest in Cray Asia/Pacific, Inc., whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests.

1.26　***Cray Financial Equity Interests*** means all shares of common or preferred stock or other instrument evidencing an ownership interest in Cray Financial Corporation, whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests.

1.27　***Cray Indenture*** means, together, that certain Indenture, dated February 1, 1986, between Cray Research, Inc. and Manufacturers Hanover Trust Company and that certain First Supplemental Indenture, dated June 30, 1996, between Silicon Graphics, Cray Research, Inc. and JP Morgan Chase, as indenture trustee, pursuant to which the Convertible Subordinated Debentures were issued, each as amended from time to time.

1.28　***Cray Indenture Trustee Fees*** means the Indenture Trustee Fees of the Indenture Trustee under the Cray Indenture.

1.29　***Cray Research America Latina Equity Interests*** means all shares of common or preferred stock or other instrument evidencing an ownership interest in Cray Research America Latina Ltd., whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests.

1.30　***Cray Research Eastern Europe Equity Interests*** means all shares of common or preferred stock or other instrument evidencing an ownership

interest in Cray Research Eastern Europe Ltd., whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests.

1.31 *Cray Research India Equity Interests* means all shares of common or preferred stock or other instrument evidencing an ownership interest in Cray Research India Ltd., whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests.

1.32 *Cray Research International Equity Interests* means all shares of common or preferred stock or other instrument evidencing an ownership interest in Cray Research International, Inc., whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests.

1.33 *Cray Research LLC Equity Interests* means all shares of common or preferred stock or other instrument evidencing an ownership interest in Cray Research, L.L.C., whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests.

1.34 *Cray Unsecured Debentures* means those certain Convertible Subordinated Debentures issued pursuant to the Cray Indenture.

1.35 *Cray Unsecured Debenture Claim* means any Claim arising under the Cray Indenture.

1.36 *Cray Unsecured Debenture Rights Offering Record Date* means July 7, 2006.

1.37 *Creditors' Committee* means the committee of unsecured creditors appointed in the Reorganization Cases pursuant to section 1102(a) of the Bankruptcy Code.

1.38 *Customer Support Agreements* means, collectively, any and all agreements to provide customer support, maintenance, warranty service or similar support to the Debtors' end-user customers, as set forth in the Plan Supplement and filed under seal.

1.39 *Debtors* means Silicon Graphics, Inc., Silicon Graphics Federal, Inc., Cray Research, L.L.C., Silicon Graphics Real Estate, Inc., Silicon Graphics World Trade Corporation, Silicon Graphics Studio, Inc., Cray Research America Latina Ltd., Cray Research Eastern Europe Ltd., Cray Research India Ltd., Cray Research International, Inc., Cray Financial Corporation, Cray Asia/Pacific, Inc., Paragraph International, Inc. and WTI Development, Inc.

1.40 *Debtors in Possession* means the Debtors in their capacity as debtors in possession in the Reorganization Cases under sections 1107(a) and 1108 of the Bankruptcy Code.

1.41 **DIP Lenders** means the lenders party to the Postpetition Financing Agreement.

1.42 **Disbursing Agent** means any entity in its capacity as a disbursing agent under Sections 6.5 and 6.6 of the Plan.

1.43 **Disclosure Statement** means that certain disclosure statement relating to the Plan, including, without limitation, all exhibits and schedules thereto, as the same may be amended, supplemented or otherwise modified from time to time, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

1.44 **Disclosure Statement Order** means the order of the Bankruptcy Court dated July 27, 2006 approving, among other things, the Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan.

1.45 **Disputed** means, with reference to any Administrative Expense Claim or Claim, any such Administrative Expense Claim or Claim (a) to the extent neither Allowed nor disallowed under the Plan or a Final Order nor deemed Allowed under section 502, 503 or 1111 of the Bankruptcy Code, (b) which has been or hereafter is listed by a Debtor on its Schedules as unliquidated, disputed or contingent and which has not been resolved by written agreement of the parties or a Final Order or (c) as to which the Debtors or any other party in interest has interposed a timely objection and/or request for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, which objection or request for estimation has not been withdrawn or determined by a Final Order. Prior to the earlier of the time an objection has been timely filed and the expiration of the time within which to object to such Claim set forth herein or otherwise established by order of the Bankruptcy Court, a Claim shall be considered Disputed to the extent that the amount of the Claim specified in a proof of Claim exceeds the amount of the Claim scheduled by the Debtor as not disputed, contingent or unliquidated (but only to the extent of such excess portion).

1.46 **Distribution Date** means (a) the Initial Distribution Date, (b) the first Business Day after the end of the months of March, June, September and December, commencing with the first such date to occur more than forty-five (45) days after the Effective Date and until the second anniversary of the Effective Date, (c) after the second anniversary of the Effective Date, the first Business Day after the end of the month of December and (d) the Final Distribution Date; *provided, however,* that (i) a Distribution Date (other than the Initial Distribution Date and the Final Distribution Date) shall not occur if the aggregate amount of Cash to be distributed on any Distribution Date is less than $50,000, in which case the amount to be distributed shall be retained and added to the amount to be distributed on the next Distribution Date, and, subject to Section 6.3 of the Plan, (ii) any General Unsecured Silicon Graphics Claim that becomes Allowed less than ten (10) Business Days prior to a Distribution Date shall be treated as a Disputed Claim for the purposes of the

distribution occurring on such Distribution Date and shall not receive a distribution until the Distribution Date immediately succeeding such Distribution Date.

1.47 ***Distribution Pro Rata Share*** means, as of any Distribution Date, the ratio (expressed as a percentage) of the amount of an Allowed General Unsecured Silicon Graphics Claim to the aggregate amount of all Allowed General Unsecured Silicon Graphics Claims at such date plus the Disputed Claim amount of all remaining Disputed General Unsecured Silicon Graphics Claims.

1.48 ***Distribution Record Date*** means the date that is three (3) Business Days from and after the Confirmation Date.

1.49 ***Effective Date*** means a Business Day selected by the Debtors on or after the Confirmation Date, on which (a) no stay of the Confirmation Order is in effect and (b) the conditions precedent to the effectiveness of the Plan specified in Section 11.1 of the Plan shall have been satisfied or waived as provided in Section 11.2 of the Plan; *provided, however*, that the Effective Date shall be no later than thirty (30) days from and after the Confirmation Date.

1.50 ***Exit Facility*** means financing obtained by the Debtors on terms and conditions reasonably acceptable to the Debtors and the Ad Hoc Committee, after consultation with the Creditors' Committee, in connection with the occurrence of the Effective Date and emergence from chapter 11.

1.51 ***Final Distribution Date*** means a date on or after the Initial Distribution Date and after (a) the deadline for the Debtors or the Reorganized Debtors to interpose objections to all General Unsecured Silicon Graphics Claims has passed, (b) all such objections have been resolved by signed agreement with the Debtors or Reorganized Debtors and/or Final Order, as may be applicable, and (c) all General Unsecured Silicon Graphics Claims that are Contingent Claims or Unliquidated Claims have been liquidated but, in any event, the Final Distribution Date shall be no later than thirty (30) days thereafter, or such later date as the Bankruptcy Court may establish, upon request by the Reorganized Debtors, for cause shown.

1.52 ***Final Insurance Order*** means the Final Order Pursuant to Sections 105(a), 362(d), 363(b) and 503(b) of the Bankruptcy Code and Rules 4001(d) and 6004(a) of the Federal Rules of Bankruptcy Procedure (i) Authorizing Debtors to (a) Continue Their Workers' Compensation Program and Their Liability, Product, Property, and Other Insurance Programs and (b) Pay All Obligations in Respect Thereof and (ii) Authorizing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations, dated May 31, 2006.

1.53 ***Final Order*** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari* or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or other proceedings for a

new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of *certiorari*, new trial, reargument or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, *certiorari* shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order.

1.54 ***General Unsecured Claim*** means any Claim against the Debtors other than an Administrative Expense Claim, Priority Tax Claim, Other Priority Claim, Secured Tax Claim, Other Secured Claim, Prepetition Credit Agreement Claim, Secured Note Claim, Secured Note Deficiency Claim, Cray Unsecured Debenture Claim, Subordinated Securities Claim or Intercompany Claim.

1.55 ***General Unsecured Cray Asia/Pacific Claim*** means any General Unsecured Claim against Cray Asia/Pacific, Inc.

1.56 ***General Unsecured Cray Financial Claim*** means any General Unsecured Claim against Cray Financial Corporation.

1.57 ***General Unsecured Cray Research America Latina Claim*** means any General Unsecured Claim against Cray Research America Latina Ltd.

1.58 ***General Unsecured Cray Research Eastern Europe Claim*** means any General Unsecured Claim against Cray Research Eastern Europe Ltd.

1.59 ***General Unsecured Cray Research India Claim*** means any General Unsecured Claim against Cray Research India Ltd.

1.60 ***General Unsecured Cray Research International Claim*** means any General Unsecured Claim against Cray Research International, Inc.

1.61 ***General Unsecured Cray Research LLC Claim*** means any General Unsecured Claim against Cray Research, L.L.C.

1.62 ***General Unsecured Paragraph Claim*** means any General Unsecured Claim against Paragraph International, Inc.

1.63 ***General Unsecured SGI Federal Claim*** means any General Unsecured Claim against SGI Federal.

1.64 ***General Unsecured SGI Real Estate Claim*** means any General Unsecured Claim against Silicon Graphics Real Estate, Inc.

1.65     ***General Unsecured SGI World Trade Claim*** means any General Unsecured Claim against SGI World Trade.

1.66     ***General Unsecured Silicon Graphics Claim*** means any General Unsecured Claim against Silicon Graphics.

1.67     ***General Unsecured Silicon Studio Claim*** means any General Unsecured Claim against Silicon Studio, Inc.

1.68     ***General Unsecured WTI Claim*** means any General Unsecured Claim against WTI Development, Inc.

1.69     ***Global Settlement*** means the settlement and compromises by and among the Debtors, the Creditors' Committee, the lenders under the Postpetition Financing Agreement, certain holders of Senior Secured Convertible Notes and Lampe Conway, contained in the Global Settlement Agreement, the Plan Term Sheet annexed thereto, and that certain Restructuring Agreement between Silicon Graphics and certain holders of Senior Secured Convertible Notes dated May 7, 2006, as amended from time to time and subject to such Global Settlement Agreement.

1.70     ***Global Settlement Agreement*** means that certain Global Settlement Agreement, dated June 23, 2006, by and among the Debtors, the Creditors' Committee, the lenders under the Postpetition Financing Agreement, certain holders of Senior Secured Convertible Notes and Lampe Conway, including the Plan Term Sheet annexed thereto.

1.71     ***Indentures*** means, collectively, the 6.50% Indenture, 11.75% Indenture and Cray Indenture.

1.72     ***Indenture Trustee*** means, individually and collectively, U.S. Bank National Association and JP Morgan Chase and/or their successor(s), in either case in its or their capacity as the indenture trustee for the Senior Secured Convertible Notes, Senior Secured Notes and Cray Unsecured Debentures.

1.73     ***Indenture Trustee Fees*** means the reasonable and customary fees and expenses of the Indenture Trustee as provided by the 6.50% Indenture, 11.75% Indenture and Cray Indenture, including, without limitation, reasonable attorneys' fees and disbursements incurred by the Indenture Trustee, whether prior to or after the Effective Date.

1.74     ***Initial Distribution Date*** means a date after the Effective Date that is selected by the Reorganized Debtors in their sole discretion but, in any event, is within forty-five (45) days after the date of service of notice of the Confirmation Date, or such later date as the Bankruptcy Court may establish upon request by Reorganized Debtors, for cause shown; *provided, however*, that in no event shall the Initial Distribution Date be more than seventy-five (75) days after the date of service of notice of the Confirmation Date.

1.75    ***Intercompany Claim*** means any Claim against any Debtor or Non-Debtor Subsidiary held by another Debtor or Non-Debtor Subsidiary.

1.76    ***IP License Agreements*** means, collectively, any and all agreements entered into by the Debtors for the primary purpose of the assignment of intellectual property licensing rights to the Debtors.

1.77    ***Lampe Conway*** means Lampe Conway & Co., LLC.

1.78    ***Lampe Conway Rights Offering Option*** means the option of Lampe Conway granted by the Backstop Purchasers to purchase shares of New Common Stock not otherwise purchased by holders of Allowed Cray Unsecured Debenture Claims pursuant to the Rights Offering, as set forth in Section 9.6 of the Plan.

1.79    ***Lien*** has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.80    ***Liquidating Trust*** means the liquidating trust established under Section 5.11 of the Plan.

1.81    ***Liquidating Trust Agreement*** means the agreement between the Debtors and the Trustee, which shall be in form and substance reasonably satisfactory to the Debtors and the Ad Hoc Committee, governing the Liquidating Trust, dated as of the Effective Date, substantially in the form set forth in the Plan Supplement.

1.82    ***Liquidating Trust Assets*** means any and all claims or causes of actions, including price fixing claims, of the Debtors arising out of the purchase of dynamic random access memory between April 1999 and June 2002 and $250,000 in Cash (which is the amount estimated to be reasonably necessary to prosecute and liquidate the foregoing) and the earnings or proceeds therefrom.

1.83    ***Local Bankruptcy Rules*** means the Local Bankruptcy Rules for the Southern District of New York, as amended from time to time.

1.84    ***Management Incentive Plan*** means the management equity and bonus incentive plan, which shall be substantially in the form set forth in the Plan Supplement and shall contain terms and conditions that shall be determined by the New Board.

1.85    ***New Board*** means each board of directors appointed pursuant to Section 10.3 of the Plan.

1.86    ***New Common Stock*** means the shares of common stock of Reorganized Silicon Graphics authorized to be issued pursuant to Section 5.7 of the Plan.

1.87    *New Management Agreements* means the employment agreements, in form and substance acceptable to the Debtors and the Ad Hoc Committee, to be executed on the Effective Date by Reorganized Silicon Graphics and the counterparties identified therein.

1.88    *New Organizational Documents* means each certificate of incorporation, certificate of formation, limited liability company agreement, bylaws, and other organizational document for each of the Reorganized Debtors, in form and substance reasonably acceptable to the Debtors and the Ad Hoc Committee and substantially in the forms set forth in the Plan Supplement.

1.89    *Non-Debtor Subsidiary* means any direct or indirect Subsidiary of Silicon Graphics that is not a Debtor.

1.90    *Non-Disclosure Agreements* means, collectively, any and all agreements entered into by the Debtors for the primary purpose of governing the non-disclosure of confidential or sensitive information.

1.91    *Old Equity Interests* means all shares of common or preferred stock or other instrument evidencing an ownership interest in Silicon Graphics, whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests; *provided, however*, that Old Equity Interests shall not include the Senior Secured Convertible Notes and the Cray Unsecured Debentures.

1.92    *Other Priority Claim* means a Claim entitled to priority in payment as specified in section 507(a)(4), (5), (6) or (7) of the Bankruptcy Code.

1.93    *Other Secured Claim* means a Secured Claim other than a Secured Tax Claim, Prepetition Credit Agreement Claim or Secured Note Claim.

1.94    *Overallotment Shares* means 1,125,000 shares of New Common Stock that the Backstop Purchasers shall receive Subscription Rights to purchase under the Backstop Commitment Agreement.

1.95    *Paragraph Equity Interests* means all shares of common or preferred stock or other instrument evidencing an ownership interest in Paragraph International, Inc., whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests.

1.96    *Person* means an individual, partnership, corporation, limited liability company, cooperative, trust, unincorporated organization, association, joint venture, government or agency or political subdivision thereof or any other form of legal entity.

1.97    *Plan* means this Joint Plan of Reorganization, including, without limitation, the exhibits and schedules hereto or contained in the Plan

Supplement, as the same may be amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof.

1.98 ***Plan Supplement*** means the supplement to the Plan containing certain documents relevant to the implementation of the Plan, which shall be in form and substance reasonably acceptable to the Debtors and the Ad Hoc Committee, following consultation with the Creditors' Committee and Lampe Conway, and shall include, but are not limited to, the lists of the initial members of the New Boards of the Reorganized Debtors, the schedules of executory contracts and unexpired leases to be assumed pursuant to the Plan, the list of potential defendants in the Debtors' or Reorganized Debtors' causes of action under section 547 of the Bankruptcy Code, forms of the Subscription Rights, Registration Rights Agreement, New Organizational Documents and Management Incentive Plan and the Liquidating Trust Agreement.

1.99 ***Postpetition Financing Agreement*** means the $130,000,000 Post-Petition Loan and Security Agreement by and among Silicon Graphics, SGI Federal and SGI World Trade, as borrowers, the lenders party thereto, Morgan Stanley Senior Funding, Inc., as administrative agent, and Wells Fargo Foothill, Inc., as collateral agent, as entered into pursuant to the Postpetition Financing Order and as modified or amended from time to time during the Reorganization Cases.

1.100 ***Postpetition Financing Obligation*** means any obligation of the Debtors arising under the Postpetition Financing Agreement and the Postpetition Financing Order.

1.101 ***Postpetition Financing Order*** means the Final Order (i) Approving Debtors' Motion for Order Authorizing Debtors to Incur Post-Petition Secured Indebtedness Pursuant to $130,000,000 Post-Petition Loan and Security Agreement; (ii) Granting Security Interests and Superpriority Claims Pursuant to Sections 105(a), 364(c) and (d) of the Bankruptcy Code; (iii) Authorizing Debtors to Repay Amounts Owed Under the Pre-petition Senior Secured Credit Facility; (iv) Granting Adequate Protection to Noteholders Under Pre-petition Senior Secured Indentures; and (v) Authorizing the Debtors to use Cash Collateral dated June 26, 2006.

1.102 ***Prepetition Agent*** means Wells Fargo Foothill, Inc., or any successor thereto, as administrative agent under the Prepetition Credit Agreement.

1.103 ***Prepetition Credit Agreement*** means that certain Third Amended and Restated Credit Agreement, dated as of October 24, 2005, as amended pursuant to that certain Amendment Number One to Third Amended and Restated Credit Agreement, dated as of November 18, 2005, among Silicon Graphics, SGI Federal and SGI World Trade, as borrowers, and Wells Fargo Foothill, Inc. and Ableco Finance, LLC, as lenders, as the same may have been further amended or modified from time to time prior to the Commencement Date.

1.104 ***Prepetition Credit Agreement Claim*** means any Claim arising under the Prepetition Credit Agreement.

1.105 ***Priority Tax Claim*** means any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.106 ***Ratable Proportion*** means, with reference to any distribution on account of any Allowed Claim in any class, a distribution equal in amount to the ratio (expressed as a percentage) that the amount of such Allowed Claim bears to the aggregate amount of Allowed Claims in such class.

1.107 ***Registration Rights Agreement*** means the registration rights agreement, in form and substance reasonably acceptable to the Debtors and the Ad Hoc Committee, after consultation with the Creditors' Committee, and substantially in the form set forth in the Plan Supplement, to be entered into on the Effective Date by and among Silicon Graphics and each holder of at least 7.5% of the New Common Stock as of the Effective Date.

1.108 ***Reorganization Cases*** means the jointly administered cases commenced by the Debtors under chapter 11 of the Bankruptcy Code.

1.109 ***Reorganized Debtors*** means the Debtors on and after the Effective Date.

1.110 ***Reorganized Silicon Graphics*** means Silicon Graphics, on and after the Effective Date.

1.111 ***Rights Offering*** means the offering of the Subscription Rights to the holders of Allowed Secured Note Claims and Allowed Cray Unsecured Debenture Claims, as described in Article IX of the Plan.

1.112 ***Rights Offering Agent*** means the agent with respect to the Rights Offering, as described in Article IX of the Plan.

1.113 ***Rights Offering Trust Account*** means the trust account or similarly segregated account or accounts maintained by the Rights Offering Agent in accordance with Article IX of the Plan, which shall be separate and apart from the Rights Offering Agent's general operating funds and/or any other funds subject to any Lien or any cash collateral arrangements.

1.114 ***Schedules*** means, collectively, the schedules of assets and liabilities, schedules of executory contracts and unexpired leases and statements of financial affairs filed by the Debtors under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007 and the Official Bankruptcy Forms in the Reorganization Cases, as may have been amended or supplemented through the Confirmation Date pursuant to Bankruptcy Rule 1007.

1.115 **Secured Claim** means any Claim that is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or, in the event that such Claim is subject to a permissible setoff under section 553 of the Bankruptcy Code, to the extent of such permissible setoff.

1.116 **Secured Tax Claim** means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code (determined irrespective of any time limitations therein and including any related Secured Claim for penalties).

1.117 **Secured Note Claim** means any Secured Claim arising under the 6.50% Indenture or the 11.75% Indenture.

1.118 **Secured Note Deficiency Claim** means any Claim arising under the 6.50% Indenture or the 11.75% Indenture, to the extent that the interest of the holder of such Claim in the Collateral securing the Claim is less than the amount of such Claim.

1.119 **Secured Note Rights Offering Record Date** means the Voting Record Date.

1.120 **Senior Secured Convertible Notes** means those certain Senior Secured Convertible Notes issued pursuant to the 6.50% Indenture.

1.121 **Senior Secured Notes** means those certain Senior Secured Notes issued pursuant to the 11.75% Indenture.

1.122 **SGI Federal** means Silicon Graphics Federal, Inc.

1.123 **SGI Federal Equity Interests** means all shares of common or preferred stock or other instrument evidencing an ownership interest in SGI Federal, whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests.

1.124 **SGI Real Estate Equity Interests** means all shares of common or preferred stock or other instrument evidencing an ownership interest in Silicon Graphics Real Estate, Inc., whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests.

1.125 **SGI World Trade** means Silicon Graphics World Trade Corporation.

1.126 **SGI World Trade Equity Interests** means all shares of common or preferred stock or other instrument evidencing an ownership interest in SGI World Trade, whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests.

1.127   ***Silicon Graphics*** means Silicon Graphics, Inc.

1.128   ***Silicon Studio Equity Interests*** means all shares of common or preferred stock or other instrument evidencing an ownership interest in Silicon Studio, Inc., whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests.

1.129   ***Subordinated Securities Claim*** means any Claim against any of the Debtors, whether or not the subject of an existing lawsuit, (a) arising from rescission of a purchase or sale of shares or any other securities, if any, of any of the Debtors or an Affiliate of the Debtors, (b) for damages arising from the purchase or sale of any security, (c) for violations of the securities laws, misrepresentations or any similar Claims, including, to the extent related to the foregoing or otherwise subject to subordination under section 510(b) of the Bankruptcy Code, but not limited to, any attorneys' fees, other charges or costs incurred on account of the foregoing claims or (d) except as otherwise provided for in the Plan, for reimbursement, contribution or indemnification allowed under section 502 of the Bankruptcy Code on account of any such Claim, including Claims based upon allegations that the Debtors made false and misleading statements and engaged in other deceptive acts in connection with the sale of securities.

1.130   ***Subscription Expiration Date*** means the deadline for voting on the Plan, as specified in the Subscription Form but subject to the Debtors' right to extend such date with the prior consent of the Backstop Purchasers (which consent shall not be unreasonably withheld), which shall be the final date by which a holder of an Allowed Secured Note Claim or Allowed Cray Unsecured Debenture Claim, as of the applicable record date, may elect to subscribe to the Rights Offering.

1.131   ***Subscription Form*** means the form to be used by a holder of Subscription Rights to exercise such Subscription Rights.

1.132   ***Subscription Purchase Price*** means $6.67 per share.

1.133   ***Subscription Right*** means the right to subscribe for one share of New Common Stock at the Subscription Purchase Price on the terms and subject to the conditions set forth in Article IX of the Plan.

1.134   ***Tax Code*** means the Internal Revenue Code of 1986, as amended.

1.135   ***Trust Advisory Board*** means the trust advisory board provided for in the Liquidating Trust Agreement, which shall have an oversight function with respect to the Liquidating Trust.

1.136   ***Trustee*** means a trustee or co-trustees, as the case may be, governing the Liquidating Trust.

1.137 **U.S. Trustee** means the United States Trustee appointed under section 581 of title 28 of the United States Code to serve in the Southern District of New York.

1.138 **Unliquidated Claim** means any Claim, the amount of liability for which has not been fixed, whether pursuant to agreement, applicable law or otherwise, as of the date on which such Claim is asserted or sought to be estimated.

1.139 **Voting Record Date** means, as applicable, July 7, 2006 for holders of Cray Unsecured Debenture Claims and July 27, 2006 for all other creditors entitled to vote on the Plan.

1.140 **WTI Equity Interests** means all shares of common or preferred stock or other instrument evidencing an ownership interest in WTI Development, Inc., whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests.

**B.     Interpretation; Application of Definitions and Rules of Construction.**

Unless otherwise specified, all Section, Article, schedule or exhibit references in the Plan are to the respective Section in, Article of or schedule or exhibit to the Plan or the Plan Supplement, as the same may be amended, waived or modified from time to time. The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular section, subsection or clause contained in the Plan. A term used herein that is not defined herein shall have the meaning ascribed to that term in the Bankruptcy Code. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.

**C.     Relief Sought by Filing the Plan.**

The filing of the Plan constitutes, among other things, a motion by the Debtors pursuant to Bankruptcy Rule 9019 to approve the settlement and compromise set forth in Section 5.1 of the Plan.

## ARTICLE II

## PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

2.1     **Administrative Expense Claims.**

Except to the extent that any entity entitled to payment of any Allowed Administrative Expense Claim agrees to a less favorable treatment, each holder of an Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Allowed Administrative Expense Claim on the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense

Claim, or as soon thereafter as is practicable; *provided, however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors shall be paid in full and performed by the Debtors or Reorganized Debtors, as the case may be, in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions. The reasonable, documented and unpaid fees and expenses of Goodwin Procter LLP, Houlihan Lokey Howard & Zukin and Frederick W. Cook & Co., Inc., as advisors to the Ad Hoc Committee, and of Milbank, Tweed, Hadley & McCloy LLP, as advisors to Lampe Conway and subject to the limitations set forth in the Global Settlement, shall be Allowed Administrative Expense Claims and shall be paid without the need for the filing of a proof of Claim and without the need for further Bankruptcy Court approval.

### 2.2 *Postpetition Financing Agreement.*

On the Effective Date, all Allowed Postpetition Financing Obligation Claims shall be paid in full in Cash. To the extent any letters of credit issued pursuant to the Postpetition Financing Agreement are outstanding on the Effective Date, such letters of credit will be cancelled and replaced with new letters of credit to be issued pursuant to the Exit Facility or 100% Cash collateralized. Upon payment and satisfaction in full of all Allowed Postpetition Financing Obligation Claims, all Liens and security interests granted to secure such obligations, whether in the Reorganization Cases or otherwise, shall be terminated and of no further force or effect.

### 2.3 *Professional Compensation and Reimbursement Claims.*

All entities seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall (a) file, on or before the date that is ninety (90) days after the Effective Date their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or Allowing any such Administrative Expense Claim. The Reorganized Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

### 2.4 *Indenture Trustee Fees.*

All Indenture Trustee Fees shall be paid in Cash on the Effective Date by the Reorganized Debtors as Administrative Expense Claims, without the need for application to, or approval of, the Bankruptcy Court; *provided, however*, that, in accordance with Section 4.7 of the Plan, the Debtors or Reorganized Debtors shall not be obligated to pay and shall have no liability for the Cray Indenture Trustee Fees in

excess of the $1.2 million distribution provided to all holders of Allowed Cray Unsecured Debenture Claims pursuant to the Plan. The Debtors have been advised that the Cray Indenture Trustee will assert its Charging Lien to pay the Cray Indenture Trustee Fees from such $1.2 million distribution. Each Indenture Trustee's Charging Lien will be discharged solely upon payment in full of such Indenture Trustee Fees as set forth herein and in Section 4.7 of the Plan. Nothing herein shall be deemed to impair, waive or discharge the Charging Lien for any fees and expenses not paid by the Reorganized Debtors.

To the extent that any Indenture Trustee provides services related to distributions pursuant to the Plan (including, but not limited to, the services referenced in Section 6.8(c) of the Plan), such Indenture Trustee will receive from the Reorganized Debtors, without further Bankruptcy Court approval, reasonable compensation for such services and reimbursement of reasonable expenses, including, but not limited to, reasonable attorneys' fees and expenses, incurred in connection with such services. These payments will be made on terms agreed to by the Indenture Trustee and the Reorganized Debtors.

### 2.5 *Priority Tax Claims*.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Debtors or the Reorganized Debtors, (a) on the Effective Date, Cash in an amount equal to such Allowed Priority Tax Claim or (b) commencing on the Effective Date and continuing over a period not exceeding five (5) years from and after the Commencement Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at the applicable rate under non-bankruptcy law, subject to the sole option of the Debtors or Reorganized Debtors to prepay the entire amount of the Allowed Priority Tax Claim and in a manner not less favorable than the most favored nonpriority unsecured Claim provided for by the Plan. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations become due.

# ARTICLE III

## CLASSIFICATION OF CLAIMS AND
## EQUITY INTERESTS, IMPAIRMENT AND VOTING

The following table designates the classes of Claims against and equity interests in the Debtors and specifies which of those classes are impaired or unimpaired by the Plan and entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code or deemed to reject the Plan.

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 | Other Priority Claims | Unimpaired | No (deemed to accept) |
| Class 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) |
| Class 3 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| Class 4 | Prepetition Credit Agreement Claims | Unimpaired | No (deemed to accept) |
| Class 5 | Secured Note Claims | Impaired | Yes |
| Class 6 | General Unsecured Silicon Graphics Claims | Impaired | Yes |
| Class 7 | Cray Unsecured Debenture Claims | Impaired | Yes |
| Class 8 | Subordinated Securities Claims | Impaired | No (deemed to reject) |
| Class 9 | Old Equity Interests | Impaired | No (deemed to reject) |
| Class 10 | General Unsecured SGI Federal Claims | Unimpaired | No (deemed to accept) |
| Class 11 | SGI Federal Equity Interests | Unimpaired | No (deemed to accept) |
| Class 12 | General Unsecured SGI World Trade Claims | Unimpaired | No (deemed to accept) |
| Class 13 | SGI World Trade Equity Interests | Unimpaired | No (deemed to accept) |
| Class 14 | General Unsecured Cray Research LLC Claims | Unimpaired | No (deemed to accept) |
| Class 15 | Cray Research LLC Equity Interests | Unimpaired | No (deemed to accept) |
| Class 16 | General Unsecured SGI Real Estate Claims | Unimpaired | No (deemed to accept) |
| Class 17 | SGI Real Estate Equity Interests | Unimpaired | No (deemed to accept) |
| Class 18 | General Unsecured Silicon Studio Claims | Unimpaired | No (deemed to accept) |
| Class 19 | Silicon Studio Equity Interests | Unimpaired | No (deemed to accept) |
| Class 20 | General Unsecured Cray Research America Latina Claims | Unimpaired | No (deemed to accept) |
| Class 21 | Cray Research America Latina Equity Interests | Unimpaired | No (deemed to accept) |
| Class 22 | General Unsecured Cray Research Eastern Europe Claims | Unimpaired | No (deemed to accept) |

| Class 23 | Cray Research Eastern Europe Equity Interests | Unimpaired | No (deemed to accept) |
|---|---|---|---|
| Class 24 | General Unsecured Cray Research India Claims | Unimpaired | No (deemed to accept) |
| Class 25 | Cray Research India Equity Interests | Unimpaired | No (deemed to accept) |
| Class 26 | General Unsecured Cray Research International Claims | Unimpaired | No (deemed to accept) |
| Class 27 | Cray Research International Equity Interests | Unimpaired | No (deemed to accept) |
| Class 28 | General Unsecured Cray Financial Claims | Unimpaired | No (deemed to accept) |
| Class 29 | Cray Financial Equity Interests | Unimpaired | No (deemed to accept) |
| Class 30 | General Unsecured Cray Asia/Pacific Claims | Unimpaired | No (deemed to accept) |
| Class 31 | Cray Asia/Pacific Equity Interests | Unimpaired | No (deemed to accept) |
| Class 32 | General Unsecured Paragraph Claims | Unimpaired | No (deemed to accept) |
| Class 33 | Paragraph Equity Interests | Unimpaired | No (deemed to accept) |
| Class 34 | General Unsecured WTI Claims | Unimpaired | No (deemed to accept) |
| Class 35 | WTI Equity Interests | Unimpaired | No (deemed to accept) |

## ARTICLE IV

## PROVISIONS FOR TREATMENT OF CLAIMS AND EQUITY INTERESTS

### 4.1 *Other Priority Claims (Class 1)*.

(a) <u>Impairment and Voting.</u> Class 1 is unimpaired by the Plan. Each holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b) <u>Distributions.</u> Except to the extent that a holder of an Allowed Other Priority Claim agrees to a different treatment, each holder of an Allowed Other Priority Claim shall receive Cash in an amount equal to such Allowed Other Priority Claim on the later of the Effective Date and the date such Allowed Other Priority Claim becomes an Allowed Other Priority Claim, or as soon thereafter as is practicable.

### 4.2 *Secured Tax Claims (Class 2)*.

(a) <u>Impairment and Voting.</u> Class 2 is unimpaired by the Plan. Each holder of an Allowed Secured Tax Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)     Distributions. Except to the extent that a holder of an Allowed Secured Tax Claim agrees to a different treatment, each holder of an Allowed Secured Tax Claim shall receive, at the sole option of the Debtors or the Reorganized Debtors, (i) Cash in an amount equal to such Allowed Secured Tax Claim or (ii) commencing on the Effective Date and continuing over a period not exceeding five (5) years from and after the Commencement Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable rate under non-bankruptcy law, subject to the sole option of the Debtors or Reorganized Debtors to prepay the entire amount of the Allowed Priority Tax Claim and in a manner not less favorable than the most favored nonpriority unsecured Claim provided for by the Plan.

### 4.3     *Other Secured Claims (Class 3).*

(a)     Impairment and Voting. Class 3 is unimpaired by the Plan. Each holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)     Distributions. Except to the extent that a holder of an Allowed Other Secured Claim agrees to a different treatment, at the sole option of the Debtors or the Reorganized Debtors, (i) on the Effective Date or as soon thereafter as is practicable, each Allowed Other Secured Claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default, (ii) each holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of the Effective Date and the date such Allowed Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable or (iii) each holder of an Allowed Other Secured Claim shall receive the Collateral securing its Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, in full and complete satisfaction of such Allowed Other Secured Claim on the later of the Effective Date and the date such Allowed Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable.

### 4.4     *Prepetition Credit Agreement Claims (Class 4).*

(a)     Impairment and Voting. Class 4 is unimpaired by the Plan. Each holder of a Prepetition Credit Agreement Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)     Distributions. Each holder of an Allowed Prepetition Credit Agreement Claim shall be paid in full, in Cash, together with postpetition interest, on the Effective Date or as soon thereafter as is practicable.

### 4.5     *Secured Note Claims (Class 5).*

(a)     Impairment and Voting. Class 5 is impaired by the Plan. Each holder of a Secured Note Claim is entitled to vote to accept or reject the Plan. The acceptance of the Plan by the holders of Secured Note Claims shall constitute agreement to waive the Secured Note Deficiency Claims as of the Effective Date.

(b)     Distributions. Each holder of an Allowed Secured Note Claim shall (i) receive its Ratable Proportion of 2,500,000 shares of New Common Stock on the Effective Date or as soon thereafter as is practicable, (ii) have the right to participate in the Rights Offering to exercise such holder's Ratable Proportion of 6,800,000 Subscription Rights on the terms and subject to the conditions of Article IX of the Plan and (iii) receive on the Effective Date or as soon thereafter as is practicable its Ratable Proportion of 100% of the beneficial interest in the Liquidating Trust (which shall be treated by all parties in accordance with Section 5.11(m) of the Plan).

### 4.6     *General Unsecured Silicon Graphics Claims (Class 6).*

(a)     Impairment and Voting. Class 6 is impaired by the Plan. Each holder of a General Unsecured Silicon Graphics Claim is entitled to vote to accept or reject the Plan.

(b)     Distributions. Except to the extent that a holder of an Allowed General Unsecured Silicon Graphics Claim agrees to a different treatment, each holder of an Allowed General Unsecured Silicon Graphics Claim shall receive its Distribution Pro Rata Share of $9.0 million in Cash on each Distribution Date or as soon thereafter as is practicable. In any distribution made to the holder of an Allowed General Unsecured Silicon Graphics Claim, there shall be deducted from such distribution the amount of any distribution previously distributed to such holder on account of such Allowed General Unsecured Silicon Graphics Claim in any distribution made prior thereto. Subject to the occurrence of the Effective Date, no distribution shall be made to holders of an Allowed Secured Note Claim on account of the Secured Note Deficiency Claim. On the Effective Date, the Debtors or the Reorganized Debtors shall fund $9.0 million in Cash into a segregated account maintained by the Disbursing Agent for the benefit of holders of Allowed General Unsecured Silicon Graphics Claims. The Debtors and the Reorganized Debtors shall not be the Disbursing Agent for the General Unsecured Silicon Graphics Claims.

### 4.7     *Cray Unsecured Debenture Claims (Class 7).*

(a)     Impairment and Voting. Class 7 is impaired by the Plan. Each holder of a Cray Unsecured Debenture Claim is entitled to vote to accept or reject the Plan.

(b)     Distributions. Each holder of an Allowed Cray Unsecured Debenture Claim shall (i) have the right to participate in the Rights Offering to exercise such holder's Ratable Proportion of 700,000 Subscription Rights on the terms and subject to the conditions of Article IX of the Plan and (ii) receive its Ratable Proportion of $1.2 million in Cash (less the Cray Indenture Trustee Fees, which shall be paid solely through the exercise of the Charging Lien on such Cash distribution) on the Effective Date or as soon thereafter as is practicable and in full and complete satisfaction of Claims against the Debtors.

### 4.8     *Subordinated Securities Claims (Class 8).*

(a)     Impairment and Voting. Class 8 is impaired by the Plan. Each holder of a Subordinated Securities Claim is deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

(b)     Distributions. Each holder of an Allowed Subordinated Securities Claim shall not receive or retain any interest or property under the Plan on account of such Allowed Subordinated Securities Claim. The treatment of Subordinated Securities Claims under the Plan is in accordance with and gives effect to the provisions of section 510(b) of the Bankruptcy Code.

### 4.9     *Old Equity Interests (Class 9).*

(a)     Impairment and Voting. Class 9 is impaired by the Plan. Each holder of an Old Equity Interest is deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

(b)     Distributions. On the Effective Date, the Old Equity Interests shall be cancelled and the holders of Old Equity Interests shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Old Equity Interests under the Plan.

### 4.10     *General Unsecured SGI Federal Claims (Class 10).*

(a)     Impairment and Voting. Class 10 is unimpaired by the Plan. Each holder of an Allowed General Unsecured SGI Federal Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)     Distributions. Except to the extent that a holder of an Allowed General Unsecured SGI Federal Claim agrees to a different treatment, each holder of an Allowed General Unsecured SGI Federal Claim shall receive Cash in an amount equal to such Allowed General Unsecured SGI Federal Claim on the later of the Effective Date and the date such Allowed General Unsecured SGI Federal Claim becomes an Allowed General Unsecured SGI Federal Claim, or as soon thereafter as is practicable.

### 4.11 *SGI Federal Equity Interests (Class 11)*.

(a) <u>Impairment and Voting.</u> Class 11 is unimpaired by the Plan. Each holder of a SGI Federal Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b) <u>Distributions.</u> The SGI Federal Equity Interests will be unaltered.

### 4.12 *General Unsecured SGI World Trade Claims (Class 12)*.

(a) <u>Impairment and Voting.</u> Class 12 is unimpaired by the Plan. Each holder of an Allowed General Unsecured SGI World Trade Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b) <u>Distributions.</u> Except to the extent that a holder of an Allowed General Unsecured SGI World Trade Claim agrees to a different treatment, each holder of an Allowed General Unsecured SGI World Trade Claim shall receive Cash in an amount equal to such Allowed General Unsecured SGI World Trade Claim on the later of the Effective Date and the date such Allowed General Unsecured SGI World Trade Claim becomes an Allowed General Unsecured SGI World Trade Claim, or as soon thereafter as is practicable.

### 4.13 *SGI World Trade Equity Interests (Class 13)*.

(a) <u>Impairment and Voting.</u> Class 13 is unimpaired by the Plan. Each holder of a SGI World Trade Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b) <u>Distributions.</u> The SGI World Trade Equity Interests will be unaltered.

### 4.14 *General Unsecured Cray Research LLC Claims (Class 14)*.

(a) <u>Impairment and Voting.</u> Class 14 is unimpaired by the Plan. Each holder of an Allowed General Unsecured Cray Research LLC Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b) <u>Distributions.</u> Except to the extent that a holder of an Allowed General Unsecured Cray Research LLC Claim agrees to a different treatment, each holder of an Allowed General Unsecured Cray Research LLC Claim shall receive Cash in an amount equal to such Allowed General Unsecured Cray Research LLC Claim on the later of the Effective Date and the date such Allowed General Unsecured Cray Research LLC Claim becomes an Allowed General Unsecured Cray Research LLC Claim, or as soon thereafter as is practicable.

### 4.15  *Cray Research LLC Equity Interests (Class 15).*

(a)  <u>Impairment and Voting.</u>  Class 15 is unimpaired by the Plan. Each holder of a Cray Research LLC Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)  <u>Distributions.</u>  The Cray Research LLC Equity Interests will be unaltered.

### 4.16  *General Unsecured SGI Real Estate Claims (Class 16).*

(a)  <u>Impairment and Voting.</u>  Class 16 is unimpaired by the Plan. Each holder of an Allowed General Unsecured SGI Real Estate Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)  <u>Distributions.</u>  Except to the extent that a holder of an Allowed General Unsecured SGI Real Estate Claim agrees to a different treatment, each holder of an Allowed General Unsecured SGI Real Estate Claim shall receive Cash in an amount equal to such Allowed General Unsecured SGI Real Estate Claim on the later of the Effective Date and the date such Allowed General Unsecured SGI Real Estate Claim becomes an Allowed General Unsecured SGI Real Estate Claim, or as soon thereafter as is practicable.

### 4.17  *SGI Real Estate Equity Interests (Class 17).*

(a)  <u>Impairment and Voting.</u>  Class 17 is unimpaired by the Plan. Each holder of a SGI Real Estate Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)  <u>Distributions.</u>  The SGI Real Estate Equity Interests will be unaltered.

### 4.18  *General Unsecured Silicon Studio Claims (Class 18).*

(a)  <u>Impairment and Voting.</u>  Class 18 is unimpaired by the Plan. Each holder of an Allowed General Unsecured Silicon Studio Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)  <u>Distributions.</u>  Except to the extent that a holder of an Allowed General Unsecured Silicon Studio Claim agrees to a different treatment, each holder of an Allowed General Unsecured Silicon Studio Claim shall receive Cash in an amount equal to such Allowed General Unsecured Silicon Studio Claim on the later of the Effective Date and the date such Allowed General Unsecured Silicon Studio Claim becomes an Allowed General Unsecured Silicon Studio Claim, or as soon thereafter as is practicable.

### 4.19 *Silicon Studio Equity Interests (Class 19)*.

(a) <u>Impairment and Voting.</u> Class 19 is unimpaired by the Plan. Each holder of a Silicon Studio Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b) <u>Distributions.</u> The Silicon Studio Equity Interests will be unaltered.

### 4.20 *General Unsecured Cray Research America Latina Claims (Class 20)*.

(a) <u>Impairment and Voting.</u> Class 20 is unimpaired by the Plan. Each holder of an Allowed General Unsecured Cray Research America Latina Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b) <u>Distributions.</u> Except to the extent that a holder of an Allowed General Unsecured Cray Research America Latina Claim agrees to a different treatment, each holder of an Allowed General Unsecured Cray Research America Latina Claim shall receive Cash in an amount equal to such Allowed General Unsecured Cray Research America Latina Claim on the later of the Effective Date and the date such Allowed General Unsecured Cray Research America Latina Claim becomes an Allowed General Unsecured Cray Research America Latina Claim, or as soon thereafter as is practicable.

### 4.21 *Cray Research America Latina Equity Interests (Class 21)*.

(a) <u>Impairment and Voting.</u> Class 21 is unimpaired by the Plan. Each holder of a Cray Research America Latina Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b) <u>Distributions.</u> The Cray Research America Latina Equity Interests will be unaltered.

### 4.22 *General Unsecured Cray Research Eastern Europe Claims (Class 22)*.

(a) <u>Impairment and Voting.</u> Class 22 is unimpaired by the Plan. Each holder of an Allowed General Unsecured Cray Research Eastern Europe Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b) <u>Distributions.</u> Except to the extent that a holder of an Allowed General Unsecured Cray Research Eastern Europe Claim agrees to a different treatment, each holder of an Allowed General Unsecured Cray Research Eastern Europe Claim shall receive Cash in an amount equal to such Allowed General

Unsecured Cray Research Eastern Europe Claim on the later of the Effective Date and the date such Allowed General Unsecured Cray Research Eastern Europe Claim becomes an Allowed General Unsecured Cray Research Eastern Europe Claim, or as soon thereafter as is practicable.

### 4.23 *Cray Research Eastern Europe Equity Interests (Class 23).*

(a)     <u>Impairment and Voting.</u> Class 23 is unimpaired by the Plan. Each holder of a Cray Research Eastern Europe Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)     <u>Distributions.</u> The Cray Research Eastern Europe Equity Interests will be unaltered.

### 4.24 *General Unsecured Cray Research India Claims (Class 24).*

(a)     <u>Impairment and Voting.</u> Class 24 is unimpaired by the Plan. Each holder of an Allowed General Unsecured Cray Research India Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)     <u>Distributions.</u> Except to the extent that a holder of an Allowed General Unsecured Cray Research India Claim agrees to a different treatment, each holder of an Allowed General Unsecured Cray Research India Claim shall receive Cash in an amount equal to such Allowed General Unsecured Cray Research India Claim on the later of the Effective Date and the date such Allowed General Unsecured Cray Research India Claim becomes an Allowed General Unsecured Cray Research India Claim, or as soon thereafter as is practicable.

### 4.25 *Cray Research India Equity Interests (Class 25).*

(a)     <u>Impairment and Voting.</u> Class 25 is unimpaired by the Plan. Each holder of a Cray Research India Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)     <u>Distributions.</u> The Cray Research India Equity Interests will be unaltered.

### 4.26 *General Unsecured Cray Research International Claims (Class 26).*

(a)     <u>Impairment and Voting.</u> Class 26 is unimpaired by the Plan. Each holder of an Allowed General Unsecured Cray Research International Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)      Distributions.  Except to the extent that a holder of an Allowed General Unsecured Cray Research International Claim agrees to a different treatment, each holder of an Allowed General Unsecured Cray Research International Claim shall receive Cash in an amount equal to such Allowed General Unsecured Cray Research International Claim on the later of the Effective Date and the date such Allowed General Unsecured Cray Research International Claim becomes an Allowed General Unsecured Cray Research International Claim, or as soon thereafter as is practicable.

4.27     *Cray Research International Equity Interests (Class 27).*

(a)      Impairment and Voting.  Class 27 is unimpaired by the Plan.  Each holder of a Cray Research International Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)      Distributions.  The Cray Research International Equity Interests will be unaltered.

4.28     *General Unsecured Cray Financial Claims (Class 28).*

(a)      Impairment and Voting.  Class 28 is unimpaired by the Plan.  Each holder of an Allowed General Unsecured Cray Financial Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)      Distributions.  Except to the extent that a holder of an Allowed General Unsecured Cray Financial Claim agrees to a different treatment, each holder of an Allowed General Unsecured Cray Financial Claim shall receive Cash in an amount equal to such Allowed General Unsecured Cray Financial Claim on the later of the Effective Date and the date such Allowed General Unsecured Cray Financial Claim becomes an Allowed General Unsecured Cray Financial Claim, or as soon thereafter as is practicable.

4.29     *Cray Financial Equity Interests (Class 29).*

(a)      Impairment and Voting.  Class 29 is unimpaired by the Plan.  Each holder of a Cray Financial Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)      Distributions.  The Cray Financial Equity Interests will be unaltered.

4.30     *General Unsecured Cray Asia/Pacific Claims (Class 30).*

(a)      Impairment and Voting.  Class 30 is unimpaired by the Plan.  Each holder of an Allowed General Unsecured Cray Asia/Pacific Claim is

28

conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)     Distributions. Except to the extent that a holder of an Allowed General Unsecured Cray Asia/Pacific Claim agrees to a different treatment, each holder of an Allowed General Unsecured Cray Asia/Pacific Claim shall receive Cash in an amount equal to such Allowed General Unsecured Cray Asia/Pacific Claim on the later of the Effective Date and the date such Allowed General Unsecured Cray Asia/Pacific Claim becomes an Allowed General Unsecured Cray Asia/Pacific Claim, or as soon thereafter as is practicable.

4.31   *Cray Asia/Pacific Equity Interests (Class 31).*

(a)     Impairment and Voting. Class 31 is unimpaired by the Plan. Each holder of a Cray Asia/Pacific Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)     Distributions. The Cray Asia/Pacific Equity Interests will be unaltered.

4.32   *General Unsecured Paragraph Claims (Class 32).*

(a)     Impairment and Voting. Class 32 is unimpaired by the Plan. Each holder of an Allowed General Unsecured Paragraph Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)     Distributions. Except to the extent that a holder of an Allowed General Unsecured Paragraph Claim agrees to a different treatment, each holder of an Allowed General Unsecured Paragraph Claim shall receive Cash in an amount equal to such Allowed General Unsecured Paragraph Claim on the later of the Effective Date and the date such Allowed General Unsecured Paragraph Claim becomes an Allowed General Unsecured Paragraph Claim, or as soon thereafter as is practicable.

4.33   *Paragraph Equity Interests (Class 33).*

(a)     Impairment and Voting. Class 33 is unimpaired by the Plan. Each holder of a Paragraph Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)     Distributions. The Paragraph Equity Interests will be unaltered.

4.34   *General Unsecured WTI Claims (Class 34).*

(a)     Impairment and Voting. Class 34 is unimpaired by the Plan. Each holder of an Allowed General Unsecured WTI Claim is conclusively

presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)  Distributions. Except to the extent that a holder of an Allowed General Unsecured WTI Claim agrees to a different treatment, each holder of an Allowed General Unsecured WTI Claim shall receive Cash in an amount equal to such Allowed General Unsecured WTI Claim on the later of the Effective Date and the date such Allowed General Unsecured WTI Claim becomes an Allowed General Unsecured WTI Claim, or as soon thereafter as is practicable.

### 4.35  *WTI Equity Interests (Class 35).*

(a)  Impairment and Voting. Class 35 is unimpaired by the Plan. Each holder of a WTI Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)  Distributions. The WTI Equity Interests will be unaltered.

## ARTICLE V

## MEANS OF IMPLEMENTATION

### 5.1  *Settlement of Claims.*

Pursuant to Bankruptcy Rule 9019, in consideration for the classification, distribution and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims or controversies resolved pursuant to the Plan as embodied in the Global Settlement, including, without limitation, all Claims and controversies regarding the subordination of the Cray Unsecured Debentures. All Plan distributions made to creditors holding Allowed Claims in any class are intended to be and shall be final, and no Plan distribution to the holder of a Claim in one class shall be subject to being shared with or reallocated to the holders of any Claim in another class by virtue of any prepetition collateral trust agreement, shared collateral agreement, subordination agreement, other similar inter-creditor arrangement or deficiency Claim.

### 5.2  *Intercompany Claims.*

Notwithstanding anything to the contrary herein, Intercompany Claims will be adjusted, continued or discharged to the extent determined appropriate by the Debtors or the Reorganized Debtors, in their sole discretion. Any such transaction may be effected on or subsequent to the Effective Date without any further action by the stockholders of any of the Debtors, the Debtors in Possession or the Reorganized Debtors.

### 5.3 *Merger/Dissolution/Consolidation*.

On or as of the Effective Date or as soon as practicable thereafter and without the need for any further action, the Reorganized Debtors may, with the prior consent of the Ad Hoc Committee (which consent shall not be unreasonably withheld), (a) cause any or all of the Reorganized Debtors or to be merged into one or more of the Reorganized Debtors, dissolved or otherwise consolidated, (b) cause the transfer of assets between or among the Reorganized Debtors or (c) engage in any other transaction in furtherance of the Plan.

### 5.4 *Cancellation of Existing Securities and Agreements*.

Except (a) as otherwise expressly provided in the Plan, (b) with respect to executory contracts or unexpired leases that have been assumed by the Debtors, (c) for purposes of evidencing a right to distributions under the Plan and with respect to the Indenture Trustees' rights to distribute and exercise the Charging Liens against the distributions in accordance with Sections 2.4 and 4.7 of the Plan, or (d) with respect to any Claim that is reinstated and rendered unimpaired under the Plan, on the Effective Date, the Postpetition Financing Agreement, Prepetition Credit Agreement, Indentures and all notes and debentures issued thereunder, all Old Equity Interests and other instruments evidencing any Claims against the Debtors or Old Equity Interests shall be deemed automatically cancelled without further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the Debtors thereunder shall be discharged.

### 5.5 *Surrender of Existing Securities*.

Each holder of the Senior Secured Convertible Notes, Senior Secured Notes and Cray Unsecured Debentures shall surrender such note(s) to the Indenture Trustee, or in the event such note(s) are held in the name of, or by a nominee of, the Depository Trust Company, the Disbursing Agent shall seek the cooperation of the Depository Trust Company to provide appropriate instructions to the Indenture Trustee. No distributions under the Plan shall be made for or on behalf of any such holder unless and until such note is received by the Indenture Trustee or appropriate instructions from the Depository Trust Company shall be received by the Indenture Trustee, or the loss, theft or destruction of such note is established to the reasonable satisfaction of the Indenture Trustee, which satisfaction may require such holder to submit (a) a lost instrument affidavit and (b) an indemnity bond holding the Debtors, Reorganized Debtors, Disbursing Agent and Indenture Trustee harmless in respect of such note and any distributions made in respect thereof. Upon compliance with this Section by a holder of any note, such holder shall, for all purposes under the Plan, be deemed to have surrendered such note. Any holder of Senior Secured Convertible Notes, Senior Secured Notes or Cray Unsecured Debentures that fails to surrender such note or satisfactorily explain its non-availability to the Indenture Trustee within two (2) years of the Effective Date shall be deemed to have no further Claim against the Debtors and the Reorganized Debtors (or their property) or the Indenture Trustee in respect of such Claim and shall not participate in any distribution under the Plan.

All property in respect of such forfeited distributions, including interest thereon, shall revert to the applicable Indenture Trustee and shall be distributed to other holders of the applicable securities who have complied with the requirements set forth in this Section, on a *pro rata* basis, subject, nevertheless, to the Charging Liens of the Indenture Trustees.

### 5.6 *Incurrence of New Indebtedness.*

The Reorganized Debtors' entry into the Exit Facility and the incurrence of the indebtedness thereunder on the Effective Date is hereby authorized without the need for any further corporate action and without any further action by holders of Claims or equity interests; *provided, however*, that the consent of Lampe Conway, which consent shall not be unreasonably withheld, shall be required if the amount of borrowings outstanding under the Exit Facility exceed $100 million on the Effective Date.

### 5.7 *Issuance of New Common Stock.*

The issuance by Reorganized Silicon Graphics of the New Common Stock on the Effective Date is hereby authorized without the need for any further corporate action and without any further action by holders of Claims or equity interests. The New Common Stock shall consist of 25,000,000 authorized shares of Reorganized Silicon Graphics and shall be distributed as follows, subject to adjustment pursuant to Section 6.10 of the Plan: 10,000,000 shares shall be issued and distributed to the holders of Allowed Secured Note Claims and Allowed Cray Unsecured Debenture Claims pursuant to Article IV of the Plan and the Rights Offering set forth in Article IX of the Plan; *provided, however*, that not more than 700,000 such shares shall be issued and distributed to holders of Allowed Cray Unsecured Debenture Claims; and further *provided, however*, that to the extent any portion of the 700,000 shares are not acquired by holders of Allowed Cray Unsecured Debenture Claims or Lampe Conway pursuant to the Lampe Conway Rights Offering Option, such shares shall be acquired by the Backstop Purchasers pursuant to the Backstop Commitment Agreement. The Overallotment Shares will be distributed to the Backstop Purchasers pursuant to Section 9.6 of the Plan, and a certain number of shares not to exceed 10% of the New Common Stock will be distributed pursuant to the terms of the New Management Incentive Plan.

### 5.8 *Exemption from Securities Laws.*

To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the issuance under the Plan of the New Common Stock and the Subscription Rights will be exempt from registration under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder.

### 5.9   *Hart-Scott-Rodino Compliance*.

Any shares of New Common Stock to be distributed under the Plan to any entity required to file a Premerger Notification and Report Form under the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended, shall not be distributed until the notification and waiting periods applicable under such Act to such entity shall have expired or been terminated.

### 5.10   *Registration Rights Agreement*.

On the Effective Date, Reorganized Silicon Graphics shall enter into the Registration Rights Agreement with each holder of at least 7.5% of the New Common Stock as of the Effective Date. Pursuant to the Registration Rights Agreement, Reorganized Silicon Graphics shall agree to register the resale of the shares of New Common Stock issued to any such holders in accordance with the requirements of the Securities Act of 1933, as amended. The Registration Rights Agreement shall provide that each holder owning at least 7.5% of the outstanding New Common Stock upon the Effective Date shall be entitled to two (2) demand rights and unlimited piggyback registration rights. In the event that any New Common Stock is not entitled to exemption from registration under the Securities Act of 1933, the holders thereof shall be entitled to unlimited piggyback registration rights.

### 5.11   *The Liquidating Trust*.

(a)   <u>Execution of Liquidating Trust Agreement.</u> On or before the Effective Date, the Liquidating Trust Agreement shall be executed by the Debtors and the Trustee, and all other necessary steps shall be taken to establish the Liquidating Trust and the beneficial interests therein which shall be for the benefit of the holders of Allowed Secured Note Claims, as provided in Section 4.5 of the Plan. In the event of any conflict between the terms of this Section 5.11 and the terms of the Liquidating Trust Agreement, the terms of the Liquidating Trust Agreement shall govern. The Liquidating Trust Agreement may provide powers, duties and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties and authorities do not affect the status of the Liquidating Trust as a liquidating trust for United States federal income tax purposes.

(b)   <u>Purpose of the Liquidating Trust.</u> The Liquidating Trust shall be established for the sole purpose of liquidating and distributing its assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

(c)   <u>Liquidating Trust Assets.</u> The Liquidating Trust shall consist of the Liquidating Trust Assets. On the Effective Date, the Debtors shall transfer all of the Liquidating Trust Assets to the Liquidating Trust for the benefit of the holders of Allowed Secured Note Claims free and clear of all liens, claims and encumbrances, and no other entity, including the Reorganized Debtors, shall have any interest, legal, beneficial or otherwise, in the Liquidating Trust or the Liquidating

Trust Assets upon their assignment and transfer to the Liquidating Trust. Such transfers shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax. Upon delivery of the Liquidating Trust Assets to the Liquidating Trust, the Reorganized Debtors shall be released of all liability with respect to the delivery of such distributions.

(d)      Governance of the Liquidating Trust. The Liquidating Trust shall be governed by the Trustee.

(e)      The Trustee. The Trustee shall be designated by the Reorganized Debtors and the Ad Hoc Committee on the Effective Date. In the event the Trustee dies, is terminated or resigns for any reason, the Trust Advisory Board shall designate a successor, which must be reasonably acceptable to the Reorganized Debtors.

(f)      Role of the Trustee. In furtherance of and consistent with the purpose of the Liquidating Trust and the Plan, the Trustee shall (i) have the power and authority to hold, manage and distribute the Liquidating Trust Assets, including prosecuting and resolving the Claims belonging to the Liquidating Trust, (ii) hold the Liquidating Trust Assets for the benefit of the holders of Allowed Secured Note Claims, and (iii) have the power and authority to hold, manage, and distribute Cash or non-Cash Liquidating Trust Assets obtained through the exercise of its power and authority. In all circumstances, the Trustee shall act in the best interests of all beneficiaries of the Liquidating Trust and in furtherance of the purpose of the Liquidating Trust.

(g)      Nontransferability of Liquidating Trust Interests. The beneficial interests in the Liquidating Trust shall not be certificated and are not transferable.

(h)      Cash. The Trustee may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code, *provided, however*, that such investments are investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings, or other controlling authorities.

(i)      Distribution of Liquidating Trust Assets. At least annually, the Trustee shall make distributions to the beneficial holders of the Liquidating Trust of all Cash on hand (including any Cash received from the Debtors on the Effective Date, and treating as Cash for purposes of this section any permitted investments under Section 5.11(h) of the Plan), except such amounts (i) as are reasonably necessary to meet contingent liabilities and to maintain the value of the Liquidating Trust Assets during liquidation, (ii) to pay reasonable expenses (including, but not limited to, any taxes imposed on the Liquidating Trust or in respect of the Liquidating Trust Assets), and (iii) to satisfy other liabilities incurred by the Liquidating Trust in accordance with this Plan or the Liquidating Trust Agreement.

(j) Costs and Expenses of the Liquidating Trust. The costs and expenses of the Liquidating Trust, including the fees and expenses of the Trustee and its retained professionals, shall be paid out of the Liquidating Trust Assets. Fees and expenses incurred in connection with the prosecution and settlement of any Claims shall be considered costs and expenses of the Liquidating Trust.

(k) Compensation of the Trustee. The individual(s) comprising the Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar roles.

(l) Retention of Professionals by the Trustee. The Trustee may retain and compensate counsel and other professionals to assist in its duties as Trustee on such terms as the Trustee deems appropriate without Bankruptcy Court approval. Without limiting the foregoing, the Trustee may retain any professional who represented parties in interest in the Reorganization Cases.

(m) Federal Income Tax Treatment of the Liquidating Trust.

(i) Liquidating Trust Assets Treated as Owned by Creditors. For all federal income tax purposes, all parties (including, without limitation, the Debtors, the Trustee and the holders of Allowed Secured Note Claims) shall treat the transfer of the Liquidating Trust Assets to the Liquidating Trust for the benefit of the holders of Allowed Secured Note Claims as (A) a transfer of the Liquidating Trust Assets directly to the holders of Allowed Secured Note Claims followed by (B) the transfer by such holders to the Liquidating Trust of the Liquidating Trust Assets in exchange for beneficial interests in the Liquidating Trust. Accordingly, the holders of the Allowed Secured Note Claims shall be treated for federal income tax purposes as the grantors and owners of their respective share of the Liquidating Trust Assets.

(ii) Tax Reporting.

(a) The Trustee shall file returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this Section 5.11(m)(ii). The Trustee shall also annually send to each holder of a beneficial interest a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and will instruct all such holders to report such items on their federal income tax returns or to forward the appropriate information to the beneficial holders with instructions to report such items on their federal income tax returns. The Trustee shall also file (or cause to be filed) any other statements, returns or disclosures relating to the Liquidating Trust that are required by any governmental unit. The trust's taxable income, gain, loss, deduction or credit will be allocated to the holders of Allowed Secured Note Claim in accordance with their relative beneficial interests in the Liquidating Trust.

(b) As soon as possible after the Effective Date, the Trustee shall make a good-faith valuation of the Liquidating Trust Assets,

and such valuation shall be used consistently by all parties (including, without limitation, the Debtors, the Trustee and the holders of Allowed Secured Note Claims) for all federal income tax purposes.

(c)     The Trustee shall be responsible for payments, out of the Liquidating Trust Assets, of any taxes imposed on the trust or its assets.

(d)     The Trustee may request an expedited determination of taxes of the Liquidating Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Liquidating Trust for all taxable periods through the dissolution of the Liquidating Trust.

(n)     <u>Dissolution.</u>  The Trustee and the Liquidating Trust shall be discharged or dissolved, as the case may be, at such time as (i) the Trustee determines, in its sole discretion, that the prosecution of the Liquidating Trust Assets is not likely to yield sufficient additional Liquidating Trust Proceeds to justify further pursuit and (ii) all distributions required to be made by the Trustee under the Plan and the Liquidating Trust Agreement have been made, but in no event shall the Liquidating Trust be dissolved later than three (3) years from the Effective Date unless the Bankruptcy Court, upon motion within the six month period prior to the third anniversary (or at least six (6) months prior to the end of an extension period), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

(o)     <u>Indemnification of Trustee.</u>  The Trustee or the individuals comprising the Trustee, as the case may be, and the Trustee's agents and professionals, shall not be liable for actions taken or omitted in its capacity as, or on behalf of, the Trustee, except those acts arising out of its or their own willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its actions or inactions in its capacity as, or on behalf of, the Trustee, except for any actions or inactions involving willful misconduct or gross negligence.  Any indemnification claim of the Trustee (and the other parties entitled to indemnification under this subsection) shall be satisfied from the Liquidating Trust Assets.  The Trustee shall be entitled to rely, in good-faith, on the advice of its retained professionals.

# ARTICLE VI

## PROVISIONS GOVERNING VOTING AND DISTRIBUTIONS

### 6.1 *Voting of Claims*.

Each holder of an Allowed Claim in an impaired class of Claims as of the Voting Record Date that is entitled to vote on the Plan pursuant to Article III and Article IV of the Plan shall be entitled to vote separately to accept or reject the Plan, as provided in the Disclosure Statement Order.

### 6.2 *Nonconsensual Confirmation*.

If any impaired class of Claims entitled to vote shall not accept the Plan by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan in accordance with Section 14.4 of the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both. With respect to the classes of Subordinated Securities Claims and Old Equity Interests, both of which are deemed to reject the Plan, the Debtors shall request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

### 6.3 *Distributions On Account of General Unsecured Silicon Graphics Claims.*

Distributions with respect to holders of Allowed General Unsecured Silicon Graphics Claims shall only be made on each Distribution Date; *provided, however*, that, if any Disputed General Unsecured Silicon Graphics Claim becomes Allowed subsequent to the Initial Distribution Date, the Reorganized Debtors may, in their sole discretion, make a distribution with respect to such Claim prior to a Distribution Date. All Allowed General Unsecured Silicon Graphics Claims held by a creditor shall be aggregated and treated as a single Claim. At the written request of the Reorganized Debtors or the Disbursing Agent, any creditor holding multiple Allowed General Unsecured Silicon Graphics Claims shall provide to the Reorganized Debtors or the Disbursing Agent, as the case may be, a single address to which any distributions shall be sent.

### 6.4 *Date of Distributions*.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 6.5 *Disbursing Agent*.

All distributions under the Plan shall be made by Reorganized Silicon Graphics as Disbursing Agent or such other entity designated by Reorganized Silicon

Graphics as a Disbursing Agent. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court and, in the event that a Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by Reorganized Silicon Graphics.

### 6.6     *Rights and Powers of Disbursing Agent.*

The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (b) make all distributions contemplated hereby, (c) employ professionals to represent it with respect to its responsibilities and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

### 6.7     *Expenses of the Disbursing Agent.*

Except as otherwise ordered by the Bankruptcy Court, any reasonable fees and expenses incurred by the Disbursing Agent (including, without limitation, taxes and reasonable attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash by the Reorganized Debtors in the ordinary course of business.

### 6.8     *Delivery of Distributions.*

(a)     <u>Last Known Address.</u>  Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim or Allowed Administrative Expense Claim shall be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtors or its agents, as applicable, unless the Debtors or Reorganized Debtors have been notified in writing of a change of address, including, without limitation, by the filing of a proof of Claim by such holder that contains an address for such holder different than the address of such holder as set forth on the Schedules.  In the event that any distribution to any holder is returned as undeliverable, the Disbursing Agent shall use commercially reasonable efforts to determine the current address of such holder, but no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; provided that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interest in property shall be returned by the Disbursing Agent to the Reorganized Debtors and shall revert to Reorganized Silicon Graphics, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred; *provided, however*, that unclaimed distributions to holders of Allowed General Unsecured Silicon Graphics Claims shall be held by the Disbursing Agent and shall be redistributed on a *pro rata* basis to the other holders of Allowed General Unsecured Silicon Graphics Claims accordingly.

(b) Distributions by Prepetition Agent. The Prepetition Agent shall be the Disbursing Agent for the Prepetition Credit Agreement Claims. Distributions under the Plan to holders of Allowed Prepetition Credit Agreement Claims shall be made by the Reorganized Debtors to the Prepetition Agent, which, in turn, shall make the distributions to the holders of such Allowed Claims. Upon delivery of the distributions set forth in Section 4.4(b) of the Plan to the Prepetition Agent, the Reorganized Debtors shall be released of all liability with respect to the delivery of such distributions.

(c) Distributions by Indenture Trustee. The Indenture Trustee shall be the Disbursing Agent for the Secured Note Claims and the Cray Unsecured Debenture Claims. Distributions under the Plan to holders of Allowed Secured Note Claims and Allowed Cray Unsecured Debenture Claims shall be made by the Reorganized Debtors to the Indenture Trustee, which, in turn, shall make the distributions to the holders of such Allowed Claims, except that the distributions in respect of the Rights Offering shall be administered in accordance with Article IX of the Plan. Upon delivery of the distributions set forth in Article IV of the Plan, to the Indenture Trustee, the Reorganized Debtors shall be released of all liability with respect to the delivery of such distributions.

(d) Distributions by the Disbursing Agent for the General Unsecured Silicon Graphics Claims.

(i) On the Effective Date, the Debtors or the Reorganized Debtors shall fund $9.0 million in Cash into a segregated account maintained by the Disbursing Agent for the benefit of the holders of Allowed General Unsecured Silicon Graphics Claims. Any interest earned thereon shall be first applied towards the fees and expenses of such Disbursing Agent with respect to such account (including any taxes imposed on, or with respect to, the account), with any excess interest reverting to the Reorganized Debtors. Distributions under the Plan to holders of Allowed General Unsecured Silicon Graphics Claims shall be made by such Disbursing Agent directly to the holders of such Claims in accordance with Article IX of the Plan. Upon funding of such $9.0 million in Cash to the Disbursing Agent, the Reorganized Debtors shall be released of all liability with respect to the delivery of such distributions.

(ii) Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Disbursing Agent shall (a) treat the segregated account established under this Section 6.8(d) as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (b) to the extent permitted by applicable law, report consistently for state and local income tax purposes. All parties (including the Debtors, Reorganized Debtors and holders of General Unsecured Silicon Graphics Claims) shall report for tax purposes consistently with such treatment.

(iii) The Disbursing Agent may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all tax returns

filed for, or on behalf of, the segregated account established under this section 6.8(d) of the Plan for all taxable periods through the termination of such account.

(e) <u>Distribution Record Date.</u> With respect to holders of all General Unsecured Claims against the Debtors, on the Distribution Record Date, the claims register shall be closed. The Debtors and the Reorganized Debtors shall have no obligation to recognize any transfer of any Claims occurring after the close of business after such date.

### 6.9 *Manner of Payment*.

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

All distributions of Cash, New Common Stock and Subscription Rights, as applicable, to the creditors of the each of the Debtors under the Plan shall be made by, or on behalf of, the applicable Debtor. Reorganized Silicon Graphics shall make a capital contribution, either directly or indirectly, to the applicable Reorganized Debtor in an amount equal to the Cash to be distributed to the creditors of such Debtor, but only at such time as, and to the extent, the Cash is actually distributed to holders of Allowed Claims.

### 6.10 *No Fractional Distributions*.

No fractional shares of New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional shares. When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized shares of New Common Stock to be distributed to holders of Allowed Claims shall be adjusted as necessary to account for the foregoing rounding.

### 6.11 *Cash Distributions*.

No payment of Cash less than $100 shall be made to any holder of an Allowed Claim unless a request therefor is made in writing.

### 6.12 *Setoffs and Recoupment*.

The Debtors may, but shall not be required to, setoff against or recoup from any Claim any Claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or Reorganized Debtors of any such Claim it may have against such claimant.

6.13    *Allocation of Plan Distributions Between Principal and Interest.*

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

## ARTICLE VII

## PROCEDURES FOR TREATING DISPUTED
## CLAIMS UNDER PLAN OF REORGANIZATION

7.1    *Objections.*

As of the Effective Date, objections to, and requests for estimation of, Administrative Expense Claims and Claims against the Debtors may be interposed and prosecuted only by the Reorganized Debtors.  Such objections and requests for estimation shall be served on the respective claimant and filed with the Bankruptcy Court on or before the latest of (a) ninety (90) days after the Effective Date, (b) sixty (60) days after a proof of Claim has been filed with the claims agent appointed in the Reorganization Cases or (c) such later date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clauses (a) and (b) above.

7.2    *No Distributions Pending Allowance.*

Notwithstanding any other provision of the Plan, if any portion of an Administrative Expense Claim or Claim is Disputed, no payment or distribution provided hereunder shall be made on account of such Administrative Expense Claim or Claim unless and until such Disputed Administrative Expense Claim or Claim becomes Allowed; *provided, however,* that the Disbursing Agent shall make distributions on account of the non-Disputed portion of any General Unsecured Silicon Graphics Claim as set forth in Article IV of the Plan.

7.3    *Distributions After Allowance.*

To the extent that a Disputed Claim, Disputed Administrative Expense Claim or portion of a Disputed General Unsecured Silicon Graphics Claim becomes Allowed, distributions (if any) shall be made to the holder of such Claim in accordance with the provisions of the Plan.  Except with respect to General Unsecured Silicon Graphics Claims, as soon as practicable after the date that the order or judgment of the Bankruptcy Court Allowing any Disputed Claim or Disputed Administrative Expense Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Administrative Expense Claim or Claim the distribution (if any) to which such holder is entitled under the Plan.

### 7.4 *Resolution of Administrative Expense Claims and Claims*.

On and after the Effective Date, the Reorganized Debtors shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Administrative Expense Claims and Claims against the Debtors and to compromise, settle or otherwise resolve any Disputed Administrative Expense Claims and Disputed Claims against the Debtors without approval of the Bankruptcy Court, other than with respect to Administrative Expense Claims relating to compensation of professionals for fees and expenses incurred prior to the Confirmation Date.

### 7.5 *Estimation of Claims.*

The Debtors or the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Contingent Claim, Unliquidated Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether any of the Debtors or the Reorganized Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Contingent Claim, Unliquidated Claim or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

### 7.6 *Interest*.

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest thereon.

## ARTICLE VIII

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 8.1 *Assumption or Rejection of Executory Contracts and Unexpired Leases*.

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtors and any person or entity prior to the Commencement Date shall be deemed rejected by the Debtors as of the Effective Date, except for any executory contract or unexpired lease (a) that has been assumed pursuant to an order of the Bankruptcy Court entered prior

to the Effective Date, (b) as to which a motion for approval of the assumption of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date or (c) that is specifically designated as a contract or lease to be assumed on schedules 8.1(A) (executory contracts) or 8.1(B) (unexpired leases), which schedules shall be contained in the Plan Supplement and which shall be deemed to include all Customer Support Agreements, Non-Disclosure Agreements, IP License Agreements and agreements between the Debtors and any U.S. governmental entity; *provided, however*, that the Debtors reserve the right, on or prior to the Confirmation Date, to amend such schedules to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be, respectively, either rejected or assumed as of the Effective Date. The Debtors shall provide notice of any such amendments to the parties to the executory contracts and unexpired leases affected thereby. The listing of a document on schedules 8.1(A) or (B) shall not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder. Whether or not identified on schedules 8.1(A) or 8.1(B), all Customer Support Agreements, Non-Disclosure Agreements, IP License Agreements and agreements between the Debtors and any U.S. governmental entity shall be assumed on the Effective Date pursuant to the Plan. Whether or not identified on schedules 8.1(A) or 8.1(B), any and all outstanding purchase orders issued to the Debtors by the Debtors' customers shall be continued on the Effective Date.

8.2 ***Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases***.

Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (a) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed pursuant to Section 8.1 of the Plan, (b) the extension of time, pursuant to section 365(d)(4) of the Bankruptcy Code, within which the Debtors may assume, assume and assign or reject the executory contracts and unexpired leases specified in Section 8.1 of the Plan through the date of entry of an order approving the assumption, assumption and assignment or rejection of such executory contracts and unexpired leases and (c) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Section 8.1 of the Plan. The effect of confirmation of the Debtors' plan of reorganization and the results thereof and the transactions resulting therefrom or any other effect of the Reorganization Cases, including specifically the changes to the Debtors' boards of directors and equity interests, shall not be and are not a "change of control" and shall not trigger any such or similar provision of any of the executory contracts and unexpired leases assumed hereby.

### 8.3 *Inclusiveness*.

Unless otherwise specified on schedules 8.1(A) or (B) of the Plan Supplement, each executory contract and unexpired lease listed or to be listed therein shall include any and all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on such schedule.

### 8.4 *Cure of Defaults*.

Except to the extent that different treatment has been agreed to by the non-debtor party or parties to any executory contract or unexpired lease to be assumed pursuant to Section 8.1 of the Plan, the Debtors shall, pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, within at least twenty (20) days prior to the later of (a) the hearing on the Debtors' motion for assumption or assumption and assignment and (b) the Confirmation Hearing, file with the Bankruptcy Court and serve by first class mail on each non-debtor party to such executory contracts or unexpired leases to be assumed pursuant to Section 8.1 of the Plan, a notice, which shall list the cure amount as to each executory contract or unexpired lease to be assumed. The parties to such executory contracts or unexpired leases to be assumed or assumed and assigned by the Debtors shall have twenty (20) days from the date of service of such notice to file and serve any objection to the cure amounts listed by the Debtors. If there are any objections filed, the Bankruptcy Court shall hold a hearing on a date to be set by the Bankruptcy Court. Notwithstanding Section 8.1 of the Plan, the Debtors shall retain their rights to reject any of their executory contracts or unexpired leases that are subject to a dispute concerning amounts necessary to cure any defaults through the Effective Date.

### 8.5 *Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan*.

Proofs of Claim for damages arising out of the rejection of an executory contract or unexpired lease must be filed with the Bankruptcy Court and served upon the attorneys for the Debtors on or before the date that is thirty (30) days after the later of (a) the date of service of notice of the Confirmation Date, (b) notice of modification to schedules 8.1(A) or (B) of the Plan Supplement (solely with respect to the party directly affected by such modification) or (c) the date of service of notice of such later rejection date that occurs as a result of a dispute concerning amounts necessary to cure any defaults (solely with respect to the party directly affected by such rejection). In the event that the rejection of an executory contract or unexpired lease by the Debtors pursuant to the Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not evidenced by a timely filed proof of Claim, shall be forever barred and shall not be enforceable

against the Debtors or the Reorganized Debtors, or their properties or interests in property as agents, successors or assigns.

### 8.6 *Indemnification Obligations.*

Subject to the occurrence of the Effective Date, the obligations of the Debtors as of the Commencement Date to indemnify, defend, reimburse or limit the liability of directors, officers or employees who are directors, officers or employees of the Debtors on or after the Confirmation Date, respectively, against any claims or causes of action as provided in the Debtors' certificates of incorporation, bylaws, other organizational documents or applicable law, shall survive confirmation of the Plan, remain unaffected thereby and not be discharged, irrespective of whether such indemnification, defense, reimbursement or limitation is owed in connection with an event occurring before or after the Commencement Date.

### 8.7 *Insurance Policies.*

Notwithstanding anything contained in the Plan to the contrary, unless specifically rejected by order of the Bankruptcy Court, all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, are continued pursuant to the Final Insurance Order. Nothing contained in this Section shall constitute or be deemed a waiver of any cause of action that the Debtors may hold against any entity, including, without limitation, the insurer, under any of the Debtors' policies of insurance.

### 8.8 *Retiree Benefits.*

On and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, the Reorganized Debtors shall continue to pay all retiree benefits of the Debtors (within the meaning of and subject to section 1114 of the Bankruptcy Code) for the duration of the period for which the Debtors had obligated themselves to provide such benefits and subject to the right of the Reorganized Debtors to modify or terminate such retiree benefits in accordance with the terms thereof.

### 8.9 *Benefit Plans.*

All employee compensation and Benefit Plans of the Debtors, including Benefit Plans and programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Commencement Date and not since terminated, shall be deemed to be, and shall be treated as if they were, executory contracts that are assumed hereunder. The Debtors' obligations under such plans and programs shall survive confirmation of the Plan, except for (a) executory contracts or Benefit Plans rejected pursuant to the Plan (to the extent such rejection does not violate sections 1114 and 1129(a)(13) of the Bankruptcy Code), (b) executory contracts or employee Benefit Plans that have previously been rejected, are the subject of a motion to reject pending as of the Confirmation Date or have been specifically waived by the beneficiaries of any employee Benefit Plan or contract and (c) such executory contracts or employee Benefit Plans to the extent they relate to former

employees whose employment by the Debtors terminated prior to the Commencement Date. Notwithstanding anything to the contrary in the Plan or the Confirmation Order, no equity, stock, option or other similar plans in effect on or prior to the Commencement Date shall be assumed.

## ARTICLE IX

## THE RIGHTS OFFERING

### 9.1 *Issuance of Subscription Rights*.

Each holder of an Allowed Secured Note Claim that was a holder as of the Secured Note Rights Offering Record Date shall receive Subscription Rights entitling such holder to purchase its Ratable Proportion, as of the Secured Note Rights Offering Record Date, of 6,800,000 shares of New Common Stock, which New Common Stock shall be issued on the Effective Date or as soon thereafter as is practicable. Each holder of an Allowed Cray Unsecured Debenture Claim that was a holder as of the Cray Unsecured Debenture Rights Offering Record Date, shall receive Subscription Rights entitling such holder to purchase its Ratable Proportion, as of the Cray Unsecured Debenture Rights Offering Record Date, of 700,000 shares of New Common Stock, which New Common Stock shall be issued on the Effective Date or as soon thereafter as is practicable. Holders of Allowed Secured Note Claims and Allowed Cray Unsecured Debenture Claims, as of the applicable record dates, shall have the right, but not the obligation, to participate in the Rights Offering as provided herein.

### 9.2 *Subscription Period*.

The Rights Offering shall commence on the date Subscription Forms are mailed to holders of Allowed Secured Note Claims and Allowed Cray Unsecured Debenture Claims, which shall be no later than seven (7) Business Days after entry of the Disclosure Statement Order. Each holder of an Allowed Secured Note Claim and Allowed Cray Unsecured Debenture Claim intending to participate in the Rights Offering must affirmatively elect to exercise its Subscription Rights on or prior to the Subscription Expiration Date. After the Subscription Expiration Date and subject to the Lampe Conway Rights Offering Option, unexercised Subscription Rights shall be treated as acquired by the Backstop Purchasers and any exercise of such Subscription Rights by any entity other than the Backstop Purchasers shall be null and void and the Debtors shall not be obligated to honor any such purported exercise received by the Rights Offering Agent after the Subscription Expiration Date, regardless of when the documents relating to such exercise were sent.

### 9.3 *Subscription Purchase Price*.

Each holder of a Subscription Right shall be required to pay, on or prior to the Subscription Expiration Date, the Subscription Purchase Price for each share of New Common Stock to be issued thereunder.

### 9.4     *Exercise of Subscription Rights.*

In order to exercise Subscription Rights, each holder of an Allowed Secured Note Claim and Allowed Cray Unsecured Debenture Claim must: (a) be a holder as of the Secured Note Rights Offering Record Date or the Cray Unsecured Debenture Rights Offering Record Date, as applicable, (b) return a duly completed Subscription Form to the Rights Offering Agent so that such form is actually received by the Rights Offering Agent on or before the Subscription Expiration Date and (c) pay to the Rights Offering Agent on or before the Subscription Expiration Date the Subscription Purchase Price multiplied by the number of shares of New Common Stock it seeks to purchase in accordance with the wire instructions set forth on the Subscription Form or by bank or cashier's check delivered to the Rights Offering Agent together with the Subscription Form. If, on or prior to the Subscription Expiration Date, the Rights Offering Agent for any reason does not receive from a given holder of Subscription Rights both a duly completed Subscription Form and immediately available funds as set forth above, such holder shall be deemed to have relinquished and waived its right to participate in the Rights Offering. The payments made in accordance with the Rights Offering shall be deposited and held by the Rights Offering Agent in the Rights Offering Trust Account. The Rights Offering Trust Account will be maintained by the Rights Offering Agent for the purpose of holding the money for administration of the Rights Offering until the Effective Date or such other later date, at the option of the Reorganized Debtors. The Rights Offering Agent shall not use such funds for any other purpose and shall not encumber or permit such funds to be encumbered with any Lien or similar encumbrance.

Each holder of an Allowed Secured Note Claim or Allowed Cray Unsecured Debenture Claim, as of the applicable record dates, may exercise all or any portion of such holder's Subscription Rights pursuant to the Subscription Form. The valid exercise of Subscription Rights shall be irrevocable. In order to facilitate the exercise of the Subscription Rights, on the commencement date of the Rights Offering, the Debtors will mail the Subscription Form to each holder of an Allowed Secured Note Claim as of the Secured Note Rights Offering Record Date and each holder of an Allowed Cray Unsecured Debenture Claim as of the Cray Unsecured Debenture Rights Offering Record Date together with appropriate instructions for the proper completion, due execution and timely delivery of the Subscription Form, as well as instructions for payment. The Debtors may adopt such additional detailed procedures consistent with the provisions of this Article IX to more efficiently administer the exercise of the Subscription Rights.

### 9.5     *Transfer Restriction; Revocation.*

The Subscription Rights are not transferable. Any such transfer or attempted transfer is null and void and the Debtors will not treat any purported transferee as the holder of any Subscription Rights. Once the holder of an Allowed Secured Note Claim or Allowed Cray Unsecured Debenture Claim has properly exercised its Subscription Rights, such exercise will not be permitted to be revoked.

### 9.6 *Lampe Conway Rights Offering Option*.

Pursuant to the Global Settlement, any amount of New Common Stock not purchased pursuant to the Subscription Rights issued to holders of Allowed Cray Unsecured Debenture Claims may be purchased by Lampe Conway, prior to the Backstop Purchasers. Lampe Conway shall notify the Debtors in writing on or before five (5) days after the deadline to exercise such Subscription Rights if it elects to purchase the shares of New Common Stock not purchased pursuant to the Subscription Rights issued to holders of Allowed Cray Unsecured Debenture Claims and the amount thereof it so elects. Lampe Conway shall pay to the Rights Offering Agent, by wire transfer in immediately available funds prior to the Effective Date, Cash in an amount equal to the Subscription Purchase Price multiplied by the number of shares of New Common Stock it intends to purchase pursuant to the Lampe Conway Rights Offering Option. The Rights Offering Agent shall deposit such payment into the Rights Offering Trust Account. Any shares of New Common Stock not timely purchased and paid for by Lampe Conway pursuant to the Lampe Conway Rights Offering Option shall be purchased pursuant to the Backstop Commitment Agreement.

### 9.7 *Backstop of the Rights Offering*.

Any amount of New Common Stock not purchased pursuant to the Subscription Rights issued to the holders of Allowed Secured Note Claims and Allowed Cray Unsecured Debenture Claims and the Lampe Conway Rights Offering Option shall be purchased by the Backstop Purchasers pursuant to the terms and subject to the conditions of the Backstop Commitment Agreement at the same price provided in the Rights Offering. Pursuant to the terms and subject to the conditions of the Backstop Commitment Agreement, the Backstop Purchasers shall pay to the Rights Offering Agent, by wire transfer in immediately available funds prior to the Effective Date, Cash in an amount equal to the Subscription Purchase Price multiplied by the number of shares of New Common Stock not purchased pursuant to the Subscription Rights issued to the holders of Allowed Secured Note Claims. The Rights Offering Agent shall deposit such payment into the Rights Offering Trust Account.

In consideration for their agreement to backstop the Rights Offering, the Backstop Purchasers shall receive the Backstop Fee and Subscription Rights to purchase the Overallotment Shares, the allocation of which is set forth in the Backstop Commitment Agreement.

### 9.8 *Distribution of the New Common Stock.*

On the Effective Date or as soon as reasonably practicable thereafter, the Rights Offering Agent shall facilitate the distribution of the New Common Stock purchased pursuant to the Rights Offering.

### 9.9 *No Interest.*

No interest shall be paid to entities exercising Subscription Rights on account of amounts paid in connection with such exercise.

### 9.10 *Exercise of Subscription Rights.*

All questions concerning the timeliness, viability, form and eligibility of any exercise of Subscription Rights shall be determined by the Debtors, whose good-faith determinations shall be final and binding. The Debtors, in their reasonable discretion, may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as they may determine, or reject the purported exercise of any Subscription Rights. Subscription Forms shall be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Debtors determine in their reasonable discretion. The Debtors will use commercially reasonable efforts to give notice to any holder of Subscription Rights regarding any defect or irregularity in connection with any purported exercise of Subscription Rights by such holder and may permit such defect or irregularity to be cured within such time as they may determine in good-faith to be appropriate; *provided, however,* that neither the Debtors nor the Disbursing Agent shall incur any liability for failure to give such notification.

## ARTICLE X

## CORPORATE GOVERNANCE AND MANAGEMENT OF THE REORGANIZED DEBTORS

### 10.1 *General.*

On the Effective Date, the management, control and operation of Reorganized Silicon Graphics and the other Reorganized Debtors shall become the general responsibility of the New Boards of each Reorganized Debtor, respectively.

### 10.2 *New Organizational Documents.*

Each of the Reorganized Debtors shall be deemed to have adopted its respective New Organizational Documents effective as of the Effective Date. On the Effective Date, or as soon thereafter as practicable, the Reorganized Debtors shall file their New Organizational Documents, as required or deemed appropriate, with the appropriate Persons in their respective jurisdictions of incorporation or establishment. The New Organizational Documents, to the extent applicable, shall prohibit the

issuance of nonvoting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code.

### 10.3 *New Boards of the Reorganized Debtors*.

On the Effective Date, the operation of Reorganized Silicon Graphics shall become the general responsibility of its New Board, subject to, and in accordance with, its New Organizational Documents. The initial New Board of Reorganized Silicon Graphics shall consist of seven members, who shall be selected by the Ad Hoc Committee in consultation with the Debtors. The initial members of the New Boards of the Reorganized Debtors, together with biographical information, shall be set forth in the Plan Supplement.

### 10.4 *Officers of the Reorganized Debtors*.

The officers of the Debtors immediately prior to the Effective Date shall serve as the initial officers of the Reorganized Debtors on and after the Effective Date. Such officers shall serve in accordance with applicable non-bankruptcy law, any employment agreement entered into with the Reorganized Debtors on or after the Effective Date and the New Organizational Documents.

### 10.5 *Management Incentive Plan*.

On the Effective Date, Reorganized Silicon Graphics shall be deemed to have adopted the Management Incentive Plan. The solicitation of votes on the Plan shall include, and be deemed to be, a solicitation for approval of the Management Incentive Plan. Entry of the Confirmation Order shall constitute such approval.

### 10.6 *New Management Agreements*.

On the Effective Date or as soon thereafter as is practicable, Reorganized Silicon Graphics shall enter into the New Management Agreements.

## ARTICLE XI

## CONDITIONS PRECEDENT TO EFFECTIVE DATE

### 11.1 *Conditions Precedent to Effectiveness*.

The Effective Date shall not occur and the Plan shall not become effective unless and until the following conditions are satisfied in full or waived in accordance with Section 11.2 of the Plan:

(a)     The Confirmation Order, in form and substance acceptable to the Debtors, shall have been entered and is a Final Order;

(b)     The conditions precedent to the effectiveness of the Exit Facility and the Backstop Commitment Agreement are satisfied or waived by the

parties thereto and the Reorganized Debtors have access to funding under the Exit Facility;

(c)     The amount of Allowed General Unsecured Claims against the Debtors other than Silicon Graphics and the amount of Disputed General Unsecured Claims against the Debtors other than Silicon Graphics that the Debtors estimate in good faith, after consultation with the Ad Hoc Committee, will ultimately be Allowed shall not aggregate more than $1,000,000;

(d)     All actions and all agreements, instruments or other documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance satisfactory to the Debtors; and

(e)     All authorizations, consents and regulatory approvals, if any, required by the Debtors in connection with the consummation of the Plan are obtained and not revoked, including the expiration or termination of the notification and waiting periods applicable under the Hart-Scott Rodino Antitrust Improvement Act of 1976, as amended, with respect to distributions of any shares of New Common Stock pursuant to the Plan to any entity required to file a Premerger Notification and Report Form thereunder.

### 11.2   *Waiver of Conditions*.

Each of the conditions precedent in Section 11.1 hereof may be waived, in whole or in part, by the Debtors with the prior consent of the Ad Hoc Committee (which consent shall not be unreasonably withheld). Any such waivers may be effected at any time, without notice, without leave or order of the Bankruptcy Court and without any formal action.

### 11.3   *Satisfaction of Conditions*.

Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action. In the event that one or more of the conditions specified in Section 11.1 of the Plan have not occurred or otherwise been waived pursuant to Section 11.2 of the Plan, (a) the Confirmation Order shall be vacated, (b) the Debtors and all holders of Claims and interests including any Old Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred and (c) the Debtors' obligations with respect to Claims and equity interests shall remain unchanged and nothing contained herein shall constitute or be deemed a waiver or release of any Claims or equity interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

**ARTICLE XII**

**EFFECT OF CONFIRMATION**

12.1   *Vesting of Assets.*

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, the Debtors, their properties and interests in property and their operations shall be released from the custody and jurisdiction of the Bankruptcy Court, and all property of the estates of the Debtors shall vest in the Reorganized Debtors free and clear of all Claims, Liens, encumbrances, charges and other interests, except as provided in the Plan.  For the avoidance of doubt, such property of the estates does not include the $9.0 million funded to the Disbursing Agent pursuant to Section 4.6 of the Plan.  From and after the Effective Date, the Reorganized Debtors may operate their business and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules or the Local Bankruptcy Rules, subject to the terms and conditions of the Plan.

12.2   *Binding Effect.*

Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Old Equity Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or interests including any Old Equity Interest of such holder is impaired under the Plan, whether or not such holder has accepted the Plan and whether or not such holder is entitled to a distribution under the Plan.

12.3   *Discharge of Claims and Termination of Equity Interests.*

Except as provided in the Plan, the rights afforded in and the payments and distributions to be made under the Plan shall terminate all Old Equity Interests and discharge all existing debts and Claims of any kind, nature or description whatsoever against or in the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code.  Except as provided in the Plan, upon the Effective Date, all existing Claims against the Debtors and Old Equity Interests shall be, and shall be deemed to be, discharged and terminated, and all holders of such Claims and Old Equity Interests shall be precluded and enjoined from asserting against the Reorganized Debtors, their successors or assignees or any of their assets or properties, any other or further Claim or Old Equity Interest based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of Old Equity Interest and whether or not the facts or legal bases therefore were known or existed prior to the Effective Date.

12.4   *Discharge.*

Upon the Effective Date, in consideration of the distributions to be made under the Plan and except as otherwise expressly provided in the Plan, each

holder (as well as any trustees and agents on behalf of each holder) of a Claim or Old Equity Interest and any Affiliate of such holder shall be deemed to have forever waived, released and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Old Equity Interests, rights and liabilities that arose prior to the Effective Date. Upon the Effective Date, all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Old Equity Interest in the Debtors.

12.5    *Injunction or Stay*.

Except as otherwise expressly provided herein or in the Confirmation Order, all Persons or entities who have held, hold or may hold Claims against or Old Equity Interests in are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Old Equity Interest against any of the Reorganized Debtors, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any Reorganized Debtor with respect to such Claim or Old Equity Interest, (c) creating, perfecting or enforcing any encumbrance of any kind against any Reorganized Debtor or against the property or interests in property of any Reorganized Debtor with respect to such Claim or Old Equity Interest, (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due to any Reorganized Debtor or against the property or interests in property of any Reorganized Debtor with respect to such Claim or Old Equity Interest and (e) pursuing any claim released pursuant to this Article XII of the Plan.

12.6    *Terms of Injunction or Stay*.

Unless otherwise provided in the Confirmation Order, all injunctions or stays arising under or entered during the Reorganization Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, that are in existence on the Confirmation Date shall remain in full force and effect until the Effective Date.

12.7    *Exculpation*.

**Notwithstanding anything herein to the contrary, as of the Effective Date, none of the Debtors, the Reorganized Debtors, the lenders party to the Postpetition Financing Agreement, the Backstop Purchasers, the Creditors' Committee, the Indenture Trustees, Lampe Conway and the Ad Hoc Committee and their respective officers, directors, members, employees, accountants, financial advisors, investment bankers, agents, restructuring advisors and attorneys and representatives (but, in each case, solely in their capacities as such) shall have or incur any liability for any Claim, cause of action or other assertion of liability for any act taken or omitted to be taken in connection with, or arising out of, the Reorganization Cases, the formulation, dissemination, confirmation, consummation or administration of the Plan,**

property to be distributed under the Plan or any other act or omission in connection with the Reorganization Cases, the Plan, the Disclosure Statement or any contract, instrument, document or other agreement related thereto; *provided, however*, that the foregoing shall not affect the liability of any person that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct or gross negligence.  Nothing in this Section 12.7 shall limit the liability of the professionals of the Debtors, the Reorganized Debtors, the lenders party to the Postpetition Financing Agreement, the Backstop Purchasers, the Creditors' Committee, the Indenture Trustees, Lampe Conway and the Ad Hoc Committee to their respective clients pursuant to DR 6-102 of the Code of Professional Responsibility.

12.8    *Releases.*

Effective as of the Confirmation Date but subject to the occurrence of the Effective Date, and in consideration of the services of (a) the present and former directors, officers, members, employees, affiliates, agents, financial advisors, restructuring advisors, attorneys and representatives of or to the Debtors who acted in such capacities after the Commencement Date; (b) the lenders party to the Postpetition Financing Agreement; (c) the Backstop Purchasers; (d) the Ad Hoc Committee; (e) each Indenture Trustee; (f) the Creditors' Committee; (g) Lampe Conway and (h) the holder of the Allowed Secured Note Claims, (x) the Debtors; (y) each holder of a Claim that votes to accept the Plan (or is deemed to accept the Plan) and (z) to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each holder of a Claim that does not vote to accept the Plan, shall release unconditionally and forever each present or former director, officer, member, employee, affiliate, agent, financial advisor, restructuring advisor, attorney and representative (and their respective affiliates) of the Debtors who acted in such capacity after the Commencement Date, the lenders party to the Postpetition Financing Agreement, the Backstop Purchasers, the Ad Hoc Committee, each Indenture Trustee, the Creditors' Committee, Lampe Conway, each holder of an Allowed Secured Note Claim and each of their respective members, officers, directors, agents, financial advisors, attorneys, employees, equity holders, parent corporations, subsidiaries, partners, affiliates and representatives (but, in each case, solely in their capacities as such) from any and all Claims or causes of action whatsoever in connection with, related to, or arising out of the Reorganization Cases, the pursuit of confirmation of the Plan, the consummation thereof, the administration thereof or the property to be distributed thereunder; *provided, however*, that the foregoing shall not operate as a waiver of or release from any causes of action arising out of the willful misconduct or gross negligence of any such person or entity.

### 12.9   *Avoidance Actions/Objections*.

Other than any releases granted herein, by the Confirmation Order and by Final Order of the Bankruptcy Court, as applicable, from and after the Effective Date, pursuant to the Global Settlement, the Reorganized Debtors shall have the right to prosecute any and all avoidance actions, recovery causes of action and objections to Claims under sections 105, 502, 510, 542 through 546, 548 through 551, and 553 of the Bankruptcy Code that belong to the Debtors or Debtors in Possession and any and all avoidance actions, recovery causes of action and objections to Claims under section 547 of the Bankruptcy Code that belong to the Debtors or Debtors in Possession against those entities or individuals identified in schedule 12.9 of the Plan Supplement. In connection with Distributions on account of General Unsecured Silicon Graphics Claims, the Debtors or the Reorganized Debtors shall, in good faith, determine the Claim each defendant in an avoidance action would have against Silicon Graphics, and each such defendant shall be deemed to hold a Disputed General Unsecured Silicon Graphics Claims in the amount so determined pending the disposition of such cause of action or the lapse of the applicable time period for such cause of action to be initiated. Distributions on account of such Disputed General Unsecured Silicon Graphics Claims shall be made in accordance with Section 6.3 of the Plan to the extent such Disputed General Unsecured Silicon Graphics Claims become Allowed.

## ARTICLE XIII

## RETENTION OF JURISDICTION

The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, or related to, the Reorganization Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code, including, without limitation:

(a)   To hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases, the allowance of Claims and Administrative Expense Claims resulting therefrom and any disputes with respect to executory contracts or unexpired leases relating to facts and circumstances arising out of or relating to the Reorganization Cases;

(b)   To determine any and all adversary proceedings, applications and contested matters;

(c)   To hear and determine all applications for compensation and reimbursement of expenses under sections 330, 331 and 503(b) of the Bankruptcy Code;

(d)   To hear and determine any timely objections to, or requests for estimation of Disputed Administrative Expense Claims and Disputed

Claims, in whole or in part and otherwise resolve disputes as to Administrative Expense Claims;

(e)     To resolve disputes as to the ownership of any Administrative Expense Claim, Claim or Old Equity Interest;

(f)     To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(g)     To issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(h)     To consider any amendments to or modifications of the Plan or to cure any defect or omission, or reconcile any inconsistency, in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(i)     To hear and determine disputes or issues arising in connection with the interpretation, implementation or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated hereby, any agreement, instrument, or other document governing or relating to any of the foregoing or any settlement approved by the Bankruptcy Court;

(j)     To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including, without limitation, any request by the Debtors prior to the Effective Date or by the Reorganized Debtors, the Trustee or the Disbursing Agent after the Effective Date for an expedited determination of tax under section 505(b) of the Bankruptcy Code);

(k)     To hear and determine all disputes involving the existence, scope, nature or otherwise of the discharges, releases, injunctions and exculpations granted under the Plan, the Confirmation Order or the Bankruptcy Code;

(l)     To issue injunctions and effect any other actions that may be necessary or appropriate to restrain interference by any person or entity with the consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

(m)     To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)     To hear and determine any rights, Claims or causes of action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory;

(o)     To recover all assets of the Debtors and property of the Debtors' estates, wherever located;

(p)     To enter a final decree closing the Reorganization
Cases; and

(q)     To hear any other matter not inconsistent with the
Bankruptcy Code.

## ARTICLE XIV

## MISCELLANEOUS PROVISIONS

### 14.1   *Effectuating Documents and Further Transactions.*

On or before the Effective Date, and without the need for any further
order or authority, the Debtors shall file with the Bankruptcy Court or execute, as
appropriate, such agreements and other documents that are in form and substance
satisfactory to them as may be necessary or appropriate to effectuate and further
evidence the terms and conditions of the Plan.  The Reorganized Debtors are
authorized to execute, deliver, file, or record such contracts, instruments, releases,
indentures and other agreements or documents and take such actions as may be
necessary or appropriate to effectuate and further evidence the terms and conditions of
the Plan and any securities issued pursuant to the Plan.

### 14.2   *Withholding and Reporting Requirements.*

In connection with the Plan and all instruments issued in connection
therewith and distributed thereon, any party issuing any instrument or making any
distribution under the Plan shall comply with all applicable withholding and reporting
requirements imposed by any federal, state or local taxing authority, and all
distributions under the Plan shall be subject to any such withholding or reporting
requirements.  Notwithstanding the above, each holder of an Allowed Claim that is to
receive a distribution under the Plan shall have the sole and exclusive responsibility
for the satisfaction and payment of any tax obligations imposed on such holder by any
governmental unit, including income, withholding and other tax obligations, on
account of such distribution.  Any party issuing any instrument or making any
distribution under the Plan has the right, but not the obligation, to not make a
distribution until such holder has made arrangements satisfactory to such issuing or
disbursing party for payment of any such tax obligations.

### 14.3   *Corporate Action.*

On the Effective Date, all matters provided for under the Plan that
would otherwise require approval of the stockholders or directors of one or more of
the Debtors or Reorganized Debtors, including, without limitation, the authorization to
issue or cause to be issued the New Common Stock and the Subscription Rights, the
effectiveness of the New Organizational Documents, the election or appointment, as
the case may be, of directors and officers of the Reorganized Debtors pursuant to the
Plan and the authorization and approval of the New Management Agreements, shall be
in effect from and after the Effective Date pursuant to the applicable general

corporation law of the states in which the Debtors or the Reorganized Debtors are incorporated, without any requirement of further action by the stockholders or directors of the Debtors or the Reorganized Debtors. On the Effective Date, or as soon thereafter as is practicable, the Reorganized Debtors shall, if required, file their amended certificates of incorporation with the Secretary of State of the state in which each such entity is (or will be) organized, in accordance with the applicable general business law of each such jurisdiction.

### 14.4   *Modification of Plan.*

Subject to the prior consent of the Ad Hoc Committee (which consent shall not be unreasonably withheld), after consultation with the Creditors' Committee and as otherwise provided for in the Global Settlement, alterations, amendments or modifications of or to the Plan may be proposed in writing by the Debtors at any time prior to the Confirmation Date, provided that the Plan, as altered, amended or modified satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code and the Debtors shall have complied with section 1125 of the Bankruptcy Code. Subject to the prior consent of the Ad Hoc Committee (which consent shall not be unreasonably withheld) and after consultation with the Creditors' Committee and as otherwise provided for in the Global Settlement, the Plan may be altered, amended or modified at any time after the Confirmation Date and before substantial consummation, provided that the Plan, as altered, amended or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended or modified, under section 1129 of the Bankruptcy Code and the circumstances warrant such alterations, amendments or modifications. A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.

Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan of Reorganization without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or equity interests.

For the avoidance of doubt, the foregoing shall not effect a waiver of any rights that any party may have with respect to modification of the Plan under section 1127 of the Bankruptcy Code.

### 14.5   *Revocation or Withdrawal of the Plan.*

The Debtors reserve the right to revoke or withdraw the Plan, in whole or in part, prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan in whole prior to the Confirmation Date, then the Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Old Equity Interests by or against the Debtors or any other

person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors. The Debtors reserve the right to withdraw the Plan with respect to any Debtors and proceed with confirmation of the Plan with respect to any other Debtors. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims against or equity interests in such Debtors withdrawn from the Plan or any other person or to prejudice in any manner the rights of such Debtors or any person in any further proceedings involving such withdrawn Debtors.

### 14.6 *Plan Supplement*.

The Plan Supplement and the documents contained therein shall be in form, scope and substance satisfactory to the Debtors, and shall be filed with the Bankruptcy Court no later than five (5) Business Days before the deadline for voting to accept or reject the Plan, provided that the documents included therein may thereafter be amended and supplemented prior to execution upon notice to and consultation with the Creditors' Committee, Lampe Conway and the Ad Hoc Committee, where reasonably necessary. The Plan Supplement and the documents contained therein are incorporated into and made a part of the Plan as if set forth in full herein.

### 14.7 *Payment of Statutory Fees*.

All fees payable under section 1930 of chapter 123 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.

### 14.8 *Post-Confirmation Date Professional Fees and Expenses*.

From and after the Confirmation Date, the Reorganized Debtors shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of professional persons thereafter incurred by the Reorganized Debtors.

### 14.9 *Dissolution of the Creditors' Committee*.

On the Effective Date, the Creditors' Committee shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Reorganization Cases, and the retention or employment of the Creditors' Committee's attorneys, accountants and other agents, if any, shall terminate other than for purposes of filing and prosecuting applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith.

### 14.10 *Indenture Trustee as Claim Holder*.

Consistent with Bankruptcy Rule 3003(c), the Reorganized Debtors shall recognize proofs of Claim timely filed by any Indenture Trustee in respect of any Claims under the Indentures. Accordingly, any Claim, proof of which is filed by the registered or beneficial holder of a Claim, is disallowed as duplicative of the Claim of the applicable Indenture Trustee, without any further action of the Bankruptcy Court.

### 14.11 *Exemption from Transfer Taxes*.

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under or in connection with the Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, the New Common Stock, the Subscription Rights, the Exit Facility, any merger agreements or agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

### 14.12 *Expedited Tax Determination*.

The Debtors and the Reorganized Debtors are authorized to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for any or all returns filed for, or on behalf of, the Debtors for any and all taxable periods (or portions thereof) ending after the Commencement Date through and including the Effective Date.

### 14.13 *Exhibits/Schedules*.

All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full herein.

### 14.14 *Substantial Consummation*.

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 14.15 *Severability of Plan Provisions*.

In the event that, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the

terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation unless such holding, alteration or interpretation materially impairs the treatment to holders of Secured Note Claims, Cray Unsecured Debenture Claims and General Unsecured Silicon Graphics Claims under the Plan. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable in accordance with its terms.

14.16 *Governing Law*.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit to the Plan or Plan Supplement provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit), the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to its principles of conflict of laws.

14.17 *Notices*.

All notices, requests and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> Silicon Graphics, Inc.
> 1200 Crittenden Lane
> Mountain View, California 94043
> Attn: Barry Weinert, Esq.
> Title: VP, General Counsel
> Telephone: (650) 960-1980
> Telecopier: (650) 933-0298
>
> - and -
>
> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, New York 10153
> Attn:   Gary T. Holtzer, Esq.
>         Stephen A. Youngman, Esq.
>         Shai Y. Waisman, Esq.
> Telephone: (212) 310-8000
> Telecopier: (212) 310-8007

Dated: September 15, 2006

Respectfully submitted,

SILICON GRAPHICS, INC.
SILICON GRAPHICS FEDERAL, INC.
SILICON GRAPHICS WORLD TRADE
   CORPORATION
CRAY RESEARCH, L.L.C.
SILICON GRAPHICS REAL ESTATE, INC.
SILICON STUDIO, INC.
CRAY RESEARCH AMERICA LATINA LTD.
CRAY RESEARCH EASTERN EUROPE LTD.
CRAY RESEARCH INDIA LTD.
CRAY RESEARCH INTERNATIONAL, INC.
CRAY FINANCIAL CORPORATION
CRAY ASIA/PACIFIC, INC.
PARAGRAPH INTERNATIONAL, INC.
WTI DEVELOPMENT, INC.

By:_____

    Name:  Kathy Lanterman
    Title:   Senior Vice President and
            Chief Financial Officer

EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
**In re**                          :

                              :       **Chapter 11 Case No.**

                              :

**SILICON GRAPHICS, INC.,** *et al.*,     :       **06-10977 (BRL)**

                              :

            **Debtors.**            :       **(Jointly Administered)**

                              :
------------------------------------------------------------x


## DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, AS MODIFIED


WEIL, GOTSHAL & MANGES LLP
Attorneys for Debtors and
   Debtors In Possession
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

Dated: ~~July 27,~~ September 15, 2006

# TABLE OF CONTENTS

**Page**

| | | | |
|---|---|---|---|
| Article I | | DEFINITIONS AND INTERPRETATION | 1 |
| | A. | Definitions | 1 |
| | 1.1 | 6.50% Indenture | 1 |
| | 1.2 | 11.75% Indenture | 1 |
| | 1.3 | Administrative Expense Claim | 1 |
| | 1.4 | Ad Hoc Committee | 2 |
| | 1.5 | Affiliate | 2 |
| | 1.6 | Allowed | 2 |
| | 1.7 | Backstop Commitment Agreement | 2 |
| | 1.8 | Backstop Fee | 2 |
| | 1.9 | Backstop Purchasers | 2 |
| | 1.10 | Ballot | 3 |
| | 1.11 | Bankruptcy Code | 3 |
| | 1.12 | Bankruptcy Court | 3 |
| | 1.13 | Bankruptcy Rules | 3 |
| | 1.14 | Benefit Plans | 3 |
| | 1.15 | Business Day | 3 |
| | 1.16 | Cash | 3 |
| | 1.17 | Charging Lien | 3 |
| | 1.18 | Claim | 3 |
| | 1.19 | Collateral | 3 |
| | 1.20 | Commencement Date | 3 |
| | 1.21 | Confirmation Date | 34 |
| | 1.22 | Confirmation Hearing | 4 |
| | 1.23 | Confirmation Order | 4 |
| | 1.24 | Contingent Claim | 4 |
| | 1.25 | Cray Asia/Pacific Equity Interests | 4 |
| | 1.26 | Cray Financial Equity Interests | 4 |
| | 1.27 | Cray Indenture | 4 |

| | | |
|---|---|---|
| 1.28 | Cray Indenture Trustee Fees | 4 |
| 1.29 | Cray Research America Latina Equity Interests | 4 |
| 1.30 | Cray Research Eastern Europe Equity Interests | 4 |
| 1.31 | Cray Research India Equity Interests | 5 |
| 1.32 | Cray Research International Equity Interests | 5 |
| 1.33 | Cray Research LLC Equity Interests | 5 |
| 1.34 | Cray Unsecured Debentures | 5 |
| 1.35 | Cray Unsecured Debenture Claim | 5 |
| 1.36 | Cray Unsecured Debenture Rights Offering Record Date | 5 |
| 1.37 | Creditors' Committee | 5 |
| 1.38 | Customer Support Agreements | 5 |
| 1.39 | Debtors | 5 |
| 1.40 | Debtors in Possession | 5 |
| 1.41 | DIP Lenders | 56 |
| 1.42 | Disbursing Agent | 6 |
| 1.43 | Disclosure Statement | 6 |
| 1.44 | Disclosure Statement Order | 6 |
| 1.45 | Disputed | 6 |
| 1.46 | Distribution Date | 6 |
| 1.47 | Distribution Pro Rata Share | 7 |
| 1.48 | Distribution Record Date | 7 |
| 1.49 | Effective Date | 7 |
| 1.50 | Exit Facility | 7 |
| 1.51 | Final Distribution Date means | 7 |
| 1.52 | Final Insurance Order | 7 |
| 1.53 | Final Order | 7 |
| 1.54 | General Unsecured Claim | 8 |
| 1.55 | General Unsecured Cray Asia/Pacific Claim | 8 |
| 1.56 | General Unsecured Cray Financial Claim | 8 |

| | | |
|---|---|---|
| 1.57 | General Unsecured Cray Research America Latina Claim | 8 |
| 1.58 | General Unsecured Cray Research Eastern Europe Claim | 8 |
| 1.59 | General Unsecured Cray Research India Claim | 8 |
| 1.60 | General Unsecured Cray Research International Claim | 8 |
| 1.61 | General Unsecured Cray Research LLC Claim | 8 |
| 1.62 | General Unsecured Paragraph Claim | 8 |
| 1.63 | General Unsecured SGI Federal Claim | 8 |
| 1.64 | General Unsecured SGI Real Estate Claim | 8 |
| 1.65 | General Unsecured SGI World Trade Claim | ~~8~~9 |
| 1.66 | General Unsecured Silicon Graphics Claim | 9 |
| 1.67 | General Unsecured Silicon Studio Claim | 9 |
| 1.68 | General Unsecured WTI Claim | 9 |
| 1.69 | Global Settlement | 9 |
| 1.70 | Global Settlement Agreement | 9 |
| 1.71 | Indentures | 9 |
| 1.72 | Indenture Trustee | 9 |
| 1.73 | Indenture Trustee Fees | 9 |
| 1.74 | Initial Distribution Date | 9 |
| 1.75 | Intercompany Claim | ~~9~~10 |
| 1.76 | ~~Lampe Conway~~IP License Agreements | 10 |
| 1.77 | Lampe Conway ~~Rights Offering Common Stock Purchase Agreement~~ | 10 |
| 1.78 | Lampe Conway Rights Offering Option | 10 |
| 1.79 | Lien | 10 |
| 1.80 | Liquidating Trust | 10 |
| 1.81 | Liquidating Trust Agreement | 10 |
| 1.82 | Liquidating Trust Assets | 10 |
| 1.83 | Local Bankruptcy Rules | 10 |
| 1.84 | Management Incentive Plan | 10 |

1.85    New Board .................................................. 10

1.86    New Common Stock ........................................ 10

1.87    New Management Agreements .............................. 11

1.88    New Organizational Documents ........................... 11

1.89    Non-Debtor Subsidiary .................................... 11

1.90    ~~Non-Disclosure Agreements~~ ........................... ~~11~~

1.91    Old Equity Interests ..................................... 11

~~1.91~~    ~~Other Priority Claim~~ ............................... ~~11~~

1.92    Other ~~Secured~~Priority Claim .......................... 11

1.93    Other Secured Claim ...................................... ~~11~~

1.94    Overallotment Shares ..................................... 11

~~1.94~~1.95                        Paragraph Equity Interests    11

~~1.95~~1.96                                            Person    11

~~1.96~~    ~~Plan~~ ................................................ ~~11~~

1.97    Plan 11

1.98    Plan Supplement .......................................... 12

~~1.98~~    ~~Postpetition Financing Agreement~~ ................... ~~12~~

1.99    Postpetition Financing ~~Obligation~~Agreement ........... 12

1.100   Postpetition Financing Obligation ....................... ~~12~~

1.101   Postpetition Financing Order ............................ 12

~~1.101~~    ~~Prepetition Agent~~ ................................ ~~12~~

1.102   Prepetition ~~Credit Agreement~~Agent .................... 12

1.103   Prepetition Credit Agreement ~~Claim~~ .................. 12

1.104   ~~Priority Tax~~Prepetition Credit Agreement Claim ....... 13

1.105   Priority Tax Claim ....................................... 13

1.106   Ratable Proportion ....................................... 13

~~1.106~~1.107                        Registration Rights Agreement    13

~~1.107~~1.108                                   Reorganization Cases    13

~~1.108~~1.109                                     Reorganized Debtors    13

1.109    Reorganized Silicon Graphics .................................... 13

1.110    Rights OfferingReorganized Silicon Graphics .................... 13

1.111    Rights Offering Agent .......................................... 13

1.112    Rights Offering Agent .......................................... 13

1.113    Rights Offering Trust Account .................................. 13

1.1131.114    Schedules .......................................... 13

1.114    Secured Claim .................................................. 13

1.115    Secured Tax Claim .............................................. 14

1.116    Secured NoteTax Claim .......................................... 14

1.117    Secured Note Deficiency Claim .................................. 14

1.118    Secured Note Deficiency Claim .................................. 14

1.119    Secured Note Rights Offering Record Date ....................... 14

1.1191.120    Senior Secured Convertible Notes .............. 14

1.1201.121    Senior Secured Notes .......................... 141.121

1.122    SGI Federal Equity Interests ................................... 14

1.123    SGI Federal Equity Interests ................................... 14

1.124    SGI Real Estate Equity Interests ............................... 14

1.124    SGI World Trade ................................................ 14

1.125    SGI World Trade Equity Interests ............................... 14

1.126    Silicon GraphicsSGI World Trade Equity Interests ............... 14

1.127    Silicon Graphics .............................................. 15

1.128    Silicon Studio Equity Interests ............................... 15

1.1281.129    Subordinated Securities Claim ............. 15

1.1291.130    Subscription Expiration Date .............. 15

1.1301.131    Subscription Form ......................... 15

1.1311.132    Subscription Purchase Price ............... 15

1.1321.133    Subscription Right ........................ 15

1.1331.134    Tax Code .................................. 15

1.1341.135    Trust Advisory Board ...................... 15

# TABLE OF CONTENTS
## (continued)

Page

| | | | |
|---|---|---|---|
| | ~~1.135~~1.136 | Trustee | 15 |
| | ~~1.136~~1.137 | U.S. Trustee | ~~15~~16 |
| | ~~1.137~~1.138 | Unliquidated Claim | 16 |
| | ~~1.138~~1.139 | Voting Record Date | 16 |
| | ~~1.139~~1.140 | WTI Equity Interests | 16 |
| B. | | Interpretation; Application of Definitions and Rules of Construction | 16 |
| C. | | Relief Sought by Filing the Plan | 16 |
| Article II | | PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS | 16 |
| | 2.1 | Administrative Expense Claims | 16 |
| | 2.2 | Postpetition Financing Agreement | 17 |
| | 2.3 | Professional Compensation and Reimbursement Claims | 17 |
| | 2.4 | Indenture Trustee Fees | 17 |
| | 2.5 | Priority Tax Claims | 18 |
| Article III | | CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS, IMPAIRMENT AND VOTING | 19 |
| Article IV | | PROVISIONS FOR TREATMENT OF CLAIMS AND EQUITY INTERESTS | 20 |
| | 4.1 | Other Priority Claims (Class 1) | 20 |
| | 4.2 | Secured Tax Claims (Class 2) | 20 |
| | 4.3 | Other Secured Claims (Class 3) | 21 |
| | 4.4 | Prepetition Credit Agreement Claims (Class 4) | 21 |
| | 4.5 | Secured Note Claims (Class 5) | 22 |
| | 4.6 | General Unsecured Silicon Graphics Claims (Class 6) | 22 |
| | 4.7 | Cray Unsecured Debenture Claims (Class 7) | 22 |
| | 4.8 | Subordinated Securities Claims (Class 8) | 23 |
| | 4.9 | Old Equity Interests (Class 9) | 23 |
| | 4.10 | General Unsecured SGI Federal Claims (Class 10) | 23 |

**TABLE OF CONTENTS**
**(continued)**

Page

| | | |
|---|---|---|
| 4.11 | SGI Federal Equity Interests (Class 11) | 24 |
| 4.12 | General Unsecured SGI World Trade Claims (Class 12) | 24 |
| 4.13 | SGI World Trade Equity Interests (Class 13) | 24 |
| 4.14 | General Unsecured Cray Research LLC Claims (Class 14) | 24 |
| 4.15 | Cray Research LLC Equity Interests (Class 15) | 25 |
| 4.16 | General Unsecured SGI Real Estate Claims (Class 16) | 25 |
| 4.17 | SGI Real Estate Equity Interests (Class 17) | 25 |
| 4.18 | General Unsecured Silicon Studio Claims (Class 18) | 25 |
| 4.19 | Silicon Studio Equity Interests (Class 19) | 26 |
| 4.20 | General Unsecured Cray Research America Latina Claims (Class 20) | 26 |
| 4.21 | Cray Research America Latina Equity Interests (Class 21) | 26 |
| 4.22 | General Unsecured Cray Research Eastern Europe Claims (Class 22) | 26 |
| 4.23 | Cray Research Eastern Europe Equity Interests (Class 23) | 27 |
| 4.24 | General Unsecured Cray Research India Claims (Class 24) | 27 |
| 4.25 | Cray Research India Equity Interests (Class 25) | 27 |
| 4.26 | General Unsecured Cray Research International Claims (Class 26) | 27 |
| 4.27 | Cray Research International Equity Interests (Class 27) | 28 |
| 4.28 | General Unsecured Cray Financial Claims (Class 28) | 28 |
| 4.29 | Cray Financial Equity Interests (Class 29) | 28 |
| 4.30 | General Unsecured Cray Asia/Pacific Claims (Class 30) | 28 |
| 4.31 | Cray Asia/Pacific Equity Interests (Class 31) | 29 |
| 4.32 | General Unsecured Paragraph Claims (Class 32) | 29 |
| 4.33 | Paragraph Equity Interests (Class 33) | 29 |
| 4.34 | General Unsecured WTI Claims (Class 34) | 29 |

| | | | |
|---|---|---|---|
| | 4.35 | WTI Equity Interests (Class 35) | 30 |
| Article V | | MEANS OF IMPLEMENTATION | 30 |
| | 5.1 | Settlement of Claims | 30 |
| | 5.2 | Intercompany Claims | 30 |
| | 5.3 | Merger/Dissolution/Consolidation | 31 |
| | 5.4 | Cancellation of Existing Securities and Agreements | 31 |
| | 5.5 | Surrender of Existing Securities | 31 |
| | 5.6 | Incurrence of New Indebtedness | 32 |
| | 5.7 | Issuance of New Common Stock | 32 |
| | 5.8 | Exemption from Securities Laws | 32 |
| | 5.9 | Hart-Scott-Rodino Compliance | 33 |
| | 5.10 | Registration Rights Agreement | 33 |
| | 5.11 | The Liquidating Trust | 33 |
| Article VI | | PROVISIONS GOVERNING VOTING AND DISTRIBUTIONS | 37 |
| | 6.1 | Voting of Claims | 37 |
| | 6.2 | Nonconsensual Confirmation | 37 |
| | 6.3 | Distributions On Account of General Unsecured Silicon Graphics Claims | 37 |
| | 6.4 | Date of Distributions | 37 |
| | 6.5 | Disbursing Agent | 37 |
| | 6.6 | Rights and Powers of Disbursing Agent | 38 |
| | 6.7 | Expenses of the Disbursing Agent | 38 |
| | 6.8 | Delivery of Distributions | 38 |
| | 6.9 | Manner of Payment | 40 |
| | 6.10 | No Fractional Distributions | 40 |
| | 6.11 | Cash Distributions | 40 |
| | 6.12 | Setoffs and Recoupment | 40 |
| | 6.13 | Allocation of Plan Distributions Between Principal and Interest | 41 |

Article VII      PROCEDURES FOR TREATING DISPUTED CLAIMS UNDER PLAN OF REORGANIZATION ............... 41

7.1    Objections ............... 41

7.2    No Distributions Pending Allowance ............... 41

7.3    Distributions After Allowance ............... 41

7.4    Resolution of Administrative Expense Claims and Claims ............... 42

7.5    Estimation of Claims ............... 42

7.6    Interest ............... 42

Article VIII      EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............... 42

8.1    Assumption or Rejection of Executory Contracts and Unexpired Leases ............... 42

8.2    Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases ............... 43

8.3    Inclusiveness ............... 4344

8.4    Cure of Defaults ............... 4344

8.5    Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan ............... 44

8.6    Indemnification Obligations ............... 4445

8.7    Insurance Policies ............... 45

8.8    Retiree Benefits ............... 45

8.9    Benefit Plans ............... 45

Article IX      THE RIGHTS OFFERING ............... 4546

9.1    Issuance of Subscription Rights ............... 4546

9.2    Subscription Period ............... 4546

9.3    Subscription Purchase Price ............... 46

9.4    Exercise of Subscription Rights ............... 4647

9.5    Transfer Restriction; Revocation ............... 47

9.6    Lampe Conway Rights Offering Option ............... 4748

| | | | |
|---|---|---|---|
| | 9.7 | Backstop of the Rights Offering | 4748 |
| | 9.8 | Distribution of the New Common Stock | 4849 |
| | 9.9 | No Interest | 4849 |
| | 9.10 | Exercise of Subscription Rights | 4849 |
| Article X | | CORPORATE GOVERNANCE AND MANAGEMENT OF THE REORGANIZED DEBTORS | 4849 |
| | 10.1 | General | 4849 |
| | 10.2 | New Organizational Documents | 49 |
| | 10.3 | New Boards of the Reorganized Debtors | 4950 |
| | 10.4 | Officers of the Reorganized Debtors | 4950 |
| | 10.5 | Management Incentive Plan | 4950 |
| | 10.6 | New Management Agreements | 4950 |
| Article XI | | CONDITIONS PRECEDENT TO EFFECTIVE DATE | 50 |
| | 11.1 | Conditions Precedent to Effectiveness | 50 |
| | 11.2 | Waiver of Conditions | 5051 |
| | 11.3 | Satisfaction of Conditions | 51 |
| Article XII | | EFFECT OF CONFIRMATION | 5152 |
| | 12.1 | Vesting of Assets | 5152 |
| | 12.2 | Binding Effect | 5152 |
| | 12.3 | Discharge of Claims and Termination of Equity Interests | 5152 |
| | 12.4 | Discharge | 52 |
| | 12.5 | Injunction or Stay | 5253 |
| | 12.6 | Terms of Injunction or Stay | 5253 |
| | 12.7 | Exculpation | 53 |
| | 12.8 | Releases | 5354 |
| | 12.9 | Avoidance Actions/Objections | 5455 |
| Article XIII | | RETENTION OF JURISDICTION | 5455 |
| Article XIV | | MISCELLANEOUS PROVISIONS | 5657 |
| | 14.1 | Effectuating Documents and Further Transactions | 5657 |

14.2 Withholding and Reporting Requirements ........................ 56̶57

14.3 Corporate Action ........................ 56̶57

14.4 Modification of Plan ........................ 57̶58

14.5 Revocation or Withdrawal of the Plan ........................ 57̶58

14.6 Plan Supplement ........................ 58̶59

14.7 Payment of Statutory Fees ........................ 58̶59

14.8 Post-Confirmation Date Professional Fees and Expenses ........................ 58̶59

14.9 Dissolution of the Creditors' Committee ........................ 58̶59

14.10 Indenture Trustee as Claim Holder ........................ 58̶60

14.11 Exemption from Transfer Taxes ........................ 59̶60

14.12 Expedited Tax Determination ........................ 59̶60

14.13 Exhibits/Schedules ........................ 59̶60

14.14 Substantial Consummation ........................ 59̶60

14.15 Severability of Plan Provisions ........................ 59̶60

14.16 Governing Law ........................ 60̶61

14.17 Notices ........................ 60̶61

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

In re                            :              **Chapter 11 Case No.**

                                 :

**SILICON GRAPHICS, INC.,** *et al.,*    :              **06-10977 (BRL)**

                                 :

             **Debtors.**         :               **(Jointly Administered)**

                                 :

-------------------------------------------------------------x

## DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION <u>UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, AS MODIFIED</u>

           Silicon Graphics, Inc., Silicon Graphics Federal, Inc., Cray Research, L.L.C., Silicon Graphics Real Estate, Inc., Silicon Graphics World Trade Corporation, Silicon Studio, Inc., Cray Research America Latina Ltd., Cray Research Eastern Europe Ltd., Cray Research India Ltd., Cray Research International, Inc., Cray Financial Corporation, Cray Asia/Pacific, Inc., Paragraph International, Inc. and WTI Development, Inc. propose the following chapter 11 plan pursuant to section 1121(a) of the Bankruptcy Code:

## ARTICLE I

## DEFINITIONS AND INTERPRETATION

**A.**      **Definitions.**

           The following terms used herein shall have the respective meanings set forth below:

1.1 **_6.50% Indenture_** means that certain indenture dated December 24, 2003 between Silicon Graphics and U.S. Bank National Association, as indenture trustee, pursuant to which the Senior Secured Convertible Notes were issued, as amended from time to time.

1.2 **_11.75% Indenture_** means that certain indenture dated December 24, 2003 between Silicon Graphics and U.S. Bank National Association, as indenture trustee, pursuant to which the Senior Secured Notes were issued, as amended from time to time.

1.3 **_Administrative Expense Claim_** means any right to payment constituting a cost or expense of administration of the Reorganization Cases Allowed under and in accordance with, as applicable, sections 330, 365, 503(b), 507(a)(2) and 507(b) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses of preserving the Debtors' estates, (b) any actual and necessary costs and expenses of operating the Debtors' businesses, (c) any indebtedness or obligations incurred or assumed by the Debtors in Possession during the Reorganization Cases and (d) any compensation for professional services rendered and reimbursement of expenses incurred. Any fees or charges assessed against the estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code is excluded from the definition of Administrative Expense Claim and shall be paid in accordance with Section 14.7 of the Plan.

1.4 **_Ad Hoc Committee_** means the ad hoc committee of certain holders of the Senior Secured Convertible Notes.

1.5 **_Affiliate_** has the meaning set forth in section 101(2) of the Bankruptcy Code.

2

1.6    ***Allowed*** means, with reference to any Claim against the Debtors, (a) any Claim against any Debtor that has been listed by such Debtor in its Schedules (as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009) as liquidated in amount and not disputed or contingent and for which no contrary proof of Claim has been filed or no timely objection to allowance or request for estimation has been interposed, (b) any timely filed proof of Claim (i) as to which no objection has been or is interposed in accordance with Section 7.1 of the Plan or such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules or the Bankruptcy Court orand as to which any such applicable period of limitation has expired or (ii) as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective holder of such Claim, (c) any Claim expressly allowed by a Final Order or under the Plan, (d) any Claim that is compromised, settled or otherwise resolved pursuant to the authority granted to the Reorganized Debtors pursuant to a Final Order of the Bankruptcy Court or under Section 7.4 of the Plan; *provided, however,* that Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims." Unless otherwise specified in the Plan or by order of the Bankruptcy Court, "Allowed Administrative Expense Claim" or "Allowed Claim" shall not, for any purpose under the Plan, include interest on such Claim from and after the Commencement Date.

1.7    ***Backstop Commitment Agreement*** means those certain commitment agreements executed by and between in each case the Debtors and each of the Backstop Purchasers in connection with the Rights Offering.

1.8    ***Backstop Fee*** means $1,000,000.

1.9    ***Backstop Purchasers*** means one or more funds managed by each of Quadrangle Debt Recovery Advisors LLC, Symphony Asset Management LLC and Watershed Asset Management, LLC.

1.10    ***Ballot*** means the form distributed to each holder of an impaired Claim that is entitled to vote to accept or reject the Plan on which is to be indicated acceptance or rejection of the Plan.

1.11    ***Bankruptcy Code*** means title 11 of the United States Code, as amended from time to time, as applicable to the Reorganization Cases.

1.12    ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of New York or any other court of the United States having jurisdiction over the Reorganization Cases.

1.13    ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time.

3

1.14   **Benefit Plans** means all employee benefit plans, policies and programs sponsored by any of the Debtors, including, without limitation, all incentive and bonus arrangements, all medical and health insurance, life insurance, dental insurance, disability benefits and coverage, leave of absence, savings plans, retirement pension plans and retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code); *provided, however, that Benefit Plans shall not include any equity, stock, option, or other similar plans in effect on or prior to the Commencement Date*.

1.15   **Business Day** means any day other than a Saturday, Sunday or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.16   **Cash** means legal tender of the United States of America.

1.17   **Charging Lien** means any Lien or other priority in payment arising prior to the Effective Date to which the applicable Indenture Trustee is entitled, pursuant to the respective Indenture, against distributions to be made to holders of Claims with respect to the Senior Secured Convertible Notes, Senior Secured Notes and Cray Unsecured Debentures for payment of any Indenture Trustee Fees.

1.18   **Claim** has the meaning set forth in section 101(5) of the Bankruptcy Code.

1.19   **Collateral** means any property or interest in property of the estates of the Debtors subject to a Lien, charge or other encumbrance to secure the payment or performance of a Claim, which Lien, charge or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state law.

1.20   **Commencement Date** means May 8, 2006, the date on which the Debtors commenced their Reorganization Cases.

1.21   **Confirmation Date** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket.

1.22   **Confirmation Hearing** means the hearing conducted by the Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy Code to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.23   **Confirmation Order** means the order or orders of the Bankruptcy Court, in form and substance reasonably acceptable to the Debtors, the Ad Hoc Committee and the Creditors' Committee, after consultation with Lampe Conway, confirming the Plan.

1.24 ***Contingent Claim*** means any Claim, the liability for which attaches or is dependent upon the occurrence or happening of, or is triggered by, an event, which event has not yet occurred, happened or been triggered as of the date on which such Claim is sought to be estimated or an objection to such Claim is filed, whether or not such event is within the actual or presumed contemplation of the holder of such Claim and whether or not a relationship between the holder of such Claim and the applicable Debtor now or hereafter exists or previously existed.

1.25 ***Cray Asia/Pacific Equity Interests*** means all shares of common or preferred stock or other instrument evidencing an ownership interest in Cray Asia/Pacific, Inc., whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests.

1.26 ***Cray Financial Equity Interests*** means all shares of common or preferred stock or other instrument evidencing an ownership interest in Cray Financial Corporation, whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests.

1.27 ***Cray Indenture*** means, together, that certain Indenture, dated February 1, 1986, between Cray Research, Inc. and Manufacturers Hanover Trust Company and that certain First Supplemental Indenture, dated June 30, 1996, between Silicon Graphics, Cray Research, Inc. and JP Morgan Chase, as indenture trustee, pursuant to which the Convertible Subordinated Debentures were issued, each as amended from time to time.

1.28 ***Cray Indenture Trustee Fees*** means the Indenture Trustee Fees of the Indenture Trustee under the Cray Indenture.

1.29 ***Cray Research America Latina Equity Interests*** means all shares of common or preferred stock or other instrument evidencing an ownership interest in Cray Research America Latina Ltd., whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests.

1.30 ***Cray Research Eastern Europe Equity Interests*** means all shares of common or preferred stock or other instrument evidencing an ownership interest in Cray Research Eastern Europe Ltd., whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests.

1.31 ***Cray Research India Equity Interests*** means all shares of common or preferred stock or other instrument evidencing an ownership interest in Cray Research India Ltd., whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests.

1.32 ***Cray Research International Equity Interests*** means all shares of common or preferred stock or other instrument evidencing an ownership interest in Cray Research International, Inc., whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests.

1.33   ***Cray Research LLC Equity Interests*** means all shares of common or preferred stock or other instrument evidencing an ownership interest in Cray Research, L.L.C., whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests.

1.34   ***Cray Unsecured Debentures*** means those certain Convertible Subordinated Debentures issued pursuant to the Cray Indenture.

1.35   ***Cray Unsecured Debenture Claim*** means any Claim arising under the Cray Indenture.

1.36   ***Cray Unsecured Debenture Rights Offering Record Date*** means July 7, 2006.

1.37   ***Creditors' Committee*** means the committee of unsecured creditors appointed in the Reorganization Cases pursuant to section 1102(a) of the Bankruptcy Code.

1.38   ***Customer Support Agreements*** means, collectively, any and all agreements to provide customer support, maintenance, warranty service or similar support to the Debtors' end-user customers, as set forth in the Plan Supplement and filed under seal.

1.39   ***Debtors*** means Silicon Graphics, Inc., Silicon Graphics Federal, Inc., Cray Research, L.L.C., Silicon Graphics Real Estate, Inc., Silicon Graphics World Trade Corporation, Silicon Studio, Inc., Cray Research America Latina Ltd., Cray Research Eastern Europe Ltd., Cray Research India Ltd., Cray Research International, Inc., Cray Financial Corporation, Cray Asia/Pacific, Inc., Paragraph International, Inc. and WTI Development, Inc.

1.40   ***Debtors in Possession*** means the Debtors in their capacity as debtors in possession in the Reorganization Cases under sections 1107(a) and 1108 of the Bankruptcy Code.

1.41   ***DIP Lenders*** means the lenders party to the Postpetition Financing Agreement.

1.42   ***Disbursing Agent*** means any entity in its capacity as a disbursing agent under Sections 6.5 and 6.6 of the Plan.

1.43   ***Disclosure Statement*** means that certain disclosure statement relating to the Plan, including, without limitation, all exhibits and schedules thereto, as the same may be amended, supplemented or otherwise modified from time to time, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

1.44   ***Disclosure Statement Order*** means the order of the Bankruptcy Court dated July 27, 2006 approving, among other things, the Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan.

1.45   ***Disputed*** means, with reference to any Administrative Expense Claim or Claim, any such Administrative Expense Claim or Claim (a) to the extent neither Allowed nor disallowed under the Plan or a Final Order nor deemed Allowed under section 502, 503 or 1111 of the Bankruptcy Code, (b) which has been or hereafter is listed by a Debtor on its Schedules as unliquidated, disputed or contingent and which has not been resolved by written agreement of the parties or a Final Order or (c) as to which the Debtors or any other party in interest has interposed a timely objection and/or request for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, which objection or request for estimation has not been withdrawn or determined by a Final Order. Prior to the earlier of the time an objection has been timely filed and the expiration of the time within which to object to such Claim set forth herein or otherwise established by order of the Bankruptcy Court, a Claim shall be considered Disputed to the extent that the amount of the Claim specified in a proof of Claim exceeds the amount of the Claim scheduled by the Debtor as not disputed, contingent or unliquidated (but only to the extent of such excess portion).

1.46   ***Distribution Date*** means (a) the Initial Distribution Date, (b) the first Business Day after the end of the months of March, June, September and December, commencing with the first such date to occur more than forty-five (45) days after the Effective Date and until the second anniversary of the Effective Date, (c) after the second anniversary of the Effective Date, the first Business Day after the end of the month of December and (d) the Final Distribution Date; *provided, however,* that (i) a Distribution Date (other than the Initial Distribution Date and the Final Distribution Date) shall not occur if the aggregate amount of Cash to be distributed on any Distribution Date is less than $50,000, in which case the amount to be distributed shall be retained and added to the amount to be distributed on the next Distribution Date, and, subject to Section 6.3 of the Plan, (ii) any General Unsecured Silicon Graphics Claim that becomes Allowed less than ten (10) Business Days prior to a Distribution Date shall be treated as a Disputed Claim for the purposes of the distribution occurring on such Distribution Date and shall not receive a distribution until the Distribution Date immediately succeeding such Distribution Date.

1.47   ***Distribution Pro Rata Share*** means, as of any Distribution Date, the ratio (expressed as a percentage) of the amount of an Allowed General Unsecured Silicon Graphics Claim to the aggregate amount of all Allowed General Unsecured Silicon Graphics Claims at such date plus the Disputed Claim amount of all remaining Disputed General Unsecured Silicon Graphics Claims.

1.48   ***Distribution Record Date*** means the date that is three (3) Business Days from and after the Confirmation Date.

1.49    ***Effective Date*** means a Business Day selected by the Debtors on or after the Confirmation Date, on which (a) no stay of the Confirmation Order is in effect and (b) the conditions precedent to the effectiveness of the Plan specified in Section 11.1 of the Plan shall have been satisfied or waived as provided in Section 11.2 of the Plan; *provided, however*, that the Effective Date shall be no later than thirty (30) days from and after the Confirmation Date.

1.50    ***Exit Facility*** means financing obtained by the Debtors on terms and conditions reasonably acceptable to the Debtors and the Ad Hoc Committee, after consultation with the Creditors' Committee, in connection with the occurrence of the Effective Date and emergence from chapter 11.

1.51    ***Final Distribution Date*** means a date on or after the Initial Distribution Date and after (a) the deadline for the Debtors or the Reorganized Debtors to interpose objections to all General Unsecured Silicon Graphics Claims has passed, (b) all such objections have been resolved by signed agreement with the Debtors or Reorganized Debtors and/or Final Order, as may be applicable, and (c) all General Unsecured Silicon Graphics Claims that are Contingent Claims or Unliquidated Claims have been liquidated but, in any event, the Final Distribution Date shall be no later than thirty (30) days thereafter, or such later date as the Bankruptcy Court may establish, upon request by the Reorganized Debtors, for cause shown.

1.52    ***Final Insurance Order*** means the Final Order Pursuant to Sections 105(a), 362(d), 363(b) and 503(b) of the Bankruptcy Code and Rules 4001(d) and 6004(a) of the Federal Rules of Bankruptcy Procedure (i) Authorizing Debtors to (a) Continue Their Workers' Compensation Program and Their Liability, Product, Property, and Other Insurance Programs and (b) Pay All Obligations in Respect Thereof and (ii) Authorizing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations, dated May 31, 2006.

1.53    ***Final Order*** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari* or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or other proceedings for a new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of *certiorari*, new trial, reargument or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, *certiorari* shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order.

1.54   ***General Unsecured Claim*** means any Claim against the Debtors other than an Administrative Expense Claim, Priority Tax Claim, Other Priority Claim, Secured Tax Claim, Other Secured Claim, Prepetition Credit Agreement Claim, Secured Note Claim, Secured Note Deficiency Claim, Cray Unsecured Debenture Claim, Subordinated Securities Claim or Intercompany Claim.

1.55   ***General Unsecured Cray Asia/Pacific Claim*** means any General Unsecured Claim against Cray Asia/Pacific, Inc.

1.56   ***General Unsecured Cray Financial Claim*** means any General Unsecured Claim against Cray Financial Corporation.

1.57   ***General Unsecured Cray Research America Latina Claim*** means any General Unsecured Claim against Cray Research America Latina Ltd.

1.58   ***General Unsecured Cray Research Eastern Europe Claim*** means any General Unsecured Claim against Cray Research Eastern Europe Ltd.

1.59   ***General Unsecured Cray Research India Claim*** means any General Unsecured Claim against Cray Research India Ltd.

1.60   ***General Unsecured Cray Research International Claim*** means any General Unsecured Claim against Cray Research International, Inc.

1.61   ***General Unsecured Cray Research LLC Claim*** means any General Unsecured Claim against Cray Research, L.L.C.

1.62   ***General Unsecured Paragraph Claim*** means any General Unsecured Claim against Paragraph International, Inc.

1.63   ***General Unsecured SGI Federal Claim*** means any General Unsecured Claim against SGI Federal.

1.64   ***General Unsecured SGI Real Estate Claim*** means any General Unsecured Claim against Silicon Graphics Real Estate, Inc.

1.65   ***General Unsecured SGI World Trade Claim*** means any General Unsecured Claim against SGI World Trade.

1.66   ***General Unsecured Silicon Graphics Claim*** means any General Unsecured Claim against Silicon Graphics.

1.67   ***General Unsecured Silicon Studio Claim*** means any General Unsecured Claim against Silicon Studio, Inc.

1.68   ***General Unsecured WTI Claim*** means any General Unsecured Claim against WTI Development, Inc.

9

1.69    ***Global Settlement*** means the settlement and compromises by and among the Debtors, the Creditors' Committee, the lenders under the Postpetition Financing Agreement, certain holders of Senior Secured Convertible Notes and Lampe Conway, contained in the Global Settlement Agreement, the Plan Term Sheet annexed thereto, and that certain Restructuring Agreement between Silicon Graphics and certain holders of Senior Secured Convertible Notes dated May 7, 2006, as amended from time to time and subject to such Global Settlement Agreement.

1.70    ***Global Settlement Agreement*** means that certain Global Settlement Agreement, dated June 23, 2006, by and among the Debtors, the Creditors' Committee, the lenders under the Postpetition Financing Agreement, certain holders of Senior Secured Convertible Notes and Lampe Conway, including the Plan Term Sheet annexed thereto.

1.71    ***Indentures*** means, collectively, the 6.50% Indenture, 11.75% Indenture and Cray Indenture.

1.72    ***Indenture Trustee*** means, individually and collectively, U.S. Bank National Association and JP Morgan Chase and/or their successor(s), in either case in its or their capacity as the indenture trustee for the Senior Secured Convertible Notes, Senior Secured Notes and Cray Unsecured Debentures.

1.73    ***Indenture Trustee Fees*** means the reasonable and customary fees and expenses of the Indenture Trustee as provided by the 6.50% Indenture, 11.75% Indenture and Cray Indenture, including, without limitation, reasonable attorneys' fees and disbursements incurred by the Indenture Trustee, whether prior to or after the Effective Date.

1.74    ***Initial Distribution Date*** means a date after the Effective Date that is selected by the Reorganized Debtors in their sole discretion but, in any event, is within forty-five (45) days after the date of service of notice of the Confirmation Date, or such later date as the Bankruptcy Court may establish upon request by Reorganized Debtors, for cause shown; *provided, however,* that in no event shall the Initial Distribution Date be more than seventy-five (75) days after the date of service of notice of the Confirmation Date.

1.75    ***Intercompany Claim*** means any Claim against any Debtor or Non-Debtor Subsidiary held by another Debtor or Non-Debtor Subsidiary.

1.76    ***IP License Agreements*** means, collectively, any and all agreements entered into by the Debtors for the primary purpose of the assignment of intellectual property licensing rights to the Debtors.

1.77    1.76 ***Lampe Conway*** means Lampe Conway & Co., LLC.

10

1.77 *Lampe Conway Rights Offering Common Stock Purchase Agreement* ~~means that certain Rights Offering Common Stock Purchase Agreement between the Debtors and Lampe Conway, in form and substance satisfactory to the Debtors and Lampe Conway, after consultation with the Creditors' Committee, governing the Lampe Conway Rights Offering Option.~~

1.78 **Lampe Conway Rights Offering Option** means the option of Lampe Conway granted by the Backstop Purchasers to purchase shares of New Common Stock not otherwise purchased by holders of Allowed Cray Unsecured Debenture Claims pursuant to the Rights Offering, as set forth in Section 9.6 of the Plan.

1.79 **Lien** has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.80 **Liquidating Trust** means the liquidating trust established under Section 5.11 of the Plan.

1.81 **Liquidating Trust Agreement** means the agreement between the Debtors and the Trustee, which shall be in form and substance reasonably satisfactory to the Debtors and the Ad Hoc Committee, governing the Liquidating Trust, dated as of the Effective Date, substantially in the form set forth in the Plan Supplement.

1.82 **Liquidating Trust Assets** means any and all claims or causes of actions, including price fixing claims, of the Debtors arising out of the purchase of dynamic random access memory between April 1999 and June 2002 and $250,000 in Cash (which is the amount estimated to be reasonably necessary to prosecute and liquidate the foregoing) and the earnings or proceeds therefrom.

1.83 **Local Bankruptcy Rules** means the Local Bankruptcy Rules for the Southern District of New York, as amended from time to time.

1.84 **Management Incentive Plan** means the management equity and bonus incentive plan, which shall be substantially in the form set forth in the Plan Supplement and shall contain terms and conditions that shall be determined by the New Board.

1.85 **New Board** means each board of directors appointed pursuant to Section 10.3 of the Plan.

1.86 **New Common Stock** means the shares of common stock of Reorganized Silicon Graphics authorized to be issued pursuant to Section 5.7 of the Plan.

1.87 **New Management Agreements** means the employment agreements, in form and substance acceptable to the Debtors and the Ad Hoc Committee ~~and substantially in the forms set forth in the Plan Supplement~~, to be executed on the Effective Date by Reorganized Silicon Graphics and the counterparties identified therein.

1.88 **New Organizational Documents** means each certificate of incorporation, certificate of formation, limited liability company agreement, bylaws, and other organizational document for each of the Reorganized Debtors, in form and substance reasonably acceptable to the Debtors and the Ad Hoc Committee and substantially in the forms set forth in the Plan Supplement.

1.89 **Non-Debtor Subsidiary** means any direct or indirect Subsidiary of Silicon Graphics that is not a Debtor.

1.90 **Non-Disclosure Agreements** means, collectively, any and all agreements entered into by the Debtors for the primary purpose of governing the non-disclosure of confidential or sensitive information.

1.91 ~~1.90~~ **Old Equity Interests** means all shares of common or preferred stock or other instrument evidencing an ownership interest in Silicon Graphics, whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests; *provided, however,* that Old Equity Interests shall not include the Senior Secured Convertible Notes and the Cray Unsecured Debentures.

1.92 ~~1.91~~ **Other Priority Claim** means a Claim entitled to priority in payment as specified in section 507(a)(4), (5), (6) or (7) of the Bankruptcy Code.

1.93 ~~1.92~~ **Other Secured Claim** means a Secured Claim other than a Secured Tax Claim, Prepetition Credit Agreement Claim or Secured Note Claim.

1.94 ~~1.93~~ **Overallotment Shares** means 1,125,000 shares of New Common Stock that the Backstop Purchasers shall receive Subscription Rights to purchase under the Backstop Commitment Agreement.

1.95 ~~1.94~~ **Paragraph Equity Interests** means all shares of common or preferred stock or other instrument evidencing an ownership interest in Paragraph International, Inc., whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests.

1.96 ~~1.95~~ **Person** means an individual, partnership, corporation, limited liability company, cooperative, trust, unincorporated organization, association, joint venture, government or agency or political subdivision thereof or any other form of legal entity.

1.97    ~~1.96~~ *Plan* means this Joint Plan of Reorganization, including, without limitation, the exhibits and schedules hereto or contained in the Plan Supplement, as the same may be amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof.

1.98    ~~1.97~~ *Plan Supplement* means the supplement to the Plan containing certain documents relevant to the implementation of the Plan, which shall be in form and substance reasonably acceptable to the Debtors and the Ad Hoc Committee, following consultation with the Creditors' Committee and Lampe Conway, and shall include, but are not limited to, the lists of the initial members of the New Boards of the Reorganized Debtors, the schedules of executory contracts and unexpired leases to be assumed pursuant to the Plan, the list of potential defendants in the Debtors' or Reorganized Debtors' causes of action under section 547 of the Bankruptcy Code, forms of the ~~New Common Stock,~~ Subscription Rights, Registration Rights Agreement, New Organizational Documents~~, New Management Agreements~~ and Management Incentive Plan and the Liquidating Trust Agreement.

1.99    ~~1.98~~ *Postpetition Financing Agreement* means the $130,000,000 Post-Petition Loan and Security Agreement by and among Silicon Graphics, SGI Federal and SGI World Trade, as borrowers, the lenders party thereto, Morgan Stanley Senior Funding, Inc., as administrative agent, and Wells Fargo Foothill, Inc., as collateral agent, as entered into pursuant to the Postpetition Financing Order and as modified or amended from time to time during the Reorganization Cases.

1.100    ~~1.99~~ *Postpetition Financing Obligation* means any obligation of the Debtors arising under the Postpetition Financing Agreement and the Postpetition Financing Order.

1.101    ~~1.100~~ *Postpetition Financing Order* means the Final Order (i) Approving Debtors' Motion for Order Authorizing Debtors to Incur Post-Petition Secured Indebtedness Pursuant to $130,000,000 Post-Petition Loan and Security Agreement; (ii) Granting Security Interests and Superpriority Claims Pursuant to Sections 105(a), 364(c) and (d) of the Bankruptcy Code; (iii) Authorizing Debtors to Repay Amounts Owed Under the Pre-petition Senior Secured Credit Facility; (iv) Granting Adequate Protection to Noteholders Under Pre-petition Senior Secured Indentures; and (v) Authorizing the Debtors to use Cash Collateral dated June 26, 2006.

1.102    ~~1.101~~ *Prepetition Agent* means Wells Fargo Foothill, Inc., or any successor thereto, as administrative agent under the Prepetition Credit Agreement.

1.103  ~~1.102~~ *Prepetition Credit Agreement* means that certain Third Amended and Restated Credit Agreement, dated as of October 24, 2005, as amended pursuant to that certain Amendment Number One to Third Amended and Restated Credit Agreement, dated as of November 18, 2005, among Silicon Graphics, SGI Federal and SGI World Trade, as borrowers, and Wells Fargo Foothill, Inc. and Ableco Finance, LLC, as lenders, as the same may have been further amended or modified from time to time prior to the Commencement Date.

1.104  ~~1.103~~ *Prepetition Credit Agreement Claim* means any Claim arising under the Prepetition Credit Agreement.

1.105  ~~1.104~~ *Priority Tax Claim* means any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.106  ~~1.105~~ *Ratable Proportion* means, with reference to any distribution on account of any Allowed Claim in any class, a distribution equal in amount to the ratio (expressed as a percentage) that the amount of such Allowed Claim bears to the aggregate amount of Allowed Claims in such class.

1.107  ~~1.106~~ *Registration Rights Agreement* means the registration rights agreement, in form and substance reasonably acceptable to the Debtors and the Ad Hoc Committee, after consultation with the Creditors' Committee, and substantially in the form set forth in the Plan Supplement, to be entered into on the Effective Date by and among Silicon Graphics and each holder of at least 7.5% of the New Common Stock as of the Effective Date.

1.108  ~~1.107~~ *Reorganization Cases* means the jointly administered cases commenced by the Debtors under chapter 11 of the Bankruptcy Code.

1.109  ~~1.108~~ *Reorganized Debtors* means the Debtors on and after the Effective Date.

1.110  ~~1.109~~ *Reorganized Silicon Graphics* means Silicon Graphics, on and after the Effective Date.

1.111  ~~1.110~~ *Rights Offering* means the offering of the Subscription Rights to the holders of Allowed Secured Note Claims and Allowed Cray Unsecured Debenture Claims, as described in Article IX of the Plan.

1.112  ~~1.111~~ *Rights Offering Agent* means the agent with respect to the Rights Offering, as described in Article IX of the Plan.

1.113   ~~1.112~~ *Rights Offering Trust Account* means the trust account or similarly segregated account or accounts maintained by the Rights Offering Agent in accordance with Article IX of the Plan, which shall be separate and apart from the Rights Offering Agent's general operating funds and/or any other funds subject to any Lien or any cash collateral arrangements.

1.114   ~~1.113~~ *Schedules* means, collectively, the schedules of assets and liabilities, schedules of executory contracts and unexpired leases and statements of financial affairs filed by the Debtors under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007 and the Official Bankruptcy Forms in the Reorganization Cases, as may have been amended or supplemented through the Confirmation Date pursuant to Bankruptcy Rule 1007.

1.115   ~~1.114~~ *Secured Claim* means any Claim that is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or, in the event that such Claim is subject to a permissible setoff under section 553 of the Bankruptcy Code, to the extent of such permissible setoff.

1.116   ~~1.115~~ *Secured Tax Claim* means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code (determined irrespective of any time limitations therein and including any related Secured Claim for penalties).

1.117   ~~1.116~~ *Secured Note Claim* means any Secured Claim arising under the 6.50% Indenture or the 11.75% Indenture.

1.118   ~~1.117~~ *Secured Note Deficiency Claim* means any Claim arising under the 6.50% Indenture or the 11.75% Indenture, to the extent that the interest of the holder of such Claim in the Collateral securing the Claim is less than the amount of such Claim.

1.119   ~~1.118~~ *Secured Note Rights Offering Record Date* means the Voting Record Date.

1.120   ~~1.119~~ *Senior Secured Convertible Notes* means those certain Senior Secured Convertible Notes issued pursuant to the 6.50% Indenture.

1.121   ~~1.120~~ *Senior Secured Notes* means those certain Senior Secured Notes issued pursuant to the 11.75% Indenture.

1.122   ~~1.121~~ *SGI Federal* means Silicon Graphics Federal, Inc.

1.123   ~~1.122~~ *SGI Federal Equity Interests* means all shares of common or preferred stock or other instrument evidencing an ownership interest in SGI Federal, whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests.

15

1.124 ~~1.123~~ *SGI Real Estate Equity Interests* means all shares of common or preferred stock or other instrument evidencing an ownership interest in Silicon Graphics Real Estate, Inc., whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests.

1.125 ~~1.124~~ *SGI World Trade* means Silicon Graphics World Trade Corporation.

1.126 ~~1.125~~ *SGI World Trade Equity Interests* means all shares of common or preferred stock or other instrument evidencing an ownership interest in SGI World Trade, whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests.

1.127 ~~1.126~~ *Silicon Graphics* means Silicon Graphics, Inc.

1.128 ~~1.127~~ *Silicon Studio Equity Interests* means all shares of common or preferred stock or other instrument evidencing an ownership interest in Silicon Studio, Inc., whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests.

1.129 ~~1.128~~ *Subordinated Securities Claim* means any Claim against any of the Debtors, whether or not the subject of an existing lawsuit, (a) arising from rescission of a purchase or sale of shares or any other securities, if any, of any of the Debtors or an Affiliate of the Debtors, (b) for damages arising from the purchase or sale of any security, (c) for violations of the securities laws, misrepresentations or any similar Claims, including, to the extent related to the foregoing or otherwise subject to subordination under section 510(b) of the Bankruptcy Code, but not limited to, any attorneys' fees, other charges or costs incurred on account of the foregoing claims or (d) except as otherwise provided for in the Plan, for reimbursement, contribution or indemnification allowed under section 502 of the Bankruptcy Code on account of any such Claim, including Claims based upon allegations that the Debtors made false and misleading statements and engaged in other deceptive acts in connection with the sale of securities.

1.130 ~~1.129~~ *Subscription Expiration Date* means the deadline for voting on the Plan, as specified in the Subscription Form but subject to the Debtors' right to extend such date with the prior consent of the Backstop Purchasers (which consent shall not be unreasonably withheld), which shall be the final date by which a holder of an Allowed Secured Note Claim or Allowed Cray Unsecured Debenture Claim, as of the applicable record date, may elect to subscribe to the Rights Offering.

1.131 ~~1.130~~ *Subscription Form* means the form to be used by a holder of Subscription Rights to exercise such Subscription Rights.

1.132 ~~1.131~~ *Subscription Purchase Price* means $6.67 per share.

16

1.133 ~~1.132~~ *Subscription Right* means the right to subscribe for one share of New Common Stock at the Subscription Purchase Price on the terms and subject to the conditions set forth in Article IX of the Plan.

1.134 ~~1.133~~ *Tax Code* means the Internal Revenue Code of 1986, as amended.

1.135 ~~1.134~~ *Trust Advisory Board* means the trust advisory board provided for in the Liquidating Trust Agreement, which shall have an oversight function with respect to the Liquidating Trust.

1.136 ~~1.135~~ *Trustee* means a trustee or co-trustees, as the case may be, governing the Liquidating Trust.

1.137 ~~1.136~~ *U.S. Trustee* means the United States Trustee appointed under section 581 of title 28 of the United States Code to serve in the Southern District of New York.

1.138 ~~1.137~~ *Unliquidated Claim* means any Claim, the amount of liability for which has not been fixed, whether pursuant to agreement, applicable law or otherwise, as of the date on which such Claim is asserted or sought to be estimated.

1.139 ~~1.138~~ *Voting Record Date* means, as applicable, July 7, 2006 for holders of Cray Unsecured Debenture Claims and July 27, 2006 for all other creditors entitled to vote on the Plan.

1.140 ~~1.139~~ *WTI Equity Interests* means all shares of common or preferred stock or other instrument evidencing an ownership interest in WTI Development, Inc., whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests.

**B.** **Interpretation; Application of Definitions and Rules of Construction.**

Unless otherwise specified, all Section, Article, schedule or exhibit references in the Plan are to the respective Section in, Article of or schedule or exhibit to the Plan or the Plan Supplement, as the same may be amended, waived or modified from time to time. The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular section, subsection or clause contained in the Plan. A term used herein that is not defined herein shall have the meaning ascribed to that term in the Bankruptcy Code. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.

**C.** **Relief Sought by Filing the Plan.**

The filing of the Plan constitutes, among other things, a motion by the Debtors pursuant to Bankruptcy Rule 9019 to approve the settlement and compromise set forth in Section 5.1 of the Plan.

## ARTICLE II

## PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

2.1 *Administrative Expense Claims*.

Except to the extent that any entity entitled to payment of any Allowed Administrative Expense Claim agrees to a less favorable treatment, each holder of an Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Allowed Administrative Expense Claim on the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable; *provided, however,* that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors shall be paid in full and performed by the Debtors or Reorganized Debtors, as the case may be, in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions. The reasonable, documented and unpaid fees and expenses of Goodwin Procter LLP, Houlihan Lokey Howard & Zukin and Frederick W. Cook & Co., Inc., as advisors to the Ad Hoc Committee, and of Milbank, Tweed, Hadley & McCloy LLP, as advisors to Lampe Conway and subject to the limitations set forth in the Global Settlement, shall be Allowed Administrative Expense Claims and shall be paid without the need for the filing of a proof of Claim and without the need for further Bankruptcy Court approval.

2.2 *Postpetition Financing Agreement*.

On the Effective Date, all Allowed Postpetition Financing Obligation Claims shall be paid in full in Cash. To the extent any letters of credit issued pursuant to the Postpetition Financing Agreement are outstanding on the Effective Date, such letters of credit will be cancelled and replaced with new letters of credit to be issued pursuant to the Exit Facility or 100% Cash collateralized. Upon payment and satisfaction in full of all Allowed Postpetition Financing Obligation Claims, all Liens and security interests granted to secure such obligations, whether in the Reorganization Cases or otherwise, shall be terminated and of no further force or effect.

2.3 *Professional Compensation and Reimbursement Claims*.

All entities seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the ~~Effective~~Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall (a) file, on or before the date that is ninety

18

(90) days after the Effective Date their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or Allowing any such Administrative Expense Claim. The Reorganized Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

### 2.4 *Indenture Trustee Fees.*

All Indenture Trustee Fees shall be paid in Cash on the Effective Date by the Reorganized Debtors as Administrative Expense Claims, without the need for application to, or approval of, the Bankruptcy Court; *provided, however,* that, in accordance with Section 4.7 of the Plan, the Debtors or Reorganized Debtors shall not be obligated to pay and shall have no liability for the Cray Indenture Trustee Fees in excess of the $1.2 million distribution provided to all holders of Allowed Cray Unsecured Debenture Claims pursuant to the Plan. The Debtors have been advised that the Cray Indenture Trustee will assert its Charging Lien to pay the Cray Indenture Trustee Fees from such $1.2 million distribution. Each Indenture Trustee's Charging Lien will be discharged solely upon payment in full of such Indenture Trustee Fees as set forth herein and in Section 4.7 of the Plan. Nothing herein shall be deemed to impair, waive or discharge the Charging Lien for any fees and expenses not paid by the Reorganized Debtors.

To the extent that any Indenture Trustee provides services related to distributions pursuant to the Plan (including, but not limited to, the services referenced in Section 6.8(c) of the Plan), such Indenture Trustee will receive from the Reorganized Debtors, without further Bankruptcy Court approval, reasonable compensation for such services and reimbursement of reasonable expenses, including, but not limited to, reasonable attorneys' fees and expenses, incurred in connection with such services. These payments will be made on terms agreed to by the Indenture Trustee and the Reorganized Debtors.

### 2.5 *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Debtors or the Reorganized Debtors, (a) on the Effective Date, Cash in an amount equal to such Allowed Priority Tax Claim or (b) commencing on the Effective Date and continuing over a period not exceeding five (5) years from and after the Commencement Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at the applicable rate under non-bankruptcy law, subject to the sole option of the Debtors or Reorganized Debtors to prepay the entire amount of the Allowed Priority Tax Claim and in a manner not less favorable than the most favored nonpriority unsecured Claim provided for by the Plan. All Allowed Priority Tax Claims that are not due and

payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations become due.

# ARTICLE III

## CLASSIFICATION OF CLAIMS AND
## EQUITY INTERESTS, IMPAIRMENT AND VOTING

The following table designates the classes of Claims against and equity interests in the Debtors and specifies which of those classes are impaired or unimpaired by the Plan and entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code or deemed to reject the Plan.

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 | Other Priority Claims | Unimpaired | No (deemed to accept) |
| Class 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) |
| Class 3 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| Class 4 | Prepetition Credit Agreement Claims | Unimpaired | No (deemed to accept) |
| Class 5 | Secured Note Claims | Impaired | Yes |
| Class 6 | General Unsecured Silicon Graphics Claims | Impaired | Yes |
| Class 7 | Cray Unsecured Debenture Claims | Impaired | Yes |
| Class 8 | Subordinated Securities Claims | Impaired | No (deemed to reject) |
| Class 9 | Old Equity Interests | Impaired | No (deemed to reject) |
| Class 10 | General Unsecured SGI Federal Claims | Unimpaired | No (deemed to accept) |
| Class 11 | SGI Federal Equity Interests | Unimpaired | No (deemed to accept) |
| Class 12 | General Unsecured SGI World Trade Claims | Unimpaired | No (deemed to accept) |
| Class 13 | SGI World Trade Equity Interests | Unimpaired | No (deemed to accept) |
| Class 14 | General Unsecured Cray Research LLC Claims | Unimpaired | No (deemed to accept) |
| Class 15 | Cray Research LLC Equity Interests | Unimpaired | No (deemed to accept) |
| Class 16 | General Unsecured SGI Real Estate Claims | Unimpaired | No (deemed to accept) |
| Class 17 | SGI Real Estate Equity Interests | Unimpaired | No (deemed to accept) |
| Class 18 | General Unsecured Silicon Studio Claims | Unimpaired | No (deemed to accept) |
| Class 19 | Silicon Studio Equity Interests | Unimpaired | No (deemed to accept) |
| Class 20 | General Unsecured Cray Research America Latina Claims | Unimpaired | No (deemed to accept) |
| Class 21 | Cray Research America Latina Equity Interests | Unimpaired | No (deemed to accept) |

| Class 22 | General Unsecured Cray Research Eastern Europe Claims | Unimpaired | No (deemed to accept) |
|---|---|---|---|
| Class 23 | Cray Research Eastern Europe Equity Interests | Unimpaired | No (deemed to accept) |
| Class 24 | General Unsecured Cray Research India Claims | Unimpaired | No (deemed to accept) |
| Class 25 | Cray Research India Equity Interests | Unimpaired | No (deemed to accept) |
| Class 26 | General Unsecured Cray Research International Claims | Unimpaired | No (deemed to accept) |
| Class 27 | Cray Research International Equity Interests | Unimpaired | No (deemed to accept) |
| Class 28 | General Unsecured Cray Financial Claims | Unimpaired | No (deemed to accept) |
| Class 29 | Cray Financial Equity Interests | Unimpaired | No (deemed to accept) |
| Class 30 | General Unsecured Cray Asia/Pacific Claims | Unimpaired | No (deemed to accept) |
| Class 31 | Cray Asia/Pacific Equity Interests | Unimpaired | No (deemed to accept) |
| Class 32 | General Unsecured Paragraph Claims | Unimpaired | No (deemed to accept) |
| Class 33 | Paragraph Equity Interests | Unimpaired | No (deemed to accept) |
| Class 34 | General Unsecured WTI Claims | Unimpaired | No (deemed to accept) |
| Class 35 | WTI Equity Interests | Unimpaired | No (deemed to accept) |

# ARTICLE IV

# PROVISIONS FOR TREATMENT OF CLAIMS AND EQUITY INTERESTS

4.1   *Other Priority Claims (Class 1)*.

(a)   Impairment and Voting. Class 1 is unimpaired by the Plan. Each holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)   Distributions. Except to the extent that a holder of an Allowed Other Priority Claim agrees to a different treatment, each holder of an Allowed Other Priority Claim shall receive Cash in an amount equal to such Allowed Other Priority Claim on the later of the Effective Date and the date such Allowed Other Priority Claim becomes an Allowed Other Priority Claim, or as soon thereafter as is practicable.

### 4.2  *Secured Tax Claims (Class 2)*.

(a)  <u>Impairment and Voting.</u>  Class 2 is unimpaired by the Plan. Each holder of an Allowed Secured Tax Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)  <u>Distributions.</u>  Except to the extent that a holder of an Allowed Secured Tax Claim agrees to a different treatment, each holder of an Allowed Secured Tax Claim shall receive, at the sole option of the Debtors or the Reorganized Debtors, (i) Cash in an amount equal to such Allowed Secured Tax Claim or (ii) commencing on the Effective Date and continuing over a period not exceeding five (5) years from and after the Commencement Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable rate under non-bankruptcy law, subject to the sole option of the Debtors or Reorganized Debtors to prepay the entire amount of the Allowed Priority Tax Claim and in a manner not less favorable than the most favored nonpriority unsecured Claim provided for by the Plan.

### 4.3  *Other Secured Claims (Class 3)*.

(a)  <u>Impairment and Voting.</u>  Class 3 is unimpaired by the Plan. Each holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)  <u>Distributions.</u>  Except to the extent that a holder of an Allowed Other Secured Claim agrees to a different treatment, at the sole option of the Debtors or the Reorganized Debtors, (i) on the Effective Date or as soon thereafter as is practicable, each Allowed Other Secured Claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default, (ii) each holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of the Effective Date and the date such Allowed Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable or (iii) each holder of an Allowed Other Secured Claim shall receive the Collateral securing its Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, in full and complete satisfaction of such Allowed Other Secured Claim on the later of the Effective Date and the date such Allowed Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable.

### 4.4 *Prepetition Credit Agreement Claims (Class 4)*.

(a) <u>Impairment and Voting.</u> Class 4 is unimpaired by the Plan. Each holder of a Prepetition Credit Agreement Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b) <u>Distributions.</u> Each holder of an Allowed Prepetition Credit Agreement Claim shall be paid in full, in Cash, together with postpetition interest, on the Effective Date or as soon thereafter as is practicable.

### 4.5 *Secured Note Claims (Class 5)*.

(a) <u>Impairment and Voting.</u> Class 5 is impaired by the Plan. Each holder of a Secured Note Claim is entitled to vote to accept or reject the Plan. The acceptance of the Plan by the holders of Secured Note Claims shall constitute agreement to waive the Secured Note Deficiency Claims as of the Effective Date.

(b) <u>Distributions.</u> Each holder of an Allowed Secured Note Claim shall (i) receive its Ratable Proportion of 2,500,000 shares of New Common Stock on the Effective Date or as soon thereafter as is practicable, (ii) have the right to participate in the Rights Offering to exercise such holder's Ratable Proportion of 6,800,000 Subscription Rights on the terms and subject to the conditions of Article IX of the Plan and (iii) receive on the Effective Date or as soon thereafter as is practicable its Ratable Proportion of 100% of the beneficial interest in the Liquidating Trust (which shall be treated by all parties in accordance with Section 5.11(m) of the Plan).

### 4.6 *General Unsecured Silicon Graphics Claims (Class 6)*.

(a) <u>Impairment and Voting.</u> Class 6 is impaired by the Plan. Each holder of a General Unsecured Silicon Graphics Claim is entitled to vote to accept or reject the Plan.

(b) <u>Distributions.</u> Except to the extent that a holder of an Allowed General Unsecured Silicon Graphics Claim agrees to a different treatment, each holder of an Allowed General Unsecured Silicon Graphics Claim shall receive its Distribution Pro Rata Share of $9.0 million in Cash on each Distribution Date or as soon thereafter as is practicable. In any distribution made to the holder of an Allowed General Unsecured Silicon Graphics Claim, there shall be deducted from such distribution the amount of any distribution previously distributed to such holder on account of such Allowed General Unsecured Silicon Graphics Claim in any distribution made prior thereto. Subject to the occurrence of the Effective Date, no distribution shall be made to holders of an Allowed Secured Note Claim on account of the Secured Note Deficiency Claim. On the Effective Date, the Debtors or the Reorganized Debtors shall fund $9.0 million in Cash into a segregated account maintained by the Disbursing Agent for the benefit of holders of Allowed General Unsecured Silicon Graphics Claims. The Debtors and the Reorganized Debtors shall not be the Disbursing Agent for the General Unsecured Silicon Graphics Claims.

### 4.7 *Cray Unsecured Debenture Claims (Class 7).*

(a) <u>Impairment and Voting.</u> Class 7 is impaired by the Plan. Each holder of a Cray Unsecured Debenture Claim is entitled to vote to accept or reject the Plan.

(b) <u>Distributions.</u> Each holder of an Allowed Cray Unsecured Debenture Claim shall (i) have the right to participate in the Rights Offering to exercise such holder's Ratable Proportion of 700,000 Subscription Rights on the terms and subject to the conditions of Article IX of the Plan and (ii) receive its Ratable Proportion of $1.2 million in Cash (less the Cray Indenture Trustee Fees, which shall be paid solely through the exercise of the Charging Lien on such Cash distribution) on the Effective Date or as soon thereafter as is practicable and in full and complete satisfaction of Claims against the Debtors.

### 4.8 *Subordinated Securities Claims (Class 8).*

(a) <u>Impairment and Voting.</u> Class 8 is impaired by the Plan. Each holder of a Subordinated Securities Claim is deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

(b) <u>Distributions.</u> Each holder of an Allowed Subordinated Securities Claim shall not receive or retain any interest or property under the Plan on account of such Allowed Subordinated Securities Claim. The treatment of Subordinated Securities Claims under the Plan is in accordance with and gives effect to the provisions of section 510(b) of the Bankruptcy Code.

### 4.9 *Old Equity Interests (Class 9).*

(a) <u>Impairment and Voting.</u> Class 9 is impaired by the Plan. Each holder of an Old Equity Interest is deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

(b) <u>Distributions.</u> On the Effective Date, the Old Equity Interests shall be cancelled and the holders of Old Equity Interests shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Old Equity Interests under the Plan.

### 4.10 *General Unsecured SGI Federal Claims (Class 10).*

(a) <u>Impairment and Voting.</u> Class 10 is unimpaired by the Plan. Each holder of an Allowed General Unsecured SGI Federal Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b) <u>Distributions.</u> Except to the extent that a holder of an Allowed General Unsecured SGI Federal Claim agrees to a different treatment, each holder of an Allowed General Unsecured SGI Federal Claim shall receive Cash in an

amount equal to such Allowed General Unsecured SGI Federal Claim on the later of the Effective Date and the date such Allowed General Unsecured SGI Federal Claim becomes an Allowed General Unsecured SGI Federal Claim, or as soon thereafter as is practicable.

### 4.11 *SGI Federal Equity Interests (Class 11)*.

(a) <u>Impairment and Voting.</u> Class 11 is unimpaired by the Plan. Each holder of a SGI Federal Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b) <u>Distributions.</u> The SGI Federal Equity Interests will be unaltered.

### 4.12 *General Unsecured SGI World Trade Claims (Class 12)*.

(a) <u>Impairment and Voting.</u> Class 12 is unimpaired by the Plan. Each holder of an Allowed General Unsecured SGI World Trade Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b) <u>Distributions.</u> Except to the extent that a holder of an Allowed General Unsecured SGI World Trade Claim agrees to a different treatment, each holder of an Allowed General Unsecured SGI World Trade Claim shall receive Cash in an amount equal to such Allowed General Unsecured SGI World Trade Claim on the later of the Effective Date and the date such Allowed General Unsecured SGI World Trade Claim becomes an Allowed General Unsecured SGI World Trade Claim, or as soon thereafter as is practicable.

### 4.13 *SGI World Trade Equity Interests (Class 13)*.

(a) <u>Impairment and Voting.</u> Class 13 is unimpaired by the Plan. Each holder of a SGI World Trade Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b) <u>Distributions.</u> The SGI World Trade Equity Interests will be unaltered.

### 4.14 *General Unsecured Cray Research LLC Claims (Class 14)*.

(a) <u>Impairment and Voting.</u> Class 14 is unimpaired by the Plan. Each holder of an Allowed General Unsecured Cray Research LLC Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b) <u>Distributions.</u> Except to the extent that a holder of an Allowed General Unsecured Cray Research LLC Claim agrees to a different treatment, each holder of an Allowed General Unsecured Cray Research LLC Claim shall receive

Cash in an amount equal to such Allowed General Unsecured Cray Research LLC Claim on the later of the Effective Date and the date such Allowed General Unsecured Cray Research LLC Claim becomes an Allowed General Unsecured Cray Research LLC Claim, or as soon thereafter as is practicable.

### 4.15 *Cray Research LLC Equity Interests (Class 15).*

(a) <u>Impairment and Voting.</u> Class 15 is unimpaired by the Plan. Each holder of a Cray Research LLC Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b) <u>Distributions.</u> The Cray Research LLC Equity Interests will be unaltered.

### 4.16 *General Unsecured SGI Real Estate Claims (Class 16).*

(a) <u>Impairment and Voting.</u> Class 16 is unimpaired by the Plan. Each holder of an Allowed General Unsecured SGI Real Estate Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b) <u>Distributions.</u> Except to the extent that a holder of an Allowed General Unsecured SGI Real Estate Claim agrees to a different treatment, each holder of an Allowed General Unsecured SGI Real Estate Claim shall receive Cash in an amount equal to such Allowed General Unsecured SGI Real Estate Claim on the later of the Effective Date and the date such Allowed General Unsecured SGI Real Estate Claim becomes an Allowed General Unsecured SGI Real Estate Claim, or as soon thereafter as is practicable.

### 4.17 *SGI Real Estate Equity Interests (Class 17).*

(a) <u>Impairment and Voting.</u> Class 17 is unimpaired by the Plan. Each holder of a SGI Real Estate Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b) <u>Distributions.</u> The SGI Real Estate Equity Interests will be unaltered.

### 4.18 *General Unsecured Silicon Studio Claims (Class 18).*

(a) <u>Impairment and Voting.</u> Class 18 is unimpaired by the Plan. Each holder of an Allowed General Unsecured Silicon Studio Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b) <u>Distributions.</u> Except to the extent that a holder of an Allowed General Unsecured Silicon Studio Claim agrees to a different treatment, each holder of an Allowed General Unsecured Silicon Studio Claim shall receive Cash in

an amount equal to such Allowed General Unsecured Silicon Studio Claim on the later of the Effective Date and the date such Allowed General Unsecured Silicon Studio Claim becomes an Allowed General Unsecured Silicon Studio Claim, or as soon thereafter as is practicable.

### 4.19 *Silicon Studio Equity Interests (Class 19).*

(a)    Impairment and Voting. Class 19 is unimpaired by the Plan. Each holder of a Silicon Studio Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Distributions. The Silicon Studio Equity Interests will be unaltered.

### 4.20 *General Unsecured Cray Research America Latina Claims (Class 20).*

(a)    Impairment and Voting. Class 20 is unimpaired by the Plan. Each holder of an Allowed General Unsecured Cray Research America Latina Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Distributions. Except to the extent that a holder of an Allowed General Unsecured Cray Research America Latina Claim agrees to a different treatment, each holder of an Allowed General Unsecured Cray Research America Latina Claim shall receive Cash in an amount equal to such Allowed General Unsecured Cray Research America Latina Claim on the later of the Effective Date and the date such Allowed General Unsecured Cray Research America Latina Claim becomes an Allowed General Unsecured Cray Research America Latina Claim, or as soon thereafter as is practicable.

### 4.21 *Cray Research America Latina Equity Interests (Class 21).*

(a)    Impairment and Voting. Class 21 is unimpaired by the Plan. Each holder of a Cray Research America Latina Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Distributions. The Cray Research America Latina Equity Interests will be unaltered.

### 4.22 *General Unsecured Cray Research Eastern Europe Claims (Class 22).*

(a)    Impairment and Voting. Class 22 is unimpaired by the Plan. Each holder of an Allowed General Unsecured Cray Research Eastern Europe

Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    <u>Distributions.</u> Except to the extent that a holder of an Allowed General Unsecured Cray Research Eastern Europe Claim agrees to a different treatment, each holder of an Allowed General Unsecured Cray Research Eastern Europe Claim shall receive Cash in an amount equal to such Allowed General Unsecured Cray Research Eastern Europe Claim on the later of the Effective Date and the date such Allowed General Unsecured Cray Research Eastern Europe Claim becomes an Allowed General Unsecured Cray Research Eastern Europe Claim, or as soon thereafter as is practicable.

### 4.23 *Cray Research Eastern Europe Equity Interests (Class 23).*

(a)    <u>Impairment and Voting.</u> Class 23 is unimpaired by the Plan. Each holder of a Cray Research Eastern Europe Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    <u>Distributions.</u> The Cray Research Eastern Europe Equity Interests will be unaltered.

### 4.24 *General Unsecured Cray Research India Claims (Class 24).*

(a)    <u>Impairment and Voting.</u> Class 24 is unimpaired by the Plan. Each holder of an Allowed General Unsecured Cray Research India Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    <u>Distributions.</u> Except to the extent that a holder of an Allowed General Unsecured Cray Research India Claim agrees to a different treatment, each holder of an Allowed General Unsecured Cray Research India Claim shall receive Cash in an amount equal to such Allowed General Unsecured Cray Research India Claim on the later of the Effective Date and the date such Allowed General Unsecured Cray Research India Claim becomes an Allowed General Unsecured Cray Research India Claim, or as soon thereafter as is practicable.

### 4.25 *Cray Research India Equity Interests (Class 25).*

(a)    <u>Impairment and Voting.</u> Class 25 is unimpaired by the Plan. Each holder of a Cray Research India Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    <u>Distributions.</u> The Cray Research India Equity Interests will be unaltered.

4.26    *General Unsecured Cray Research International Claims*
*(Class 26).*

(a)    Impairment and Voting. Class 26 is unimpaired by the Plan. Each holder of an Allowed General Unsecured Cray Research International Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Distributions. Except to the extent that a holder of an Allowed General Unsecured Cray Research International Claim agrees to a different treatment, each holder of an Allowed General Unsecured Cray Research International Claim shall receive Cash in an amount equal to such Allowed General Unsecured Cray Research International Claim on the later of the Effective Date and the date such Allowed General Unsecured Cray Research International Claim becomes an Allowed General Unsecured Cray Research International Claim, or as soon thereafter as is practicable.

4.27    *Cray Research International Equity Interests (Class 27).*

(a)    Impairment and Voting. Class 27 is unimpaired by the Plan. Each holder of a Cray Research International Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Distributions. The Cray Research International Equity Interests will be unaltered.

4.28    *General Unsecured Cray Financial Claims (Class 28).*

(a)    Impairment and Voting. Class 28 is unimpaired by the Plan. Each holder of an Allowed General Unsecured Cray Financial Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Distributions. Except to the extent that a holder of an Allowed General Unsecured Cray Financial Claim agrees to a different treatment, each holder of an Allowed General Unsecured Cray Financial Claim shall receive Cash in an amount equal to such Allowed General Unsecured Cray Financial Claim on the later of the Effective Date and the date such Allowed General Unsecured Cray Financial Claim becomes an Allowed General Unsecured Cray Financial Claim, or as soon thereafter as is practicable.

4.29    *Cray Financial Equity Interests (Class 29).*

(a)    Impairment and Voting. Class 29 is unimpaired by the Plan. Each holder of a Cray Financial Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b) <u>Distributions.</u> The Cray Financial Equity Interests will be unaltered.

### 4.30 *General Unsecured Cray Asia/Pacific Claims (Class 30).*

(a) <u>Impairment and Voting.</u> Class 30 is unimpaired by the Plan. Each holder of an Allowed General Unsecured Cray Asia/Pacific Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b) <u>Distributions.</u> Except to the extent that a holder of an Allowed General Unsecured Cray Asia/Pacific Claim agrees to a different treatment, each holder of an Allowed General Unsecured Cray Asia/Pacific Claim shall receive Cash in an amount equal to such Allowed General Unsecured Cray Asia/Pacific Claim on the later of the Effective Date and the date such Allowed General Unsecured Cray Asia/Pacific Claim becomes an Allowed General Unsecured Cray Asia/Pacific Claim, or as soon thereafter as is practicable.

### 4.31 *Cray Asia/Pacific Equity Interests (Class 31).*

(a) <u>Impairment and Voting.</u> Class 31 is unimpaired by the Plan. Each holder of a Cray Asia/Pacific Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b) <u>Distributions.</u> The Cray Asia/Pacific Equity Interests will be unaltered.

### 4.32 *General Unsecured Paragraph Claims (Class 32).*

(a) <u>Impairment and Voting.</u> Class 32 is unimpaired by the Plan. Each holder of an Allowed General Unsecured Paragraph Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b) <u>Distributions.</u> Except to the extent that a holder of an Allowed General Unsecured Paragraph Claim agrees to a different treatment, each holder of an Allowed General Unsecured Paragraph Claim shall receive Cash in an amount equal to such Allowed General Unsecured Paragraph Claim on the later of the Effective Date and the date such Allowed General Unsecured Paragraph Claim becomes an Allowed General Unsecured Paragraph Claim, or as soon thereafter as is practicable.

### 4.33 *Paragraph Equity Interests (Class 33).*

(a) <u>Impairment and Voting.</u> Class 33 is unimpaired by the Plan. Each holder of a Paragraph Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)     Distributions. The Paragraph Equity Interests will be unaltered.

### 4.34   *General Unsecured WTI Claims (Class 34).*

(a)     Impairment and Voting. Class 34 is unimpaired by the Plan. Each holder of an Allowed General Unsecured WTI Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)     Distributions. Except to the extent that a holder of an Allowed General Unsecured WTI Claim agrees to a different treatment, each holder of an Allowed General Unsecured WTI Claim shall receive Cash in an amount equal to such Allowed General Unsecured WTI Claim on the later of the Effective Date and the date such Allowed General Unsecured WTI Claim becomes an Allowed General Unsecured WTI Claim, or as soon thereafter as is practicable.

### 4.35   *WTI Equity Interests (Class 35).*

(a)     Impairment and Voting. Class 35 is unimpaired by the Plan. Each holder of a WTI Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)     Distributions. The WTI Equity Interests will be unaltered.

## ARTICLE V

## MEANS OF IMPLEMENTATION

### 5.1   *Settlement of Claims.*

Pursuant to Bankruptcy Rule 9019, in consideration for the classification, distribution and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims or controversies resolved pursuant to the Plan as embodied in the Global Settlement, including, without limitation, all Claims and controversies regarding the subordination of the Cray Unsecured Debentures. All Plan distributions made to creditors holding Allowed Claims in any class are intended to be and shall be final, and no Plan distribution to the holder of a Claim in one class shall be subject to being shared with or reallocated to the holders of any Claim in another class by virtue of any prepetition collateral trust agreement, shared collateral agreement, subordination agreement, other similar inter-creditor arrangement or deficiency Claim.

### 5.2   *Intercompany Claims.*

Notwithstanding anything to the contrary herein, Intercompany Claims will be adjusted, continued or discharged to the extent determined appropriate by the

Debtors or the Reorganized Debtors, in their sole discretion. Any such transaction may be effected on or subsequent to the Effective Date without any further action by the stockholders of any of the Debtors, the Debtors in Possession or the Reorganized Debtors.

### 5.3 *Merger/Dissolution/Consolidation*.

On or as of the Effective Date or as soon as practicable thereafter and without the need for any further action, the Reorganized Debtors may, with the prior consent of the Ad Hoc Committee (which consent shall not be unreasonably withheld), (a) cause any or all of the Reorganized Debtors or to be merged into one or more of the Reorganized Debtors, dissolved or otherwise consolidated, (b) cause the transfer of assets between or among the Reorganized Debtors or (c) engage in any other transaction in furtherance of the Plan.

### 5.4 *Cancellation of Existing Securities and Agreements*.

Except (a) as otherwise expressly provided in the Plan, (b) with respect to executory contracts or unexpired leases that have been assumed by the Debtors, (c) for purposes of evidencing a right to distributions under the Plan and with respect to the Indenture Trustees' rights to distribute and exercise the Charging Liens against the distributions in accordance with Sections 2.4 and 4.7 of the Plan, or (d) with respect to any Claim that is reinstated and rendered unimpaired under the Plan, on the Effective Date, the Postpetition Financing Agreement, Prepetition Credit Agreement, Indentures and all notes and debentures issued thereunder, all Old Equity Interests and other instruments evidencing any Claims against the Debtors or Old Equity Interests shall be deemed automatically cancelled without further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the Debtors thereunder shall be discharged.

### 5.5 *Surrender of Existing Securities*.

Each holder of the Senior Secured Convertible Notes, Senior Secured Notes and Cray Unsecured Debentures shall surrender such note(s) to the Indenture Trustee, or in the event such note(s) are held in the name of, or by a nominee of, the Depository Trust Company, the Disbursing Agent shall seek the cooperation of the Depository Trust Company to provide appropriate instructions to the Indenture Trustee. No distributions under the Plan shall be made for or on behalf of any such holder unless and until such note is received by the Indenture Trustee or appropriate instructions from the Depository Trust Company shall be received by the Indenture Trustee, or the loss, theft or destruction of such note is established to the reasonable satisfaction of the Indenture Trustee, which satisfaction may require such holder to submit (a) a lost instrument affidavit and (b) an indemnity bond holding the Debtors, Reorganized Debtors, Disbursing Agent and Indenture Trustee harmless in respect of such note and any distributions made in respect thereof. Upon compliance with this Section by a holder of any note, such holder shall, for all purposes under the Plan, be deemed to have surrendered such note. Any holder of Senior Secured Convertible

Notes, Senior Secured Notes or Cray Unsecured Debentures that fails to surrender such note or satisfactorily explain its non-availability to the Indenture Trustee within two (2) years of the Effective Date shall be deemed to have no further Claim against the Debtors and the Reorganized Debtors (or their property) or the Indenture Trustee in respect of such Claim and shall not participate in any distribution under the Plan. All property in respect of such forfeited distributions, including interest thereon, shall revert to the applicable Indenture Trustee and shall be distributed to other holders of the applicable securities who have complied with the requirements set forth in this Section, on a *pro rata* basis, subject, nevertheless, to the Charging Liens of the Indenture Trustees.

### 5.6    *Incurrence of New Indebtedness*.

The Reorganized Debtors' entry into the Exit Facility and the incurrence of the indebtedness thereunder on the Effective Date is hereby authorized without the need for any further corporate action and without any further action by holders of Claims or equity interests; *provided, however*, that the consent of Lampe Conway, which consent shall not be unreasonably withheld, shall be required if the amount of borrowings outstanding under the Exit Facility exceed $100 million on the Effective Date.

### 5.7    *Issuance of New Common Stock*.

The issuance by Reorganized Silicon Graphics of the New Common Stock on the Effective Date is hereby authorized without the need for any further corporate action and without any further action by holders of Claims or equity interests. The New Common Stock shall consist of 25,000,000 authorized shares of Reorganized Silicon Graphics and shall be distributed as follows, subject to adjustment pursuant to Section 6.10 of the Plan: 10,000,000 shares shall be issued and distributed to the holders of Allowed Secured Note Claims and Allowed Cray Unsecured Debenture Claims pursuant to Article IV of the Plan and the Rights Offering set forth in Article IX of the Plan; *provided, however*, that not more than 700,000 such shares shall be issued and distributed to holders of Allowed Cray Unsecured Debenture Claims; and further *provided, however*, that to the extent any portion of the 700,000 shares are not acquired by holders of Allowed Cray Unsecured Debenture Claims or Lampe Conway pursuant to the Lampe Conway Rights Offering Option, such shares shall be acquired by the Backstop Purchasers pursuant to the Backstop Commitment Agreement. The Overallotment Shares will be distributed to the Backstop Purchasers pursuant to Section 9.6 of the Plan, and a certain number of shares not to exceed 10% of the New Common Stock will be distributed pursuant to the terms of the New Management Incentive Plan.

### 5.8    *Exemption from Securities Laws*.

To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the issuance under the Plan of the New Common Stock and the Subscription Rights will be exempt from registration under the

Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder.

### 5.9    *Hart-Scott-Rodino Compliance*.

Any shares of New Common Stock to be distributed under the Plan to any entity required to file a Premerger Notification and Report Form under the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended, shall not be distributed until the notification and waiting periods applicable under such Act to such entity shall have expired or been terminated.

### 5.10    *Registration Rights Agreement*.

On the Effective Date, Reorganized Silicon Graphics shall enter into the Registration Rights Agreement with each holder of at least 7.5% of the New Common Stock as of the Effective Date. Pursuant to the Registration Rights Agreement, Reorganized Silicon Graphics shall agree to register the resale of the shares of New Common Stock issued to any such holders in accordance with the requirements of the Securities Act of 1933, as amended. The Registration Rights Agreement shall provide that each holder owning at least 7.5% of the outstanding New Common Stock upon the Effective Date shall be entitled to two (2) demand rights and unlimited piggyback registration rights. In the event that any New Common Stock is not entitled to exemption from registration under the Securities Act of 1933, the holders thereof shall be entitled to unlimited piggyback registration rights.

### 5.11    *The Liquidating Trust*.

(a)    Execution of Liquidating Trust Agreement.    On or before the Effective Date, the Liquidating Trust Agreement shall be executed by the Debtors and the Trustee, and all other necessary steps shall be taken to establish the Liquidating Trust and the beneficial interests therein which shall be for the benefit of the holders of Allowed Secured Note Claims, as provided in Section 4.5 of the Plan. In the event of any conflict between the terms of this Section 5.11 and the terms of the Liquidating Trust Agreement, the terms of the Liquidating Trust Agreement shall govern. The Liquidating Trust Agreement may provide powers, duties and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties and authorities do not affect the status of the Liquidating Trust as a liquidating trust for United States federal income tax purposes.

(b)    Purpose of the Liquidating Trust.    The Liquidating Trust shall be established for the sole purpose of liquidating and distributing its assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

(c)    Liquidating Trust Assets.    The Liquidating Trust shall consist of the Liquidating Trust Assets. On the Effective Date, the Debtors shall transfer all of the Liquidating Trust Assets to the Liquidating Trust for the benefit of the holders of Allowed Secured Note Claims free and clear of all liens, claims and

encumbrances, and no other entity, including the Reorganized Debtors, shall have any interest, legal, beneficial or otherwise, in the Liquidating Trust or the Liquidating Trust Assets upon their assignment and transfer to the Liquidating Trust. Such transfers shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax. Upon delivery of the Liquidating Trust Assets to the Liquidating Trust, the Reorganized Debtors shall be released of all liability with respect to the delivery of such distributions.

(d) Governance of the Liquidating Trust. The Liquidating Trust shall be governed by the Trustee.

(e) The Trustee. The Trustee shall be designated by the Reorganized Debtors and the Ad Hoc Committee on the Effective Date. In the event the Trustee dies, is terminated or resigns for any reason, the Trust Advisory Board shall designate a successor, which must be reasonably acceptable to the Reorganized Debtors.

(f) Role of the Trustee. In furtherance of and consistent with the purpose of the Liquidating Trust and the Plan, the Trustee shall (i) have the power and authority to hold, manage and distribute the Liquidating Trust Assets, including prosecuting and resolving the Claims belonging to the Liquidating Trust, (ii) hold the Liquidating Trust Assets for the benefit of the holders of Allowed Secured Note Claims, and (iii) have the power and authority to hold, manage, and distribute Cash or non-Cash Liquidating Trust Assets obtained through the exercise of its power and authority. In all circumstances, the Trustee shall act in the best interests of all beneficiaries of the Liquidating Trust and in furtherance of the purpose of the Liquidating Trust.

(g) Nontransferability of Liquidating Trust Interests. The beneficial interests in the Liquidating Trust shall not be certificated and are not transferable.

(h) Cash. The Trustee may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code, *provided, however*, that such investments are investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings, or other controlling authorities.

(i) Distribution of Liquidating Trust Assets. At least annually, the Trustee shall make distributions to the beneficial holders of the Liquidating Trust of all Cash on hand (including any Cash received from the Debtors on the Effective Date, and treating as Cash for purposes of this section any permitted investments under Section 5.11(h) of the Plan), except such amounts (i) as are reasonably necessary to meet contingent liabilities and to maintain the value of the Liquidating Trust Assets during liquidation, (ii) to pay reasonable expenses (including, but not limited to, any taxes imposed on the Liquidating Trust or in respect of the

Liquidating Trust Assets), and (iii) to satisfy other liabilities incurred by the Liquidating Trust in accordance with this Plan or the Liquidating Trust Agreement.

(j)     Costs and Expenses of the Liquidating Trust.  The costs and expenses of the Liquidating Trust, including the fees and expenses of the Trustee and its retained professionals, shall be paid out of the Liquidating Trust Assets.  Fees and expenses incurred in connection with the prosecution and settlement of any Claims shall be considered costs and expenses of the Liquidating Trust.

(k)     Compensation of the Trustee.  The individual(s) comprising the Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar roles.

(l)     Retention of Professionals by the Trustee.  The Trustee may retain and compensate counsel and other professionals to assist in its duties as Trustee on such terms as the Trustee deems appropriate without Bankruptcy Court approval.  Without limiting the foregoing, the Trustee may retain any professional who represented parties in interest in the Reorganization Cases.

(m)     Federal Income Tax Treatment of the Liquidating Trust.

(i)     Liquidating Trust Assets Treated as Owned by Creditors.  For all federal income tax purposes, all parties (including, without limitation, the Debtors, the Trustee and the holders of Allowed Secured Note Claims) shall treat the transfer of the Liquidating Trust Assets to the Liquidating Trust for the benefit of the holders of Allowed Secured Note Claims as (A) a transfer of the Liquidating Trust Assets directly to the holders of Allowed Secured Note Claims followed by (B) the transfer by such holders to the Liquidating Trust of the Liquidating Trust Assets in exchange for beneficial interests in the Liquidating Trust. Accordingly, the holders of the Allowed Secured Note Claims shall be treated for federal income tax purposes as the grantors and owners of their respective share of the Liquidating Trust Assets.

(ii)     Tax Reporting.

(a)     The Trustee shall file returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this Section 5.11(m)(ii).  The Trustee shall also annually send to each holder of a beneficial interest a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and will instruct all such holders to report such items on their federal income tax returns or to forward the appropriate information to the beneficial holders with instructions to report such items on their federal income tax returns.  The Trustee shall also file (or cause to be filed) any other statements, returns or disclosures relating to the Liquidating Trust that are required by any governmental unit.  The trust's taxable income, gain, loss, deduction or credit will be allocated to the holders of Allowed Secured Note Claim in accordance with their relative beneficial interests in the Liquidating Trust.

(b)     As soon as possible after the Effective Date, the Trustee shall make a good-faith valuation of the Liquidating Trust Assets, and such valuation shall be used consistently by all parties (including, without limitation, the Debtors, the Trustee and the holders of Allowed Secured Note Claims) for all federal income tax purposes.

(c)     The Trustee shall be responsible for payments, out of the Liquidating Trust Assets, of any taxes imposed on the trust or its assets.

(d)     The Trustee may request an expedited determination of taxes of the Liquidating Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Liquidating Trust for all taxable periods through the dissolution of the Liquidating Trust.

(n)     <u>Dissolution.</u>  The Trustee and the Liquidating Trust shall be discharged or dissolved, as the case may be, at such time as (i) the Trustee determines, in its sole discretion, that the prosecution of the Liquidating Trust Assets is not likely to yield sufficient additional Liquidating Trust Proceeds to justify further pursuit and (ii) all distributions required to be made by the Trustee under the Plan and the Liquidating Trust Agreement have been made, but in no event shall the Liquidating Trust be dissolved later than three (3) years from the Effective Date unless the Bankruptcy Court, upon motion within the six month period prior to the third anniversary (or at least six (6) months prior to the end of an extension period), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

(o)     <u>Indemnification of Trustee.</u>  The Trustee or the individuals comprising the Trustee, as the case may be, and the Trustee's agents and professionals, shall not be liable for actions taken or omitted in its capacity as, or on behalf of, the Trustee, except those acts arising out of its or their own willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its actions or inactions in its capacity as, or on behalf of, the Trustee, except for any actions or inactions involving willful misconduct or gross negligence.  Any indemnification claim of the Trustee (and the other parties entitled to indemnification under this subsection) shall be satisfied from the Liquidating Trust Assets.  The Trustee shall be entitled to rely, in good-faith, on the advice of its retained professionals.

# ARTICLE VI

## PROVISIONS GOVERNING VOTING AND DISTRIBUTIONS

### 6.1     *Voting of Claims*.

Each holder of an Allowed Claim in an impaired class of Claims as of the Voting Record Date that is entitled to vote on the Plan pursuant to Article III and Article IV of the Plan shall be entitled to vote separately to accept or reject the Plan, as provided in the Disclosure Statement Order.

### 6.2     *Nonconsensual Confirmation*.

If any impaired class of Claims entitled to vote shall not accept the Plan by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan in accordance with Section 14.4 of the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both.  With respect to the classes of Subordinated Securities Claims and Old Equity Interests, both of which are deemed to reject the Plan, the Debtors shall request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

### 6.3     *Distributions On Account of General Unsecured Silicon Graphics Claims.*

Distributions with respect to holders of Allowed General Unsecured Silicon Graphics Claims shall only be made on each Distribution Date; *provided, however*, that, if any Disputed General Unsecured Silicon Graphics Claim becomes Allowed subsequent to the Initial Distribution Date, the Reorganized Debtors may, in their sole discretion, make a distribution with respect to such Claim prior to a Distribution Date.  All Allowed General Unsecured Silicon Graphics Claims held by a creditor shall be aggregated and treated as a single Claim.  At the written request of the Reorganized Debtors or the Disbursing Agent, any creditor holding multiple Allowed General Unsecured Silicon Graphics Claims shall provide to the Reorganized Debtors or the Disbursing Agent, as the case may be, a single address to which any distributions shall be sent.

### 6.4     *Date of Distributions*.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 6.5     *Disbursing Agent*.

All distributions under the Plan shall be made by Reorganized Silicon Graphics as Disbursing Agent or such other entity designated by Reorganized Silicon

Graphics as a Disbursing Agent. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court and, in the event that a Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by Reorganized Silicon Graphics.

### 6.6 *Rights and Powers of Disbursing Agent*.

The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (b) make all distributions contemplated hereby, (c) employ professionals to represent it with respect to its responsibilities and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

### 6.7 *Expenses of the Disbursing Agent*.

Except as otherwise ordered by the Bankruptcy Court, any reasonable fees and expenses incurred by the Disbursing Agent (including, without limitation, taxes and reasonable attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash by the Reorganized Debtors in the ordinary course of business.

### 6.8 *Delivery of Distributions*.

(a)     Last Known Address.  Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim or Allowed Administrative Expense Claim shall be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtors or its agents, as applicable, unless the Debtors or Reorganized Debtors have been notified in writing of a change of address, including, without limitation, by the filing of a proof of Claim by such holder that contains an address for such holder different than the address of such holder as set forth on the Schedules.  In the event that any distribution to any holder is returned as undeliverable, the Disbursing Agent shall use commercially reasonable efforts to determine the current address of such holder, but no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; provided that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interest in property shall be returned by the Disbursing Agent to the Reorganized Debtors and shall revert to Reorganized Silicon Graphics, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred; *provided, however*, that unclaimed distributions to holders of Allowed General Unsecured Silicon Graphics Claims shall be held by the Disbursing Agent and

shall be redistributed on a *pro rata* basis to the other holders of Allowed General Unsecured Silicon Graphics Claims accordingly.

(b)     <u>Distributions by Prepetition Agent.</u>  The Prepetition Agent shall be the Disbursing Agent for the Prepetition Credit Agreement Claims. Distributions under the Plan to holders of Allowed Prepetition Credit Agreement Claims shall be made by the Reorganized Debtors to the Prepetition Agent, which, in turn, shall make the distributions to the holders of such Allowed Claims.  Upon delivery of the distributions set forth in Section 4.4(b) of the Plan to the Prepetition Agent, the Reorganized Debtors shall be released of all liability with respect to the delivery of such distributions.

(c)     <u>Distributions by Indenture Trustee.</u>  The Indenture Trustee shall be the Disbursing Agent for the Secured Note Claims and the Cray Unsecured Debenture Claims.  Distributions under the Plan to holders of Allowed Secured Note Claims and Allowed Cray Unsecured Debenture Claims shall be made by the Reorganized Debtors to the Indenture Trustee, which, in turn, shall make the distributions to the holders of such Allowed Claims, except that the distributions in respect of the Rights Offering shall be administered in accordance with Article IX of the Plan.  Upon delivery of the distributions set forth in Article IV of the Plan, to the Indenture Trustee, the Reorganized Debtors shall be released of all liability with respect to the delivery of such distributions.

(d)     <u>Distributions by the Disbursing Agent for the General Unsecured Silicon Graphics Claims.</u>

(i)     On the Effective Date, the Debtors or the Reorganized Debtors shall fund $9.0 million in Cash into a segregated account maintained by the Disbursing Agent for the benefit of the holders of Allowed General Unsecured Silicon Graphics Claims.  Any interest earned thereon shall be first applied towards the fees and expenses of such Disbursing Agent with respect to such account (including any taxes imposed on, or with respect to, the account), with any excess interest reverting to the Reorganized Debtors.  Distributions under the Plan to holders of Allowed General Unsecured Silicon Graphics Claims shall be made by such Disbursing Agent directly to the holders of such Claims in accordance with Article IX of the Plan.  Upon funding of such $9.0 million in Cash to the Disbursing Agent, the Reorganized Debtors shall be released of all liability with respect to the delivery of such distributions.

(ii)     Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Disbursing Agent shall (a) treat the segregated account established under this Section 6.8(d) as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (b) to the extent permitted by applicable law, report consistently for state and local income tax purposes.  All parties (including the Debtors, Reorganized Debtors and holders of

40

General Unsecured Silicon Graphics Claims) shall report for tax purposes consistently with such treatment.

        (iii)    The Disbursing Agent may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the segregated account established under this section 6.8(d) of the Plan for all taxable periods through the termination of such account.

        (e)    <u>Distribution Record Date.</u>  With respect to holders of all General Unsecured Claims against the Debtors, on the Distribution Record Date, the claims register shall be closed. The Debtors and the Reorganized Debtors shall have no obligation to recognize any transfer of any Claims occurring after the close of business after such date.

### 6.9    *Manner of Payment*.

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

All distributions of Cash, New Common Stock and Subscription Rights, as applicable, to the creditors of the each of the Debtors under the Plan shall be made by, or on behalf of, the applicable Debtor. Reorganized Silicon Graphics shall make a capital contribution, either directly or indirectly, to the applicable Reorganized Debtor in an amount equal to the Cash to be distributed to the creditors of such Debtor, but only at such time as, and to the extent, the Cash is actually distributed to holders of Allowed Claims.

### 6.10    *No Fractional Distributions*.

No fractional shares of New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional shares. When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized shares of New Common Stock to be distributed to holders of Allowed Claims shall be adjusted as necessary to account for the foregoing rounding.

### 6.11    *Cash Distributions*.

No payment of Cash less than $100 shall be made to any holder of an Allowed Claim unless a request therefor is made in writing.

### 6.12 *Setoffs and Recoupment*.

The Debtors may, but shall not be required to, setoff against or recoup from any Claim any Claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or Reorganized Debtors of any such Claim it may have against such claimant.

### 6.13 *Allocation of Plan Distributions Between Principal and Interest*.

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

## ARTICLE VII

## PROCEDURES FOR TREATING DISPUTED CLAIMS UNDER PLAN OF REORGANIZATION

### 7.1 *Objections*.

As of the Effective Date, objections to, and requests for estimation of, Administrative Expense Claims and Claims against the Debtors may be interposed and prosecuted only by the Reorganized Debtors. Such objections and requests for estimation shall be served on the respective claimant and filed with the Bankruptcy Court on or before the latest of (a) ninety (90) days after the Effective Date, (b) sixty (60) days after a proof of Claim has been filed with the claims agent appointed in the Reorganization Cases or (c) such later date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clauses (a) and (b) above.

### 7.2 *No Distributions Pending Allowance*.

Notwithstanding any other provision of the Plan, if any portion of an Administrative Expense Claim or Claim is Disputed, no payment or distribution provided hereunder shall be made on account of such Administrative Expense Claim or Claim unless and until such Disputed Administrative Expense Claim or Claim becomes Allowed; *provided, however*, that the Disbursing Agent shall make distributions on account of the non-Disputed portion of any General Unsecured Silicon Graphics Claim as set forth in Article IV of the Plan.

### 7.3 *Distributions After Allowance*.

To the extent that a Disputed Claim, Disputed Administrative Expense Claim or portion of a Disputed General Unsecured Silicon Graphics Claim becomes Allowed, distributions (if any) shall be made to the holder of such Claim in accordance

with the provisions of the Plan. Except with respect to General Unsecured Silicon Graphics Claims, as soon as practicable after the date that the order or judgment of the Bankruptcy Court Allowing any Disputed Claim or Disputed Administrative Expense Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Administrative Expense Claim or Claim the distribution (if any) to which such holder is entitled under the Plan.

### 7.4 *Resolution of Administrative Expense Claims and Claims*.

On and after the Effective Date, the Reorganized Debtors shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Administrative Expense Claims and Claims against the Debtors and to compromise, settle or otherwise resolve any Disputed Administrative Expense Claims and Disputed Claims against the Debtors without approval of the Bankruptcy Court, other than with respect to Administrative Expense Claims relating to compensation of professionals for fees and expenses incurred prior to the Confirmation Date.

### 7.5 *Estimation of Claims*.

The Debtors or the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Contingent Claim, Unliquidated Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether any of the Debtors or the Reorganized Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Contingent Claim, Unliquidated Claim or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

### 7.6 *Interest*.

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest thereon.

**ARTICLE VIII**

**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

8.1 *Assumption or Rejection of Executory Contracts and Unexpired Leases.*

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtors and any person or entity prior to the Commencement Date shall be deemed rejected by the Debtors as of the Effective Date, except for any executory contract or unexpired lease (a) that has been assumed pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (b) as to which a motion for approval of the assumption of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date or (c) that is specifically designated as a contract or lease to be assumed on schedules 8.1(A) (executory contracts) or 8.1(B) (unexpired leases), which schedules shall be contained in the Plan Supplement and which shall be deemed to include all Customer Support Agreements, Non-Disclosure Agreements, IP License Agreements and agreements between the Debtors and any U.S. governmental entity; *provided, however,* that the Debtors reserve the right, on or prior to the Confirmation Date, to amend such schedules to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be, respectively, either rejected or assumed as of the Effective Date. The Debtors shall provide notice of any such amendments to the parties to the executory contracts and unexpired leases affected thereby. The listing of a document on schedules 8.1(A) or (B) shall not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder. Whether or not identified on schedules 8.1(A) or 8.1(B), all Customer Support Agreements, Non-Disclosure Agreements, IP License Agreements and agreements between the Debtors and any U.S. governmental entity shall be assumed on the Effective Date pursuant to the Plan. Whether or not identified on schedules 8.1(A) or 8.1(B), any and all outstanding purchase orders issued to the Debtors by the Debtors' customers shall be continued on the Effective Date.

8.2 *Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases.*

Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (a) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed pursuant to Section 8.1 of the Plan, (b) the extension of time, pursuant to section 365(d)(4) of the Bankruptcy Code, within which the Debtors may assume, assume and assign or reject the executory contracts and unexpired leases specified in Section 8.1 of the Plan through the date of entry of an order approving the assumption, assumption and assignment or rejection of such executory contracts and unexpired leases and (c) the approval, pursuant to sections

365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Section 8.1 of the Plan. The effect of confirmation of the Debtors' plan of reorganization and the results thereof and the transactions resulting therefrom or any other effect of the Reorganization Cases, including specifically the changes to the Debtors' boards of directors and equity interests, shall not be and are not a "change of control" and shall not trigger any such or similar provision of any of the executory contracts and unexpired leases assumed hereby.

### 8.3    *Inclusiveness*.

Unless otherwise specified on schedules 8.1(A) or (B) of the Plan Supplement, each executory contract and unexpired lease listed or to be listed therein shall include any and all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on such schedule.

### 8.4    *Cure of Defaults*.

Except to the extent that different treatment has been agreed to by the non-debtor party or parties to any executory contract or unexpired lease to be assumed pursuant to Section 8.1 of the Plan, the Debtors shall, pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, within at least twenty (20) days prior to the later of (a) the hearing on the Debtors' motion for assumption or assumption and assignment and (b) the Confirmation Hearing, file with the Bankruptcy Court and serve by first class mail on each non-debtor party to such executory contracts or unexpired leases to be assumed pursuant to Section 8.1 of the Plan, a notice, which shall list the cure amount as to each executory contract or unexpired lease to be assumed.  The parties to such executory contracts or unexpired leases to be assumed or assumed and assigned by the Debtors shall have twenty (20) days from the date of service of such notice to file and serve any objection to the cure amounts listed by the Debtors.  If there are any objections filed, the Bankruptcy Court shall hold a hearing on a date to be set by the Bankruptcy Court.  Notwithstanding Section 8.1 of the Plan, the Debtors shall retain their rights to reject any of their executory contracts or unexpired leases that are subject to a dispute concerning amounts necessary to cure any defaults through the Effective Date.

### 8.5    *Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan*.

Proofs of Claim for damages arising out of the rejection of an executory contract or unexpired lease must be filed with the Bankruptcy Court and served upon the attorneys for the Debtors on or before the date that is thirty (30) days after the later

of (a) the date of service of notice of the Confirmation Date, (b) notice of modification to schedules 8.1(A) or (B) of the Plan Supplement (solely with respect to the party directly affected by such modification) or (c) the date of service of notice of such later rejection date that occurs as a result of a dispute concerning amounts necessary to cure any defaults (solely with respect to the party directly affected by such rejection). In the event that the rejection of an executory contract or unexpired lease by the Debtors pursuant to the Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not evidenced by a timely filed proof of Claim, shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors, or their properties or interests in property as agents, successors or assigns.

### 8.6     *Indemnification Obligations.*

Subject to the occurrence of the Effective Date, the obligations of the Debtors as of the Commencement Date to indemnify, defend, reimburse or limit the liability of directors, officers or employees who are directors, officers or employees of the Debtors on or after the Confirmation Date, respectively, against any claims or causes of action as provided in the Debtors' certificates of incorporation, bylaws, other organizational documents or applicable law, shall survive confirmation of the Plan, remain unaffected thereby and not be discharged, irrespective of whether such indemnification, defense, reimbursement or limitation is owed in connection with an event occurring before or after the Commencement Date.

### 8.7     *Insurance Policies.*

Notwithstanding anything contained in the Plan to the contrary, unless specifically rejected by order of the Bankruptcy Court, all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, are continued pursuant to the Final Insurance Order. Nothing contained in this Section shall constitute or be deemed a waiver of any cause of action that the Debtors may hold against any entity, including, without limitation, the insurer, under any of the Debtors' policies of insurance.

### 8.8     *Retiree Benefits.*

On and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, the Reorganized Debtors shall continue to pay all retiree benefits of the Debtors (within the meaning of and subject to section 1114 of the Bankruptcy Code) for the duration of the period for which the Debtors had obligated themselves to provide such benefits and subject to the right of the Reorganized Debtors to modify or terminate such retiree benefits in accordance with the terms thereof.

### 8.9     *Benefit Plans.*

All employee compensation and Benefit Plans of the Debtors, including Benefit Plans and programs subject to sections 1114 and 1129(a)(13) of the

Bankruptcy Code, entered into before or after the Commencement Date and not since terminated, shall be deemed to be, and shall be treated as if they were, executory contracts that are assumed hereunder. The Debtors' obligations under such plans and programs shall survive confirmation of the Plan, except for (a) executory contracts or Benefit Plans rejected pursuant to the Plan (to the extent such rejection does not violate sections 1114 and 1129(a)(13) of the Bankruptcy Code), (b) executory contracts or employee Benefit Plans that have previously been rejected, are the subject of a motion to reject pending as of the Confirmation Date or have been specifically waived by the beneficiaries of any employee Benefit Plan or contract and (c) such executory contracts or employee Benefit Plans to the extent they relate to former employees whose employment by the Debtors terminated prior to the Commencement Date. Notwithstanding anything to the contrary in the Plan or the Confirmation Order, no equity, stock, option or other similar plans in effect on or prior to the Commencement Date shall be assumed.

# ARTICLE IX

# THE RIGHTS OFFERING

### 9.1 *Issuance of Subscription Rights*.

Each holder of an Allowed Secured Note Claim that was a holder as of the Secured Note Rights Offering Record Date shall receive Subscription Rights entitling such holder to purchase its Ratable Proportion, as of the Secured Note Rights Offering Record Date, of 6,800,000 shares of New Common Stock, which New Common Stock shall be issued on the Effective Date or as soon thereafter as is practicable. Each holder of an Allowed Cray Unsecured Debenture Claim that was a holder as of the Cray Unsecured Debenture Rights Offering Record Date, shall receive Subscription Rights entitling such holder to purchase its Ratable Proportion, as of the Cray Unsecured Debenture Rights Offering Record Date, of 700,000 shares of New Common Stock, which New Common Stock shall be issued on the Effective Date or as soon thereafter as is practicable. Holders of Allowed Secured Note Claims and Allowed Cray Unsecured Debenture Claims, as of the applicable record dates, shall have the right, but not the obligation, to participate in the Rights Offering as provided herein.

### 9.2 *Subscription Period*.

The Rights Offering shall commence on the date Subscription Forms are mailed to holders of Allowed Secured Note Claims and Allowed Cray Unsecured Debenture Claims, which shall be no later than seven (7) Business Days after entry of the Disclosure Statement Order. Each holder of an Allowed Secured Note Claim and Allowed Cray Unsecured Debenture Claim intending to participate in the Rights Offering must affirmatively elect to exercise its Subscription Rights on or prior to the Subscription Expiration Date. After the Subscription Expiration Date and subject to the Lampe Conway Rights Offering Option, unexercised Subscription Rights shall be treated as acquired by the Backstop Purchasers and any exercise of such Subscription

Rights by any entity other than the Backstop Purchasers shall be null and void and the Debtors shall not be obligated to honor any such purported exercise received by the Rights Offering Agent after the Subscription Expiration Date, regardless of when the documents relating to such exercise were sent.

9.3 **_Subscription Purchase Price_**.

Each holder of a Subscription Right shall be required to pay, on or prior to the Subscription Expiration Date, the Subscription Purchase Price for each share of New Common Stock to be issued thereunder.

9.4 **_Exercise of Subscription Rights_**.

In order to exercise Subscription Rights, each holder of an Allowed Secured Note Claim and Allowed Cray Unsecured Debenture Claim must: (a) be a holder as of the Secured Note Rights Offering Record Date or the Cray Unsecured Debenture Rights Offering Record Date, as applicable, (b) return a duly completed Subscription Form to the Rights Offering Agent so that such form is actually received by the Rights Offering Agent on or before the Subscription Expiration Date and (c) pay to the Rights Offering Agent on or before the Subscription Expiration Date the Subscription Purchase Price multiplied by the number of shares of New Common Stock it seeks to purchase in accordance with the wire instructions set forth on the Subscription Form or by bank or cashier's check delivered to the Rights Offering Agent together with the Subscription Form. If, on or prior to the Subscription Expiration Date, the Rights Offering Agent for any reason does not receive from a given holder of Subscription Rights both a duly completed Subscription Form and immediately available funds as set forth above, such holder shall be deemed to have relinquished and waived its right to participate in the Rights Offering. The payments made in accordance with the Rights Offering shall be deposited and held by the Rights Offering Agent in the Rights Offering Trust Account. The Rights Offering Trust Account will be maintained by the Rights Offering Agent for the purpose of holding the money for administration of the Rights Offering until the Effective Date or such other later date, at the option of the Reorganized Debtors. The Rights Offering Agent shall not use such funds for any other purpose and shall not encumber or permit such funds to be encumbered with any Lien or similar encumbrance.

Each holder of an Allowed Secured Note Claim or Allowed Cray Unsecured Debenture Claim, as of the applicable record dates, may exercise all or any portion of such holder's Subscription Rights pursuant to the Subscription Form. The valid exercise of Subscription Rights shall be irrevocable. In order to facilitate the exercise of the Subscription Rights, on the commencement date of the Rights Offering, the Debtors will mail the Subscription Form to each holder of an Allowed Secured Note Claim as of the Secured Note Rights Offering Record Date and each holder of an Allowed Cray Unsecured Debenture Claim as of the Cray Unsecured Debenture Rights Offering Record Date together with appropriate instructions for the proper completion, due execution and timely delivery of the Subscription Form, as well as instructions for payment. The Debtors may adopt such additional detailed procedures consistent with

48

the provisions of this Article IX to more efficiently administer the exercise of the Subscription Rights.

### 9.5    *Transfer Restriction; Revocation.*

The Subscription Rights are not transferable. Any such transfer or attempted transfer is null and void and the Debtors will not treat any purported transferee as the holder of any Subscription Rights. Once the holder of an Allowed Secured Note Claim or Allowed Cray Unsecured Debenture Claim has properly exercised its Subscription Rights, such exercise will not be permitted to be revoked.

### 9.6    *Lampe Conway Rights Offering Option.*

Pursuant to the Global Settlement, any amount of New Common Stock not purchased pursuant to the Subscription Rights issued to holders of Allowed Cray Unsecured Debenture Claims may be purchased by Lampe Conway, prior to the Backstop Purchasers~~, in accordance with the terms and subject to the conditions of the Lampe Conway Rights Offering Common Stock Purchase Agreement~~. Lampe Conway shall notify the Debtors in writing on or before five (5) days after the deadline to exercise such Subscription Rights if it elects to purchase the shares of New Common Stock not purchased pursuant to the Subscription Rights issued to holders of Allowed Cray Unsecured Debenture Claims and the amount thereof it so elects. Lampe Conway shall pay to the Rights Offering Agent, by wire transfer in immediately available funds prior to the Effective Date, Cash in an amount equal to the Subscription Purchase Price multiplied by the number of shares of New Common Stock it intends to purchase pursuant to the Lampe Conway Rights Offering Option. The Rights Offering Agent shall deposit such payment into the Rights Offering Trust Account. Any shares of New Common Stock not timely purchased and paid for by Lampe Conway pursuant to the Lampe Conway Rights Offering Option shall be purchased pursuant to the Backstop Commitment Agreement.

### 9.7    *Backstop of the Rights Offering.*

Any amount of New Common Stock not purchased pursuant to the Subscription Rights issued to the holders of Allowed Secured Note Claims and Allowed Cray Unsecured Debenture Claims and the Lampe Conway Rights Offering Option shall be purchased by the Backstop Purchasers pursuant to the terms and subject to the conditions of the Backstop Commitment Agreement at the same price provided in the Rights Offering. Pursuant to the terms and subject to the conditions of the Backstop Commitment Agreement, the Backstop Purchasers shall pay to the Rights Offering Agent, by wire transfer in immediately available funds prior to the Effective Date, Cash in an amount equal to the Subscription Purchase Price multiplied by the number of shares of New Common Stock not purchased pursuant to the Subscription Rights issued to the holders of Allowed Secured Note Claims. The Rights Offering Agent shall deposit such payment into the Rights Offering Trust Account.

In consideration for their agreement to backstop the Rights Offering, the Backstop Purchasers shall receive the Backstop Fee and Subscription Rights to purchase the Overallotment Shares, the allocation of which is set forth in the Backstop Commitment Agreement.

### 9.8 *Distribution of the New Common Stock.*

On the Effective Date or as soon as reasonably practicable thereafter, the Rights Offering Agent shall facilitate the distribution of the New Common Stock purchased pursuant to the Rights Offering.

### 9.9 *No Interest.*

No interest shall be paid to entities exercising Subscription Rights on account of amounts paid in connection with such exercise.

### 9.10 *Exercise of Subscription Rights.*

All questions concerning the timeliness, viability, form and eligibility of any exercise of Subscription Rights shall be determined by the Debtors, whose good-faith determinations shall be final and binding. The Debtors, in their reasonable discretion, may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as they may determine, or reject the purported exercise of any Subscription Rights. Subscription Forms shall be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Debtors determine in their reasonable discretion. The Debtors will use commercially reasonable efforts to give notice to any holder of Subscription Rights regarding any defect or irregularity in connection with any purported exercise of Subscription Rights by such holder and may permit such defect or irregularity to be cured within such time as they may determine in good-faith to be appropriate; *provided, however*, that neither the Debtors nor the Disbursing Agent shall incur any liability for failure to give such notification.

## ARTICLE X

## CORPORATE GOVERNANCE AND MANAGEMENT OF THE REORGANIZED DEBTORS

### 10.1 *General.*

On the Effective Date, the management, control and operation of Reorganized Silicon Graphics and the other Reorganized Debtors shall become the general responsibility of the New Boards of each Reorganized Debtor, respectively.

### 10.2 *New Organizational Documents.*

Each of the Reorganized Debtors shall be deemed to have adopted its respective New Organizational Documents effective as of the Effective Date. On the

Effective Date, or as soon thereafter as practicable, the Reorganized Debtors shall file their New Organizational Documents, as required or deemed appropriate, with the appropriate Persons in their respective jurisdictions of incorporation or establishment. The New Organizational Documents, to the extent applicable, shall prohibit the issuance of nonvoting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code.

### 10.3   *New Boards of the Reorganized Debtors*.

On the Effective Date, the operation of Reorganized Silicon Graphics shall become the general responsibility of its New Board, subject to, and in accordance with, its New Organizational Documents.  The initial New Board of Reorganized Silicon Graphics shall consist of fiveseven members, who shall be selected by the Ad Hoc Committee in consultation with the Debtors.  The initial members of the New Boards of the Reorganized Debtors, together with biographical information, shall be set forth in the Plan Supplement.

### 10.4   *Officers of the Reorganized Debtors*.

The officers of the Debtors immediately prior to the Effective Date shall serve as the initial officers of the Reorganized Debtors on and after the Effective Date.  Such officers shall serve in accordance with applicable non-bankruptcy law, any employment agreement entered into with the Reorganized Debtors on or after the Effective Date and the New Organizational Documents.

### 10.5   *Management Incentive Plan*.

On the Effective Date, Reorganized Silicon Graphics shall be deemed to have adopted the Management Incentive Plan.  The solicitation of votes on the Plan shall include, and be deemed to be, a solicitation for approval of the Management Incentive Plan.  Entry of the Confirmation Order shall constitute such approval.

### 10.6   *New Management Agreements*.

On the Effective Date or as soon thereafter as is practicable, Reorganized Silicon Graphics shall enter into the New Management Agreements.

## ARTICLE XI

## CONDITIONS PRECEDENT TO EFFECTIVE DATE

### 11.1   *Conditions Precedent to Effectiveness*.

The Effective Date shall not occur and the Plan shall not become effective unless and until the following conditions are satisfied in full or waived in accordance with Section 11.2 of the Plan:

(a)     The Confirmation Order, in form and substance acceptable to the Debtors, shall have been entered and is a Final Order;

(b)     The conditions precedent to the effectiveness of the Exit Facility and the Backstop Commitment Agreement are satisfied or waived by the parties thereto and the Reorganized Debtors have access to funding under the Exit Facility;

(c)     The amount of Allowed General Unsecured Claims against the Debtors other than Silicon Graphics and the amount of Disputed General Unsecured Claims against the Debtors other than Silicon Graphics that the Debtors estimate in good faith, after consultation with the Ad Hoc Committee, will ultimately be Allowed shall not aggregate more than $1,000,000;

(d)     All actions and all agreements, instruments or other documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance satisfactory to the Debtors; and

(e)     All authorizations, consents and regulatory approvals, if any, required by the Debtors in connection with the consummation of the Plan are obtained and not revoked, including the expiration or termination of the notification and waiting periods applicable under the Hart-Scott Rodino Antitrust Improvement Act of 1976, as amended, with respect to distributions of any shares of New Common Stock pursuant to the Plan to any entity required to file a Premerger Notification and Report Form thereunder.

### 11.2   *Waiver of Conditions*.

Each of the conditions precedent in Section 11.1 hereof may be waived, in whole or in part, by the Debtors with the prior consent of the Ad Hoc Committee (which consent shall not be unreasonably withheld).  Any such waivers may be effected at any time, without notice, without leave or order of the Bankruptcy Court and without any formal action.

### 11.3   *Satisfaction of Conditions*.

Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.  In the event that one or more of the conditions specified in Section 11.1 of the Plan have not occurred or otherwise been waived pursuant to Section 11.2 of the Plan, (a) the Confirmation Order shall be vacated, (b) the Debtors and all holders of Claims and interests including any Old Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred and (c) the Debtors' obligations with respect to Claims and equity interests shall remain unchanged and nothing contained herein shall constitute or be deemed a waiver or release of any Claims or equity interests by or against the Debtors or any

other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

# ARTICLE XII

## EFFECT OF CONFIRMATION

### 12.1    *Vesting of Assets*.

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, the Debtors, their properties and interests in property and their operations shall be released from the custody and jurisdiction of the Bankruptcy Court, and all property of the estates of the Debtors shall vest in the Reorganized Debtors free and clear of all Claims, Liens, encumbrances, charges and other interests, except as provided in the Plan. For the avoidance of doubt, such property of the estates does not include the $9.0 million funded to the Disbursing Agent pursuant to Section 4.6 of the Plan. From and after the Effective Date, the Reorganized Debtors may operate their business and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules or the Local Bankruptcy Rules, subject to the terms and conditions of the Plan.

### 12.2    *Binding Effect*.

Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Old Equity Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or interests including any Old Equity Interest of such holder is impaired under the Plan, whether or not such holder has accepted the Plan and whether or not such holder is entitled to a distribution under the Plan.

### 12.3    *Discharge of Claims and Termination of Equity Interests*.

Except as provided in the Plan, the rights afforded in and the payments and distributions to be made under the Plan shall terminate all Old Equity Interests and discharge all existing debts and Claims of any kind, nature or description whatsoever against or in the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code. Except as provided in the Plan, upon the Effective Date, all existing Claims against the Debtors and Old Equity Interests shall be, and shall be deemed to be, discharged and terminated, and all holders of such Claims and Old Equity Interests shall be precluded and enjoined from asserting against the Reorganized Debtors, their successors or assignees or any of their assets or properties, any other or further Claim or Old Equity Interest based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of Old Equity Interest and whether or not the facts or legal bases therefore were known or existed prior to the Effective Date.

### 12.4 *Discharge.*

Upon the Effective Date, in consideration of the distributions to be made under the Plan and except as otherwise expressly provided in the Plan, each holder (as well as any trustees and agents on behalf of each holder) of a Claim or Old Equity Interest and any Affiliate of such holder shall be deemed to have forever waived, released and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Old Equity Interests, rights and liabilities that arose prior to the Effective Date. Upon the Effective Date, all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Old Equity Interest in the Debtors.

### 12.5 *Injunction or Stay.*

Except as otherwise expressly provided herein or in the Confirmation Order, all Persons or entities who have held, hold or may hold Claims against or Old Equity Interests in are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Old Equity Interest against any of the Reorganized Debtors, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any Reorganized Debtor with respect to such Claim or Old Equity Interest, (c) creating, perfecting or enforcing any encumbrance of any kind against any Reorganized Debtor or against the property or interests in property of any Reorganized Debtor with respect to such Claim or Old Equity Interest, (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due to any Reorganized Debtor or against the property or interests in property of any Reorganized Debtor with respect to such Claim or Old Equity Interest and (e) pursuing any claim released pursuant to this Article XII of the Plan.

### 12.6 *Terms of Injunction or Stay.*

Unless otherwise provided in the Confirmation Order, all injunctions or stays arising under or entered during the Reorganization Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, that are in existence on the Confirmation Date shall remain in full force and effect until the Effective Date.

### 12.7 *Exculpation*.

Notwithstanding anything herein to the contrary, as of the Effective Date, none of the Debtors, the Reorganized Debtors, the lenders party to the Postpetition Financing Agreement, the Backstop Purchasers, the Creditors' Committee, the Indenture Trustees, Lampe Conway and the Ad Hoc Committee and their respective officers, directors, members, employees, accountants, financial advisors, investment bankers, agents, restructuring advisors and attorneys and representatives (but, in each case, solely in their capacities as such) shall have or incur any liability for any Claim, cause of action or other assertion of liability for any act taken or omitted to be taken in connection with, or arising out of, the Reorganization Cases, the formulation, dissemination, confirmation, consummation or administration of the Plan, property to be distributed under the Plan or any other act or omission in connection with the Reorganization Cases, the Plan, the Disclosure Statement or any contract, instrument, document or other agreement related thereto; *provided*, *however*, that the foregoing shall not affect the liability of any person that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct or gross negligence. <u>Nothing in this Section 12.7 shall limit the liability of the professionals of the Debtors, the Reorganized Debtors, the lenders party to the Postpetition Financing Agreement, the Backstop Purchasers, the Creditors' Committee, the Indenture Trustees, Lampe Conway and the Ad Hoc Committee to their respective clients pursuant to DR 6-102 of the Code of Professional Responsibility.</u>

### 12.8 *Releases*.

Effective as of the Confirmation Date but subject to the occurrence of the Effective Date, and in consideration of the services of (a) the present and former directors, officers, members, employees, affiliates, agents, financial advisors, restructuring advisors, attorneys and representatives of or to the Debtors who acted in such capacities after the Commencement Date; (b) the lenders party to the Postpetition Financing Agreement; (c) the Backstop Purchasers; (d) the Ad Hoc Committee; (e) each Indenture Trustee; (f) the Creditors' Committee; (g) Lampe Conway and (h) the holder of the Allowed Secured Note Claims, (x) the Debtors; (y) each holder of a Claim that votes to accept the Plan (or is deemed to accept the Plan) and (z) to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each holder of a Claim that does not vote to accept the Plan, shall release unconditionally and forever each present or former director, officer, member, employee, affiliate, agent, financial advisor, restructuring advisor, attorney and representative (and their respective affiliates) of the Debtors who acted in such capacity after the Commencement Date, the lenders party to the Postpetition Financing Agreement, the Backstop Purchasers, the Ad Hoc Committee, each Indenture Trustee, the Creditors' Committee, Lampe Conway, each holder of an Allowed Secured Note Claim and each of their respective members, officers, directors, agents, financial advisors, attorneys,

**employees, equity holders, parent corporations, subsidiaries, partners, affiliates and representatives (but, in each case, solely in their capacities as such) from any and all Claims or causes of action whatsoever in connection with, related to, or arising out of the Reorganization Cases, the pursuit of confirmation of the Plan, the consummation thereof, the administration thereof or the property to be distributed thereunder; *provided, however,* that the foregoing shall not operate as a waiver of or release from any causes of action arising out of the willful misconduct or gross negligence of any such person or entity.**

### 12.9 *Avoidance Actions/Objections*.

Other than any releases granted herein, by the Confirmation Order and by Final Order of the Bankruptcy Court, as applicable, from and after the Effective Date, pursuant to the Global Settlement, the Reorganized Debtors shall have the right to prosecute any and all avoidance actions, recovery causes of action and objections to Claims under sections 105, 502, 510, 542 through 546, 548 through 551, and 553 of the Bankruptcy Code that belong to the Debtors or Debtors in Possession and any and all avoidance actions, recovery causes of action and objections to Claims under section 547 of the Bankruptcy Code that belong to the Debtors or Debtors in Possession against those entities or individuals identified in schedule 12.9 of the Plan Supplement. In connection with Distributions on account of General Unsecured Silicon Graphics Claims, the Debtors or the Reorganized Debtors shall, in good faith, determine the Claim each defendant in an avoidance action would have against Silicon Graphics, and each such defendant shall be deemed to hold a Disputed General Unsecured Silicon Graphics Claims in the amount so determined pending the disposition of such cause of action or the lapse of the applicable time period for such cause of action to be initiated. Distributions on account of such Disputed General Unsecured Silicon Graphics Claims shall be made in accordance with Section 6.3 of the Plan to the extent such Disputed General Unsecured Silicon Graphics Claims become Allowed.

## ARTICLE XIII

## RETENTION OF JURISDICTION

The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, or related to, the Reorganization Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code, including, without limitation:

(a) To hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases, the allowance of Claims and Administrative Expense Claims resulting therefrom and any disputes with respect to executory contracts or unexpired leases relating to facts and circumstances arising out of or relating to the Reorganization Cases;

(b)    To determine any and all adversary proceedings, applications and contested matters;

(c)    To hear and determine all applications for compensation and reimbursement of expenses under sections 330, 331 and 503(b) of the Bankruptcy Code;

(d)    To hear and determine any timely objections to, or requests for estimation of Disputed Administrative Expense Claims and Disputed Claims, in whole or in part and otherwise resolve disputes as to Administrative Expense Claims;

(e)    To resolve disputes as to the ownership of any Administrative Expense Claim, Claim or Old Equity Interest;

(f)    To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(g)    To issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(h)    To consider any amendments to or modifications of the Plan or to cure any defect or omission, or reconcile any inconsistency, in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(i)    To hear and determine disputes or issues arising in connection with the interpretation, implementation or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated hereby, any agreement, instrument, or other document governing or relating to any of the foregoing or any settlement approved by the Bankruptcy Court;

(j)    To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including, without limitation, any request by the Debtors prior to the Effective Date or by the Reorganized Debtors, the Trustee or the Disbursing Agent after the Effective Date for an expedited determination of tax under section 505(b) of the Bankruptcy Code);

(k)    To hear and determine all disputes involving the existence, scope, nature or otherwise of the discharges, releases, injunctions and exculpations granted under the Plan, the Confirmation Order or the Bankruptcy Code;

(l)    To issue injunctions and effect any other actions that may be necessary or appropriate to restrain interference by any person or entity with the consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

(m) To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n) To hear and determine any rights, Claims or causes of action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory;

(o) To recover all assets of the Debtors and property of the Debtors' estates, wherever located;

(p) To enter a final decree closing the Reorganization Cases; and

(q) To hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XIV

## MISCELLANEOUS PROVISIONS

14.1 *Effectuating Documents and Further Transactions*.

On or before the Effective Date, and without the need for any further order or authority, the Debtors shall file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents that are in form and substance satisfactory to them as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Reorganized Debtors are authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any securities issued pursuant to the Plan.

14.2 *Withholding and Reporting Requirements*.

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, any party issuing any instrument or making any distribution under the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any governmental unit, including income, withholding and other tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

### 14.3  *Corporate Action.*

On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the stockholders or directors of one or more of the Debtors or Reorganized Debtors, including, without limitation, the authorization to issue or cause to be issued the New Common Stock and the Subscription Rights, the effectiveness of the New Organizational Documents, the election or appointment, as the case may be, of directors and officers of the Reorganized Debtors pursuant to the Plan and the authorization and approval of the New Management Agreements, shall be in effect from and after the Effective Date pursuant to the applicable general corporation law of the states in which the Debtors or the Reorganized Debtors are incorporated, without any requirement of further action by the stockholders or directors of the Debtors or the Reorganized Debtors.  On the Effective Date, or as soon thereafter as is practicable, the Reorganized Debtors shall, if required, file their amended certificates of incorporation with the Secretary of State of the state in which each such entity is (or will be) organized, in accordance with the applicable general business law of each such jurisdiction.

### 14.4  *Modification of Plan.*

Subject to the prior consent of the Ad Hoc Committee (which consent shall not be unreasonably withheld), after consultation with the Creditors' Committee and as otherwise provided for in the Global Settlement, alterations, amendments or modifications of or to the Plan may be proposed in writing by the Debtors at any time prior to the Confirmation Date, provided that the Plan, as altered, amended or modified satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code and the Debtors shall have complied with section 1125 of the Bankruptcy Code. Subject to the prior consent of the Ad Hoc Committee (which consent shall not be unreasonably withheld) and after consultation with the Creditors' Committee and as otherwise provided for in the Global Settlement, the Plan may be altered, amended or modified at any time after the Confirmation Date and before substantial consummation, provided that the Plan, as altered, amended or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended or modified, under section 1129 of the Bankruptcy Code and the circumstances warrant such alterations, amendments or modifications.  A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.

Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan of Reorganization without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or equity interests.

For the avoidance of doubt, the foregoing shall not effect a waiver of any rights that any party may have with respect to modification of the Plan under section 1127 of the Bankruptcy Code.

14.5     ***Revocation or Withdrawal of the Plan.***

The Debtors reserve the right to revoke or withdraw the Plan, in whole or in part, prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan in whole prior to the Confirmation Date, then the Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Old Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.  The Debtors reserve the right to withdraw the Plan with respect to any Debtors and proceed with confirmation of the Plan with respect to any other Debtors.  In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims against or equity interests in such Debtors withdrawn from the Plan or any other person or to prejudice in any manner the rights of such Debtors or any person in any further proceedings involving such withdrawn Debtors.

### 14.6 *Plan Supplement*.

The Plan Supplement and the documents contained therein shall be in form, scope and substance satisfactory to the Debtors, and shall be filed with the Bankruptcy Court no later than five (5) Business Days before the deadline for voting to accept or reject the Plan, provided that the documents included therein may thereafter be amended and supplemented prior to execution upon notice to and consultation with the Creditors' Committee, Lampe Conway and the Ad Hoc Committee, where reasonably necessary. The Plan Supplement and the documents contained therein are incorporated into and made a part of the Plan as if set forth in full herein.

### 14.7 *Payment of Statutory Fees*.

All fees payable under section 1930 of chapter 123 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.

### 14.8 *Post-Confirmation Date Professional Fees and Expenses*.

From and after the Confirmation Date, the Reorganized Debtors shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of professional persons thereafter incurred by the Reorganized Debtors.

### 14.9 *Dissolution of the Creditors' Committee*.

On the Effective Date, the Creditors' Committee shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Reorganization Cases, and the retention or employment of the Creditors' Committee's attorneys, accountants and other agents, if any, shall terminate other than for purposes of filing and prosecuting applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith.

### 14.10 *Indenture Trustee as Claim Holder*.

Consistent with Bankruptcy Rule 3003(c), the Reorganized Debtors shall recognize proofs of Claim timely filed by any Indenture Trustee in respect of any Claims under the Indentures. Accordingly, any Claim, proof of which is filed by the registered or beneficial holder of a Claim, is disallowed as duplicative of the Claim of the applicable Indenture Trustee, without any further action of the Bankruptcy Court.

### 14.11 *Exemption from Transfer Taxes*.

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under or in connection with the Plan,

the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, the New Common Stock, the Subscription Rights, the Exit Facility, any merger agreements or agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

### 14.12 *Expedited Tax Determination*.

The Debtors and the Reorganized Debtors are authorized to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for any or all returns filed for, or on behalf of, the Debtors for any and all taxable periods (or portions thereof) ending after the Commencement Date through and including the Effective Date.

### 14.13 *Exhibits/Schedules*.

All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full herein.

### 14.14 *Substantial Consummation*.

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 14.15 *Severability of Plan Provisions*.

In the event that, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation unless such holding, alteration or interpretation materially impairs the treatment to holders of Secured Note Claims, Cray Unsecured Debenture Claims and General Unsecured Silicon Graphics Claims under the Plan. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable in accordance with its terms.

### 14.16 *Governing Law*.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit to the Plan or Plan Supplement provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit), the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to its principles of conflict of laws.

### 14.17 *Notices*.

All notices, requests and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> Silicon Graphics, Inc.
> 1200 Crittenden Lane
> Mountain View, California 94043
> Attn: Barry Weinert, Esq.
> Title: VP, General Counsel
> Telephone: (650) 960-1980
> Telecopier: (650) 933-0298
>
> - and -
>
> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, New York 10153
> Attn: Gary T. Holtzer, Esq.
>      Stephen A. Youngman, Esq.
>      Shai Y. Waisman, Esq.
> Telephone: (212) 310-8000
> Telecopier: (212) 310-8007

Dated: ~~July 27,~~ September 15, 2006

Respectfully submitted,

SILICON GRAPHICS, INC.
SILICON GRAPHICS FEDERAL, INC.
SILICON GRAPHICS WORLD TRADE CORPORATION
CRAY RESEARCH, L.L.C.
SILICON GRAPHICS REAL ESTATE, INC.
SILICON STUDIO, INC.
CRAY RESEARCH AMERICA LATINA LTD.
CRAY RESEARCH EASTERN EUROPE LTD.
CRAY RESEARCH INDIA LTD.
CRAY RESEARCH INTERNATIONAL, INC.
CRAY FINANCIAL CORPORATION
CRAY ASIA/PACIFIC, INC.
PARAGRAPH INTERNATIONAL, INC.
WTI DEVELOPMENT, INC.

By: ~~/s/ Kathy Lanterman~~
    Name:  Kathy Lanterman
    Title:    Senior Vice President and
             Chief Financial Officer

64

Document comparison done by DeltaView on Friday, September 15, 2006
3:00:42 PM

| Input: | |
|---|---|
| Document 1 | pcdocs://ny2/1674715/1 |
| Document 2 | pcdocs://ny2/1674715/4 |
| Rendering set | Standard |

| Legend: |
|---|
| Insertion |
| Deletion |
| Moved from |
| Moved to |
| Style change |
| Format change |
| Moved deletion |
| Inserted cell |
| Deleted cell |
| Moved cell |
| Split/Merged cell |
| Padding cell |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 129 |
| Deletions | 163 |
| Moved from | 2 |
| Moved to | 2 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 296 |

EXHIBIT C

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer, Esq. (GH 7732)
Stephen A. Youngman, Esq. (*pro hac vice*)
Shai Y. Waisman, Esq. (SW 6854)

Attorneys for Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | |
| | : | **Chapter 11 Case No.** |
| | : | |
| **SILICON GRAPHICS, INC., *et al.*,** | : | **06-10977 (BRL)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

------------------------------------------------------------x

**AMENDED PLAN SUPPLEMENT**
**TO DEBTORS' PLAN OF REORGANIZATION**

# TABLE OF CONTENTS[*]

**ITEM**

List of Initial Board Members......................................................................................1

Form of New Organizational Documents......................................................................2

Form of Registration Rights Agreement........................................................................3

Schedules 8.1(A) and (B)..............................................................................................4

Schedule 12.9................................................................................................................5

---

[*] These documents are in draft form and may be amended or modified.

**ITEM 1**

## List of Initial Board Members

With respect to Silicon Graphics, Inc., the initial board of directors of reorganized Silicon Graphics, Inc. shall consist of seven members, and the List of Initial Board Members is hereby amended to (i) remove James A. Mesterharm and to include James A. McDivitt, a current member of the board of directors of Silicon Graphics, Inc. and (ii) clarify that Kevin Katari is a Managing Member of Watershed Asset Management, L.L.C.

**ITEM 2**

**[Form of Amended Certificate of Incorporation of SGI]**

~~SECOND~~ AMENDED AND RESTATED

CERTIFICATE OF INCORPORATION

OF

**SILICON GRAPHICS, INC.**

Silicon Graphics, Inc., a corporation organized and existing under the laws of the State of Delaware (the "Corporation"), hereby certifies as follows:

1.    The name of the Corporation is Silicon Graphics, Inc.  The date of the filing of the original Certificate of Incorporation with the Secretary of State of the State of Delaware was September 5, 1986 (the "Original Certificate").

2.    On May 8, 2006, the Corporation and certain of its subsidiaries (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (Case Nos. 06-10977 (BRL) through 06-10990 (BRL)).  This ~~Second~~ Amended and Restated Certificate of Incorporation amends and restates the Original Certificate, as amended to date (the "Certificate of Incorporation"), and has been duly adopted in accordance with Sections 242, 245 and 303 of the General Corporation Law of the State of Delaware (the "DGCL"), pursuant to the authority granted to the Corporation under Section 303 of the DGCL to put into effect and carry out the Debtors' First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, as confirmed on September [__], 2006 by order (the "Order") of the Bankruptcy Court.  Provision for amending the Certificate of Incorporation is contained in the Order of the Bankruptcy Court having jurisdiction under the Bankruptcy Code for the reorganization of the Corporation.

3.    The Certificate of Incorporation of the Corporation is hereby amended and restated in its entirety to read as follows:

ARTICLE I

The name of the Corporation is ~~SGI Corporation~~Silicon Graphics, Inc.

ARTICLE II

The address of the Corporation's registered office in the State of Delaware is c/o The Corporation Trust Company, 1209 Orange Street in the City of Wilmington, County of New Castle.  The name of its registered agent at such address is The Corporation Trust Company.

ARTICLE III

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the DGCL.

## ARTICLE IV

## CAPITAL STOCK

The total number of shares of capital stock which the Corporation shall have authority to issue is [_____] shares, of which (i) 25,000,000 shares shall be a class designated as common stock, par value $0.01 per share (the "Common Stock"), and (ii) [_____] shares shall be a class designated as undesignated preferred stock, par value $0.01 per share (the "Undesignated Preferred Stock").

The number of authorized shares of the class of Undesignated Preferred Stock may from time to time be increased or decreased (but not below the number of shares outstanding) by the affirmative vote of the holders of a majority of the outstanding shares of Common Stock entitled to vote, without a vote of the holders of the Undesignated Preferred Stock (except as otherwise provided in any certificate of designations of any series of Undesignated Preferred Stock).

The powers, preferences and rights of, and the qualifications, limitations and restrictions upon, each class or series of stock shall be determined in accordance with, or as set forth below in, this Article IV.

## A.    COMMON STOCK

Subject to all the rights, powers and preferences of the Undesignated Preferred Stock and except as provided by law or in this Article IV (or in any certificate of designations of any series of Undesignated Preferred Stock):

(a)    the holders of the Common Stock shall have the exclusive right to vote for the election of directors of the Corporation (the "Directors") and on all other matters requiring stockholder action, each outstanding share entitling the holder thereof to one vote on each matter properly submitted to the stockholders of the Corporation for their vote; provided, however, that, except as otherwise required by law, holders of Common Stock, as such, shall not be entitled to vote on any amendment to this Certificate (or on any amendment to a certificate of designations of any series of Undesignated Preferred Stock) that alters or changes the powers, preferences, rights or other terms of one or more outstanding series of Undesignated Preferred Stock if the holders of such affected series are entitled to vote, either separately or together with the holders of one or more other such series, on such amendment pursuant to this Certificate (or pursuant to a certificate of designations of any series of Undesignated Preferred Stock) or pursuant to the DGCL;

(b)    dividends may be declared and paid or set apart for payment upon the Common Stock out of any assets or funds of the Corporation legally available for the payment of dividends, but only when and as declared by the Board of Directors or any authorized committee thereof; and

2

(c)    upon the voluntary or involuntary liquidation, dissolution or winding up of the Corporation, the net assets of the Corporation shall be distributed pro rata to the holders of the Common Stock.

## B.    UNDESIGNATED PREFERRED STOCK

The Board of Directors or any authorized committee thereof is expressly authorized, to the fullest extent permitted by law, to provide for the issuance of the shares of Undesignated Preferred Stock in one or more series of such stock, and by filing a certificate pursuant to applicable law of the State of Delaware, to establish or change from time to time the number of shares of each such series, and to fix the designations, powers, including voting powers, full or limited, or no voting powers, preferences and the relative, participating, optional or other special rights of the shares of each series and any qualifications, limitations and restrictions thereof.

## C.    NONVOTING EQUITY SECURITIES

The Corporation shall not issue any nonvoting equity securities to the extent prohibited by section 1123(a)(6) of the Title 11 of the United States Code (the "Bankruptcy Code") as in effect on the date of the filing of this Certificate with the Secretary of State of the State of Delaware; provided, however, that this Section C of Article IV (i) will have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (ii) will have such force and effect, if any, only for so long as Section 1123(a)(6) of the Bankruptcy Code is in effect and applicable to the Corporation, and (iii) in all events may be amended or eliminated in accordance with such applicable law as from time to time may be in effect.

## ARTICLE V

## STOCKHOLDER ACTION

1.    Action without Meeting.  Except as otherwise provided herein, any action required or permitted to be taken by the stockholders of the Corporation at any annual or special meeting of stockholders of the Corporation must be effected at a duly called annual or special meeting of stockholders and may not be taken or effected by a written consent of stockholders in lieu thereof.

2.    Special Meetings.  Except as otherwise required by statute and subject to the rights, if any, of the holders of any series of Undesignated Preferred Stock, special meetings of the stockholders of the Corporation may be called only by the Board of Directors acting pursuant to a resolution approved by the affirmative vote of a majority of the Directors then in office. Only those matters set forth in the notice of the special meeting may be considered or acted upon at a special meeting of stockholders of the Corporation.

## ARTICLE VI

## DIRECTORS

3

1.     General.  The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors except as otherwise provided herein or required by law.

2.     Election of Directors.  Election of Directors need not be by written ballot unless the By-laws of the Corporation (the "By-laws") shall so provide.

3.     Number of Directors; Term of Office.   The number of Directors of the Corporation shall be fixed solely and exclusively by resolution duly adopted from time to time by the Board of Directors.  The Directors, other than those who may be elected by the holders of any series of Undesignated Preferred Stock, shall be classified, with respect to the term for which they severally hold office, into three classes, as nearly equal in number as reasonably possible. The initial Class I Directors of the Corporation shall be **[Insert Names]**; the initial Class II Directors of the Corporation shall be **[Insert Names]**; and the initial Class III Directors of the Corporation shall be **[Insert Names]**. The initial Class I Directors shall serve for a term expiring at the annual meeting of stockholders to be held in **[2007]**, the initial Class II Directors shall serve for a term expiring at the annual meeting of stockholders to be held in **[2008]**, and the initial Class III Directors shall serve for a term expiring at the annual meeting of stockholders to be held in **[2009]**.  At each annual meeting of stockholders, Directors elected to succeed those Directors whose terms expire shall be elected for a term of office to expire at the third succeeding annual meeting of stockholders after their election.  Notwithstanding the foregoing, the Directors elected to each class shall hold office until their successors are duly elected and qualified or until their earlier resignation, death or removal.

Notwithstanding the foregoing, whenever, pursuant to the provisions of Article IV of this Certificate, the holders of any one or more series of Undesignated Preferred Stock shall have the right, voting separately as a series or together with holders of other such series, to elect Directors at an annual or special meeting of stockholders, the election, term of office, filling of vacancies and other features of such directorships shall be governed by the terms of this Certificate and any certificate of designations applicable thereto.

4.     Vacancies.   Subject to the rights, if any, of the holders of any series of Undesignated Preferred Stock to elect Directors and to fill vacancies in the Board of Directors relating thereto, any and all vacancies in the Board of Directors, however occurring, including, without limitation, by reason of an increase in size of the Board of Directors, or the death, resignation, disqualification or removal of a Director, shall be filled solely and exclusively by the affirmative vote of a majority of the remaining Directors then in office, even if less than a quorum of the Board of Directors, and not by the stockholders.  Any Director appointed in accordance with the preceding sentence shall hold office for the remainder of the full term of the class of Directors in which the new directorship was created or the vacancy occurred and until such Director's successor shall have been duly elected and qualified or until his or her earlier resignation, death or removal.  Subject to the rights, if any, of the holders of any series of Undesignated Preferred Stock to elect Directors, when the number of Directors is increased or decreased, the Board of Directors shall, subject to Article VI.3 hereof, determine the class or classes to which the increased or decreased number of Directors shall be apportioned; provided, however, that no decrease in the number of Directors shall shorten the term of any incumbent Director.  In the event of a vacancy in the Board of Directors, the remaining Directors, except as

4

otherwise provided by law, shall exercise the powers of the full Board of Directors until the vacancy is filled.

5.     Removal.  Subject to the rights, if any, of any series of Undesignated Preferred Stock to elect Directors and to remove any Director whom the holders of any such stock have the right to elect, any Director (including persons elected by Directors to fill vacancies in the Board of Directors) may be removed from office (i) only with cause and (ii) only by the affirmative vote of the holders of 75% or more of the shares then entitled to vote at an election of Directors.  At least forty-five (45) days prior to any meeting of stockholders at which it is proposed that any Director be removed from office, written notice of such proposed removal and the alleged grounds thereof shall be sent to the Director whose removal will be considered at the meeting.

## ARTICLE VII

### LIMITATION OF LIABILITY

A Director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a Director, except for liability (a) for any breach of the Director's duty of loyalty to the Corporation or its stockholders, (b) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (c) under Section 174 of the DGCL or (d) for any transaction from which the Director derived an improper personal benefit.  If the DGCL is amended after the effective date of this Certificate to authorize corporate action further eliminating or limiting the personal liability of Directors, then the liability of a Director of the Corporation shall be eliminated or limited to the fullest extent permitted by the DGCL, as so amended.

Any repeal or modification of this Article VII by either of (i) the stockholders of the Corporation or (ii) an amendment to the DGCL, shall not adversely affect any right or protection existing at the time of such repeal or modification with respect to any acts or omissions occurring before such repeal or modification of a person serving as a Director at the time of such repeal or modification.

## ARTICLE VIII

### AMENDMENT OF BY-LAWS

1.     Amendment by Directors.  Except as otherwise provided by law, the By-laws of the Corporation may be amended or repealed by the Board of Directors by the affirmative vote of a majority of the Directors then in office.

2.     Amendment by Stockholders.  The By-laws of the Corporation may be amended or repealed at any annual meeting of stockholders, or special meeting of stockholders called for such purpose as provided in the By-laws, by the affirmative vote of at least 75% of the outstanding shares entitled to vote on such amendment or repeal, voting together as a single class; provided, however, that if the Board of Directors recommends that stockholders approve such amendment or repeal at such meeting of stockholders, such amendment or repeal shall only

LIBC/2827507.3
NY2:\168135601\01\CC01\676533\03\ZXMD03!.DOC\74207.0008

require the affirmative vote of the majority of the outstanding shares entitled to vote on such amendment or repeal, voting together as a single class.

## ARTICLE IX

### AMENDMENT OF CERTIFICATE OF INCORPORATION

The Corporation reserves the right to amend or repeal this Certificate in the manner now or hereafter prescribed by statute and this Certificate, and all rights conferred upon stockholders herein are granted subject to this reservation. Whenever any vote of the holders of voting stock is required to amend or repeal any provision of this Certificate, and in addition to any other vote of holders of voting stock that is required by this Certificate or by law, such amendment or repeal shall require the affirmative vote of the majority of the outstanding shares entitled to vote on such amendment or repeal, and the affirmative vote of the majority of the outstanding shares of each class entitled to vote thereon as a class, at a duly constituted meeting of stockholders called expressly for such purpose; provided, however, that the affirmative vote of not less than 75% of the outstanding shares entitled to vote on such amendment or repeal, and the affirmative vote of not less than 75% of the outstanding shares of each class entitled to vote thereon as a class, shall be required to amend or repeal any provision of Article V, Article VI, Article VII, Article VIII or Article IX of this Certificate.

## ARTICLE X

### BUSINESS OPPORTUNITIES

(a)     In anticipation that [_____] and/or their respective affiliates (collectively, the "Substantial Holders") will each be, indirectly or directly, a substantial stockholder of the Corporation, and in recognition of the benefits to be derived by the Corporation through its continued contractual, corporate and business relations with the Substantial Holders (including service of the respective officers, directors, partners, managers, employees or affiliates of the Substantial Holders (collectively, "Substantial Persons") to the Corporation) the provisions of this Article X are set forth to regulate, define and guide the conduct of certain affairs of the Corporation as they may involve Substantial Holders and any Substantial Persons, and the powers, rights, duties and liabilities of the Corporation and its officers, directors and stockholders in connection therewith.

(b)     Except as any Substantial Holder may otherwise agree in writing, such Substantial Holder shall have the right to (i) engage, directly or indirectly, in the same or similar business activities or lines of business as the Corporation and (ii) do business with any client, competitor or customer of the Corporation, with the result that the Corporation shall have no right in or to such activities or any proceeds or benefits therefrom, and neither a Substantial Holder nor any Substantial Person shall be liable to the Corporation or its stockholders for breach of any fiduciary duty by reason of any such activities of such Substantial Holder or of such Substantial Person's participation therein. In the event that a Substantial Holder or any Substantial Person acquires knowledge of a potential transaction or matter that may be a corporate opportunity for both such Substantial Holder and the Corporation, the Substantial Holder and such Substantial Person shall have no duty to communicate or present such corporate

6

opportunity to the Corporation and the Corporation hereby renounces any interest or expectancy it may have in such corporate opportunity, with the result that the Substantial Holder or such Substantial Person shall not be liable to the Corporation or its stockholders for breach of any fiduciary duty, including for breach of any fiduciary duty as a stockholder of the Corporation by reason of the fact that such Substantial Holder pursues or acquires such corporate opportunity for itself, directs such corporate opportunity to another person or entity, or does not present such corporate opportunity to the Corporation, unless such transaction or corporate opportunity is presented to, or acquired, created or developed by, or otherwise comes into the possession of, a Substantial Person expressly and solely in such Substantial Person's capacity as a director of the Corporation,

(c)     For the purposes of this Article X only, "corporate opportunities" shall not include any business opportunities that the Corporation is not financially or contractually able to undertake, or that are, from their nature, not in the line of the Corporation's business or that are ones in which the Corporation has no interest; and the "Corporation" shall mean the Corporation and all corporations, partnerships, joint ventures, associations and other entities in which the Corporation beneficially owns (directly or indirectly) fifty percent or more of the outstanding voting stock, voting power or similar voting interests.

(d)     Any person or entity purchasing or otherwise acquiring any interest in any shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Article X.

Notwithstanding anything in this Restated Certificate of Incorporation to the contrary and in addition to any vote of the Board required by this Restated Certificate of Incorporation, the affirmative vote of the holders of 75% of the shares of capital stock of the Corporation held by the Substantial Holders shall be required to alter, amend or repeal in a manner adverse to the interests of a Substantial Holder or any Substantial Person, or adopt any provision adverse to the interests of a Substantial Holder or any Substantial Person and inconsistent with, any provision of this Article X.

[End of Text]

LIBC/2827507.3
NY2:\1681356\01\101CC01\1676533\03\ZXMD03!.DOC\74207.0008

THIS ~~SECOND~~ AMENDED AND RESTATED CERTIFICATE OF INCORPORATION is executed as of this _____ day of _____, 2006.

SILICON GRAPHICS, INC.

By:_____
    Name:
    Title:

LIBC/2827507.3
NY2:\1681356~01~\101CC01~1676533\03\ZXMD03~!.DOC\74207.0008

Document comparison done by DeltaView on Friday, September 15, 2006 10:59:43 AM

| Input: | |
|---|---|
| Document 1 | pcdocs://ny2/1681356/1 |
| Document 2 | pcdocs://ny2/1681356/2 |
| Rendering set | Standard |

| Legend: |  |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 3 |
| Deletions | 6 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 9 |

[Form of Amended By-laws of SGI]

# SECOND AMENDED AND RESTATED

## BY-LAWS

### OF

~~SGI CORPORATION~~
<u>SILICON GRAPHICS, INC.</u>
a Delaware corporation

**Adopted: _____, 2006**

ARTICLE I - Stockholders.................................................................................1
    SECTION 1.  Annual Meeting................................................................1
    SECTION 2.  Notice of Stockholder Business and Nominations..............1
    SECTION 3.  Special Meetings..............................................................4
    SECTION 4.  Notice of Meetings; Adjournments...................................4
    SECTION 5.  Quorum...........................................................................5
    SECTION 6.  Voting and Proxies...........................................................5
    SECTION 7.  Action at Meeting.............................................................5
    SECTION 8.  Stockholder Lists.............................................................5
    SECTION 9.  Presiding Officer..............................................................6
    SECTION 10.  Inspectors of Elections....................................................6

ARTICLE II - Directors....................................................................................6
    SECTION 1.  Powers.............................................................................6
    SECTION 2.  Number and Terms...........................................................7
    SECTION 3.  Qualification.....................................................................7
    SECTION 4.  Vacancies.........................................................................7
    SECTION 5.  Removal...........................................................................7
    SECTION 6.  Resignation.......................................................................7
    SECTION 7.  Regular Meetings..............................................................7
    SECTION 8.  Special Meetings...............................................................7
    SECTION 9.  Notice of Meetings............................................................7
    SECTION 10.  Quorum...........................................................................8
    SECTION 11.  Action at Meeting............................................................8
    SECTION 12.  Action by Consent............................................................8
    SECTION 13.  Manner of Participation.....................................................9
    SECTION 14.  Committees.....................................................................9
    SECTION 15.  Compensation of Directors................................................9

ARTICLE III - Officers....................................................................................9
    SECTION 1.  Enumeration.....................................................................9
    SECTION 2.  Election............................................................................10
    SECTION 3.  Qualification.....................................................................10
    SECTION 4.  Tenure..............................................................................10
    SECTION 5.  Resignation.......................................................................10
    SECTION 6.  Removal...........................................................................10
    SECTION 7.  Absence or Disability.........................................................10
    SECTION 8.  Vacancies.........................................................................10
    SECTION 9.  Chief Executive Officer......................................................10
    SECTION 10.  Chairman of the Board......................................................11
    SECTION 11.  President..........................................................................11
    SECTION 12.  Chief Financial Officer......................................................11
    SECTION 13.  Chief Operating Officer.....................................................11
    SECTION 14.  Vice Presidents and Assistant Vice Presidents....................11
    SECTION 15.  Treasurer and Assistant Treasurers....................................11
    SECTION 16.  Secretary and Assistant Secretaries....................................12

# Table of Contents

Page

SECTION 17. Other Powers and Duties................................................................12

ARTICLE IV - Capital Stock........................................................................................12
SECTION 1. Certificates of Stock................................................................12
SECTION 2. Transfers..................................................................................13
SECTION 3. Record Holders........................................................................13
SECTION 4. Record Date.............................................................................13
SECTION 5. Replacement of Certificates.....................................................13

ARTICLE V - Indemnification.....................................................................................14
SECTION 1. Definitions...............................................................................14
SECTION 2. Indemnification of Directors and Officers...............................15
SECTION 3. Indemnification of Non-Officer Employees.............................16
SECTION 4. Good Faith...............................................................................16
SECTION 5. Advancement of Expenses to Directors Prior to Final Disposition...........17
SECTION 6. Advancement of Expenses to Officers and Non-Officer Employees
     Prior to Final Disposition......................................................17
SECTION 7. Contractual Nature of Rights....................................................18
SECTION 8. Non-Exclusivity of Rights........................................................18
SECTION 9. Insurance..................................................................................18
SECTION 10. Other Indemnification.............................................................19

ARTICLE VI - Miscellaneous Provisions....................................................................19
SECTION 1. Fiscal Year...............................................................................19
SECTION 2. Seal..........................................................................................19
SECTION 3. Execution of Instruments.........................................................19
SECTION 4. Voting of Securities..................................................................19
SECTION 5. Resident Agent.........................................................................20
SECTION 6. Corporate Records....................................................................20
SECTION 7. Certificate.................................................................................20
SECTION 8. Amendment of By-laws............................................................20
SECTION 9. Notices.....................................................................................20
SECTION 10. Waivers...................................................................................21

# SECOND AMENDED AND RESTATED

# BY-LAWS

# OF

# ~~SGI CORPORATION~~
## SILICON GRAPHICS, INC.
### a Delaware corporation

### (the "Corporation")

## ARTICLE I

### Stockholders

SECTION 1.  Annual Meeting.  The annual meeting of stockholders (any such meeting being referred to in these By-laws as an "Annual Meeting") shall be held at the hour, date and place within or outside of the United States which is fixed by the Board of Directors, which time, date and place may subsequently be changed at any time by vote of the Board of Directors.  If no Annual Meeting has been held for a period of thirteen months after the Corporation's last Annual Meeting, a special meeting in lieu thereof may be held, and such special meeting shall have, for the purposes of these By-laws or otherwise, all the force and effect of an Annual Meeting.  Any and all references hereafter in these By-laws to an Annual Meeting or Annual Meetings also shall be deemed to refer to any special meeting(s) in lieu thereof.

SECTION 2.  Notice of Stockholder Business and Nominations.

(a)     Annual Meetings of Stockholders.

(1)     Nominations of persons for election to the Board of Directors of the Corporation and the proposal of business to be considered by the stockholders may be made at an Annual Meeting (a) pursuant to the Corporation's notice of meeting, (b) by or at the direction of the Board of Directors or (c) by any stockholder of the Corporation who was a stockholder of record at the time of giving of notice provided for in this By-law, who is entitled to vote at the meeting, who is present (in person or by proxy) at the meeting and who complies with the notice procedures set forth in this By-law.  In addition to the other requirements set forth in this By-law, for any proposal of business to be considered at an Annual Meeting, it must be a proper subject for action by stockholders of the Corporation under Delaware law.

(2)     For nominations or other business to be properly brought before an Annual Meeting by a stockholder pursuant to clause (c) of paragraph (a)(1) of this By-law, the stockholder must have given timely notice thereof in writing to the Secretary of the Corporation.  To be timely, a stockholder's notice shall be delivered to the Secretary at the principal executive offices of the Corporation not later than the close of business on

the 90th day nor earlier than the close of business on the 120th day prior to the first anniversary of the preceding year's Annual Meeting; provided, however, that in the event that the date of the Annual Meeting is advanced by more than 30 days before or delayed by more than 60 days after such anniversary date, notice by the stockholder to be timely must be so delivered not later than the close of business on the later of the 90th day prior to such Annual Meeting or the 10th day following the day on which public announcement of the date of such meeting is first made. Such stockholder's notice shall set forth: (a) as to each person whom the stockholder proposes to nominate for election or reelection as a director, all information relating to such person that is required to be disclosed in solicitations of proxies for election of directors in an election contest, or is otherwise required, in each case pursuant to Regulation 14A under the Securities Exchange Act of 1934, as amended (the "Exchange Act") (including such person's written consent to being named in the proxy statement as a nominee and to serving as a director if elected); (b) as to any other business that the stockholder proposes to bring before the meeting, a brief description of the business desired to be brought before the meeting, the reasons for conducting such business at the meeting, any material interest in such business of such stockholder and the beneficial owner, if any, on whose behalf the proposal is made, and the names and addresses of other stockholders known by the stockholder proposing such business to support such proposal, and the class and number of shares of the Corporation's capital stock beneficially owned by such other stockholders; and (c) as to the stockholder giving the notice and the beneficial owner, if any, on whose behalf the nomination or proposal is made (i) the name and address of such stockholder, as they appear on the Corporation's books, and of such beneficial owner, (ii) the class and number of shares of the Corporation which are owned beneficially and of record by such stockholder and such beneficial owner, (iii) a description of all arrangements or understanding between such beneficial owner and each proposed nominee and any other person or persons (including their names) pursuant to which the nomination(s) are to be made, and (iv) a representation whether the beneficial owner intends or is part of a group that intends (x) to deliver a proxy statement and/or form of proxy to holders of at least the percentage of the Corporation's outstanding capital stock requirement to elect the nominee and/or (y) otherwise to solicit proxies from stockholders in support of such nomination.

(3)     Notwithstanding anything in the second sentence of paragraph (a)(2) of this By-law to the contrary, in the event that the number of directors to be elected to the Board of Directors of the Corporation is increased and there is no public announcement naming all of the nominees for director or specifying the size of the increased Board of Directors made by the Corporation at least 85 days prior to the first anniversary of the preceding year's Annual Meeting, a stockholder's notice required by this By-law shall also be considered timely, but only with respect to nominees for any new positions created by such increase, if it shall be delivered to the Secretary at the principal executive offices of the Corporation not later than the close of business on the 10th day following the day on which such public announcement is first made by the Corporation.

(b)     General.

(1)     Only such persons who are nominated in accordance with the provisions of this By-law shall be eligible for election and to serve as directors and only such business shall be conducted at an Annual Meeting as shall have been brought before the meeting in accordance with the provisions of this By-law.  The Board of Directors or a designated committee thereof shall have the power to determine whether a nomination or any business proposed to be brought before the meeting was made in accordance with the provisions of this By-law.  If neither the Board of Directors nor such designated committee makes a determination as to whether any stockholder proposal or nomination was made in accordance with the provisions of this By-law, the presiding officer of the Annual Meeting shall have the power and duty to determine whether the stockholder proposal or nomination was made in accordance with the provisions of this By-law.  If the Board of Directors or a designated committee thereof or the presiding officer, as applicable, determines that any stockholder proposal or nomination was not made in accordance with the provisions of this By-law, such proposal or nomination shall be disregarded and shall not be presented for action at the Annual Meeting.

(2)     Except as otherwise required by law, nothing in this Section 2 shall obligate the Corporation or the Board of Directors to include in any proxy statement or other stockholder communication distributed on behalf of the Corporation or the Board of Directors information with respect to any nominee for director submitted by a stockholder.

(3)     Notwithstanding the foregoing provisions of this Section 2, if the stockholder (or a qualified representative of the stockholder) does not appear at the Annual or special meeting of stockholders of the Corporation to present a nomination, such nomination shall be disregarded, notwithstanding the proxies in respect of such vote that may have been received by the Corporation.  For purposes of this Section 2, to be considered a qualified representative of the stockholder, a person must be authorized by a written instrument executed by such stockholder or an electronic transmission delivered by such stockholder to act for such stockholder as proxy at the Annual or special meeting of stockholders and such person must produce such written instrument or electronic transmission, or a reliable reproduction of the written instrument or electronic transmission, at the Annual or special meeting of stockholders.

(4)     For purposes of this By-law, "public announcement" shall mean disclosure in a press release reported by the Dow Jones News Service, Associated Press or comparable national news service or in a document publicly filed by the Corporation with the Securities and Exchange Commission pursuant to Section 13, 14 or 15(d) of the Exchange Act.

(5)     Notwithstanding the foregoing provisions of this By-law, a stockholder shall also comply with all applicable requirements of the Exchange Act and the rules and regulations thereunder with respect to the matters set forth in this By-law.  Nothing in this By-law shall be deemed to affect any rights of (i) stockholders to request inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 under the

Exchange Act or (ii) the holders of any series of Undesignated Preferred Stock to elect directors under specified circumstances.

SECTION 3. <u>Special Meetings.</u> Except as otherwise required by statute and subject to the rights, if any, of the holders of any series of Undesignated Preferred Stock, special meetings of the stockholders of the Corporation may be called only by the Board of Directors acting pursuant to a resolution approved by the affirmative vote of a majority of the Directors then in office. Only those matters set forth in the notice of the special meeting may be considered or acted upon at a special meeting of stockholders of the Corporation._

SECTION 4. <u>Notice of Meetings; Adjournments.</u> A notice of each Annual Meeting stating the hour, date and place, if any, of such Annual Meeting shall be given not less than 10 days nor more than 60 days before the Annual Meeting, to each stockholder entitled to vote thereat by delivering such notice to such stockholder or by mailing it, postage prepaid, addressed to such stockholder at the address of such stockholder as it appears on the Corporation's stock transfer books.

Notice of all special meetings of stockholders shall be given in the same manner as provided for Annual Meetings, except that the notice of all special meetings shall state the purpose or purposes for which the meeting has been called.

Notice of an Annual Meeting or special meeting of stockholders need not be given to a stockholder if a waiver of notice is executed before or after such meeting by such stockholder or if such stockholder attends such meeting, unless such attendance is for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting was not lawfully called or convened.

The Board of Directors may postpone and reschedule any previously scheduled Annual Meeting or special meeting of stockholders and any record date with respect thereto, regardless of whether any notice or public disclosure with respect to any such meeting has been sent or made pursuant to Section 2 of this Article I of these By-laws or otherwise. In no event shall the public announcement of an adjournment, postponement or rescheduling of any previously scheduled meeting of stockholders commence a new time period for the giving of a stockholder's notice under Section 2 of this Article I of these By-laws.

When any meeting is convened, the presiding officer may adjourn the meeting if (a) no quorum is present for the transaction of business, (b) the Board of Directors determines that adjournment is necessary or appropriate to enable the stockholders to consider fully information which the Board of Directors determines has not been made sufficiently or timely available to stockholders, or (c) the Board of Directors determines that adjournment is otherwise in the best interests of the Corporation. When any Annual Meeting or special meeting of stockholders is adjourned to another hour, date or place, notice need not be given of the adjourned meeting other than an announcement at the meeting at which the adjournment is taken of the hour, date and place, if any, to which the meeting is adjourned and the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such adjourned meeting; <u>provided</u>, <u>however</u>, that if the adjournment is for more than 30 days, or if

after the adjournment a new record date is fixed for the adjourned meeting, notice of the adjourned meeting and the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such adjourned meeting shall be given to each stockholder of record entitled to vote thereat and each stockholder who, by law or under the Certificate of Incorporation of the Corporation (as the same may hereafter be amended and/or restated, the "Certificate") or these By-laws, is entitled to such notice.

SECTION 5. Quorum.

A majority of the shares entitled to vote, present in person or represented by proxy, shall constitute a quorum at any meeting of stockholders. If less than a quorum is present at a meeting, the holders of voting stock representing a majority of the voting power present at the meeting or the presiding officer may adjourn the meeting from time to time, and the meeting may be held as adjourned without further notice, except as provided in Section 4 of this Article I. At such adjourned meeting at which a quorum is present, any business may be transacted which might have been transacted at the meeting as originally noticed. The stockholders present at a duly constituted meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough stockholders to leave less than a quorum.

SECTION 6. Voting and Proxies.

Stockholders shall have one vote for each share of stock entitled to vote owned by them of record according to the stock ledger of the Corporation, unless otherwise provided by law or by the Certificate. Stockholders may vote either (i) in person, (ii) by written proxy or (iii) by a transmission permitted by §212(c) of the Delaware General Corporation Law ("DGCL"). Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission permitted by §212(c) of the DGCL may be substituted for or used in lieu of the original writing or transmission for any and all purposes for which the original writing or transmission could be used, provided that such copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission. Proxies shall be filed in accordance with the procedures established for the meeting of stockholders. Except as otherwise limited therein or as otherwise provided by law, proxies authorizing a person to vote at a specific meeting shall entitle the persons authorized thereby to vote at any adjournment of such meeting, but they shall not be valid after final adjournment of such meeting. A proxy with respect to stock held in the name of two or more persons shall be valid if executed by or on behalf of any one of them unless at or prior to the exercise of the proxy the Corporation receives a specific written notice to the contrary from any one of them.

SECTION 7. Action at Meeting.

When a quorum is present at any meeting of stockholders, any matter before any such meeting (other than an election of a director or directors) shall be decided by a majority of the votes properly cast for and against such matter, except where a larger vote is required by law, by the Certificate or by these By-laws. Any election of directors by stockholders shall be determined by a plurality of the votes properly cast on the election of directors.

LIBC/2827554.2

## SECTION 8.  Stockholder Lists.

The Secretary or an Assistant Secretary (or the Corporation's transfer agent or other person authorized by these By-laws or by law) shall prepare and make, at least 10 days before every Annual Meeting or special meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder.  Such list shall be open to the examination of any stockholder, for a period of at least 10 days prior to the meeting in the manner provided by law.  The list shall also be open to the examination of any stockholder during the whole time of the meeting as provided by law.

## SECTION 9.  Presiding Officer.

The Chairman of the Board, if one is elected, or if not elected or in his or her absence, the President shall preside at all Annual Meetings or special meetings of stockholders and shall have the power, among other things, to adjourn such meeting at any time and from time to time, subject to Sections 4 and 5 of this Article I.  The order of business and all other matters of procedure at any meeting of the stockholders shall be determined by the presiding officer.

## SECTION 10. Inspectors of Elections.

(a)     Inspectors of Elections.  The Corporation shall, in advance of any meeting of stockholders, appoint one or more inspectors to act at the meeting and make a written report thereof.  The Corporation may designate one or more persons as alternate inspectors to replace any inspector who fails to act.  If no inspector or alternate is able to act at a meeting of stockholders, the presiding officer shall appoint one or more inspectors to act at the meeting.  Any inspector may, but need not, be an officer, employee or agent of the Corporation.  Each inspector, before entering upon the discharge of his or her duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of his or her ability.  The inspectors shall perform such duties as are required by the DGCL, including the counting of all votes and ballots.  The inspectors may appoint or retain other persons or entities to assist the inspectors in the performance of the duties of the inspectors.  The presiding officer may review all determinations made by the inspectors, and in so doing the presiding officer shall be entitled to exercise his or her sole judgment and discretion and he or she shall not be bound by any determinations made by the inspectors.  All determinations by the inspectors and, if applicable, the presiding officer, shall be subject to further review by any court of competent jurisdiction.

## ARTICLE II

### Directors

## SECTION 1.  Powers.

The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors except as otherwise provided by the Certificate or required by law.

SECTION 2. Number and Terms.

The number of directors of the Corporation shall be fixed solely and exclusively by resolution duly adopted from time to time by the Board of Directors. The directors shall hold office in the manner provided in the Certificate.

SECTION 3. Qualification.

No director need be a stockholder of the Corporation.

SECTION 4. Vacancies.

Vacancies in the Board of Directors shall be filled in the manner provided in the Certificate.

SECTION 5. Removal.

Directors may be removed from office only in the manner provided in the Certificate.

SECTION 6. Resignation.

A director may resign at any time by giving written notice to the Chairman of the Board, if one is elected, the President or the Secretary. A resignation shall be effective upon receipt, unless the resignation otherwise provides.

SECTION 7. Regular Meetings.

The regular annual meeting of the Board of Directors shall be held, without notice other than this Section 7, on the same date and at the same place as the Annual Meeting following the close of such meeting of stockholders. Other regular meetings of the Board of Directors may be held at such hour, date and place as the Board of Directors may by resolution from time to time determine and publicize by means of reasonable notice given to any director who is not present at the meeting at which such resolution is adopted.

LIBC/2827554.2

### SECTION 8. Special Meetings.

Special meetings of the Board of Directors may be called, orally or in writing, by or at the request of a majority of the directors, the Chairman of the Board, if one is elected, or the President. The person calling any such special meeting of the Board of Directors may fix the hour, date and place thereof.

### SECTION 9. Notice of Meetings.

Notice of the hour, date and place of all special meetings of the Board of Directors shall be given to each director by the Secretary or an Assistant Secretary, or in case of the death, absence, incapacity or refusal of such persons, by the Chairman of the Board, if one is elected, or the President or such other officer designated by the Chairman of the Board, if one is elected, or the President. Notice of any special meeting of the Board of Directors shall be given to each director in person, by telephone, or by facsimile, electronic mail or other form of electronic communication, sent to his or her business or home address, at least 24 hours in advance of the meeting, or by written notice mailed to his or her business or home address, at least 48 hours in advance of the meeting. Such notice shall be deemed to be delivered when hand delivered to such address, read to such director by telephone, deposited in the mail so addressed, with postage thereon prepaid if mailed, dispatched or transmitted if faxed, telexed or telecopied, or sent by electronic mail or other form of electronic communication, or when delivered to the telegraph company if sent by telegram.

A written waiver of notice signed before or after a meeting by a director and filed with the records of the meeting shall be deemed to be equivalent to notice of the meeting. The attendance of a director at a meeting shall constitute a waiver of notice of such meeting, except where a director attends a meeting for the express purpose of objecting at the beginning of the meeting to the transaction of any business because such meeting is not lawfully called or convened. Except as otherwise required by law, by the Certificate or by these By-laws, neither the business to be transacted at, nor the purpose of, any meeting of the Board of Directors need be specified in the notice or waiver of notice of such meeting.

### SECTION 10. Quorum.

At any meeting of the Board of Directors, a majority of the total number of directors shall constitute a quorum for the transaction of business, but if less than a quorum is present at a meeting, a majority of the directors present may adjourn the meeting from time to time, and the meeting may be held as adjourned without further notice, except as provided in Section 9 of this Article II. Any business which might have been transacted at the meeting as originally noticed may be transacted at such adjourned meeting at which a quorum is present. For purposes of this section, the total number of directors includes any unfilled vacancies on the Board of Directors.

### SECTION 11. Action at Meeting.

LIBC/2827554.2

At any meeting of the Board of Directors at which a quorum is present, the vote of a majority of the directors present shall constitute action by the Board of Directors, unless otherwise required by law, by the Certificate or by these By-laws.

SECTION 12. Action by Consent.

Any action required or permitted to be taken at any meeting of the Board of Directors may be taken without a meeting if all members of the Board of Directors consent thereto in writing or by electronic transmission and the writing or writings or electronic transmission or transmissions are filed with the records of the meetings of the Board of Directors. Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form. Such consent shall be treated as a resolution of the Board of Directors for all purposes.

SECTION 13. Manner of Participation.

Directors may participate in meetings of the Board of Directors by means of conference telephone or other communications equipment by means of which all directors participating in the meeting can hear each other, and participation in a meeting in accordance herewith shall constitute presence in person at such meeting for purposes of these By-laws.

SECTION 14. Committees.

The Board of Directors, by vote of a majority of the directors then in office, may elect one or more committees, including, without limitation, a Compensation Committee, a Nominating and Corporate Governance Committee and an Audit Committee, and may delegate thereto some or all of its powers except those which by law, by the Certificate or by these By-laws may not be delegated. Except as the Board of Directors may otherwise determine, any such committee may make rules for the conduct of its business, but unless otherwise provided by the Board of Directors or in such rules, its business shall be conducted so far as possible in the same manner as is provided by these By-laws for the Board of Directors. All members of such committees shall hold such offices at the pleasure of the Board of Directors. The Board of Directors may abolish any such committee at any time. Any committee to which the Board of Directors delegates any of its powers or duties shall keep records of its meetings and shall report its action to the Board of Directors.

SECTION 15. Compensation of Directors.

Directors shall receive such compensation for their services as shall be determined by a majority of the Board of Directors, or a designated committee thereof, provided that directors who are serving the Corporation as employees and who receive compensation for their services as such, shall not receive any salary or other compensation for their services as directors of the Corporation.

# ARTICLE III

## Officers

SECTION 1.  Enumeration.

The officers of the Corporation shall consist of a President, a Treasurer, a Secretary and such other officers, including, without limitation, a Chairman of the Board of Directors, a Chief Executive Officer and one or more Vice Presidents (including Executive Vice Presidents or Senior Vice Presidents), Assistant Vice Presidents, Assistant Treasurers and Assistant Secretaries, as the Board of Directors may determine.

SECTION 2.  Election.

At the regular annual meeting of the Board of Directors following the Annual Meeting, the Board of Directors shall elect the Chief Executive Officer, the President, the Treasurer and the Secretary.  Other officers may be elected by the Board of Directors at such regular annual meeting of the Board of Directors or at any other regular or special meeting.

SECTION 3.  Qualification.

No officer need be a stockholder or a director.  Any person may occupy more than one office of the Corporation at any time.

SECTION 4.  Tenure.

Except as otherwise provided by the Certificate or by these By-laws, each of the officers of the Corporation shall hold office until the regular annual meeting of the Board of Directors following the next Annual Meeting and until his or her successor is elected and qualified or until his or her earlier resignation or removal.

SECTION 5.  Resignation.

Any officer may resign by delivering his or her written resignation to the Corporation addressed to the President or the Secretary, and such resignation shall be effective upon receipt unless it is specified to be effective at some other time or upon the happening of some other event.

SECTION 6.  Removal.

Except as otherwise provided by law, the Board of Directors may remove any officer with or without cause by the affirmative vote of a majority of the directors then in office.

SECTION 7.  Absence or Disability.

LIBC/2827554.2

In the event of the absence or disability of any officer, the Board of Directors may designate another officer to act temporarily in place of such absent or disabled officer.

SECTION 8.  Vacancies.

Any vacancy in any office may be filled for the unexpired portion of the term by the Board of Directors.

SECTION 9.  Chief Executive Officer.

The Chief Executive Officer shall, subject to the direction of the Board of Directors, have such powers and shall perform such duties as the Board of Directors may from time to time designate. If there is no Chairman of the Board or if he or she is absent, the Chief Executive Officer shall preside, when present, at all meetings of stockholders and of the Board of Directors.

SECTION 10. Chairman of the Board.

The Chairman of the Board, if one is elected, shall preside, when present, at all meetings of the stockholders and of the Board of Directors.  The Chairman of the Board shall have such other powers and shall perform such other duties as the Board of Directors may from time to time designate.

SECTION 11. President.

The President, if one is elected, shall have such powers and shall perform such duties as the Board of Directors may from time to time designate.

SECTION 12. Chief Financial Officer.

The Chief Financial Officer, if one is elected, shall have such powers and shall perform such duties as the Board of Directors may from time to time designate.

SECTION 13. Chief Operating Officer.

The Chief Operating Officer, if one is elected, shall have such powers and shall perform such duties as the Board of Directors may from time to time designate.

SECTION 14. Vice Presidents and Assistant Vice Presidents.

Any Vice President (including any Executive Vice President or Senior Vice President) and any Assistant Vice President shall have such powers and shall perform such duties as the Board of Directors or the Chief Executive Officer may from time to time designate.

SECTION 15. Treasurer and Assistant Treasurers.

LIBC/2827554.2

The Treasurer shall, subject to the direction of the Board of Directors and except as the Board of Directors or the Chief Executive Officer may otherwise provide, have general charge of the financial affairs of the Corporation and shall cause to be kept accurate books of account. The Treasurer shall have custody of all funds, securities, and valuable documents of the Corporation. He or she shall have such other duties and powers as may be designated from time to time by the Board of Directors or the Chief Executive Officer.

Any Assistant Treasurer shall have such powers and perform such duties as the Board of Directors or the Chief Executive Officer may from time to time designate.

SECTION 16. <u>Secretary and Assistant Secretaries.</u>

The Secretary shall record all the proceedings of the meetings of the stockholders and the Board of Directors (including committees of the Board) in books kept for that purpose. In his or her absence from any such meeting, a temporary secretary chosen at the meeting shall record the proceedings thereof. The Secretary shall have charge of the stock ledger (which may, however, be kept by any transfer or other agent of the Corporation). The Secretary shall have custody of the seal of the Corporation, and the Secretary, or an Assistant Secretary, shall have authority to affix it to any instrument requiring it, and, when so affixed, the seal may be attested by his or her signature or that of an Assistant Secretary. The Secretary shall have such other duties and powers as may be designated from time to time by the Board of Directors or the Chief Executive Officer. In the absence of the Secretary, any Assistant Secretary may perform his or her duties and responsibilities.

Any Assistant Secretary shall have such powers and perform such duties as the Board of Directors or the Chief Executive Officer may from time to time designate.

SECTION 17. <u>Other Powers and Duties.</u>

Subject to these By-laws and to such limitations as the Board of Directors may from time to time prescribe, the officers of the Corporation shall each have such powers and duties as generally pertain to their respective offices, as well as such powers and duties as from time to time may be conferred by the Board of Directors or the Chief Executive Officer.

<u>ARTICLE IV</u>

<u>Capital Stock</u>

SECTION 1. <u>Certificates of Stock.</u>

Each stockholder shall be entitled to a certificate of the capital stock of the Corporation in such form as may from time to time be prescribed by the Board of Directors. Such certificate shall be signed by the Chairman of the Board of Directors, the Chief Executive Officer, the President or a Vice President and by the Treasurer or an Assistant Treasurer, or the Secretary or an Assistant Secretary. The Corporation seal and the signatures by the Corporation's officers, the transfer agent or the registrar may be facsimiles. In case any officer, transfer agent or registrar who has

signed or whose facsimile signature has been placed on such certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if he or she were such officer, transfer agent or registrar at the time of its issue. Every certificate for shares of stock which are subject to any restriction on transfer and every certificate issued when the Corporation is authorized to issue more than one class or series of stock shall contain such legend with respect thereto as is required by law.

SECTION 2. Transfers.

Subject to any restrictions on transfer and unless otherwise provided by the Board of Directors, shares of stock may be transferred only on the books of the Corporation by the surrender to the Corporation or its transfer agent of the certificate theretofore properly endorsed or accompanied by a written assignment or power of attorney properly executed, with transfer stamps (if necessary) affixed, and with such proof of the authenticity of signature as the Corporation or its transfer agent may reasonably require.

SECTION 3. Record Holders.

Except as may otherwise be required by law, by the Certificate or by these By-laws, the Corporation shall be entitled to treat the record holder of stock as shown on its books as the owner of such stock for all purposes, including the payment of dividends and the right to vote with respect thereto, regardless of any transfer, pledge or other disposition of such stock, until the shares have been transferred on the books of the Corporation in accordance with the requirements of these By-laws.

SECTION 4. Record Date.

In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date: (a) in the case of determination of stockholders entitled to vote at any meeting of stockholders, shall, unless otherwise required by law, not be more than sixty nor less than ten days before the date of such meeting; and (b) in the case of any other action, shall not be more than sixty days prior to such other action. If no record date is fixed: (i) the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held; (ii) the record date for determining stockholders for any other purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

SECTION 5. Replacement of Certificates.

LIBC/2827554.2

In case of the alleged loss, destruction or mutilation of a certificate of stock, a duplicate certificate may be issued in place thereof, upon such terms as the Board of Directors may prescribe.

## ARTICLE V

### Indemnification

SECTION 1. <u>Definitions. For purposes of this Article:</u>

(a) "<u>Corporate Status</u>" describes the status of a person who is serving or has served (i) as a Director of the Corporation, (ii) as an Officer of the Corporation, or (iii) as a director, partner, trustee, officer, employee or agent of any other corporation, partnership, limited liability company, joint venture, trust, employee benefit plan, foundation, association, organization or other legal entity which such person is or was serving at the request of the Corporation. For purposes of this Section 1(a), an Officer or Director of the Corporation who is serving or has served as a director, partner, trustee, officer, employee or agent of a Subsidiary shall be deemed to be serving at the request of the Corporation. Notwithstanding the foregoing, "Corporate Status" shall not include the status of a person who is serving or has served as a director, officer, employee or agent of a constituent corporation absorbed in a merger or consolidation transaction with the Corporation with respect to such person's activities prior to said transaction, unless specifically authorized by the Board of Directors or the stockholders of the Corporation;

(b) "<u>Director</u>" means any person who serves or has served the Corporation as a director on the Board of Directors of the Corporation;

(c) "<u>Disinterested Director</u>" means, with respect to each Proceeding in respect of which indemnification is sought hereunder, a Director of the Corporation who is not and was not a party to such Proceeding;

(d) "<u>Expenses</u>" means all attorneys' fees, retainers, court costs, transcript costs, fees of expert witnesses, private investigators and professional advisors (including, without limitation, accountants and investment bankers), travel expenses, duplicating costs, printing and binding costs, costs of preparation of demonstrative evidence and other courtroom presentation aids and devices, costs incurred in connection with document review, organization, imaging and computerization, telephone charges, postage, delivery service fees, and all other disbursements, costs or expenses of the type customarily incurred in connection with prosecuting, defending, preparing to prosecute or defend, investigating, being or preparing to be a witness in, settling or otherwise participating in, a Proceeding;

(e) "<u>Liabilities</u>" means judgments, damages, liabilities, losses, penalties, excise taxes, fines and amounts paid in settlement.

(f) "<u>Non-Officer Employee</u>" means any person who serves or has served as an employee or agent of the Corporation, but who is not or was not a Director or Officer;

(g)     "Officer" means any person who serves or has served the Corporation as an officer of the Corporation appointed by the Board of Directors of the Corporation;

(h)     "Proceeding" means any threatened, pending or completed action, suit, arbitration, alternate dispute resolution mechanism, inquiry, investigation, administrative hearing or other proceeding, whether civil, criminal, administrative, arbitrative or investigative; and

(i)     "Subsidiary" shall mean any corporation, partnership, limited liability company, joint venture, trust or other entity of which the Corporation owns (either directly or through or together with another Subsidiary of the Corporation) either (i) a general partner, managing member or other similar interest or (ii) (A) 50% or more of the voting power of the voting capital equity interests of such corporation, partnership, limited liability company, joint venture or other entity, or (B) 50% or more of the outstanding voting capital stock or other voting equity interests of such corporation, partnership, limited liability company, joint venture or other entity.

SECTION 2.  Indemnification of Directors and Officers.

(a)     Subject to the operation of Section 4 of this Article V of these By-laws, each Director and Officer shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the DGCL, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than such law permitted the Corporation to provide prior to such amendment) and to the extent authorized in this Section 2.

(1)     Actions, Suits and Proceedings Other than By or In the Right of the Corporation. Each Director and Officer shall be indemnified and held harmless by the Corporation against any and all Expenses and Liabilities that are incurred or paid by such Director or Officer or on such Director's or Officer's behalf in connection with any Proceeding or any claim, issue or matter therein (other than an action by or in the right of the Corporation), which such Director or Officer is, or is threatened to be made, a party to or participant in by reason of such Director's or Officer's Corporate Status, if such Director or Officer acted in good faith and in a manner such Director or Officer reasonably believed to be in or not opposed to the best interests of the Corporation and, with respect to any criminal proceeding, had no reasonable cause to believe his or her conduct was unlawful.

(2)     Actions, Suits and Proceedings By or In the Right of the Corporation. Each Director and Officer shall be indemnified and held harmless by the Corporation against any and all Expenses that are incurred by such Director or Officer or on such Director's or Officer's behalf in connection with any Proceeding or any claim, issue or matter therein by or in the right of the Company, which such Director or Officer is, or is threatened to be made, a party to or participant in by reason of such Director's or Officer's Corporate Status, if such Director or Officer acted in good faith and in a manner such Director or Officer reasonably believed to be in or not opposed to the best interests of the Corporation and, with respect to any criminal proceeding, had no reasonable cause to believe his or her conduct was unlawful; provided, however, that no indemnification shall be made under this Section 2(a)(2) in respect of any claim, issue or matter as to

which such Director or Officer shall have been finally adjudged by a court of competent jurisdiction to be liable to the Company, unless, and only to the extent that, the Court of Chancery or another court in which such Proceeding was brought shall determine upon application that, despite adjudication of liability, but in view of all the circumstances of the case, such Director or Officer is fairly and reasonably entitled to indemnification for such Expenses that such court deem proper.

(3)     The rights of indemnification provided by this Section 2 shall continue as to a Director or Officer after he or she has ceased to be a Director or Officer and shall inure to the benefit of his or her heirs, executors, administrators and personal representatives. Notwithstanding the foregoing, the Corporation shall indemnify any Director or Officer seeking indemnification in connection with a Proceeding initiated by such Director or Officer only if such Proceeding was authorized in advance by the Board of Directors of the Corporation, unless such Proceeding was brought to enforce an Officer or Director's rights to indemnification or, in the case of Directors, advancement of Expenses under these By-laws in accordance with the provisions set forth herein.

SECTION 3. <u>Indemnification of Non-Officer Employees.</u>

Subject to the operation of Section 4 of this Article V of these By-laws, each Non-Officer Employee may, in the discretion of the Board of Directors of the Corporation, be indemnified by the Corporation to the fullest extent authorized by the DGCL, as the same exists or may hereafter be amended, against any or all Expenses and Liabilities that are incurred by such Non-Officer Employee or on such Non-Officer Employee's behalf in connection with any threatened, pending or completed Proceeding, or any claim, issue or matter therein, which such Non-Officer Employee is, or is threatened to be made, a party to or participant in by reason of such Non-Officer Employee's Corporate Status, if such Non-Officer Employee acted in good faith and in a manner such Non-Officer Employee reasonably believed to be in or not opposed to the best interests of the Corporation and, with respect to any criminal proceeding, had no reasonable cause to believe his or her conduct was unlawful. The rights of indemnification provided by this Section 3 shall exist as to a Non-Officer Employee after he or she has ceased to be a Non-Officer Employee and shall inure to the benefit of his or her heirs, personal representatives, executors and administrators. Notwithstanding the foregoing, the Corporation may indemnify any Non-Officer Employee seeking indemnification in connection with a Proceeding initiated by such Non-Officer Employee only if such Proceeding was authorized in advance by the Board of Directors of the Corporation.

SECTION 4. <u>Good Faith.</u>

Unless ordered by a court, no indemnification shall be provided pursuant to this Article V to a Director, to an Officer or to a Non-Officer Employee unless a determination shall have been made that such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Corporation and, with respect to any criminal Proceeding, such person had no reasonable cause to believe his or her conduct was unlawful. Such determination shall be made by (a) a majority vote of the Disinterested Directors, even though less than a quorum of the Board of Directors, (b) a committee comprised of Disinterested

Directors, such committee having been designated by a majority vote of the Disinterested Directors (even though less than a quorum), (c) if there are no such Disinterested Directors, or if a majority of Disinterested Directors so directs, by independent legal counsel in a written opinion, or (d) by the stockholders of the Corporation.

SECTION 5.  Advancement of Expenses to Directors Prior to Final Disposition.

(a)  The Corporation shall advance all Expenses incurred by or on behalf of any Director in connection with any Proceeding in which such Director is involved by reason of such Director's Corporate Status within 30 days after the receipt by the Corporation of a written statement from such Director requesting such advance or advances from time to time, whether prior to or after final disposition of such Proceeding.  Such statement or statements shall reasonably evidence the Expenses incurred by such Director and shall be preceded or accompanied by an undertaking by or on behalf of such Director to repay any Expenses so advanced if it shall ultimately be determined that such Director is not entitled to be indemnified against such Expenses.  Notwithstanding the foregoing, the Corporation shall advance all Expenses incurred by or on behalf of any Director seeking advancement of expenses hereunder in connection with a Proceeding initiated by such Director only if such Proceeding was (i) authorized by the Board of Directors of the Corporation, or (ii) brought to enforce Director's rights to indemnification or advancement of Expenses under these By-laws.

(b)  If a claim for advancement of Expenses hereunder by a Director is not paid in full by the Corporation within 30 days after receipt by the Corporation of documentation of Expenses and the required undertaking, such Director may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim and if successful in whole or in part, such Director shall also be entitled to be paid the expenses of prosecuting such claim.  The failure of the Corporation (including its Board of Directors or any committee thereof, independent legal counsel, or stockholders) to make a determination concerning the permissibility of such advancement of Expenses under this Article V shall not be a defense to the action and shall not create a presumption that such advancement is not permissible. The burden of proving that a Director is not entitled to an advancement of expenses shall be on the Corporation.

(c)  In any suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final adjudication that the Director has not met any applicable standard for indemnification set forth in the DGCL.

SECTION 6.  Advancement of Expenses to Officers and Non-Officer Employees Prior to Final Disposition.

(a)  The Corporation may, at the discretion of the Board of Directors of the Corporation, advance any or all Expenses incurred by or on behalf of any Officer or any Non-Officer Employee in connection with any Proceeding in which such is involved by reason of the Corporate Status of such Officer or Non-Officer Employee upon the receipt by the Corporation of a statement or statements from such Officer or Non-Officer Employee requesting such advance or advances from time to time, whether prior to or after final disposition of such

Proceeding. Such statement or statements shall reasonably evidence the Expenses incurred by such Officer and Non-Officer Employee and shall be preceded or accompanied by an undertaking by or on behalf of such to repay any Expenses so advanced if it shall ultimately be determined that such Officer or Non-Officer Employee is not entitled to be indemnified against such Expenses.

(b)      In any suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final adjudication that the Officer or Non-Officer Employee has not met any applicable standard for indemnification set forth in the DGCL.

SECTION 7.  Contractual Nature of Rights.

(a)      The foregoing provisions of this Article V shall be deemed to be a contract between the Corporation and each Director and Officer entitled to the benefits hereof at any time while this Article V is in effect, and any repeal or modification thereof shall not affect any rights or obligations then existing with respect to any state of facts then or theretofore existing or any Proceeding theretofore or thereafter brought based in whole or in part upon any such state of facts.

(b)      If a claim for indemnification hereunder by a Director or Officer is not paid in full by the Corporation within 60 days after receipt by the Corporation of a written claim for indemnification, such Director or Officer may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim, and if successful in whole or in part, such Director or Officer shall also be entitled to be paid the expenses of prosecuting such claim.  The failure of the Corporation (including its Board of Directors or any committee thereof, independent legal counsel, or stockholders) to make a determination concerning the permissibility of such indemnification under this Article V shall not be a defense to the action and shall not create a presumption that such indemnification is not permissible.  The burden of proving that a Director or Officer is not entitled to indemnification shall be on the Corporation.

(c)      In any suit brought by a Director or Officer to enforce a right to indemnification hereunder, it shall be a defense that such Director or Officer has not met any applicable standard for indemnification set forth in the DGCL.

SECTION 8.  Non-Exclusivity of Rights.

The rights to indemnification and to advancement of Expenses set forth in this Article V shall not be exclusive of any other right which any Director, Officer, or Non-Officer Employee may have or hereafter acquire under any statute, provision of the Certificate or these By-laws, agreement, vote of stockholders or Disinterested Directors or otherwise.

SECTION 9.  Insurance.

The Corporation may maintain insurance, at its expense, to protect itself and any Director, Officer or Non-Officer Employee against any liability of any character asserted against or

incurred by the Corporation or any such Director, Officer or Non-Officer Employee, or arising out of any such person's Corporate Status, whether or not the Corporation would have the power to indemnify such person against such liability under the DGCL or the provisions of this Article V.

SECTION 10. Other Indemnification.

The Corporation's obligation, if any, to indemnify any person under this Article V as a result of such person serving, at the request of the Corporation, as a director, partner, trustee, officer, employee or agent of another corporation, partnership, joint venture, trust, employee benefit plan or other enterprise shall be reduced by any amount such person may collect as indemnification from such other corporation, partnership, joint venture, trust, employee benefit plan or enterprise.

## ARTICLE VI

### Miscellaneous Provisions

SECTION 1. Fiscal Year.

The fiscal year of the Corporation shall be determined by the Board of Directors and may be amended by the Board of Directors.

SECTION 2. Seal.

The Board of Directors shall have power to adopt and alter the seal of the Corporation.

SECTION 3. Execution of Instruments.

All deeds, leases, transfers, contracts, bonds, notes and other obligations to be entered into by the Corporation in the ordinary course of its business without director action may be executed on behalf of the Corporation by the Chief Executive Officer, Chairman of the Board, if one is elected, the President, Chief Operating Officer, or the Chief Financial Officer, or the Treasurer or any other officer, employee or agent of the Corporation as the Board of Directors or Executive Committee may authorize.

SECTION 4. Voting of Securities.

Unless the Board of Directors otherwise provides, the Chairman of the Board, if one is elected, the President or the Treasurer may waive notice of and act on behalf of this Corporation, or appoint another person or persons to act as proxy or attorney in fact for this Corporation with or without discretionary power and/or power of substitution, at any meeting of stockholders or shareholders of any other corporation or organization, any of whose securities are held by this Corporation.

LIBC/2827554.2

SECTION 5. Resident Agent.

The Board of Directors may appoint a resident agent upon whom legal process may be served in any action or proceeding against the Corporation.

SECTION 6. Corporate Records.

The original or attested copies of the Certificate, By-laws and records of all meetings of the incorporators, stockholders and the Board of Directors and the stock transfer books, which shall contain the names of all stockholders, their record addresses and the amount of stock held by each, may be kept outside the State of Delaware and shall be kept at the principal office of the Corporation, at the office of its counsel or at an office of its transfer agent or at such other place or places as may be designated from time to time by the Board of Directors.

SECTION 7. Certificate.

All references in these By-laws to the Certificate shall be deemed to refer to the Certificate of Incorporation of the Corporation, as amended and in effect from time to time.

SECTION 8. Amendment of By-laws.

(a)     Amendment by Directors.  Except as provided otherwise by law, these By-laws may be amended or repealed by the Board of Directors by the affirmative vote of a majority of the directors then in office.

(b)     Amendment by Stockholders.  These By-laws may be amended or repealed at any Annual Meeting, or special meeting of stockholders called for such purpose, by the affirmative vote of at least 75% of the outstanding shares entitled to vote on such amendment or repeal, voting together as a single class; provided, however, that if the Board of Directors recommends that stockholders approve such amendment or repeal at such meeting of stockholders, such amendment or repeal shall only require the affirmative vote of the majority of the outstanding shares entitled to vote on such amendment or repeal, voting together as a single class. Notwithstanding the foregoing, stockholder approval shall not be required unless mandated by the Certificate, these By-laws, or other applicable law.

SECTION 9. Notices.

If mailed, notice to stockholders shall be deemed given when deposited in the mail, postage prepaid, directed to the stockholder at such stockholder's address as it appears on the records of the Corporation.  Without limiting the manner by which notice otherwise may be given to stockholders, any notice to stockholders may be given by electronic transmission in the manner provided in Section 232 of the DGCL.

SECTION 10. <u>Waivers.</u>

A written waiver of any notice, signed by a stockholder or director, or waiver by electronic transmission by such person, whether given before or after the time of the event for which notice is to be given, shall be deemed equivalent to the notice required to be given to such person. Neither the business nor the purpose of any meeting need be specified in such a waiver.

[End of Text]

Document comparison done by DeltaView on Friday, September 15, 2006 11:02:44 AM

| Input: | |
|---|---|
| Document 1 | pcdocs://ny2/1681358/1 |
| Document 2 | pcdocs://ny2/1681358/2 |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 5 |
| Deletions | 5 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 10 |

**[Form of Amended Certificate of Incorporation of Delaware Subsidiary Debtors]**

**FORM OF**

**AMENDED AND RESTATED**

**CERTIFICATE OF INCORPORATION**

**OF**

**[NAME OF DELAWARE CORPORATION]**

[Name of Corporation], a corporation organized and existing under the laws of the State of Delaware (the "Corporation"), hereby certifies as follows:

1.    That the name of the Corporation is [Name of Corporation]. The date of the filing of the original Certificate of Incorporation with the Secretary of State of the State of Delaware was [_____ __, _____] (the "Original Certificate").

2.    On May 8, 2006, the Corporation and certain of its affiliates (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (Case Nos. 06-10977 (BRL) through 06-10990 (BRL)). This Amended and Restated Certificate of Incorporation amends and restates the Original Certificate, as amended to date (the "Certificate of Incorporation"), and has been duly adopted in accordance with Sections 242, 245 and 303 of the General Corporation Law of the State of Delaware (the "DGCL"), pursuant to the authority granted to the Corporation under Section 303 of the DGCL to put into effect and carry out the Debtors' First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, as confirmed on September [__], 2006 by order (the "Order") of the Bankruptcy Court. Provision for amending the Certificate of Incorporation is contained in the Order of the Bankruptcy Court having jurisdiction under the Bankruptcy Code for the reorganization of the Corporation.

3.    The Certificate of Incorporation of the Corporation is hereby amended and restated in its entirety to read as follows:

ARTICLE I

The name of the Corporation is Silicon Graphics Federal, Inc. [_____].

ARTICLE II

The address of the Corporation's registered office in the State of Delaware is c/o The Corporation Trust Company, 1209 Orange Street, in the City of Wilmington, County of New Castle. The name of its registered agent at such address is The Corporation Trust Company.

## ARTICLE III

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the DGCL.

## ARTICLE IV

The total number of shares of all classes of stock which the Corporation shall have authority to issue is One Thousand (1,000) shares of Common Stock, $0.001 par value per share (the "Common Stock").

The Corporation shall not issue any nonvoting equity securities to the extent prohibited by Section 1123(a)(6) of the Title 11 of the United States Code (the "Bankruptcy Code") as in effect on the date of the filing of this Amended and Restated Certificate of Incorporation with the Secretary of State of the State of Delaware; provided, however, that this paragraph of Article IV (i) will have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (ii) will have such force and effect, if any, only for so long as Section 1123(a)(6) of the Bankruptcy Code is in effect and applicable to the Corporation, and (iii) in all events may be amended or eliminated in accordance with such applicable law as from time to time may be in effect.

## ARTICLE V

In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware:

(a)     The board of directors of the Corporation is expressly authorized to adopt, amend or repeal the By-Laws of the Corporation.

(b)     Elections of directors need not be by written ballot unless the By-Laws of the Corporation shall so provide.

(c)     The books of the Corporation may be kept at such place within or outside of the State of Delaware as the By-Laws of the Corporation may provide or as may be designated from time to time by the board of directors of the Corporation. Meetings of stockholders may be held within or outside of the State of Delaware, as the Bylaws of the Corporation may provide.

## ARTICLE VI

(a)     The Corporation shall indemnify, to the extent provided in subsection (b) below, these persons:

(i)     Any director or officer of the Corporation;

(ii)     Any former director or officer of the Corporation; and

(iii)     Any person who, while a director or officer of the Corporation, is or was serving at the Corporation's request as a director, officer, agent or employee of

another Corporation of which the Corporation owns or has owned stock, or of which it is or has been a creditor.

(b)     The indemnification shall be against expenses actually and necessarily incurred by such person, and any amount paid in satisfaction of judgments in connection with any action, suit or proceeding (whether civil or criminal) in which he is made a party by reason of being or having been such a director, officer, agent or employee (whether or not such at the time the costs or expenses are incurred by or imposed on him) except in relation to matters as to which he shall be adjudged in such action, suit or proceeding to be liable for gross negligence or willful misconduct in the performance of a duty.

(c)     The Corporation may also reimburse to any such person, the reasonable costs of settlement of any such action, suit or proceeding, if it is found by a majority of the directors not involved in the matter (whether or not a quorum) that (1) it was to the interest of the Corporation to make such a settlement and (2) such person was not guilty of gross negligence or willful misconduct.

(d)     These rights of indemnification and reimbursement shall not be exclusive of any other rights to which such person may be entitled by law, the by-laws, agreement, stockholders' vote or otherwise.

ARTICLE VII

The corporation reserves the right at any time, and from time to time, to amend, alter, change or repeal any provision contained in this Certificate, and to add or insert other provisions authorized by the laws of the State of Delaware at the time in force, in the manner now or hereafter prescribed by law; and all rights, preferences and privileges of whatsoever nature conferred upon stockholders, directors or any other persons whomsoever by and pursuant to this Certificate in its present form or as hereafter amended are granted subject to the rights reserved in this Article VII.


**IN WITNESS WHEREOF**, this Amended and Restated Certificate of Incorporation has been executed by a duly authorized officer of the Corporation on this _____ day of _____, 2006.


By:_____
        Name:
        Title:

Document comparison done by DeltaView on Friday, September 15, 2006 11:08:06 AM

| Input: | |
|---|---|
| Document 1 | pcdocs://ny2/1681360/1 |
| Document 2 | pcdocs://ny2/1681360/2 |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| ~~Deletion~~ | |
| ~~Moved from~~ | |
| Moved to | |
| Style change | |
| Format change | |
| ~~Moved deletion~~ | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 3 |
| Deletions | 4 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 7 |

**ITEM 3**

**REGISTRATION RIGHTS AGREEMENT**

REGISTRATION RIGHTS AGREEMENT dated as of _____ __, 2006, by and between ~~SGI Corporation (formerly~~ Silicon Graphics, Inc.~~)~~, a Delaware corporation (as debtor in possession and reorganized debtor, as applicable, the "Company"), and the investors listed in Exhibit C hereto (collectively, the "Investors" and individually an "Investor").

WHEREAS, on May 8, 2006, the Company and certain of its subsidiaries (as debtors in possession and reorganized debtors, as applicable, together with the Company, collectively, the "Debtors") commenced cases under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code") (collectively, the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

WHEREAS, the Company issued shares of common stock, par value $.~~001~~01 per share (the "Common Stock"), of the reorganized Company (the "New Common Stock") and offered and sold shares of New Common Stock (the "Rights Offering Shares") pursuant to a rights offering (the "Rights Offering") in connection with the Debtors' First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated July 27, 2006 (as modified, the "Plan"), which Plan was confirmed pursuant to an order of the Bankruptcy Court dated September [___], 2006.

WHEREAS, in connection with the consummation of the transactions contemplated by those certain Backstop Commitment Agreements, each dated as of July 31, 2006 (the "Backstop Commitment Agreements"), by and between the Company and each of the Investors, the Investors acquired shares of Common Stock in accordance with the provisions of the Backstop Commitment Agreements (the "Backstop Shares", and together with the New Common Stock and the Rights Offering Shares, the "Investor Shares").

WHEREAS, in consideration of the Investors' commitment to purchase the Investor Shares pursuant to and on the terms and conditions set forth in the Plan and in the Backstop Commitment Agreements, the Company has agreed to enter into a registration rights agreement with respect to the securities held by Investors.

NOW THEREFORE, in consideration of the foregoing and the covenants and agreements contained herein, in the Plan and in the Backstop Commitment Agreements, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.     **Certain Definitions.**

In addition to the terms defined elsewhere in this Agreement, the following terms shall have the following meanings:

"Affiliate" of any Person means any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlling," "controlled by" and "under

common control with") as used with respect to any Person means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Aggregate Value" has the meaning set forth in Section 11 hereof.

"Agreement" means this Registration Rights Agreement, including all amendments, modifications and supplements and any exhibits or schedules to any of the foregoing, and shall refer to this Registration Rights Agreement as the same may be in effect at the time such reference becomes operative.

"Backstop Commitment Agreements" has the meaning set forth in the recitals.

"Backstop Shares" has the meaning set forth in the recitals.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Business Day" means any day, except a Saturday, Sunday or legal holiday on which banking institutions in The City of New York are authorized or obligated by law or executive order to close.

"Chapter 11 Cases" has the meaning set forth in the recitals.

"Common Stock" has the meaning set forth in the recitals.

"Company" has the meaning set forth in the introductory paragraph and includes any other person referred to in the second sentence of Section 16(c) hereof.

"Debtors" has the meaning set forth in the recitals.

"Defaulting Holder" has the meaning set forth in Section 11 hereof.

"Demanding Key Holder" means a Key Holder requesting a Demand Registration pursuant to Section 2(a) hereof.

"Demand Registration" has the meaning set forth in Section 2(a) hereof.

"Demand Registration Delay Period" has the meaning set forth in Section 2(f) hereof.

"Demand Registration Statement" has the meaning set forth in Section 2(b) hereof.

"Demand Registration Statement Filing Date" has the meaning set forth in Section 2(a) hereof.

"Demand Rights" has the meaning set forth in Section 12(a) hereof.

2

"Effectiveness Default" has the meaning set forth in Section 11 hereof.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, or any successor statute, and the rules and regulations of the SEC thereunder.

"Filing Default" has the meaning set forth in Section 11 hereof.

"Free Writing Prospectus" means a free writing prospectus as defined in Rule 405 under the Securities Act.

"Full Cooperation" means, in connection with any underwritten offering, where, in addition to the cooperation otherwise required by this Agreement, (a) members of senior management of the Company (including the chief executive officer and chief financial officer) fully cooperate with the underwriter(s) in connection therewith and make themselves available to participate in "road-shows" and other customary marketing activities in such locations (domestic and foreign) as reasonably recommended by the underwriter(s) (including one-on-one meetings with prospective purchasers of the Registrable Common Stock) and (b) the Company prepares preliminary and final prospectuses (preliminary and final prospectus supplements in the case of an offering pursuant to a Shelf Registration Statement) for use in connection therewith containing such additional information as reasonably requested by the underwriter(s) (in addition to the minimum amount of information required by law, rule or regulation).

"Fully Marketed Underwritten Offering" means an underwritten offering in which there is Full Cooperation but shall not include a "registered direct" or other agented transaction that does not involve the preparation of a preliminary prospectus or preliminary prospectus supplement in the case of the offering pursuant to a Shelf Registration Statement.

"Governmental Entity" means any national, federal, state, municipal, local, territorial, foreign or other government or any department, commission, board, bureau, agency, regulatory authority or instrumentality thereof, or any court, judicial, administrative or arbitral body or public or private tribunal.

"Investor" and "Investors" have the meanings set forth in the introductory paragraph.

"Investor Shares" has the meaning set forth in the recitals.

"Issuer Free Writing Prospectus" means an issuer free writing prospectus as defined in Rule 433 under the Securities Act.

"Key Holder" means any Investor, together with its Affiliates, holding at least seven and one-half percent (7.5%) of the outstanding Common Stock as of the Effective Date of the Plan (as defined in the Plan) and such transferees as provided in Section 12 hereof.

"Liquidated Damages" has the meaning set forth in Section 11 hereof.

"New Common Stock" has the meaning set forth in the recitals.

LIBC/2828855.4

"Permitted Free Writing Prospectus" has the meaning set forth in Section 13 hereof.

"Person" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated organization, association, corporation, institution, public benefit corporation, Governmental Entity or any other entity.

"Piggyback Registration" has the meaning set forth in Section 4(a) hereof.

"Piggyback Registration Statement" has the meaning set forth in Section 4(a) hereof.

"Plan" has the meaning set forth in the recitals.

"Prospectus" means the prospectus or prospectuses included in any Registration Statement, all amendments and supplements to the prospectus, including post-effective amendments, and all material incorporated by reference in such prospectus or prospectuses.

"Registrable Common Stock" means (i) the Investor Shares, (ii) any other shares of Common Stock held by any of the Key Holders now or in the future, and (iii) any other securities into or for which the Common Stock referred to in clauses (i) or (ii) has been converted, substituted or exchanged, and any securities issued or issuable with respect thereto upon any stock dividend or stock split or in connection with a combination of shares, reclassification, recapitalization, merger, consolidation or other reorganization or otherwise ; provided, however, that a share of Common Stock will cease to be Registrable Common Stock if (a) a registration statement covering such share of Common Stock has been declared effective by the Commission and such share of Common Stock has been sold or disposed of pursuant to such effective registration statement, or (b) such share of Common Stock has been sold or disposed of pursuant to Rule 144 (or any successor rule) under the Securities Act; or (c) such share of Common Stock has been transferred to a Person who is not (and does not become as a result of such transfer) a Key Holder; or (d) such share of Common Stock ceases to be outstanding.

"Registration Default" has the meaning set forth in Section 11 hereof.

"Registration Expenses" has the meaning set forth in Section 9(a) hereof.

"Registration Statement" means any registration statement of the Company that covers any of the Registrable Common Stock pursuant to the provisions of this Agreement, including the Prospectus, amendments and supplements to such Registration Statement, including post-effective amendments, all exhibits and all materials incorporated by reference in such Registration Statement.

"Rights Offering" has the meaning set forth in the recitals.

"Rights Offering Shares" has the meaning set forth in the recitals.

"Rule 144" means Rule 144 promulgated by the SEC pursuant to the Securities Act, as such rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the SEC as a replacement thereto having substantially the same effect as such rule.

4

"Rule 415" means Rule 415 promulgated by the SEC pursuant to the Securities Act, as such rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the SEC as a replacement thereto having substantially the same effect as such rule.

"SEC" means the Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended, or any successor statute and the rules and regulations of the SEC thereunder.

"Shelf Registration" has the meaning set forth in Section 3(a) hereof.

"Shelf Registration Statement" has the meaning set forth in Section 3(a) hereof.

"Shelf Registration Statement Filing Date" has the meaning set forth in Section 3(a) hereof.

"Suspension Default" has the meaning set forth in Section 11 hereof.

"Takedown Default" has the meaning set forth in Section 11 hereof.

"transferee" has the meaning set forth in Section 14 hereof.

"underwritten registration or underwritten offering" means an offering in which securities of the Company are sold to one or more underwriter (as defined in Section 2(a)(11) of the Securities Act) for resale to the public.

"Underwritten Shelf Takedown" has the meaning set forth in Section 3(b) hereof.

"Underwritten Shelf Takedown Delay Period" has the meaning set forth in Section 3(f) hereof.

2. **Demand Registrations.**

(a)    Demand Registration on Form S-1.  At any time and from time to time, any Key Holder may request, in writing, that the Company effect the registration on Form S-1 (or any successor form) providing for the resale pursuant to Rule 415 from time to time of Registrable Common Stock owned by such Key Holder (a "Demand Registration"), in accordance with the methods of distribution set forth in such Demand Registration Statement (which plan of distribution is attached hereto as Exhibit A, modified to be consistent with then current market practice and in accordance with then applicable securities laws, rules and regulations); provided, however, that if the Key Holder requesting a Demand Registration pursuant to this Section 2(a) intends to distribute the Registrable Common Stock by means of an underwritten offering, the Demand Registration shall not provide for resale pursuant to Rule 415 and the plan of distribution shall be that plan of distribution provided by the lead underwriter for the underwritten offering.  As promptly as practicable after such request, but in any event within sixty (60) days after the Company's receipt of such request by the Key Holder (the "Demand Registration Statement Filing Date"), the Company shall file a registration statement on Form S-1 or such other form under the Securities Act then available to the Company.  The Company

shall use its commercially reasonable best efforts to cause a Demand Registration Statement to be declared effective by the SEC as promptly as practicable following such filing. Notwithstanding anything to the contrary herein, (i) the right to request a Demand Registration pursuant to this Section 2(a) shall be suspended upon the Company becoming eligible to file a Registration Statement on Form S-3 (or any successor form), provided that the Company has filed a Shelf Registration Statement (as defined below) and such Shelf Registration Statement has been declared effective by the SEC, and (ii) the right to request a Demand Registration pursuant to this Section 2(a) shall terminate if none of the events specified in clauses (i), (ii) or (iii) in the immediately following sentence occurs. The foregoing notwithstanding, the Key Holders shall be entitled to exercise their Demand Registration rights during the term of this Agreement in the event (i) the Company, after filing the Shelf Registration Statement, is no longer eligible to use Form S-3 prior to the expiration of the time period specified in Section 3(g), (ii) the Shelf Registration is withdrawn prior to the expiration of the time period specified in Section 3(g) or (iii) sales under the Shelf Registration Statement are suspended for periods in excess of those set forth in the last sentence of Section 3(f).

(b) <u>Notice of Demand Registration on Form S-1</u>. Upon receipt of any request for a Demand Registration, the Company shall promptly, but in any event within five (5) Business Days after the Company's receipt of such request by the Key Holder, give written notice of such proposed registration to all other Key Holders. Such Key Holders shall have the right, by giving written notice to the Company within ten (10) days after the Company provides its notice, to elect to have included in such registration such shares of their Registrable Common Stock as such Key Holders may request in such notice of election, subject in the case of an underwritten offering to the terms of Section 2(e). Thereupon, the Company shall, as expeditiously as possible, use commercially reasonable best efforts to effect the registration of all Registrable Common Stock which the Company has been requested to so register (the "<u>Demand Registration Statement</u>").

(c) <u>Number of Demand Registrations</u>. Each Key Holder on the date hereof shall be entitled to request two (2) Demand Registrations pursuant to Section 2(a). For purposes of Section 2, a request for registration shall not be counted as a Demand Registration (i) until such time as the Demand Registration Statement has been declared effective by the SEC (provided that the requesting Key Holder may withdraw its request for such registration and such request shall not count as a Demand Registration if (X) such withdrawal is as a result of information concerning the business or financial condition of the Company which is made known to the Key Holders after the date on which such registration was requested or (Y) the Demanding Key Holder agrees to pay the Registration Expenses therefor pursuant to Section 9); or (ii) if, as a result of an exercise of the underwriter's cut-back provisions, less than 75% of the total amount of Registrable Common Stock that the Demanding Key Holder has requested to be included in such Demand Registration Statement are included therein.

(d) <u>Number of Fully Marketed Underwritten Offerings</u>. The Key Holders shall be entitled to request no more than six (6) (and no more than two (2) per Key Holder) Fully Marketed Underwritten Offerings pursuant to all of the Demand Registration Statements and Shelf Registration Statements and no more than two (2) Fully Marketed Underwritten Offerings pursuant to all of the Demand Registration Statements and Shelf Registration Statements in any 12 month period. If the Demanding Key Holder intends to distribute the Registrable Common

Stock covered by its request by means of a Fully Marketed Underwritten Offering, it shall so advise the Company as a part of its request made pursuant to Section 2(a) and the Company shall include such information in its written notice referred to in Section 2(b). In such event, (i) the right of any other Key Holder to include its Registrable Common Stock in such registration pursuant to Section 2(a) shall be conditioned upon such other Key Holder's participation in such Fully Marketed Underwritten Offering on the terms set forth herein, and (ii) all Key Holders including Registrable Common Stock in such registration shall enter into an underwriting agreement upon customary terms with the underwriter or underwriters managing the offering; provided that such underwriting agreement shall not provide for indemnification or contribution obligations on the part of the Key Holders greater than the obligations of the Key Holders pursuant to Section 10. If a Key Holder requests a Fully Marketed Underwritten Offering, the Company shall cause there to occur Full Cooperation in connection therewith. An underwritten offering shall not count as one of the permitted Fully Marketed Underwritten Offerings if there is not Full Cooperation in connection therewith.

(e)     Priority on Demand Registrations. If, in connection with a Demand Registration pursuant to Section 2(a) commenced as an underwritten offering, the managing underwriter shall advise the Company that in its opinion the number of shares requested to be included in such registration exceeds the number that can be sold in such offering without having an adverse effect on such offering, including the price at which such shares can be sold, then the Company shall include in such registration the maximum number of shares that such underwriter advises can be so sold without having such effect, allocated (i) first, to Registrable Common Stock requested by the Key Holders to be included in such registration on a *pro rata* basis, (ii) second, to the shares of Common Stock to be sold for the account of Company, and (iii) third, among all shares of Common Stock requested to be included in such registration by any other Persons allocated among such Persons in such manner as they may agree.

(f)     Restrictions on Demand Registrations. If at the time of any request to register Registrable Common Stock by a Key Holder pursuant to Section 2(a), the Company is engaged or has plans to engage in a registered public offering or is engaged in any other activity which, in the good faith determination of the Company's Board of Directors, would be adversely affected by the requested registration, then the Company may at its option direct that such request be delayed for a period not in excess of forty-five (45) days from the date of such request, such right to delay a request to be exercised by the Company not more than twice in any 365-day period but in no event may such two 45-day periods be consecutive or so close in proximity as to cause a delay with respect to the filing of a Demand Registration Statement to be longer than sixty (60) days. The period during which any filing is so delayed hereunder is referred to as a "Demand Registration Delay Period". In the event that, in the judgment of the Company, it is advisable to suspend use of a Prospectus included in a Demand Registration Statement due to pending material developments or other events that have not yet been publicly disclosed and as to which the Company believes public disclosure would be detrimental to the Company, the Company shall notify all Key Holders to such effect, and, upon receipt of such notice, each of the Key Holders shall immediately discontinue any sales of Registrable Common Stock pursuant to such Demand Registration Statement until each of the Key Holders has received copies of a supplemented or amended Prospectus or until each of the Key Holders is advised in writing by the Company that the then current Prospectus may be used and has received copies of any additional or supplemental filings that are incorporated or deemed incorporated by reference in

7

such Prospectus. Notwithstanding anything to the contrary herein, the Company shall not exercise its rights under the preceding sentence to suspend sales of Registrable Common Stock for a period in excess of forty-five (45) days consecutively or ninety (90) days in any 365-day period.

(g) <u>Effective Period of Demand Registrations</u>. After any Demand Registration filed pursuant to this Agreement has become effective, the Company shall use commercially reasonable best efforts to keep such Demand Registration Statement effective for a period of at least eighteen (18) months from the date on which the SEC declares such Demand Registration Statement effective plus the duration of any Demand Registration Statement Delay Period and any period during which the use of a Prospectus is suspended pursuant to Section 2(f), or such shorter period that shall terminate on the earliest of (x) when all of the Registrable Common Stock covered by such Demand Registration Statement have been sold pursuant to such Demand Registration Statement in accordance with the plan of distribution set forth therein, and (y) when, in the opinion of counsel to the Key Holders, all outstanding Registrable Common Stock may be resold without registration under the Securities Act pursuant to Rule 144(k) under the Securities Act or any successor provision thereto.

**3.    Shelf Registrations.**

(a) <u>Shelf Registration on Form S-3</u>. As soon as the Company becomes eligible to file a Registration Statement on Form S-3 (or any successor form relating to secondary offerings), the Company shall prepare and file or cause to be prepared and filed with the SEC, as soon as practicable, but in any event within ten (10) days of the Company becoming eligible to file a Registration Statement on Form S-3 (the "<u>Shelf Registration Statement Filing Date</u>") a Registration Statement on Form S-3 (or any successor thereto) relating to the offering on a continuous or delayed basis pursuant to Rule 415 from time to time by the Key Holders of all then outstanding Registrable Common Stock (a "<u>Shelf Registration</u>" and any such Registration Statement filed on Form S-3 (or any successor thereto) a "<u>Shelf Registration Statement</u>"), in each case, in accordance with the methods of distribution set forth in such Shelf Registration Statement (which plan of distribution is attached as hereto as <u>Exhibit A</u> modified to be consistent with then current market practice and in accordance with then applicable securities laws, rules and regulations) and, thereafter, shall use its commercially reasonable best efforts to cause such Shelf Registration Statement to be declared effective under the Securities Act as promptly as practicable thereafter. Notwithstanding the foregoing, the Company may be able combine a Shelf Registration Statement from primary and/or secondary offerings. Furthermore, the Company shall not be required to prepare and file a Shelf Registration Statement if all Registrable Common Stock shall have been sold or if, in the opinion of counsel to the Key Holders, all outstanding Registrable Common Stock may be resold without registration under the Securities Act pursuant to Rule 144(k) under the Securities Act or any successor provision thereto.

(b) <u>Underwritten Shelf Takedowns</u>. At any time and from time to time, any Key Holder may request, in writing (an "<u>Underwritten Takedown Request</u>"), that the Company effect on underwritten shelf takedown (other than a "registered direct" or other agented transaction that does not involve the preparation of a preliminary prospectus or a preliminary prospectus supplement in the case of any offering pursuant to a Shelf Registration Statement) of

all or a portion of such Key Holder's Registrable Common Stock (an "Underwritten Shelf Takedown"), in accordance with the terms specified in such Underwritten Takedown Request. In connection with each such Underwritten Shelf Takedown, the Company shall cause there to occur Full Cooperation.

(c)     Notice of Underwritten Shelf Takedowns.  Upon receipt of any request for an Underwritten Shelf Takedown, the Company shall promptly, but in any event within five (5) Business Days after the Company's receipt of an Underwritten Takedown Request from a Key Holder, give written notice of such proposed Underwritten Shelf Takedown to all other Key Holders. Such other Key Holders shall have the right, by giving written notice to the Company within five (5) days after the Company provides its notice, to elect to have included in such Underwritten Shelf Takedown such shares of their Registrable Common Stock as such other Key Holders may request in such notice of election, subject to the terms of Section 3(e).  In such event, (i) the right of any other Key Holder to include its Registrable Common Stock in such Underwritten Shelf Takedown pursuant to this Section 3 shall be conditioned upon such other Key Holder's participation in such Underwritten Shelf Takedown on the terms set forth herein, and (ii) all Key Holders including Registrable Common Stock in such Underwritten Shelf Takedown shall enter into an underwriting agreement upon customary terms with the underwriter or underwriters managing the offering; provided that such underwriting agreement shall not provide for indemnification or contribution obligations on the part of the Key Holders greater than the obligations of the Key Holders pursuant to Section 10.  Thereupon, the Company shall, as expeditiously as possible, use its commercially reasonable best efforts to effect the Underwritten Shelf Takedown covering all of the Registrable Common Stock which the Company has been requested to include in such Underwritten Shelf Takedown.

(d)     Limitations on Takedowns.  There shall be no limit on the aggregate number of takedowns off such Shelf Registration Statement; provided, however, that the Company shall not be obligated to effect (i) more than six (6) (and no more than two (2) per Key Holder) Fully Marketed Underwritten Offerings pursuant to all Demand Registration Statements and Shelf Registration Statements, (ii) two (2) Fully Marketed Underwritten Offerings pursuant to all Demand Registration Statements and Shelf Registration Statements in any 12-month period.  For purposes of this Section 3(d), an Underwritten Shelf Takedown shall not be counted as a Fully Marketed Underwritten Offering (i) if the requesting Key Holder withdraws its request and (X) such withdrawal is as a result of information concerning the business or financial condition of the Company which is made known to the Key Holders after the date on which such Underwritten Shelf Takedown was requested or (Y) the Key Holder making such demand agrees to pay the Registration Expenses therefore pursuant to Section 9; (ii) if, as a result of an exercise of the underwriter's cut-back provisions, less than 75% of the total amount of Registrable Common Stock that Key Holders have requested to be included in such Underwritten Shelf Takedown are sold or (iii) there is not Full Cooperation by the Company in connection therewith.

(e)     Priority of Underwritten Shelf Registration Takedowns.  If, in connection with an Underwritten Shelf Takedown pursuant to this Section 3, the managing underwriter shall advise the Company that in its opinion the number of shares requested to be included in such registration exceeds the number that can be sold in such offering without having an adverse effect on such offering, including the price at which such shares can be sold, then the Company shall include in such registration the maximum number of shares that such underwriter advises

9

can be so sold without having such effect, allocated (i) first, to Registrable Common Stock requested by the Key Holders to be included in such Underwritten Shelf Takedown on a *pro rata* basis, (ii) second, to securities to be sold on account of the Company and (iii) third, among all shares of Common Stock requested to be included in such registration by any other Persons allocated among such Persons in such manner as they may agree.

(f)     Restrictions on Underwritten Shelf Takedowns.  If at the time of any request to effect an Underwritten Shelf Takedown by a Key Holder pursuant to Section 3(b), the Company is engaged or has plans to engage in a registered public offering or is engaged in any other activity which, in the good faith determination of the Company's Board of Directors, would be adversely affected by the requested Underwritten Shelf Takedown, then the Company may at its option direct that such request be delayed for a period not in excess of forty-five (45) days from the date of such request, such right to delay a request to be exercised by the Company not more than twice in any 365-day period but in no event may such two 45-day periods be consecutive or so close in proximity as to cause a delay with respect to such Underwritten Shelf Takedown to be longer than sixty (60) days.  The period during which any filing is so delayed hereunder is referred to as an "Underwritten Shelf Takedown Delay Period".  In the event that, in the judgment of the Company, it is advisable to suspend use of a Prospectus included in a Shelf Registration Statement due to pending material developments or other events that have not yet been publicly disclosed and as to which the Company believes public disclosure would be detrimental to the Company, the Company shall notify all Key Holders to such effect, and, upon receipt of such notice, each of the Key Holders shall immediately discontinue any sales of Registrable Common Stock pursuant to such Shelf Registration Statement until each of the Key Holders has received copies of a supplemented or amended Prospectus or until the Key Holders are advised in writing by the Company that the then current Prospectus may be used and has received copies of any additional or supplemental filings that are incorporated or deemed incorporated by reference in such Prospectus.  Notwithstanding anything to the contrary herein, the Company shall not exercise its rights under the preceding sentence to suspend sales of Registrable Common Stock for a period in excess of forty-five (45) days consecutively or ninety (90) days in any 365-day period.

(g)     Effective Period of Shelf Registration.  The Company shall use its commercially reasonable best efforts to keep any Shelf Registration Statement filed pursuant to Section 3(a) continuously effective (including by filing supplements and amendments) in order to permit the Prospectus forming part thereof to be usable by the Key Holders for such period that will terminate upon the earliest to occur of the following: (i) when all Registrable Common Stock have been sold pursuant to such Shelf Registration Statement, (ii) when, in the opinion of counsel to the Key Holders, all outstanding Registrable Common Stock may be resold without registration under the Securities Act pursuant to Rule 144(k) under the Securities Act or any successor provision thereto and (iii) three (3) years from the date on which the SEC declares such Shelf Registration Statement effective plus the duration of any Underwritten Shelf Registration Delay Period and any period during which the use of a Prospectus is suspended pursuant to Section 3(f).

LIBC/2828855.4

### 4. Piggyback Registrations.

(a) <u>Right to Piggyback</u>. Whenever the Company proposes to publicly sell or register for sale any of its common equity securities pursuant to a registration statement (a "<u>Piggyback Registration Statement</u>") under the Securities Act (other than a registration statement on Form S-8 or on Form S-4 or any similar successor forms thereto), for its own account (a "<u>Piggyback Registration</u>"), the Company shall give prompt written notice, in any event within five (5) Business Days of the Company's decision to effect a sale or registration, to the Key Holders of its intention to effect such sale or registration and, subject to Section 4(b), shall include in such registration all Registrable Common Stock with respect to which the Company has received a written request from the Key Holders for inclusion therein within ten (10) days after the receipt of the Company's notice. The Company may postpone or withdraw the filing or the effectiveness of a Piggyback Registration at any time in its sole discretion, without prejudice to the Key Holders' right to immediately request a Demand Registration hereunder. A Piggyback Registration shall not be considered a Demand Registration for purposes of Section 2 of this Agreement or an Underwritten Shelf Takedown for purposes of Section 3 of this Agreement.

(b) <u>Priority on Piggyback Registrations</u>. If a Piggyback Registration is initiated as an underwritten primary registration or Underwritten Shelf Takedown on behalf of the Company, and the managing underwriter advises the Company in writing that in its opinion the number of securities requested to be included in such registration exceeds the number that can be sold in such offering without having an adverse effect on such offering, including the price at which such securities can be sold, then the Company shall include in such registration the maximum number of shares that such underwriter advises can be so sold without having such effect, allocated (i) first, to the securities the Company proposes to sell, (ii) second, to the Registrable Common Stock requested to be included therein by the Key Holders, and (iii) third, among other securities requested to be included in such registration by other security holders of the Company on such basis as such holders may agree among themselves and the Company.

### 5. Other Registrations.

The Company shall not grant to any Person the right, other than as set forth herein and except to employees of the Company with respect to registrations on Form S-8 and with respect to registrations on Form S-4 (or any successor forms thereto), to request the Company to register any securities of the Company except such rights as are (a) not more favorable than or inconsistent with the rights granted to the Key Holders, and (b) that do not adversely affect the priorities set forth herein of the Key Holders.

### 6. Selection of Underwriters.

If any of the Registrable Common Stock covered by a Demand Registration Statement or a Shelf Registration Statement is to be sold in an underwritten offering, the Key Holder making the demand or requesting the Underwritten Shelf Takedown shall have the right to select the managing underwriter(s) to administer the offering subject to the prior approval of the Company, which approval shall not be unreasonably withheld.

11

## 7. Holdback Agreements.

Each of the Key Holders (regardless of whether or not such Key Holder is a selling stockholder in any underwritten Demand Registration, Underwritten Shelf Takedown or underwritten Piggyback Registration, and, in each case, with respect to the Registrable Common Stock not included in such underwritten offering) and the Company agrees not to, and the Company, if requested by the lead managing underwriter, shall obtain from its directors and executive officers (other than with respect to shares deemed to be beneficially owned by such officer or director or an Affiliate of such officer or director which are included in the underwritten offering), and use its commercially reasonable best efforts to obtain from its beneficial owners of 5% or more of the Company's outstanding voting stock, agreements (in the underwriters' customary form) not to, directly or indirectly offer, sell, pledge, contract to sell, (including any short sale), grant any option to purchase or otherwise dispose of any equity securities of the Company or enter into any hedging transaction relating to any equity securities of the Company during the 90 days beginning on the effective date of any underwritten Demand Registration Statement or any underwritten Piggyback Registration Statement or the pricing date of any Underwritten Shelf Registration Takedown (except as part of such underwritten registration or pursuant to registrations on Form S-8 or S-4 or any successor forms thereto) unless the underwriter managing the offering otherwise agrees to a shorter period, provided, however, that (i) the lock-up agreements, if any, with the Company's officers and directors shall be on terms no less favorable than those of the Key Holders; and (ii) if (A) the Company issues an earnings release or material news, or a material event relating to the Company occurs, during the last 17 days of the lock-up period, or (B) prior to the expiration of the holdback period, the Company announces that it will release earnings results during the 16-day period beginning on the last day of the holdback period, the restrictions imposed by this Section 7 shall continue to apply until the expiration of the 18-day period beginning on the issuance of the earnings release or the occurrence of the material news or material event; provided, however, that this sentence shall not apply if any research published or distributed by any underwriter on the Company would be compliant under Rule 139 of the Securities Act and the Company's securities are actively traded as defined in Rule 101(c)(1) of Regulation M of the Exchange Act.

The Company may impose stop-transfer instructions with respect to the Registrable Common Stock not included in the underwritten offering or other securities subject to the foregoing restriction until the end of the applicable holdback period.

## 8. Procedures.

(a) Whenever a Key Holder requests that any Registrable Common Stock be registered or sold pursuant to this Agreement, the Company shall use commercially reasonable best efforts to effect the registration and the sale of such Registrable Common Stock in accordance with the intended methods of disposition thereof, and pursuant thereto the Company shall as expeditiously as possible:

(i) prepare and file with the SEC a Registration Statement with respect to such Registrable Common Stock and use commercially reasonable best efforts to cause such Registration Statement to become effective as soon as practicable thereafter; and at least three (3) Business Days before filing a Registration Statement or Prospectus or any

amendments or supplements thereto (including any prospectus supplement for a shelf takedown), furnish to the selling Key Holders and the underwriter or underwriters, if any, copies of all such documents proposed to be filed, including documents incorporated by reference in the Prospectus and, if requested by the selling Key Holders, the exhibits incorporated by reference, and the selling Key Holders (and the underwriter(s), if any) shall have the opportunity to review and comment thereon, and the Company will make such changes and additions thereto as reasonably requested by the selling Key Holders (and the underwriter(s), if any) prior to filing any Registration Statement or amendment thereto or any Prospectus or any supplement thereto;

(ii)     prepare and file with the SEC such amendments and supplements to such Registration Statement and the Prospectus used in connection therewith as may be necessary to keep such Registration Statement effective as set forth in Section 2 or 3, as applicable, hereof, or such shorter period as is necessary to complete the distribution of the securities covered by such Registration Statement and comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such Registration Statement during such period in accordance with the intended methods of disposition by the Key Holders thereof set forth in such Registration Statement and, in the case of the Shelf Registration Statement, prepare such prospectus supplements containing such disclosures as may be reasonably requested by the Key Holders or any underwriter(s) in connection with each shelf takedown;

(iii)     furnish to the selling Key Holders such number of copies of such Registration Statement, each amendment and supplement thereto, the Prospectus included in such Registration Statement (including each preliminary Prospectus) and such other documents as the selling Key Holders and any underwriter(s) may reasonably request in order to facilitate the disposition of the Registrable Common Stock, provided, however, that the Company shall have no such obligation to furnish copies of a final prospectus if the conditions of Rule 172(c) under the Securities Act are satisfied by the Company;

(iv)     use commercially reasonable best efforts to register or qualify such Registrable Common Stock under such other securities or blue sky laws of such jurisdictions (domestic or foreign) as any underwriter(s) reasonably requests to enable the Key Holders and any underwriter(s) to consummate the disposition in such jurisdictions of the Registrable Common Stock (provided, that the Company will not be required to (1) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this subparagraph (iv), (2) subject itself to taxation in any such jurisdiction or (3) consent to general service of process in any such jurisdiction);

(v)     promptly notify the selling Key Holders and any underwriter(s), at any time when a Prospectus relating thereto is required to be delivered under the Securities Act, of the occurrence of any event as a result of which the Prospectus included in such Registration Statement contains an untrue statement of a material fact or omits any material fact necessary to make the statements therein not misleading, and, at the request of the selling Key Holders or any underwriter(s), the Company shall prepare a supplement or amendment to such Prospectus so that, as thereafter delivered to the purchasers of such Registrable Common Stock, such Prospectus shall not contain an

13

untrue statement of a material fact or omit to state any material fact necessary to make the statements therein not misleading;

(vi)     in the case of an underwritten offering, (i) enter into such agreements (including underwriting agreements in customary form), (ii) take all such other actions as the selling Key Holders or the underwriter(s) reasonably request in order to expedite or facilitate the disposition of such Registrable Common Stock (including, without limitation, causing senior management and other Company personnel to cooperate with the Key Holders and the underwriter(s) in connection with performing due diligence), (iii) cause its counsel to issue opinions of counsel in form, substance and scope as are customary in underwritten offerings, addressed and delivered to the underwriter(s) and the selling Key Holders and (iv) cause its independent certified public accountants to issue "comfort letters" in form, substance and scope as are customary in underwritten offerings, addressed and delivered to the underwriter, if any, and the Company shall request for such "comfort letters" to also be addressed and delivered to each selling Key Holders;

(vii)     in connection with each Fully Marketed Underwritten Offering requested by the Key Holders under Section 2 or 3, cause there to occur Full Cooperation and, in all other cases, cause members of senior management of the Company to be available to participate in, and to cooperate with the underwriter(s) in connection with customary marketing activities (including select conference calls and one-on-one meetings with prospective purchasers);

(viii)     make available for inspection by the Key Holders, any underwriter participating in any disposition pursuant to such Registration Statement, and any attorney, accountant or other agent retained by the Key Holders or underwriter, all financial and other records, pertinent corporate documents and properties of the Company, and cause the Company's officers, directors, employees and independent accountants to supply all information reasonably requested by the selling Key Holders, underwriter, attorney, accountant or agent in connection with such Registration Statement;

(ix)     use commercially reasonable best efforts to cause all such Registrable Common Stock to be listed or qualified on each securities exchange, if any, on which securities of the same class issued by the Company are then listed or traded;

(x)     provide a transfer agent and registrar for all such Registrable Common Stock not later than the effective date of such Registration Statement;

(xi)     if requested, cause to be delivered, immediately prior to the pricing of any underwritten offering, immediately prior to effectiveness of each Registration Statement (and, in the case of an underwritten offering, at the time of closing of the sale of Registrable Common Stock pursuant thereto), letters from the Company's independent registered public accountants addressed to each underwriter, if any, and request such letters to be addressed to the selling Key Holders, stating that such accountants are independent public accountants within the meaning of the Securities Act and the applicable rules and regulations adopted by the SEC thereunder, and otherwise in

customary form and covering such financial and accounting matters as are customarily covered by letters of the independent registered public accountants delivered in connection with primary underwritten public offerings; and

       (xii)    promptly notify the selling Key Holders and the underwriter or underwriters, if any:

       (1)    when the Registration Statement, any pre-effective amendment, the Prospectus or any Prospectus supplement or post-effective amendment to the Registration Statement has been filed and, with respect to the Registration Statement or any post-effective amendment, when the same has become effective;

       (2)    of any written request by the SEC for amendments or supplements to the Registration Statement or Prospectus;

       (3)    of the notification to the Company by the SEC of its initiation of any proceeding with respect to the issuance by the SEC of any stop order suspending the effectiveness of the Registration Statement; and

       (4)    of the receipt by the Company of any notification with respect to the suspension of the qualification of any Registrable Common Stock for sale under the applicable securities or blue sky laws of any jurisdiction.

       (b)    The Company represents and warrants that no Registration Statement (including any amendments or supplements thereto and Prospectuses contained therein) shall contain any untrue statement of a material fact or omit to state a material fact required to be stated therein, or necessary to make the statements therein not misleading (except that the Company makes no representation or warranty with respect to information relating to the Key Holders furnished to the Company by or on behalf of the Key Holders specifically for use therein).

       (c)    The Company shall make available to the selling Key Holders (i) promptly after the same is prepared and publicly distributed, filed with the SEC, or received by the Company, one copy of each Registration Statement and any amendment thereto, each preliminary Prospectus and Prospectus and each amendment or supplement thereto, each letter written by or on behalf of the Company to the SEC or the staff of the SEC (or other governmental agency or self-regulatory body or other body having jurisdiction, including any domestic or foreign securities exchange), and each item of correspondence from the SEC or the staff of the SEC (or other governmental agency or self-regulatory body or other body having jurisdiction, including any domestic or foreign securities exchange), in each case relating to such Registration Statement, and (ii) such number of copies of a Prospectus, including a preliminary Prospectus, and all amendments and supplements thereto and such other documents as the selling Key Holders or any underwriter may reasonably request in order to facilitate the disposition of the Registrable Common Stock. The Company will promptly notify the selling Key Holders of the effectiveness of each Registration Statement or any post-effective amendment. The Company will promptly respond to any and all comments received from the SEC, with a view towards

15

causing each Registration Statement or any amendment thereto to be declared effective by the SEC as soon as practicable and shall file an acceleration request as soon as practicable following the resolution or clearance of all SEC comments or, if applicable, following notification by the SEC that any such Registration Statement or any amendment thereto will not be subject to review.

(d)     The Company shall not permit any officer, director, underwriter, broker or any other person acting on behalf of the Company to use any Free Writing Prospectus in connection with any registration statement covering Registrable Common Stock, without the prior written consent of the selling Key Holder and any underwriter which consent shall not be unreasonably withheld or delayed.  Any consent to the use of a free writing prospectus included in an underwriting agreement to which the Key Holders are parties shall be deemed to satisfy the requirement for such consent.

(e)     The Company may require the Key Holders to furnish to the Company any other information regarding the Key Holders and the distribution of such securities as the Company reasonably determines, based on the advice of counsel, is required to be included in any Registration Statement.

## 9.     Registration Expenses.

(a)     All expenses incident to the Company's performance of or compliance with this Agreement, including, without limitation, all registration and filing fees (including SEC registration fees and NASD filing fees), fees and expenses of compliance with securities or "blue sky" laws, listing application fees, printing expenses, transfer agent's and registrar's fees, cost of printing and distributing Prospectuses in preliminary and final form as well as any amendments or supplements thereto, and fees and disbursements of counsel for the Company and all accountants and other Persons retained by the Company (all such expenses being herein called "Registration Expenses") (but not including any underwriting discounts or commissions) shall be borne by the Company.  In addition, the Company shall pay its internal expenses (including, without limitation, all salaries and expenses of its officers and employees performing legal or accounting duties), the expense of any annual audit or quarterly review, the expense of any liability insurance and the expenses and fees for listing the securities to be registered on each securities exchange on which they are to be listed.

(b)     In connection with each registration initiated hereunder (whether a Demand Registration, Shelf Registration, Piggyback Registration or any Fully Marketed Underwritten Offering under each of the foregoing), the Company shall pay, or shall reimburse the Key Holders for, the reasonable fees and disbursements of one law firm chosen by the Key Holders as their counsel.

(c)     The obligation of the Company to bear the expenses described in Section 9(a) and to pay or reimburse the Key Holders for the expenses described in Section 9(b) shall apply irrespective of whether a registration, once properly demanded, if applicable, becomes effective, is withdrawn or suspended, is converted to another form of registration and irrespective of when any of the foregoing shall occur.

16

## 10. Indemnification.

(a)     The Company shall indemnify, to the fullest extent permitted by law, the Key Holders and their respective officers, directors, employees and Affiliates and each Person who controls the Key Holders (within the meaning of the Securities Act) against all losses, claims, damages, liabilities and expenses arising out of or based upon any untrue or alleged untrue statement of material fact contained in any Registration Statement, Prospectus or preliminary Prospectus or any Issuer Free Writing Prospectus or any amendment thereof or supplement thereto or any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading or any violation or alleged violation by the Company of the Securities Act, the Exchange Act or applicable "blue sky" laws; provided, however that the Company shall not be liable in any case to the extent any such loss, claim, damage, liability or expense arises out of or is based upon an untrue statement or allegedly untrue statement or omission or alleged omission contained in the Registration Statement, Prospectus or preliminary prospectus or any Issuer Freewriting Prospectus or any amendment thereto or supplement thereof in reliance upon and in conformity with information relating to the Key Holders furnished in writing to the Company by the Key Holders expressly for use therein. In connection with an underwritten offering, the Company shall indemnify such underwriter(s), their officers, employees and directors and each Person who controls such underwriter(s) (within the meaning of the Securities Act) to the same extent as provided above with respect to the indemnification of the Key Holders.

(b)     In connection with any Registration Statement in which the Key Holders are participating, the Key Holders shall furnish to the Company, in writing, such information as the Company reasonably determines, based on the advice of counsel, is required to be included in any such Registration Statement or Prospectus and shall indemnify, to the fullest extent permitted by law, the Company, its officers, employees, directors, Affiliates, and each Person who controls the Company (within the meaning of the Securities Act) against all losses, claims, damages, liabilities and expenses arising out of or based upon any untrue or alleged untrue statement of material fact contained in the Registration Statement, Prospectus or preliminary Prospectus or any amendment thereof or supplement thereto or any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, but only to the extent that the same are made in reliance and in conformity with information relating to the Key Holders furnished in writing to the Company by the Key Holders expressly for use therein.

(c)     Any Person entitled to indemnification hereunder shall (i) give prompt written notice to the indemnifying party of any claim with respect to which it seeks indemnification and (ii) unless in such indemnified party's reasonable judgment a conflict of interest between such indemnified and indemnifying parties may exist with respect to such claim, permit such indemnifying party to assume the defense of such claim with counsel reasonably satisfactory to the indemnified party. If such defense is assumed, the indemnifying party shall not be subject to any liability for any settlement made by the indemnified party without its consent (but such consent will not be unreasonably withheld). An indemnifying party who is not entitled to, or elects not to, assume the defense of a claim shall not be obligated to pay the fees and expenses of more than one counsel (in addition to any local counsel) for all parties indemnified by such indemnifying party with respect to such claim, unless in the reasonable

judgment of any indemnified party there may be one or more legal or equitable defenses available to such indemnified party that are in addition to or may conflict with those available to another indemnified party with respect to such claim. Failure to give prompt written notice shall not release the indemnifying party from its obligations hereunder.

(d)     The indemnification provided for under this Agreement shall remain in full force and effect regardless of any investigation made by or on behalf of the indemnified party or any officer, director or controlling Person of such indemnified party and shall survive the transfer of securities.

(e)     If the indemnification provided for in or pursuant to this Section 10 is due in accordance with the terms hereof, but is held by a court to be unavailable or unenforceable in respect of any losses, claims, damages, liabilities or expenses referred to herein, then each applicable indemnifying party, in lieu of indemnifying such indemnified party, shall contribute to the amount paid or payable by such indemnified Person as a result of such losses, claims, damages, liabilities or expenses in such proportion as is appropriate to reflect the relative fault of the indemnifying party on the one hand and of the indemnified party on the other in connection with the statements or omissions that result in such losses, claims, damages, liabilities or expenses as well as any other relevant equitable considerations. The relative fault of the indemnifying party on the one hand and of the indemnified Person on the other shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the indemnifying party or by the indemnified party, and by such party's relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. In no event shall the liability of the Key Holders be greater in amount than the amount of net proceeds received by the Key Holders upon such sale.

## 11.     Liquidated Damages.

The Company and each Investor agrees that each Investor will suffer damages if the Company fails to fulfill its obligations pursuant to this Agreement and that it would not be possible to ascertain the extent of such damages with precision. Accordingly, the Company hereby agrees to pay partial liquidated damages and not a penalty ("Liquidated Damages") to each Key Holder whose Registrable Common Stock are included in a Demand Registration Statement filed pursuant to Section 2 or in a Shelf Registration Statement filed pursuant to Section 3 if: (a) such registration statement is not filed by the Company on or before the Demand Registration Filing Date, in the case of a Demand Registration Statement, or on or before the Shelf Registration Statement Filing Date, in the case of a Shelf Registration Statement (such an event, a "Filing Default"); (b) such registration statement is not declared effective by the SEC on or prior to the earlier of (i) the forty-five (45) calendar days following the Demand Registration Statement Filing Date or Shelf Registration Statement Filing Date, as applicable, (ninety (90) calendar days in the event of a full review by the SEC) and (ii) the fifth Business Day after the SEC advises the Company that the Demand Registration Statement or Shelf Registration Statement, as applicable, will not be reviewed or that the SEC has no further comments on the Demand Registration Statement or Shelf Registration Statement, as applicable (such an event, an "Effectiveness Default"); (c) such Demand Registration Statement providing for resale pursuant to Rule 415 or Shelf Registration Statement, as applicable, after its effectiveness date ceases to

be effective and available to such Key Holder for any continuous period that exceeds forty-five (45) days or for one or more period that exceeds in the aggregate ninety (90) days in a twelve (12) month period (such an event, a "Suspension Default") or (d) the Company delays a Key Holder's request for an Underwritten Shelf Takedown for a period that exceeds sixty (60) days (such an event, a "Takedown Default" and together with a Filing Default, Effectiveness Default and Suspension Default, a "Registration Default"). The foregoing notwithstanding, during any periods that the Company is unable to meet its obligations under this Section 11 with respect to the registration of the Registrable Common Stock because any Key Holder fails to furnish information regarding such Key Holder required to be included in any Demand Registration Statement or Shelf Registration Statement within five (5) Business Days after receipt by the Key Holder of the Company's request for such information (a "Defaulting Holder"), the time periods set forth in clauses (a) through (d) above shall be extended solely with respect to such Defaulting Holder by the number of days of any such delay in providing the required information and any Liquidated Damages accruing solely with respect to such Defaulting Holder at such time shall be tolled and the Registration Default that may otherwise occur as a result of such delay solely with respect to such Defaulting Holder shall be suspended, until such required information is delivered by the Defaulting Holder to the Company. For further clarification, the Company shall remain obligated to pay Liquidated Damages with respect to Registration Defaults to any Key Holder that is not a Defaulting Holder. In the event of a Registration Default, the Company shall as Liquidated Damages pay to each of the requesting Key Holders, for each 30-day period of a Registration Default, an amount in cash equal to one percent (1%) of the aggregate value of each such requesting Key Holder's Registrable Common Stock on the date hereof calculated in accordance with Exhibit B hereto (the "Aggregate Value") up to a maximum of seven and one-half percent (7.5%) of the Aggregate Value provided that Liquidation Damages in respect of a Suspension Default or a Takedown Default shall not be payable in relation to Registrable Common Stock not owned by such Key Holder at the time of the Suspension Default or Takedown Default. The Company shall pay the Liquidated Damages the date of each such Registration Default and in each monthly anniversary thereof until the applicable Registration Default is cured. The Liquidated Damages payable herein shall apply on a *pro rata* basis for any portion of a thirty (30) day period of a Registration Default. The Liquidated Damages payable herein shall be in addition to any other rights the Key Holders have hereunder or under applicable law.

## 12.    Rule 144.

So long as the Company is subject to Section 13 or 15(d) of the Exchange Act, the Company covenants that it will file the reports required to be filed by it under the Securities Act and the Exchange Act and the rules and regulations adopted by the SEC thereunder, and it will take such further action as the Key Holders may reasonably request to make available adequate current public information with respect to the Company meeting the current public information requirements of Rule 144(c) under the Securities Act, to the extent required to enable the Key Holders to sell Registrable Common Stock without registration under the Securities Act within the limitation of the exemptions provided by (i) Rule 144 under the Securities Act, as such Rule may be amended from time to time, or (ii) any similar rule or regulation hereafter adopted by the SEC. Upon the request of the Key Holders, the Company will deliver to the Key Holders a

LIBC/2828855.4

written statement within two (2) Business Days of such request as to whether it has complied with such information and requirements.

## 13. Free Writing Prospectuses.

Each Key Holder represents that it has not prepared or had prepared on its behalf or used or referred to, and agrees that it will not prepare or have prepared on its behalf or use or refer to, and agrees that it will not prepare or have prepared on its behalf or use or refer to, any Free Writing Prospectus, and has not distributed and will not distribute any written materials in connection with the offer or sale of Common Stock without the prior written consent of the Company and, in connection with any underwritten offering, the underwriters. Any such Free Writing Prospectus consented to by the Company and the underwriters, as the case may be, is hereinafter referred to as a "Permitted Free Writing Prospectus." The Company represents and agrees that it has treated and will treat, as the case may be, each Permitted Free Writing Prospectus as an Issuer Free Writing Prospectus, including in respect of timely filing with the SEC, legending and record keeping.

## 14. Transfer of Registration Rights.

(a)    The Key Holders may transfer all or any portion of their then-remaining rights under this Agreement to any transferee who acquires at least 15% of the Registrable Common Stock initially received by the Key Holders pursuant to the Plan (each, a "transferee"). Any transfer of registration rights pursuant to this Section 14 shall be effective upon receipt by the Company of (i) written notice from the Key Holders stating the name and address of any transferee and identifying the amount of Registrable Common Stock with respect to which the rights under this Agreement are being transferred and the nature of the rights so transferred and (ii) a written agreement from the transferee to be bound by all of the terms of this Agreement. In connection with any such transfer, the term "Key Holders" as used in this Agreement shall, where appropriate to assign such rights to such transferees, be deemed to refer to the transferee holders of such Registrable Common Stock. The Key Holders and such transferees may exercise the registration rights hereunder in such proportion (not to exceed the then-remaining rights hereunder) as they shall agree among themselves. For further clarification, (i) in no event shall the aggregate number of rights to request a Demand Registration hereunder (the "Demand Rights") be greater than the number of Demand Rights granted on the date hereof and (ii) the initial Key Holders and their transferees shall not have in the aggregate a greater number of Demand Rights than such number of Demand Rights remaining at the time of any such transfer.

(b)    After such transfer, the Key Holders shall retain their rights under this Agreement with respect to all other Registrable Common Stock owned by the Key Holders. Upon the request of the Key Holders, the Company shall execute a Registration Rights Agreement with such transferee or a proposed transferee substantially similar to the applicable sections of this Agreement.

## 15. Termination.

This Agreement shall terminate upon the earliest to occur of (i) ten (10) years from the date hereof, (ii) when all shares of Registrable Common Stock have been sold, (iii) when, in the

opinion of counsel to the Key Holders, all outstanding Registrable Common Stock may be resold without registration under the Securities Act pursuant to Rule 144(k) under the Securities Act or any successor provision thereto, or (iv) Key Holders representing fifty percent (50%) of the Registrable Shares agree, by written consent, to terminate this Agreement.

**16.    Miscellaneous.**

(a)    <u>Notices</u>.  All notices, requests, consents and other communications required or permitted hereunder shall be in writing and shall be hand delivered or mailed postage prepaid by registered or certified mail or by facsimile transmission (with immediate telephone confirmation thereafter) and, in the case of the Key Holders, shall also be sent via e-mail,

>       If to the Company, to:
>       Silicon Graphics, Inc.
>       1200 Crittendon Lane
>       Mountain View, CA  94043
>       Attention:  Mr. Barry Weinert
>       Vice President and General Counsel
>       Fax:  (650) 933-0203
>
>       - with a copy to -
>
>       Weil, Gotshal & Manges, LLP
>       767 Fifth Avenue
>       New York, NY  10153
>       Attention:  Gary T. Holtzer, Esq.
>       Fax: (212) 310-8007

If to the Key Holders to the address set forth in <u>Exhibit C</u> and if to any transferee Key Holders, to the address of such transferee Key Holders set forth in the transfer documentation provided to the Company, in each case with copies to (which shall not constitute notice) their respective counsel at the address set forth in <u>Exhibit C</u>, or at such other address as such party each may specify by written notice to the others, and each such notice, request, consent and other communication shall for all purposes of the Agreement be treated as being effective or having been given when delivered personally, upon one Business Day after being deposited with a courier if delivered by courier, upon receipt of facsimile confirmation if transmitted by facsimile, or, if sent by mail, at the earlier of its receipt or 72 hours after the same has been deposited in a regularly maintained receptacle for the deposit of United States mail, addressed and postage prepaid as aforesaid.

(b)    <u>No Waivers</u>.  No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

21

(c)     Successors and Assigns. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. If the outstanding Common Stock is converted into or exchanged or substituted for other securities issued by any other Person, as a condition to the effectiveness of the merger, consolidation, reclassification, share exchange or other transaction pursuant to which such conversion, exchange, substitution or other transaction takes place, such other Person shall automatically become bound hereby with respect to such other securities constituting Registrable Common Stock and, if requested by the Key Holders or a permitted transferee, shall further evidence such obligation by executing and delivering to the Key Holders and such transferee a written agreement to such effect in form and substance satisfactory to the Key Holders.

(d)     Governing Law. The internal laws of the State of Delaware shall govern the enforceability and validity of this Agreement, the construction of its terms and the interpretation of the rights and duties of the parties, without regard to its principles of conflicts of laws that would implicate the substantive or procedural laws of any other jurisdiction.

(e)     Jurisdiction. Any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby may be brought in any federal or state court located in the County and State of New York, and each of the parties hereby consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each party agrees that service of process on such party as provided in Section 16(a) shall be deemed effective service of process on such party.

(f)     Waiver of Jury Trial. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

(g)     Counterparts; Effectiveness. This Agreement may be executed in any number of counterparts (including by facsimile) and by different parties hereto in separate counterparts, with the same effect as if all parties had signed the same document. All such counterparts shall be deemed an original, shall be construed together and shall constitute one and the same instrument. This Agreement shall become effective when each party hereto shall have received counterparts hereof signed by all of the other parties hereto.

(h)     Entire Agreement. This Agreement contains the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes and replaces all other prior agreements, written or oral, among the parties hereto with respect to the subject matter hereof.

LIBC/2828855.4

(i)     Captions.  The headings and other captions in this Agreement are for convenience and reference only and shall not be used in interpreting, construing or enforcing any provision of this Agreement.

(j)     Severability.  If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such a determination, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

(k)     Amendments.  The provisions of this Agreement, including the provisions of this sentence, may not be amended, modified or supplemented, and waivers or consents to or departures from the provisions hereof may not be given, without the written consent of the Company and the Key Holders holding fifty percent (50%) of the Registrable Common Stock.

(l)     Aggregation of Stock.  All Registrable Common Stock held by or acquired by any Person who is an Affiliate of any of the Key Holders will be aggregated together for the purpose of determining the availability of any rights under this Agreement.

(m)     Equitable Relief.  The parties hereto agree that legal remedies may be inadequate to enforce the provisions of this Agreement and that equitable relief, including specific performance and injunctive relief, may be used to enforce the provisions of this Agreement.

[Execution Page Follows]

LIBC/2828855.4

IN WITNESS WHEREOF, this Registration Rights Agreement has been duly executed by each of the parties hereto as of the date first written above.

SILICON GRAPHICS, INC.

By:_____
    Name:
    Title:

[KEY HOLDERS]

## PLAN OF DISTRIBUTION

Silicon Graphics, Inc. [or such defined term] is registering the shares of common stock covered by this prospectus for the selling stockholders. As used in this prospectus, "selling stockholders" includes the donees, transferees, pledgees or others who may later hold the selling stockholders' interests. Pursuant to a registration rights agreement, dated as of _____ __, 2006, Silicon Graphics agreed to register the common stock owned by the selling stockholders and to indemnify the selling stockholders against certain liabilities related to the selling of the common stock, including liabilities arising under the Securities Act. Under the registration rights agreement, Silicon Graphics also agreed to pay the costs and fees of registering the shares of common stock; however, the selling stockholders will pay any brokerage commissions or underwriting discounts relating to the sale of the shares of common stock.

The selling stockholders may sell the common stock being offered hereby in one or more of the following ways at various times:

- to underwriters for resale to the public or to institutional investors;

- directly to institutional investors; or

- through agents to the public or to institutional investors.

The selling stockholder may offer its shares of common stock in one or more offerings pursuant to one or more prospectus supplements, if required by applicable law, and any such prospectus supplement will set forth the terms of the relevant offering to the extent required. To the extent the shares of common stock offered pursuant to a prospectus supplement remain unsold, the selling stockholders may offer those shares of common stock on different terms pursuant to another prospectus supplement.

The selling stockholders will act independently of Silicon Graphics in making decisions with respect to the timing, manner and size of each sale. The selling stockholders may sell the common stock on any national securities exchange on which the common stock may be listed and traded or otherwise, at market prices prevailing at the time of sale, at prices related to the prevailing market prices, or at negotiated prices. If underwriters are used in the sale, the common stock will be acquired by the underwriters for their own account and may be resold at various times in one or more transactions, including negotiated transactions, at a fixed public offering price or prices, which may be changed, at market prices prevailing at the time of sale, at prices related to such prevailing market prices, or at negotiated prices. A distribution of the common stock by the selling stockholders may also be effected through the issuance by the selling stockholders or others of derivative securities, including without limitation, warrants, exchangeable securities, forward delivery contracts and the writing of options.

In addition, the selling stockholders may sell some or all of the shares of common stock covered by this prospectus through:

- a block trade in which a broker-dealer will attempt to sell as agent, but may position or resell a portion of the block, as principal, in order to facilitate the transaction;

- purchases by a broker-dealer, as principal, and resale by the broker-dealer for its account;

- ordinary brokerage transactions and transactions in which a broker solicits purchasers; or

- privately negotiated transactions.

The selling stockholders may also enter into hedging transactions. For example, the selling stockholders may:

- enter into transactions with a broker-dealer or affiliate thereof in connection with which such broker-dealer or affiliate will engage in short sales of the common stock pursuant to this prospectus, in which case such broker-dealer or affiliate may use shares of common stock received from the selling stockholders to close out its short positions;

- sell common stock short itself and redeliver such shares to close out its short positions;

- enter into option or other types of transactions that require the selling stockholders to deliver common stock to a broker-dealer or an affiliate thereof, who will then resell or transfer the common stock under this prospectus; or

- loan or pledge the common stock to a broker-dealer or an affiliate thereof, who may sell the loaned shares or, in an event of default in the case of a pledge, sell the pledged shares pursuant to this prospectus.

In addition, _____ may enter into derivative or hedging transactions with third parties, or sell securities not covered by this prospectus to third parties in privately negotiated transactions. In connection with such a transaction, the third parties may sell securities covered by and pursuant to this prospectus and an applicable prospectus supplement. If so, the third party may use securities borrowed from _____ or others to settle such sales and may use securities received from _____ to close out any related short positions. _____ may also loan or pledge securities covered by this prospectus and an applicable prospectus supplement to third parties, who may sell the loaned securities or, in an event of default in the case of a pledge, sell the pledged securities pursuant to this prospectus and the applicable prospectus supplement.

The applicable prospectus supplement will set forth the terms of the offering of the common stock covered by this prospectus, including:

- the name or names of any underwriters, dealers or agents and the amounts of securities underwritten or purchased by each of them, if any; and

- the public offering price of the common stock and the proceeds to the selling stockholders and any discounts, commissions or concessions or other items constituting compensation allowed, reallowed or paid to underwriters, dealers or agents, if any.

Any public offering price and any discounts, commissions, concessions or other items constituting compensation allowed or reallowed or paid to underwriters, dealers or agents may be changed from time to time.

The selling stockholders may negotiate and pay broker-dealers' commissions, discounts or concessions for their services. Broker-dealers engaged by the selling stockholders may allow other broker-dealers to participate in resales. The selling stockholders and any broker-dealers involved in the sale or resale of the common stock may qualify as "underwriters" within the meaning of Section 2(a)(11) of the Securities Act. In addition, the broker-dealers' commissions, discounts or concessions may qualify as underwriters' compensation under the Securities Act. If any the selling stockholders qualifies as an "underwriter," it will be subject to the prospectus delivery requirements of Section 5(b)(2) of the Securities Act.

In addition to selling its common stock under this prospectus, the selling stockholders may:

- agree to indemnify any broker-dealer or agent against certain liabilities related to the selling of the common stock, including liabilities arising under the Securities Act;

- transfer its common stock in other ways not involving market makers or established trading markets, including directly by gift, distribution, or other transfer;

- sell its common stock under Rule 144 of the Securities Act rather than under this prospectus, if the transaction meets the requirements of Rule 144; or

- sell its common stock by any other legally available means.

Document comparison done by DeltaView on Friday, September 15, 2006 11:15:41 AM

| Input: | |
|---|---|
| Document 1 | pcdocs://ny2/1681371/1 |
| Document 2 | pcdocs://ny2/1681371/2 |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 2 |
| Deletions | 4 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 6 |

# Silicon Graphics, Inc.

Liquidated Damages Calculation

*(US Dollars)*

## Share Price Calculations

| | | |
|---|---|---|
| Disclosure Statement Equity Value | | $179,100,000 |
| Shares Outstanding [1] | | 11,125,000 |
| Share Price | | $16.10 |

| | All Holders Exercise Rights [2] | No Holders Exercise Rights [3] |
|---|---|---|
| **Aggregate Consideration** | | |
| Total Shares Received by Backstop Providers | 5,451,058 | 9,787,917 |
| Total Value of Shares Received | $87,755,909.02 | $157,574,466.04 |
| Liquidated Damages at 1.0% | $877,559.09 | $1,575,744.66 |
| Liquidated Damages at 7.5% | $6,581,693.18 | $11,818,084.95 |

(1) Assumes full exercise of the Over-Allotment by the Backstop Providers.
(2) Assumes full exercise of the Rights by holders other than the Backstop Providers.
(3) Assumes no exercise of the Rights by holders other than the Backstop Providers.

**ITEM 4**

## Schedule 8.1(A)

**The following:**

| | | | |
|---|---|---|---|
| $0.00 | Pixar | Alias/SGI Letter Agreement | 12/10/04 |

is amended and replaced with:

| | | | |
|---|---|---|---|
| $0.00 | Pixar | Alias/SGI Letter Agreement | 4/2/2004 |

**The following:**

| | | | |
|---|---|---|---|
| $436,918.86 | Pinnacle Data Systems, Inc. | Repair Service Agreement | 8/4/04 |

is amended and replaced with:

| | | | |
|---|---|---|---|
| $463,240.37* | Pinnacle Data Systems, Inc. | Repair Service Agreement | 8/4/04 |

**The following:**

| | | | |
|---|---|---|---|
| $350,000.00 | Novell (f/k/a SuSE Linux AG) | SuSE OEM and License Agreement for | 8/6/03 |

is amended and replaced with:

| | | | |
|---|---|---|---|
| $406,475.44* | Novell (f/k/a SuSE Linux AG) | SuSE OEM and License Agreement for | 8/6/03 |

**The following are amended to include "*" after the Proposed Cure Amount:**

| | | | |
|---|---|---|---|
| $76,500.00 | Sun Microsystems, Inc. | Sun Technology License and | 12/21/00 |
| $1,883,548.12 | IBM | Agreement for Purchase of Products. | 7/28/94 |
| $635,065.00 | Signal Perfection Ltd. | Master Subcontracting Agreement | 5/3/00 |
| $450,000.00 | Xyratex | Purchase Agreement | 8/29/03 |
| $79,942.22 | Red Hat, Inc. | Advanced Hardware Partner Program | 4/30/04 |
| $42,914.23 | Avaya | Customer Agreement | 12/1/05 |
| $29,348.68 | Expert Network Corp | Subscription Software License | 3/18/05 |
| $28,046.69 | Shared Technologies, Inc. | Master Telecommunications Equipment | 7/11/02 |
| $14,715.00 | Siegeworks | Maintenance & Support | 12/21/05 |
| $5,900.18 | Insight Financial Corporation | Lease Renewal Agreement. | 11/1/05 |

## Schedule 8.1(A) is hereby amended to include:

| | | | |
|---|---|---|---|
| $0 | Raytheon Company | PO #4400183511 | 4/24/2006 |
| $0 | Raytheon Company | PO #4400183541 | 4/24/2006 |
| $0 | Raytheon Company | PO #4400183546 | 4/24/2006 |
| $0 | Raytheon Company | PO #4400183598 | 4/24/2006 |
| $0 | Raytheon Company | PO #4400179157 | 3/23/2006 |
| $0 | Raytheon Company | PO #4400177794 | 3/14/2006 |
| $0 | Raytheon Company | PO #4400175898 | 2/28/2006 |
| $0 | Raytheon Company | PO #4400174364 | 2/16/2006 |
| $0 | Raytheon Company | PO #4400170595 | 1/23/2006 |
| $0 | Raytheon Company | PO #4400169478 | 1/12/2006 |
| $0 | Raytheon Company | PO #4400168393 | 1/4/2006 |
| $0 | Raytheon Company | PO #4400168395 | 1/4/2006 |
| $0 | Raytheon Company | PO #4400167532 | 12/16/2005 |
| $0 | Raytheon Company | PO #4400167536 | 12/16/2005 |
| $0 | Raytheon Company | PO #4400164472 | 11/23/2005 |
| $0 | Raytheon Company | PO #4400153817 | 9/20/2005 |
| $0 | Raytheon Company | PO #4400147549 | 8/11/2005 |
| $0 | Raytheon Company | PO #4400106003 | 2/11/2005 |
| $0 | Raytheon Company | PO #4400106011 | 2/11/2005 |
| $0 | Raytheon Company | PO #4400106065 | 2/11/2005 |
| $0 | Raytheon Company | PO #4400105539 | 2/10/2005 |
| $0 | Raytheon Company | PO #4400077211 | 9/8/2004 |
| $0 | Raytheon Company | PO #4400063816 | 6/18/2004 |
| $0 | Raytheon Company | PO #4400062307 | 6/10/2004 |
| $0 | Raytheon Company | PO #4400058157 | 5/19/2004 |
| $0 | Raytheon Company | PO #4400056232 | 5/10/2004 |
| $0 | Raytheon Company | PO #4400048888 | 4/5/2004 |
| $0 | Raytheon Company | PO #71-BDC1-BD-0755 | 10/9/2003 |
| $0 | Raytheon Company | PO #71-BDC1-BD-0642 | 9/13/2003 |
| $0 | Raytheon Company | PO #71-BDC1-BD-0328 | 6/7/2003 |
| $0 | Raytheon Company | PO #71-BDC1-BD-0334 | 6/7/2003 |
| $0 | Raytheon Company | PO #53-45T7-BD-1371 | 10/1/2002 |
| $215,476.00* | Storage Technology Corporation | Remarketing Agreement (contract #R55567) and amendments | 7/1/98 |
| $83,452.00* | Storage Technology Corporation | Multinational Maintenance Agreement | 8/1/00 |
| $0 | Visual Collaboration Technologies | OpenGL Optimizer Distribution Agreement | 2/14/04 |
| $0 | JPMorgan Chase Vastera (f/k/a Vastera) | Consulting Agreement | 2/26/98 |

Schedule 8.1(B)

**The following:**

| $7,000.00 | United Properties | Real Estate Consulting Agreement – Lease Administration | 1/1/06 |
|---|---|---|---|

is amended and replaced with:

| $7,000.00* | United Properties | Real Estate Consulting Agreement – Lease Administration | 1/1/06 |
|---|---|---|---|

**ITEM 5**

Schedule 12.9

**Schedule 12.9 is hereby amended to delete:**

PINNACLE SYSTEMS INC.
NOVELL INC
IBM
XYRATEX
RED HAT
AVAYA
SHARED TECHNOLOGIES ALLEGIANCE
INSIGHT FINANCIAL
STORAGE TECHNOLOGY